1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4   **United States of America,**           )
                                             )
5                           Plaintiff,       )      **CR 08-00814-PHX-DGC**
                                             )
6          vs.                               )      Phoenix, Arizona
                                             )      **May 28, 2010**
7   **Daniel David Rigmaiden** and Ransom    )
    Marion Carter, III,                      )
8                                            )
                            Defendants.      )
9   _____)

10

11

12

13          **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14          **REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS**

15                    <u>**STATUS CONFERENCE**</u>

16                    (EXCLUDING EX-PARTE DISCUSSION)

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

```
14:26:43   1                     A P P E A R A N C E S

           2

           3   For the Government:

           4           U.S. Attorneys Office
                       By:  FREDERICK A. BATTISTA, ESQ.
14:26:43   5           40 North Central Ave., Ste 1200
                       Phoenix, AZ  85004
           6

           7

           8   For Defendant Rigmaiden, Pro Per:

           9           Daniel David Rigmaiden
                       Central Arizona Detention Center – Florence
14:26:43  10           P.O. Box 6300
                       Florence, AZ  85132
          11

          12   Shadow Counsel for Defendant Rigmaiden:

          13           Law Office of Philip A. Seplow
                       By:  PHILIP A. SEPLOW, ESQ.
          14           2000 N. 7th St.
                       Phoenix, AZ  85006
14:26:43  15

          16

          17   For Defendant Carter:

          18           Taylor W. Fox, PC
                       By: TAYLOR W. FOX, ESQ.
          19           2 N Central Ave, Ste 735
                       Phoenix, AZ 85004
14:26:43  20

          21

          22

          23

          24

          25
```

**P R O C E E D I N G S**

14:26:43  1

2

3        THE COURTROOM DEPUTY:  Criminal case 08-814, United

4    States of America versus Daniel David Rigmaiden and Ransom

14:12:09  5    Marion Carter, III.  This is the time set for status

6    conference.

7        MR. BATTISTA:  Good afternoon, Your Honor.  Fred

8    Battista on behalf the United States.

9        THE COURT:  Good afternoon.

14:12:17  10       MR. RIGMAIDEN:  Good afternoon, Your Honor.  Daniel

11   Rigmaiden on behalf of himself.

12       MR. SEPLOW:  Good afternoon, Your Honor.  Philip

13   Seplow, advisory counsel for Mr. Rigmaiden.

14       THE COURT:  Good afternoon.

14:12:26  15       MR. FOX:  Afternoon.  Taylor Fox on behalf of Ransom

16   Carter, III, who is present.

17       THE COURT:  Good afternoon.

18       Good afternoon, Mr. Carter.

19       All right.  We set this status conference back in

14:12:38  20   March for the purpose of talking about the status of discovery

21   in the case, talking about when Mr. Rigmaiden would be

22   prepared to file the motion to suppress that he has under way,

23   and to discuss a firm trial date.

24       There was, at that time, a couple of motions that

14:13:02  25   Mr. Rigmaiden had filed to compel disclosures that would

14:13:06  1    assist in the preparation of the motion to suppress.  One is

2    at Docket 251 and the other is at Docket 252.

3         I set in the order that I entered after that last

4    hearing a deadline of April 16 for the government to respond

14:13:22  5    to the motions and April 30 for Mr. Rigmaiden to reply.

6         I have received -- well, the docket doesn't show any

7    responses from the government.  They're not in the docket.  At

8    least not when I looked at it three times this afternoon.  I

9    understand that they have been prepared because Mr. Rigmaiden

14:13:44 10    has twice requested additional time to file a reply to them,

11    but it looks to me like they never got filed in the court.

12         Have you looked at that, Mr. Battista?

13         MR. BATTISTA:  Your Honor, I wasn't aware that was an

14    issue.  I'll rectify the matter.  I know that there's -- what

14:14:02 15    happened was is we went to file these on the day they were due

16    and there was an issue with the case had been unsealed and then

17    somehow inadvertently resealed.  The documents, I believe, were

18    given to your court staff.  Your court staff advised us to not

19    attempt to file them, that that would potentially confuse

14:14:25 20    things even more.  And I believe that we were advised that once

21    the clerk's office was able to resolve the computer glitch in

22    the case, then the documents would be filed for us.

23         So I know that we physically got the documents to the

24    court, but we couldn't file them because of a glitch.

14:14:46 25         If we need to resubmit them, we can do that.  But

14:14:49  1   that's -- that was my understanding of the status of those

2   documents.  And obviously the defendant was furnished copies

3   of what we had provided to the court.

4              THE COURT:  Okay.

14:15:00  5              Lisa.

6              (The Court and the courtroom deputy confer.)

7              THE COURT:  All right.  Lisa thinks she can get them

8   filed.  If she doesn't, she'll be back in touch with you.  Why

9   don't you assume, Mr. Battista, we'll get them into the docket.

14:15:54 10             Mr. Rigmaiden, I'm assuming you've had them since

11  late April.

12             THE DEFENDANT:  Yeah, about April 20, I believe.

13             THE COURT:  Right.  Okay.

14             All right.  I granted the first motion for additional

14:16:07 15  time for you to reply.  I'm going to grant the second one as

16  well.  You said in that motion, Mr. Rigmaiden, that you would

17  either bring it here today so it could be filed or you may

18  need additional time.  Tell me what the status of your reply

19  is.

14:16:25 20             THE DEFENDANT:  I have it with me today.  It's right

21  here on the table.  I could file it now, but I'd rather mail it

22  to the government first and try to work out a few issues before

23  I actually file it, if that's all right.

24             THE COURT:  All right.  So if I give you until the

14:16:37 25  June 14th date you requested, will that be time enough to try

14:16:41  1    to work things out?

        2              THE DEFENDANT:  I believe so.

        3              THE COURT:  Okay.  Then I will enter an order granting

        4    your second motion to extend and setting the reply date for

14:16:49  5    June 14th.

        6              THE DEFENDANT:  Thank you.

        7              THE COURT:  Currently the trial date -- well, before

        8    we talk about the trial date, are there any discovery issues

        9    between you, Mr. Rigmaiden, and the government, Mr. Battista,

14:17:11 10    other than those that are addressed in these motions?

       11              THE DEFENDANT:  There is one issue.  I received on

       12    March 23rd about 7,000 pages of IP addresses, and then on

       13    February 25th I received 2,700 pages of computer forensic

       14    reports, and all this is in paper form at CCA.  There's not

14:17:38 15    much I can do with it because it was all -- it was originally

       16    in digital form.  If I have columns and columns of IP addresses

       17    on paper, there's not much I can do as far as analyzing the IP

       18    address or giving them to the private investigator.  We have to

       19    scan those into a computer and convert them to text.

14:17:55 20              I asked the government to provide me with discovery

       21    in digital form and they indicated in a letter on -- let me

       22    see.  This was May 10, 2010.  They said they wouldn't provide

       23    me with any of the previous discovery in digital form.  They

       24    said something about not wanting to scan it.  But all this

14:18:12 25    discovery originated in digital form, so it would be just a

14:18:15  1    matter of them copying CDs and mailing it to Mr. Seplow or my

2    private investigator so we can begin to do work on that

3    discovery since that kind of falls in line with digital

4    discovery.

14:18:26  5        That's one of the issues I was having as far as

6    discovery is concerned, I have these big boxes of all this

7    information and there's not really much I can do with it.  I

8    can't sit there reading through IP addresses all day.  There's

9    thousands and thousands of pages.  A program would need be

14:18:41 10    used in analyzing that and establish what's going to be used

11    and not used as far as my defense is concerned.  I wanted the

12    government to provide me with all that information in digital

13    form.

14        THE COURT:  Mr. Battista.

14:18:53 15        MR. BATTISTA:  Your Honor, my understanding of what

16    the defendant was requesting, and it may have just been

17    inartfully presented to the government, was the defense asking

18    for all of the discovery he had received in digital form.  And

19    my response was is that we were not going to simply recopy

14:19:11 20    things.

21        THE COURT:  Do you have a problem --

22        MR. BATTISTA:  No, Your Honor.  If we have doc- -- if

23    we have matters that are already in digital form, we can make

24    them available to Mr. Seplow.

14:19:22 25        The reason we can't make them available directly to

14:19:25   1    the defendant is because of security concerns, just generic

2    security concerns, at CCA.  We can't give him compact disks,

3    unfortunately, because compact disks can broken and turned

4    into weapons.

14:19:40   5         THE COURT:  But you don't have a problem with giving

6    Mr. Seplow a disk with these IP addresses?

7         MR. BATTISTA:  No, Your Honor.  And all Mr. Rigmaiden

8    needs to do -- and he has a discovery index which lists the

9    particular items in detail.  So if he can give us particular

14:19:55  10    items that he believes that we have in digital form, we can

11    then provide them to Mr. Seplow.  That's the -- that would not

12    be a problem.

13         THE COURT:  Does this solve the problem,

14    Mr. Rigmaiden?

14:20:07  15         THE DEFENDANT:  I did ask for all discovery in digital

16    form, but what I meant by that is anything they have currently

17    in digital form that I wanted in digital form, too.  There's no

18    point in printing it out and giving it to me in paper form if

19    it's already in digital form.

14:20:21  20         I'm not asking they take their paper files and scan

21    them all and do all that work for me.  I'm just asking that

22    whatever they have that is already in digital form, I want to

23    have it in digital form as well.  Especially these IP

24    addresses and the computer forensic reports.

14:20:34  25         THE COURT:  Let's do this:  Let's have you in a letter

14:20:37   1   to Mr. Battista specify what you want in digital form.  I don't
       2   think I'm going to require the government to go back and look
       3   at every document they have produced to you and then look on a
       4   computer to see if they still have it in digital form.  It
14:20:49   5   seems to me what really matters is you getting those very
       6   voluminous lists in digital form so you can search them.
       7          THE DEFENDANT:  Yeah.
       8          THE COURT:  So specify what it is you really need in
       9   digital form, and it sounds like Mr. Battista can get it to
14:21:03  10   Mr. Seplow.
      11          THE DEFENDANT:  All right.  One question I have is the
      12   discovery I have has Bates numbers at the bottom, it says
      13   "defendant's copy" and there's a number.  I just wanted to have
      14   some clarification whether or not those documents are the same
14:21:13  15   as the ones that were previously provided to Mr. Seplow and my
      16   other attorneys, if the numbers were going to match between
      17   those two sets of documents, because I know one says Bates
      18   stamp number and then there's a date with the number.  But my
      19   set of discovery just says "defendant's copy" and the Bates
14:21:29  20   number, but there's no date there.
      21          THE COURT:  Do you know if the numbers correspond,
      22   Mr. Battista?
      23          MR. BATTISTA:  Your Honor, the discovery's been
      24   gathered from many, many different sources.  Again, everything
14:21:44  25   that -- anything that's been disclosed to any defense counsel

14:21:47  1    of Mr. Rigmaiden and to Mr. Rigmaiden, they're exact copies.

2    In other words, we're not creating a different file for

3    Mr. Rigmaiden.  So we have one set.  Occasionally we may

4    designate something as, quote, unquote, the defendant's copy

14:22:04  5    just so we know what to physically deliver to him to CCA versus

6    what to provide to Mr. Seplow.  So that's -- it's just -- it

7    may say "defendant's copy."  That's just so that we can keep

8    track of who's getting what.  But it's all the exact same

9    documents.

14:22:22 10          THE COURT:  But when do you that, when you label it

11    "defendant's copy," if I understand you correctly, the number,

12    Bates number on that document, is the same number that's on

13    Mr. Seplow's copy of the document.

14          MR. BATTISTA:  Yes.  In other words, the only

14:22:33 15    difference is that, well, all we're doing is Mr. Seplow now is

16    getting a cc copy of any letter that goes to Mr. Rigmaiden.

17          THE COURT:  All right.

18          Any other discovery issues we need to discuss?

19          THE DEFENDANT:  My copies don't have dates on them.  I

14:22:50 20    kind of wanted to have the dates that they were originally

21    provided.

22          THE COURT:  Why?

23          THE DEFENDANT:  Well, there could be issues as far as

24    if I wanted to raise prejudice in the future like if something

14:23:01 25    happened and the government didn't have certain discovery at a

11

14:23:04  1  certain date then I could show that, you know, if something

2  would have happened sooner, then they wouldn't have come up

3  with this discovery at this time.

4      THE COURT:  Well, I'm not going require them to go

14:23:13  5  back and date all the documents they've produced to you,

6  Mr. Rigmaiden.  If a prejudice issue comes up, you can raise

7  that.  But it doesn't seem to me worth forcing them to go back

8  and apply dates to all of the documents you've received.

9      Are there other discovery issues you need to raise?

14:23:32 10      THE DEFENDANT:  That's all of them, Your Honor.

11      THE COURT:  Okay.  Now, Mr. Fox, obviously you're

12  fairly new in the case.  My understanding is you were appointed

13  in the last couple of weeks.  Is that right?

14      MR. FOX:  Yes.

14:23:48 15      THE COURT:  Are there any issues that you've

16  identified that need to be addressed in this status conference

17  today?

18      MR. FOX:  Not at this time.

19      THE COURT:  Okay.  The trial date currently for

14:23:59 20  Mr. Rigmaiden is August 10th because I granted a motion that

21  continued it from June 8th to August 10th.  Do you know if your

22  client has the same date, Mr. Fox?

23      MR. FOX:  I believe so.

24      THE COURT:  Okay.

14:24:16 25      Mr. Rigmaiden, do you have an idea today as to when

14:24:20  1   you're going to be prepared to file the motion to suppress

2   you've been working on?

3           THE DEFENDANT:  Well, I was hoping to have a firm

4   estimate, but I've been having to put so much time into this

14:24:31  5   reply and it's 78 -- 74 pages.  So all the time I've been

6   putting in lately has been going to the reply.  I know once

7   this gets settled as far as what the government's going to give

8   me, I'll be able to look at whatever discovery they're finally

9   going to turn over and I'll be able to make that estimate

14:24:49 10   pretty quickly by looking at what evidence I have to work with

11   as far as writing the motion to suppress.

12           So -- and plus there's some issues with getting some

13   legal research with the paralegal and that kind -- I was

14   hoping I'd be able to read some cases and I'd be able to get a

14:25:02 15   better idea about the arguments I would raise, but that didn't

16   happen.  I don't know, I just kind of ran into different

17   stumbling blocks.  So I don't really have a firm estimate for

18   you today.

19           THE COURT:  What is 74 pages?

14:25:16 20           THE DEFENDANT:  This is the reply to the government's

21   response.

22           THE COURT:  74 pages of text?

23           THE DEFENDANT:  Yes.

24           THE COURT:  You've written 74 pages in the reply?

14:25:24 25           THE DEFENDANT:  That's correct.

14:25:27   1        THE COURT:  Are you aware that our local rules contain

           2   page limitations?

           3        THE DEFENDANT:  I'm aware of that.  But in the Supreme

           4   Court's *Bagley* case, they stated the importance of filing

14:25:39   5   specific discovery requests and I don't think that a local rule

           6   should overrule my right to make specific discovery requests of

           7   the government.  I know the more specific I make my requests

           8   and more culpable they are later if they decide to withhold

           9   evidence from me, and it also puts them on notice that what I

14:25:58  10   need and if they don't provide it, it gives me the chance to

          11   make decisions about trial and pretrial.  So I should be able

          12   to make specific requests even if it's over the local rule

          13   limit of --

          14        THE COURT:  But your reply is not your request.  The

14:26:11  15   request is spelled out in a lot of detail in your two motions.

          16   Are you adding new documents in your reply?

          17        THE DEFENDANT:  There are new exhibits, yes.

          18        THE COURT:  I mean are you asking for material in your

          19   reply that you didn't ask for in the motions?

14:26:26  20        THE DEFENDANT:  No.  I go into further detail what it

          21   is specifically I'm asking for and why they should provide it

          22   and why they shouldn't be allowed to withhold it.

          23        THE COURT:  Well, as you probably know, Mr. Rigmaiden,

          24   before you can file a document that exceeds the court's page

14:26:39  25   limitation, you have to file a motion seeking permission to

14:26:42  1   file --

         2              THE DEFENDANT:  Yes.

         3              THE COURT:  -- an over-page document.  When I rule on

         4   those I look at the document.  I can't say I've ever received a

14:26:50  5   74-page reply before.  If you end up wanting to file that, I'll

         6   look at it and decide if 74 pages are really needed to address

         7   the issues here.  On that basis I'll decide whether to grant

         8   you excess pages.

         9              THE DEFENDANT:  If it isn't granted, would I be able

14:27:09 10   to file it as a new discovery request?

        11              THE COURT:  Well, I don't know because I don't know

        12   what's in it.

        13              THE DEFENDANT:  Okay.

        14              THE COURT:  I mean, normally discovery requests aren't

14:27:16 15   filed with the court.

        16              THE DEFENDANT:  This is why I wanted to send it to the

        17   government before filing it anyways.

        18              THE COURT:  Well, if, after sending it to the

        19   government, you're able to shorten it, which I assume is part

14:27:28 20   of the reason you wanted to send it to the government in the

        21   first place --

        22              THE DEFENDANT:  That's correct.

        23              THE COURT:  -- then that would be a good idea, I

        24   think.

14:27:35 25              THE DEFENDANT:  Okay.

14:27:42  1          THE COURT:  What you said earlier, then, you don't

2    know today when you're going to have your motion to suppress

3    ready to file.  Is that right?

4          THE DEFENDANT:  That's right.

14:27:53  5          THE COURT:  All right.  I think what we will do, then,

6    is leave the trial date at August 10.  What that will do, since

7    that's the standard trial setting for August, is prompt the

8    setting of a status conference in late July, probably --

9    actually it's going -- I'm not sure if it's going to be the

14:28:15  10   middle of July or very first of August, but we'll set status

11   conferences for all the trials set on August 10.  So that will

12   get us back in here to talk about where we are.

13         Obviously, if that motion hasn't been filed, we're

14   not going to go to trial on August 10.  But hopefully by that

14:28:30  15   time you'll have a firm fix on when the motion is going to be

16   filed, if it hasn't already been filed, and we can then look

17   at how much time we need to resolve the motion and get ready

18   for trial and set a firm trial date.

19         Were you going to say something, Mr. Rigmaiden?

14:28:46  20         THE DEFENDANT:  I thought you were asking if I would

21   have a firm date by then.

22         THE COURT:  Well, no.  I'm saying if by that status

23   conference you haven't filed the motion, then I'm going to ask

24   you when it will be filed so we can try to project out and get

14:28:59  25   a firm trial date on the calendar.

14:29:01    1            THE DEFENDANT:  Okay.  I understand.

            2            THE COURT:  Okay.  Mr. Battista, do you have other

            3   matters you wish to raise today?

            4            MR. BATTISTA:  Just for the record, if the defendant

14:29:10    5   has any motions pending, I have no objection to the motions

            6   that are pending.

            7            THE COURT:  All right.  That's fine.

            8            MR. BATTISTA:  And then for the defendant's

            9   information, there's -- I think the battle in the case -- the

14:29:30   10   defendant is seeking discovery regarding the operation and use

           11   of the tracking device which led to the location of his

           12   apartment.  The government in its response has informed the

           13   defendant that the government believes that those are sensitive

           14   investigative techniques and that we intend to litigate to the

14:29:49   15   fullest extent the release of any sensitive investigative

           16   techniques regarding these devices.  So eventually that will

           17   most likely be an issue.

           18            If the defendant has particular discovery requests

           19   that don't relate to that, we have been endeavoring to respond

14:30:11   20   as best as possible to any of his requests.

           21            So, again, the defendant will review what the

           22   defendant has, and I see he has a copy of it with us, with

           23   him, today.  If he would like, he can give that to Mr. Seplow

           24   and we can get a copy of it and get it back to him, mail it

14:30:29   25   back to him, so that -- because I know that mailing things has

14:30:32  1    been an issue for Mr. Rigmaiden.  So if a copy of it is

2    physically here and he would like to have us to have access to

3    it, I'm willing to accommodate the defendant in any way

4    possible just to save him the hassle of trying to ship it.

14:30:46  5         If there are requests -- we'll review this discovery

6    request.  If in reviewing the discovery the defendant has any

7    particular issues about particular items, he can always send

8    us a short letter and we will continue to endeavor to work

9    with him.  At his request, he requested a more extensive index

14:31:04 10    of the discovery.  That is -- we did produce that for him.

11         We have -- for the Court's information, we have a

12    master set of discovery in order, with all the letters

13    attached to the discovery from day 1 to today.  So if the

14    defendant wanted to task someone to come and look at our

14:31:31 15    master set of discovery, we do have a master set of discovery

16    in chronological order that we maintain.  So we have a record

17    of everything that's been sent to the defendant and his

18    counsels and when it was sent by dated letter.  So there is a

19    master set.

14:31:48 20         I can understand because of different defense counsel

21    and defendant being at CCA that it may be difficult for him to

22    maintain a complete master set.  But for the Court's

23    information and the defendant's information, we do have a

24    chronological master set of discovery available for review.

14:32:04 25         THE COURT:  All right.

14:32:05   1          You've mentioned something that perhaps we ought to
           2   talk about for a minute.
           3          It sounds as though you are not going to turn over
           4   the discovery he's seeking concerning the operation of this
14:32:16   5   device.
           6          MR. BATTISTA:  That's correct.
           7          THE COURT:  Is that the stingray device?
           8          MR. BATTISTA:  That's correct.
           9          THE COURT:  I think that's what it's been called in
14:32:24  10   here before.  I don't know what a stingray device is.
          11          MR. BATTISTA:  They go by different names.  I'm just
          12   using a generic tracking device term.
          13          THE COURT:  Can you give me a 30-second description of
          14   what it does.
14:32:36  15          MR. BATTISTA:  Your Honor, basically in this
          16   particular case, as stated in the search warrant affidavits,
          17   it's the allegation of the government that the defendant was
          18   filing fraudulent tax returns via the use of a computer and
          19   Verizon wireless air card.  The Verizon wireless air card, in a
14:33:01  20   sense, can turn a laptop into like a cell phone.  The cell
          21   phone, when it's in operation -- the air card, when it's in
          22   operation, it communicates with cell towers.  The government
          23   has sensitive investigative techniques which allows it to
          24   locate the air card.  That information brought us to an area
14:33:26  25   where we believe the air card was located.  It was a series of

14:33:31  1    apartments within an apartment complex.

2              Further, standard law enforcement investigative

3         techniques then helped us to identify which apartment within

4         the apartment complex we believed the air card was operating

14:33:46  5    out of.

6              So what the defendant is seeking is the information

7         in terms of the nature of the devices, the operation of the

8         devices.  Basically every -- a significant amount of

9         information in terms of the operation of these devices.  And

14:34:04 10    in communication with the Department of Justice and FBI

11        headquarters, we will be strenuously seeking to not disclose

12        the operation of these particular devices.

13             It's -- to my knowledge, they have never been

14        disclosed anywhere in the country and it's our position that

14:34:27 15    it's not necessary in this particular case that they be

16        disclosed.

17             THE COURT:  Are these devices, as you've said, devices

18        that pick up on the air card signal?

19             MR. BATTISTA:  That's correct, Your Honor.

14:34:43 20    THE COURT:  And generally locate where it is?

21             MR. BATTISTA:  Correct.  And in this particular case,

22        we had a general -- we had general information in terms of a

23        number of units in the apartment complex that possibly could

24        contain the air card.  We had communications with the

14:35:02 25    management of the apartment complex.  Two of the units were

14:35:05  1   vacant.  One of the units was occupied by an elderly gentleman

2   with no criminal history.  The fourth unit had been leased by a

3   white male in his 20s under false identification.  As part of

4   the false identification, in order to obtain the lease a

14:35:21  5   fraudulent tax return was used in order to get the lease.

6          So once the general area of the air card was located

7   through additional law enforcement investigation techniques,

8   we were able to then focus in on a particular unit.

9          So, in other words the investigative techniques did

14:35:42 10   not tell us exactly where the air card was operating, but

11   they -- the investigative techniques told us where to look.

12          THE COURT:  Mr. Rigmaiden, I'm assuming that as a

13   general matter the motion you're going to be filing is going to

14   be a Fourth Amendment motion?

14:35:56 15          THE DEFENDANT:  That's correct.

16          THE COURT:  You're going to be arguing, I assume, that

17   the use of this device was an unconstitutional invasion of your

18   privacy or unconstitutional search without appropriate warrant,

19   something like that?

14:36:14 20          THE DEFENDANT:  That's right.

21          THE COURT:  The reason I'm having this discussion

22   right now with you all is to put to you this question:  Is it

23   going to be necessary for you to understand the inner workings

24   of this device in order to make the motion?  I'm guessing

14:36:36 25   you're going to be relying upon traditional Fourth Amendment

14:36:43  1   principles in arguing this is an invasive form of search that

2   picks up on private communications and that you can't do that

3   without satisfying the Fourth Amendment.  And so I'm wondering

4   if you need to understand the precise mechanics and workings of

14:36:58  5   that device in order to make the argument that it was

6   improperly intrusive.

7         THE DEFENDANT:  Yes, I do, Your Honor, because there's

8   a lot of conflicting statements.  I have evidence from the

9   discovery showing that the FBI technical service division

14:37:14  10  agents actually located the air card directly inside apartment

11  number 1122, which is one of their reports I have as an exhibit

12  in my motion.  And there are numerous cases such as *Kyllo* and

13  *Karo* where the Supreme Court has analyzed in detail the

14  technology in making their decision regarding how invasive it

14:37:34  15  actually is.

16        And as far as the precision is concerned, by

17  analyzing the technology I'll be able to refute or confirm

18  whatever the government's saying about general proximity,

19  which I don't really agree with.

14:37:46  20        I have a lot of reports, some of them say they

21  narrowed it down to three apartments.  Some say they narrowed

22  it down to an apartment complex.  Some say they narrowed it

23  down directly to the apartment.  And who's to say that the

24  government didn't find it in some other way and they're just

14:38:01  25  using the stingray device to go in through the back door?

14:38:04   1       And by having access to how the device operates and

2   by having access to the location data and where they actually

3   used the device, then I'll be able to confirm whether or not

4   what they're saying is true or not.

14:38:13   5       And even the cases they relied upon, which is *Van*

6   *Horn* and *Green* and *Van Horn*, they wanted to withhold a type of

7   microphone and where it was hidden.  And in this case the

8   government's not telling me what they used, they say there's a

9   stingray device.  Everybody knows what a microphone is.  So I

14:38:33  10   should be at least told what the stingray device is, how it

11   operates.  Because in *Van Horn* the case they're relying on,

12   they were able to know that it was just a typical microphone

13   used to record their conversations and they were allowed to

14   listen to wiretap recording as well, which would be akin to

14:38:48  15   the location data they logged with this device in this case.

16   So I should be able to see the location data and also the

17   details of the device while establishing my arguments.

18       THE COURT:  Well, obviously, as you all talk about the

19   reply -- well, not "obviously," but obvious to me at this point

14:39:07  20   not knowing very much about the issue, it seems to me it's

21   going to come down to a question of how much the defendant

22   needs the information in order to defend himself.  I'm assuming

23   that when it comes to sensitive law enforcement techniques, I

24   have to evaluate whether the defendant is being deprived of

14:39:30  25   information essential to his defense in the interest of

14:39:32  1    preserving sensitive law enforcement techniques.

2         It also seems to me that -- I'm talking entirely

3    hypothetically, but let's say that the government had a

4    particularly secret law enforcement technique that it used and

14:39:47  5    it was unwilling to disclose the details of that technique,

6    and yet without disclosing the details I couldn't rule

7    accurately on the Fourth Amendment.  Then it seems to me the

8    government then has to make a decision either not to prosecute

9    or to reveal the technique.  Conversely, if a defendant can

14:40:06  10   make a Fourth Amendment argument effectively without knowing

11   the precise details of how something works, then it seems to

12   me I can say it's okay for you to withhold that sensitive law

13   enforcement technique because it's not prejudicing the

14   defendant.

14:40:20  15       But I think that's going to be the tension I have to

16   address on the question of what is or is not discoverable.

17   And I'm just talking off the top of my head at this point to

18   give you a sense for what I think is going to ultimately be

19   the decision I'm going to have to make.  And I would encourage

14:40:39  20   you to think about that.  If you think I'm wrong, obviously

21   you'll tell me.  But I think it's going to be a question of

22   what the defendant really needs to defend himself versus what

23   the government really needs to keep secret in order to be an

24   effective law enforcer and how those two interests balance

14:40:56  25   out, recognizing that the defendant has the right to defend

74

himself.

          MR. BATTISTA:  Your Honor, another -- in order to make

that decision, Your Honor, I believe that the Court may also,

in order to assist it in its decision, there may come a time

when an ex parte hearing may be appropriate where the

government can inform the Court as to what the sensitive nature

of the issues are so the Court can make a determination as to

whether -- how the Court should balance the competing

interests.  And the government will be prepared to do that.

          And the defendant may have some concerns that there's

a possibility that the government could agree to allow the

defendant to advise the Court of what his concerns are, and

potentially some of those concerns may be at least the

government can at first address them ex parte to the Court so

the Court could make a determination as to whether or not

there's an issue in the first place.

          So I just put that out there as it looks like this is

going to take some time, it will take a lot of effort on

everybody's part, and that is another possibility that may

come to light in this particular -- as we proceed down the

road.

          THE COURT:  All right.  Well, obviously I can't make

any decisions now or form any opinions, but I'll leave it to

you all to talk about it, and where you can't agree, then I'll

have to dive into it and do my best to make a decision.

14:42:31  1          THE DEFENDANT:  So you know, Your Honor, all these

2      issues were covered in the 74 pages in my reply.

3          THE COURT:  I don't doubt that they are.

4          THE DEFENDANT:  Okay.

14:42:39  5          THE COURT:  All right.  Anything else we need to

6      address on discovery or trial scheduling?  We'll leave it for

7      August 10th, we'll talk to you at the standard status

8      conference setting.  Are there other matters we need to

9      address?

14:42:50 10          MR. BATTISTA:  Your Honor, if the defendant about --

11     just about the document the defendant has, how he'd like to

12     proceed with that.

13         THE COURT:  Do you have a copy with you today,

14     Mr. Rigmaiden?

14:43:00 15         THE DEFENDANT:  Yes.

16         THE COURT:  Well, if you want to save the time, you

17     can just give it to Mr. Battista today so he can start

18     reviewing the reply and get back to you so you can meet that

19     June 14th deadline.

14:43:10 20         THE DEFENDANT:  I wanted to give a copy to Mr. Seplow

21     as well.  Could they make a copy?

22         THE COURT:  Yeah.  Why don't you give it to Mr. Seplow

23     and he can get it to Mr. Battista.  That's fine.

24         THE DEFENDANT:  Okay.

14:43:21 25         THE COURT:  Okay.  Just a second.

14:43:24    1                    (The Court and the courtroom deputy confer.)

            2                    THE COURT:  Okay.  I need to talk to Mr. Rigmaiden

            3      about a couple of ex parte motions he filed related to the

            4      defense, so we'll go ahead and excuse the government and we'll

14:44:02    5      excuse Mr. Fox and Mr. Carter.

            6                    (Ex-parte discussion reported but not transcribed

            7      herein.)

            8                    (End of partial transcript.)

            9                              *  *  *  *  *

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 3rd day of September, 2010.

s/ Patricia Lyons, RPR, CRR
Official Court Reporter