JOHN S. LEONARDO
United States Attorney
District of Arizona

FREDERICK A. BATTISTA
Maryland State Bar Member
PETER S. SEXTON
Arizona State Bar No.  011089
JAMES R. KNAPP
Arizona State Bar No. 021166
Assistant U.S. Attorneys
Two Renaissance Square
40 North First Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone:  (602) 514-7500
Fred.Battista@usdoj.gov
Peter.Sexton@usdoj.gov
James.Knapp2@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>      v.<br><br>Daniel David Rigmaiden,<br><br>            Defendant. | No. CR-08-0814-001-PHX-DGC<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS** |

The United States, through undersigned counsel, opposes defendant's motion to suppress. (CR 824.) As argued below, the United States' collection of historical records pursuant to subpoenas and court orders was reasonable, the FBI's efforts to locate the aircard pursuant to the tracking warrant were reasonable, and the search of defendant's apartment and computer pursuant to the search warrant was reasonable. Accordingly, his motion should be denied.

Defendant's brief contains nearly 200 pages of alleged facts and more than 150 pages of argument, along with two addenda with 20 pages of additional arguments.  The motion also includes four lengthy declarations from defendant and references thousands of pages of proposed exhibits.  Other pleadings have also been filed by defendant regarding the seizure of evidence in this case.  In total, CR 824, 826, 830, 847, 857 and 858.  Rather than respond point by point to these pleadings and materials, which seems certain to result in more voluminous filings, the United States has attempted to address defendant's arguments by grouping them into categories. No doubt some allegations have been left unanswered. This is not a concession that they are true

1  or legitimate; to the contrary, it is a conclusion that they are irrelevant. The United States will

2  provide supplemental briefing on any of defendant's allegations or claims, however, upon the

3  Court's request.

4  **I.**     **Statement of Facts.**

5         Defendant was a thief and a fugitive.  Known only as "the Hacker" to his co-conspirators

6  and the federal agents who pursued him, defendant stole hundreds of identities, compromised

7  numerous innocent victims' computers, compromised numerous other innocent victims' financial

8  affairs, filed more than 1,200 fraudulent tax returns with the Internal Revenue Service and

9  laundered hundreds of thousands of dollars through co-conspirators' bank accounts. [1]

10        1.     Overview of the Scheme

11        The investigation that led to the arrest of defendant Daniel David Rigmaiden was a joint

12  investigation involving the Internal Revenue Service - Criminal Investigation (IRS-CI), the

13  Federal Bureau of Investigation (FBI), and the U.S. Postal Inspection Service (USPIS).  The

14  investigation initially led to the authorization of a Northern District of California Search Warrant

15  No. 08-70460-HRL, on July 22, 2008. The authorization required that the warrant be executed

16  within 10 days.  Due to the fact that the occupant of the subject apartment had not been observed

17  in the area, the warrant was not executed and was returned not executed on July 30, 2008.  On

18  that same date, upon an independent finding of probable cause, the investigation team obtained

19  Northern District of California Amended Search Warrant No. 08-70460-HRL (hereinafter SW

20  08-70460) (CR 464-2), and executed the amended warrant at defendant's apartment on August

21  3, 2008.  The execution of the warrant revealed significant evidence related to a sophisticated

22  scheme to fraudulently obtain tax proceeds filed in the name of innocent third parties and

23  deceased individuals, and illegally obtain the proceeds from these tax returns. Up until

24  defendant's arrest and identification through fingerprint analysis, he was primarily known to the

25  investigation team and his associates who had agreed to cooperate against him simply as the

26  _____

27        [1] There is no known evidence that defendant ever personally referred to himself at the
   "Hacker."

28                                          2

"Hacker."  Through their efforts, the investigation team determined that the Hacker operated in the United States, was involved in acquiring identity information of deceased and living individuals, including their social security numbers, and using that information to conduct an electronic bulk tax filing scheme; and directing the deposit of the proceeds of those fraudulent tax returns to bank accounts and debit cards where the funds could be accessed by the Hacker and co-conspirators.

Prior to the authorization of SW 08-70460, the investigation team determined that for tax year 2006, refunds totaling approximately $1,112,040.00 were falsely claimed via the subject electronically filed returns.  Based on the significant similarities associated with the IP addresses, return format, and e-mail addresses, the IRS Fraud Detection Center located in Austin, Texas (AFDC) identified approximately 1,272 returns, 175 IP addresses, and 73 bank accounts that were believed to be linked to this scheme for tax year 2007.  As of June 26, 2008, refunds totaling approximately $2,133,824.00 had been falsely claimed via electronically filed returns for the 2007 tax year.

2.      Carter Tax and Accounting – The Tip of the Iceberg

In May 2007, IRS-CI in Phoenix became aware of questionable activity involving an account in the name of Carter Tax & Accounting LLC.  Subsequent co-defendant Ransom Marion Carter was the authorized signer for the account.  Between May 22 and May 25, 2007, 75 U. S. Treasury electronic credits totaling approximately $129,364.00 labeled "tax refund" were posted to the account.  On May 26, 2007, Ransom Carter withdrew $24,500.00 from the account and purchased two cashier's checks with the funds.

On June 5, 2007, EFile Tax Returns, Inc., an authorized IRS e-file provider and member of the Free File Alliance LLC, contacted the ETA, regarding a large volume of returns filed through its website using what appeared to be an automated process.  EFile Tax Returns, Inc., identified approximately 200 returns for tax year 2006 and 400 for tax year 2005, which appeared to be related to the subject automated scheme.

3

The AFDC researched the returns identified by EFile Tax Returns, Inc., and identified Ransom Carters' Compass Bank account as one of the accounts destined to receive refunds claimed on those returns.  A search was conducted for all electronically filed returns with refunds destined for the above referenced Compass Bank account.  Approximately 209 returns, claiming over $339,000.00 in refunds, were identified bearing this particular bank account number and routing number.

IRS-CI analysis of the subject returns revealed multiple fraudulent returns filed from single IP addresses within short time periods, indicating the use of some type of computerized bulk filing system.  Based on analysis of the IP addresses, it appeared the returns were filed from multiple locations around the United States.  However, the real IP address was apparently hidden, possibly by utilizing illicit proxies or intermediary computers to submit the returns and prevent the identification of the individual filing the returns.

3.      Informants CI 1 and CI 2 Who Lead the Investigation Team to the Hacker

In January 2008, an individual pending unrelated felony fraud charges, in the Superior Court of Arizona, agreed to provide information to IRS-CI and USPIS in order to potentially gain consideration with respect to his/her pending state charges.  This individual will hereinafter be referred to as CI 1.  As of the date of the authorization of SW 08-70460, based on information known to IRS-CI, CI 1 was believed to be credible and his/her information had been corroborated and documented through independent investigation, recorded telephone calls, and recorded e-mails.  In a debriefing, CI 1 advised that an individual he/she knew only by his/her street name (initially SN 1 in the affidavit and then CI 2) and another unknown individual CI 1 referred to as the Hacker, had been operating an automated system to file fraudulent tax returns using the names and Social Security Numbers of deceased individuals.

CI 1 further stated Ransom Carter's receipt of refunds through the Compass Bank account Carter established in 2006, in the name of Carter Tax & Accounting LLC, represented a successful test run of the scheme.  CI 1 said SN 1 and his associates intended to pursue the same scheme for the 2008 filing season (for income earned in 2007).  CI 1 also stated he/she believed

4

1    that during prior years, going back as far as 2005, the fraudulent tax returns had directed refunds

2    be credited to pre-paid debit cards.

3         Based on the information provided by CI 1 and CI 1's agreement to work as a confidential

4    informant on behalf of law enforcement, an undercover operation was initiated by IRS-CI and

5    USPIS to determine the true identity of SN 1, the Hacker and their associates, and gather

6    evidence concerning the nature and extent of the bulk filing scheme. Per SN 1's instructions to

7    CI 1, IRS-CI and USPIS, with the assistance of CI 1, established an undercover shell business

8    and a related undercover bank account at Meridian Bank ("Meridian undercover bank account").

9         In the course of the scheme, SN 1 asked CI 1 to open a safe mail.net e-mail account. The

10   purported purpose of using this e-mail service was to avoid detection. In February 2008, CI 1

11   e-mailed the account number and routing numbers for the Meridian undercover bank account

12   to SN 1. SN 1 subsequently advised CI 1 the Hacker would begin to e-file fraudulent returns

13   which directed refunds be sent to the Meridian undercover bank account. Throughout the initial

14   stages of the undercover operation, CI 1 communicated with SN 1 via telephone and his safe

15   mail.net account. Incoming e-mails from SN 1 revealed a particular IP address which an internet

16   directory service revealed is owned by Comcast Cable Communications, Inc. In late February

17   2008, in response to a Grand Jury subpoena, Comcast reported the subject IP address was leased

18   by SN 1 at SN 1's residential address. It was determined SN 1 was, in fact, the subscriber.

19        In early March 2008, the AFDC identified 72 electronically filed tax returns with refunds,

20   totaling approximately $117,496.00, destined for the Meridian controlled undercover bank

21   account. Over $62,000.00 was deposited to the Meridian undercover bank account in

22   mid-March 2008. After the aforementioned deposits, CI 1 contacted SN 1 and informed him

23   money had been deposited in the account. CI 1 told SN 1 he/she would withdraw $9,000.00 in

24   mid-March 2008 and ship it to SN 1 on March 18, 2008, via FedEx. CI 1 further advised he/she

25   would withdraw money from the account every week and ship $9,000.00 to SN 1 every other

26   week. The withdrawn money not "shipped" was to be CI 1's cut. SN 1 provided CI 1 with the

27

28                                                5

name and address where the money was to be shipped.  SN 1 also told CI 1 to provide the

tracking number so he could monitor the shipment of the package.

In late March 2008, an IRS-CI agent withdrew $9,000.00 in currency from the Meridian

undercover bank account and on April 1, 2008, $9,000.00 was shipped overnight priority mail

to SN 1.  For the first and second shipments, agents witnessed SN 1 leave his/her personal

residence, arrive at the destination of the package delivery, leave the destination with a package

appearing to be the undercover package, and return to his/her residence.

On April 14, 2008, a third shipment in the amount of $9,000.00 currency was sent

overnight priority mail to SN 1.  On April 15, 2008, SN 1 was arrested when leaving the

destination location carrying the third and final shipment of $9,000.00 currency.

After his/her arrest on related federal charges, SN 1 agreed to act as a confidential

informant and assist law enforcement in identifying and apprehending the Hacker and will be

hereinafter referred to as CI 2.  CI 2 then advised he/she had never met the Hacker in person and

had never spoken to the Hacker telephonically or via Voice Over Internet Protocol (VOIP).  CI

2 maintained ongoing contact with the Hacker via encrypted e-mail using a safe-mail.net e-mail

account.  Safe-mail.net is located in the country of Israel.  CI 2 has also indicated the Hacker

previously operated a website (www.fakeid.tv) where the Hacker sold fake California driver's

licenses.

4.    The Controlled Delivery of $68,000.00 to the Hacker

The Hacker had been led to believe CI 2 had an associate, "Daniel," who worked in the

banking industry and was willing to assist CI 2 in moving the "Hacker's"  fraudulent tax return

proceeds from the Meridian undercover bank account quickly and without detection.

On April 17, 2008, CI 2 sent an encrypted e-mail to the Hacker explaining he/she had

received an additional $9,000.00 in currency from the Meridian undercover bank account, and

was expecting to receive an additional $75,000.00 by April 22, 2008.  CI 2 inquired how the

Hacker wanted his cut ($68,000.00) of the money.  The Hacker provided CI 2 detailed

instructions regarding how to physically wash $68,000.00 in currency in lantern fuel to remove

6

any drug or explosive residues which might cause a detection dog to alert on the package.  CI 2 was further instructed to double vacuum seal the currency, to place the sealed currency in the cavity of a toy, gift wrap the toy so it appeared to be a present, attach a birthday card for a dying child, package it for overnight FedEx delivery, and have the package held for pickup at the destination location.

Additionally, the Hacker informed CI 2 he would send a courier, armed with an AR-15 in a duffle bag, to pick up the package.  The Hacker added the courier would be prepared to shoot anyone who attempted to arrest him while he was in possession of the package.  The Hacker informed CI 2 he would send details of the operation in an encrypted format to the media before the pickup date.  If law enforcement conducted a sting on the pickup, the Hacker would then provide information to the media to decrypt his prior message.  The Hacker advised this would make law enforcement look bad by proving that law enforcement knew the potential for violence at a public place before conducting the sting.

On May 5, 2008, the Hacker sent CI 2 an encrypted e-mail with directions to send a package containing $68,000.00 in currency to Patrick Stout, to a commercial address in Palo Alto, California, and to arrive the morning of May 6, 2008.  This location was determined to be a FedEx/Kinko's retail store open 24 hours a day.  Prior to the shipment, CI 2 provided the Hacker with the undercover package's tracking number via another encrypted e-mail.

The package containing $68,000.00 in currency was delivered to the FedEx/Kinko's store on May 6, 2008.  On May 7, 2008, at approximately 5:00 am, a then unknown white male, average build, wearing a dark jacket with a hood, who appeared to be in his twenties and presented identification in the name "Patrick Stout," was observed entering the back entrance of the Fed Ex/Kinko's on foot and retrieving the package.  The male carried the box to a nearby corner where he ripped open the box, removed the contents containing the currency and discarded the packaging in a nearby dumpster.  The then unknown male proceeded toward a nearby train station.  Agents conducting surveillance were unsuccessful in efforts to identify the then unknown male or follow him to his final destination.  Upon execution of SW 08-70460,

1   identification bearing defendant's photograph and the false identity "Patrick Stout" was found

2   in defendant's apartment along with many of the pre-recorded $100 bills that were part of the

3   $68,000 shipment.

4         On or about May 8, 2008, the Hacker e-mailed CI 2 and confirmed receipt of the money.

5   The Hacker indicated in his e-mail the money was picked up by a third party.  The Hacker

6   advised CI 2 that the courier who retrieved the package believed that he was being followed by

7   police.  According to the Hacker, the courier advised he noticed a "car circling around the area

8   after he left with the driver acting like he was looking for someone.  There were also some

9   suspect characters walking around on foot 'trying to follow him' so he said he did a 180 and

10  'came right at them' but they did not do anything about it.  The Hacker then advised that the

11  courier was "likely just really paranoid."

12        5.      False Identity No. 1 for the Hacker - "Patrick Stout"

13        Investigation of the name "Patrick Stout" led the investigation team to a Post Office Box

14  located in Sacramento, California, that was opened under the name "Patrick Stout" on November

15  21, 2007 and was closed on May 31, 2008.  Investigation of the information provided to open

16  the Post Office Box determined that the California Driver's License number used to open the

17  Post Office Box was actually assigned to a female with a different name in California.

18        Approximately two weeks after the "Hacker's" receipt of the $68,000 controlled delivery,

19  an account was opened with Bullion Direct in the name of "Patrick Stout."  According to its

20  website prior to the authorization of SW 09-70460, Bullion Direct held itself out to be an online

21  source to buy and sell precious metals, including gold, silver, platinum and palladium coins and

22  bars.  Bullion Direct shipped precious metals to customers via UPS/FedEx or United States

23  Postal Service registered mail.  The investigation further revealed that an unknown individual

24  used a debit card, which was linked to fraudulent tax refunds, to purchase United States Postal

25  Money Orders.  The postal money orders were then used to purchase gold through Bullion Direct

26  for the "Patrick Stout" account.  Two separate shipments of gold, totaling approximately

27

28

$18,000, were mailed via FedEx to "Patrick Stout", to the same FedEx/Kinkos location as the $68,000 controlled delivery.

6.     The Bigger and Better "Daniel" Undercover Account

After the $68,000 controlled delivery, CI 2 and the Hacker soon thereafter agreed "Daniel" would withdraw all of the money from the Meridian undercover bank account and deposit the money in an account controlled by "Daniel." CI 2 informed the Hacker, "Daniel" was able to make very large one-time withdrawals only at the end of each quarter, the next quarter ending June 30, 2008.

On May 16, 2008, CI 2 informed the Hacker that "Daniel" had moved $364,260 (the remaining cut for CI 2 and the Hacker) from the Meridian undercover bank account into another bank account believed to be controlled by "Daniel." CI 2 provided a Bank of America routing number and undercover account number to the Hacker where future tax refunds could be deposited. Per the Hacker's request, the funds in the Bank of America account would be swept weekly into another account controlled by "Daniel."

On May, 27, 2008, the Hacker informed CI 2 he had filed approximately 200 additional fraudulent tax returns seeking refunds destined for the new undercover account located at Bank of America. As of June 26, 2008, the AFDC had identified 249 fraudulent tax returns claiming approximately $404,382 destined for this account. The returns were filed from multiple IP addresses.

7.     False Identity No. 2 - "Travis Rupard"

On March 1, 2008, a fraudulent tax return for James A. Johnson (xxx-xx-3549) was filed with the Internal Revenue Service using IP address 75.208.105.186, with a refund amount of $2,099.00 destined for a debit card issued by Galileo Processing. This debit card account was linked by the investigation team to the Meridian undercover bank account through analysis of connected IP addresses and bank accounts. The account holder was listed as James Johnson (xxx-xx-8024) with an address in Alameda, California. The AFDC identified additional tax returns electronically filed claiming refunds destined for same account as follows:

9

| Date | Name | Social Sec # | City, State | Refund | IP Address |
|------|------|--------------|-------------|--------|------------|
| 01/19/08 | James L Johnson | xxx-xx-5366 | Culver City, CA | $2,397 | 24.205.80.123 |
| 02/07/08 | James Johnson | xxx-xx-4889 | Bentonville, AR | $2,437 | 76.195.145.182 |
| 02/29/08 | James B Johnson | xxx-xx-1692 | Rocky Ridge, MD | $717 | 67.82.193.84 |
| 02/29/08 | James B Johnson | xxx-xx-8023 | Culver City, CA | $1,384 | 76.250.136.120 |
| 03/01/08 | James D Johnson | xxx-xx-7537 | North Wilkesboro, NC | $2,249 | 68.36.156.35 |
| 03/01/08 | James C Johnson | xxx-xx-4542 | Chicago, IL | $1,061 | 68.36.156.35 |

On March 1, 2008, a fraudulent tax return for Michael S. Deshields (xxx-xx-8782) was filed with the Internal Revenue Service using IP address 75.208.105.186, with a refund amount of $1,988.00 destined for a debit card issued by NetSpend.  This debit card account was linked by the investigation team to the Meridian undercover bank account through analysis of connected IP addresses and bank accounts.   The account holder was listed as Barbara L. Piper (xxx-xx-8344) with an address in Detroit, Michigan.  The AFDC identified three additional tax returns electronically filed claiming refunds destined for the same debit card account as follows:

| Date | Name | Social Sec # | City, State | Refund | IP Address |
|------|------|--------------|-------------|--------|------------|
| 01/22/08 | Barbara Piper | xxx-xx-8344 | Marion, IN | $5,514 | 24.251.75.193 |
| 02/29/08 | Arjuna Desilva | xxx-xx-6629 | Phoenix, AZ | $1,463 | 208.97.32.251 |
| 02/29/08 | Banhdasack Detsadachanh | xxx-xx-5124 | Lake Havasu City, AZ | $1,861 | 68.36.156.35 |

On March 5, 2008, a tax return for Robert W. Galletly (xxx-xx-7628) was filed with the Internal Revenue Service using IP address 75.209.41.104, with a refund amount of $1,093.00 destined for a debit card issued by Account Now.  This debit card account was linked by the investigation team to the Meridian undercover bank account through analysis of connected IP addresses and bank accounts.  The account holder was listed as Margaret Murray (xxx-xx-0901)

with an address in Petersburg, Virginia.   The AFDC identified three additional tax returns electronically filed claiming refunds destined for the same debit account number as follows:

| Date | Name | Social Sec # | City, State | Refund | IP Address |
|------|------|--------------|-------------|--------|------------|
| 01/17/08 | Margaret Murray | xxx-xx-0901 | Millville, NJ | $3,907 | 68.44.96.153 |
| 03/05/08 | Beth A Gallamore | xxx-xx-5092 | Phoenix, AZ | $1,490 | 99.130.28.126 |
| 03/25/08 | Justin P Hopper | xxx-xx-9313 | West Chester, PA | $980 | 24.61.51.52 |

On March 26, 2008, a tax return for Kevin Furman (xxx-xx-8975) from Eugene, Oregon, was filed with the Internal Revenue Service using IP address 75.209.101.132, with a refund amount of $1,282.00 destined for the Meridian undercover bank account.   Furman died on August 30, 1989.

Investigation revealed the IP addresses associated with the James Johnson, Michael Deshields, Robert Galletly, and Kevin Furman tax returns were registered to Verizon Wireless. In response to a Federal Grand Jury subpoena, Verizon Wireless reported that IP addresses 75.208.105.186, 75.209.41.104, and 75.209.101.132 were utilized by a person who opened the account in the name of Travis Rupard, with Post Office Box 730031, San Jose, California, and telephone number (206) 666-3620.   The above mentioned IP addresses were linked via the following mobile device number (MDN): (415) 264-9596.   Verizon Wireless issued the Broadband Access Card to Travis Rupard, with ESN 005-00717190, assigned telephone number (415) 264-9596 and Verizon Wireless account number 270691733, to the customer claiming to be "Travis Rupard" on May 23, 2006.   This device will hereinafter be referred to as the "Aircard."

USPIS conducted an investigation of Post Office Box 730031 in San Jose, California and determined this PO Box was opened on March 31, 2006 and was closed on August 31, 2006. The application indicated an individual purporting to be Travis Rupard presented a California Driver's License, number D2740168 and a Student ID Card, and provided a physical address of 1780 Oakland Road, #17, San Jose, California, 95131.   Further investigation showed the

California Driver's License number was assigned to a female with a Bakersfield, California, address.  Based on information provided by the San Jose, California, Post Office, the address 1780 Oakland Road was a physical street address for the Leasing Offices of an apartment complex in San Jose.  There were no apartment numbers or suite numbers associated with 1780 Oakland Road, San Jose, California.

8.   False Identity No. 3 - "Aaron Johnson"

CI 2 advised that he/she had been involved with the Hacker in a number of fraudulent schemes over a period of several years and in the past he/she had sent money to the Hacker by sending it to e-gold account XXXX337.  A Federal Grand Jury subpoena was issued for documents related to this account.  Records showed that this account was created on August 16, 2006, in the name of Sam Blat and Benjamin Cohan.  Records corroborated that CI 2 sent the Hacker $7,640 on August 17, 2006.  The Sam Blat account sent money to an account in the name of Aaron Johnson on five occasions beginning on November 19, 2006 through December 22, 2006.  On July 31, 2006, an account in the name of Travis Rupard, 6447 Ivy Lane, San Jose, California, 95129, e-mail address travisrupard@safe-mail.net, telephone number (408) 252-1678, sent $9.50 to the Aaron Johnson account.  The name Aaron Johnson was listed as the account holder of a Southwest Bank Account used to receive fraudulent tax refunds.  In the course of the undercover investigation, the Hacker asked CI 2 to inquire about the Southwest Bank Account with "Daniel" to determine if the Hacker could obtain proceeds in the account. The Hacker had advised CI 2 that he had been unable to withdraw the proceeds from the scheme out of this account.

9.   The Role Played by Time Zones in the Investigation, IP Transaction Records for the Hacker & CI 2 E-mails

On or about June 25, 2008, in response to an Order issued pursuant to 18 U.S.C. § 2703(d), Verizon Wireless provided IP transaction information related to the IP addresses utilized by the Verizon Travis Rupard account identified above.  Verizon Wireless reported connection times in Greenwich Mean Time (GMT).   GMT was researched on www.greenwichmeantime.com. The website indicated that during Daylight Saving Time (DST),

which began on Sunday, March 9, 2008, that Pacific Daylight Saving Time (PDST) for California, the suspected location of the Hacker, is GMT – 7 hours.  During DST, Arizona was on the same time as California.  Paragraphs 46 through 58 of the affidavit submitted in support of SW 08-70460 set forth below detailed a clear association between the Hacker's Aircard and e-mail communications with CI 2.  Three examples are set forth below.

46.    On May 15, 2008, the Hacker sent CI 2 an e-mail using IP address 67.187.132.91 at 07:37:13 a.m. GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 01:29:34 a.m. GMT and as late as 08:40:23 a.m. GMT, including multiple connections at 07:35 a.m. GMT, two connections at 07:36 a.m. and multiple connections at 07:37 a.m. GMT.

\*       \*       \*

50.    On May 19, 2008, the Hacker sent CI 2 an e-mail using e-mail address from IP address 67.187.132.91 at 4:00:38 a.m. GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address as early as 3:28:45 a.m. GMT and as late as 5:58:36 p.m. GMT, including a connection at 3:50:10 a.m. GMT and a connection at 04:00:43 a.m. GMT.

\*       \*       \*

58.    On June 1, 2008, the Hacker sent CI 2 an e-mail using IP address 98.194.41.225 at 02:02:20 a.m. GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 01:39:17 a.m. and as late as 05:45:02 p.m. GMT, including multiple connections at 2:01 a.m. GMT and one connection at 02:02:27 a.m. GMT.

11.    Undercover Meridian Bank Account Access and Gmail Access

In the course of the undercover investigation, CI 2 provided logon credentials to access the Meridian undercover bank account to the Hacker.  In order to access account information online, the Hacker utilized the username "Mike1," which was reserved for his exclusive use. Meridian Bank's online banking service required a user to authenticate his or her identity when logging into an account from a computer not recognized by the bank.  When this occurred, the user was challenged and had to enter a one time security code.  The Hacker received the one-time security code at Gmail account andersonsats@gmail.com.

On May 16, 2008, at 12:43:34 p.m. GMT, IP address 81.27.4.177 accessed the e-mail account andersonsats@gmail.com.  This e-mail access was after the logon rejection yet before

13

the successful logon to the Meridian undercover bank account by IP address 81.27.4.177. Verizon Wireless broadband access card connection records (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) reported the Travis Rupard Account connected to IP address 81.27.4.177 multiple times on May 16, 2008 including connections during 12:42 p.m. 12:43 p.m. and 12:44 p.m. GMT.

On May 24, 2008, the Hacker attempted to logon to the Meridian undercover bank account from IP address 68.199.62.250.  At 11:00:02 Arizona time, the bank rejected the logon because the computer was not recognized and challenged the user.  At 11:01:34, Arizona Time, after entering the one time security code and enrolling the computer, the Hacker's login was authenticated.  The Hacker accessed Account Summary, Account History and a Check Image.

On May 24, 2008, at 06:00:36 p.m. GMT, IP address 68.199.62.250 accessed the e-mail account andersonsats@gmail.com.  This e-mail access was after the logon rejection yet before the successful logon to the Meridian undercover bank account by IP address 68.199.62.250.

Verizon Wireless broadband access card connection records (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) reported the Travis Rupard Account connected to IP address 68.199.62.250 multiple times on May 24, 2008, including connections during 6:00 p.m., 6:01 p.m. and 6:02 p.m. GMT.

11.     Analysis of IP Addresses Used to File Fraudulent Tax Returns

The IP Addresses logged for the 395 tax returns filed using the undercover bank account located at Meridian Bank were researched on an internet reference directory.  A sampling of the IP addresses and ISP information is set forth below:

| IP Address | Internet Service Provider | No. of Returns | Subscriber | City & State |
|---|---|---|---|---|
| 12.216.17.121 | Media Com Communications | 10 | Janet Martin | Des Moines, IA |
| 24.26.218.97 | Time Warner Cable | 21 | Bruce Hicks | Belton, TX |
| 24.17.47.176 | Comcast Cable Communications Inc. | 9 | Gayle Johnston | Willow Springs, IL |

| 67.168.17.7 | Comcast Cable Communications Inc. | 18 | Derek Smith | Federal Way, WA |
|---|---|---|---|---|
| 67.175.211.144 | Comcast Cable Communications Inc. | 2 | Valerie Wachholz | Mundelein, IL |
| 75.209.101.132 | Verizon Wireless | 1 | Travis Rupard | San Jose, CA |

Based on the analysis of the IP Addresses, it appeared as if the returns were filed from multiple locations throughout the United States. However, due to the nature of the information contained in the returns, and the manner in which they were filed, it appeared the real IP Address, or IP Addresses, were hidden, possibly by use of IP spoofing, IP anonymizer services, or utilizing a botnet to submit the returns. In order to gain additional information regarding these types of activities, the affiant for SW 08-70460 consulted IRS-CI Special Agent Tracy Daun and FBI Special Agent Richard Murray. At that time, Special Agent Daun had been a special agent with IRS-CI since February 2001. She had participated in numerous criminal investigations relating to financial crimes, including but not limited to, income tax related crimes, money laundering, wire fraud, telemarketing fraud and mail fraud. Special Agent Daun expanded her expertise to include computer forensics, and computer crime scene investigations in January 2006, when she received training as a Computer Investigative Specialist (CIS) at the Federal Law Enforcement Training Center. She was trained in the execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation and authentication of evidence. Special Agent Daun had taken computer related courses covering databases, spreadsheets, word processors, and other specialized software developed to assist with forensic analysis of digital data, digital evidence recovery, password detection, etc.

At that same time, Special Agent Murray had been an FBI Special Agent since 1999 and had been assigned to the Phoenix FBI Cyber Squad since 2005. SA Murray had participated in investigations relating to computer crime including computer intrusions and fraud committed using computers. SA Murray had received over 350 hours of computer crime training including,

15

but not limited to topics on Internet investigations, networking, computer intrusion investigations, computer security and wireless technology.

Special Agents Daun and Murray advised the affiant that using a proxy or intermediary computer could allow individuals to mask their true IP address and true identity and appear to be another computer.  By using a proxy computer, an attacker could make it appear that his transmittal has come from another machine by sending and receiving communications through the proxy computer.  In addition, they advised that IP anonymizer services are internet based anonymization tools available to hide an individual's real identity.  An Internet user may visit an anonymizer tool's website and complete all of their web browsing/actions through the site.  Special Agent Daun was aware of multiple free anonymizing websites on the internet including Anonymouse, iphide.com, and Proxify.

Special Agents Daun and Murray further advised that the term botnet was generally used to refer to a collection of compromised computers (called zombie computers) running programs, under a common command and control infrastructure.  A botnet's originator could control the group remotely.  A botnet typically ran hidden.  While most owners are oblivious to the infection, the networks of botnets are frequently used to launch spam e-mail campaigns, denial-of-service attacks or on-line fraud schemes.

12.    Tax Return Filing Activity by the Aircard

The AFDC reported the following fraudulent returns were filed on May 22, 2008, using IP address 24.3.79.57, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 19:38:01 | JESSLYN ACERET | $560.00 |
| 19:41:36 | RICHARD R AUILERA | $929.00 |
| 19:48:28 | GINA M. ABAGNARO | $1,538.00 |
| 19:57:27 | MIGUEL A. ALARCON | $1,566.00 |
| 20:00:12 | DONALD M. ADAMS | $1,756.00 |
| 20:11:55 | KATRYNKA N. ADACHI | $912.00 |
| 20:17:58 | CHRISTOPHER B. AKIN | $2,211.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed connections to IP address 24.3.79.57 on May 23, 2008, as early as 12:29:43 a.m. GMT and as late as 7:00:41 p.m. GMT.  Therefore, it appeared that the subject Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on May 24, 2008, using IP address 24.47.154.61, with refunds destined for the undercover Bank of America account:

| IP Time (PSDT) | Name | Refund Amount |
|---|---|---|
| 13:28:07 | STEVEN A. ABBOTT | $2,150.00 |
| 13:30:56 | MICHAEL Y. AHN | $1,136.00 |
| 13:31:06 | KEITH T. ALLEN | $1,596.00 |
| 13:33:00 | JOSEPH C. AIREY | $1,006.00 |
| 13:42:12 | ARTHUR A. ADOLPHSON | $1,159.00 |
| 13:43:00 | MICHAEL L. ADELMAN | $479.00 |
| 13:44:07 | DAVID C. ACKERMAN | $1,303.00 |
| 13:44:55 | ANA C. ALFARO | $1,436.00 |
| 13:53:41 | ELIZABETH ALLEN | $1,857.00 |
| 13:58:03 | CARLOS O. ALVARADO | $507.00 |
| 14:00:25 | RYAN D. ALVARADO | $635.00 |
| 14:03:07 | JAMES P. ACOSTA | $2,179.00 |
| 14:05:51 | CAROL S. AKINS | $2,085.00 |
| 14:08:54 | MIGUEL D. ADAME | $1,034.00 |
| 14:09:52 | MEMORIE P. AGUERRE | $779.00 |
| 14:11:57 | LARRY A. ACEVEZ | $428.00 |
| 14:19:26 | DAVID L. ALCANTAR | $1,152.00 |
| 14:20:14 | JOHN D. ADAMSON | $1,930.00 |
| 14:21:17 | MARIO C. ALONSO | $602.00 |
| 14:25:35 | DANIEL A. ACETO | $953.00 |
| 14:30:45 | DAVID R. ACUNA | $655.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 24.47.154.61 on May 24, 2008, as early as 8:23:51 p.m. GMT and as late as 9:30:59 p.m. GMT.  Therefore, it appeared that the subject Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on May 25, 2008, using IP address 74.73.116.37, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 12:11:53 | DON A. ABELLA | $1,945.00 |
| 12:17:18 | ROGER L. ADAMS | $1,329.00 |
| 12:23:41 | REUBEN ALICEA | $1,036.00 |
| 12:25:26 | LUIS J. ALATRISTE |  $1,238.00 |
| 12:27:00 | MICHAEL ACOSTA | $673.00 |
| 12:31:01 | CAROLYN M. ADAMS | $1,120.00 |
| 12:34:12 | MARY R. AKINS | $1,815.00 |
| 12:39:06 | MATTHEW S. ALVAREZ | $1,668.00 |
| 12:45:42 | MARTIN M. AGUAYO | $418.00 |
| 12:51:29 | BRIAN W. ALBOHER | $1,452.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed multiple connections to IP address 74.73.116.37 on May 25, 2008, as early as 7:10:14 p.m. GMT and as late as 7:59:36 p.m. GMT.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on May 26, 2008, using IP address 67.187.132.91, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 20:05:49 | LOREN L. AISENBREY | $1,572.00 |
| 20:07:03 | WALTER F. ALEXANDER | $1,747.00 |

18

| 20:08:05 | DAVID ALVAREZ | $575.00 |
| 20:09:18 | SHARON M. ADAMS | $1,447.00 |
| 20:15:03 | BART AGUIRRE | $425.00 |
| 20:23:03 | PATRICK ALDERETE | $652.00 |
| 20:24:20 | GLORIA A. AGANZA | $1,939.00 |
| 20:27:57 | EUGENE A. ALCANTER | $1,246.00 |
| 20:29:15 | MANUEL M. ADVIENTO | $1,457.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed multiple connections to IP address 67.187.132.91 on May 27, 2008, as early as 2:54:47 a.m. GMT and as late as 3:58:26 a.m. GMT.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on May 27, 2008, using IP address 67.64.43.108, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 11:21:03 | MICHAEL ALDERSON | $1,436.00 |
| 11:23:20 | ROBERT M. AASE | $1,470.00 |
| 11:27:31 | AHMAD R. ALFRED | $924.00 |
| 11:35:15 | ROBERT J. ADAME | $2,130.00 |
| 11:39:59 | JAMES E. ADAMS | $1,763.00 |
| 11:42:03 | DELAWRENCE L. ADKINS | $1,981.00 |
| 11:47:23 | LEONARD S. ABEYTA | $1,420.00 |
| 11:48:58 | LIZABETH A. AGUILAR | $655.00 |
| 11:50:52 | WAYNE A. ABEL | $725.00 |
| 11:56:09 | DANIEL E. ALBRIGHT | $1,200.00 |
| 11:59:40 | BRENT C. ALLRED | $987.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account connecting with multiple connections to IP address 67.64.43.108 on May 27, 2008, as

19

early as 6:18:31 p.m. GMT and as late as 7:04:01 p.m. GMT.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on May 28, 2008, using IP address 66.42.152.107, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 13:14:46 | MARCIA ADKINS | $1,056.00 |
| 13:16:07 | BETTY A. ABRIL | $981.00 |
| 13:20:02 | DARLENE ALARCON | $1,302.00 |
| 13:21:27 | SERGIO R. AGUILAR | $1,103.00 |
| 13:22:54 | GERALD D. AKERS | $1,188.00 |
| 13:25:47 | BRYAN M. ACOSTA | $1,326.00 |
| 13:27:15 | GARY L. ALDINGER | $1,865.00 |
| 13:28:40 | DANIEL E. ADAMS | $2,045.00 |
| 13:30:04 | MARIO N. AGUIRRE | $593.00 |
| 13:40:18 | MICHAEL G. ALLEN | $1,238.00 |
| 14:09:54 | MARK S. ADLER | $1,166.00 |
| 14:11:48 | JULIA L. AKMAN | $1,413.00 |
| 14:14:40 | RAYMOND ALVAREZ | $2,081.00 |
| 14:17:18 | CHARLES O. ALIANO | $1,079.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 66.42.152.107 on May 28, 2008, as early as 8:13:27 p.m. GMT and as late as 9:17:22 p.m. GMT.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on June 1, 2008, using IP address 68.198.200.5, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 11:4348 | THOMAS G. ANDRADE | $1,525.00 |

20

| | | |
|---|---|---|
| 11:50:06 | ARTHUR R. ALVAREZ | $1,651.00 |
| 11:51:28 | GLORIA J. ARMIJO | $1,910.00 |
| 11:53:14 | DALE W. AMBLER | $2,592.00 |
| 11:55:27 | DALE B. ALFORD | $950.00 |
| 12:14:59 | ROBERT G. AMMONS | $2,854.00 |
| 12:38:03 | DAVID A. ALFATHER | $888.00 |
| 12:39:37 | MICHELLE L. ANDREWS | $2,562.00 |
| 12:41:08 | ROBERTO A. ALVAREZ | $1,935.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 68.198.200.5 on June 1, 2008 as early as 6:42:21pm GMT and as late as 7:42:48pm GMT.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on June 3, 2008, using IP address 67.64.43.108, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 13:16:53 | DAVID C. ALBERTSON | $2,443.00 |
| 13:27:16 | JESUS E. ALVARADO | $2,349.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 67.64.43.108 on June 3, 2008, as early as 8:13:09 p.m. GMT and as late as 8:47:38 p.m. GMT.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on June 3, 2008, using IP address 76.229.232.193, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 13:50:37 | KIM W. ALLEN | $2,736.00 |
| 13:52:39 | MICHAEL A. AMATUCCI | $2,211.00 |

| 13:55:17 | JENNIFER L. BARNUM | $2,774.00 |
| 14:04:01 | PATRICIA E. ALLEN | $2,842.00 |
| 14:06:49 | JAMES D. ALTUM | $2,741.00 |
| 14:23:29 | MARIA D. BARRAZA | $2,842.00 |
| 14:25:08 | JOSE A. ALVARENGA | $2,481.00 |
| 14:26:36 | AMBER D. BARFIELD | $2,964.00 |
| 14:28:25 | KAREN D. ALEXANDER | $2,335.00 |
| 14:39:03 | JAMES B. ALEXANDER | $2,113.00 |
| 14:40:36 | SCOTT A. ANDERSON | $2,722.00 |
| 14:45:11 | TRISHA L. BARTLETT | $2,353.00 |
| 14:49:01 | LEO L. ALBERT | $2,241.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 76.229.232.193 on June 3, 2008, as early as 8:48:23 p.m. GMT and as late as 10:07:17 p.m. GMT on June 3, 2008.  Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on June 4, 2008, using IP address 67.172.220.94, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 23:16:11 | RICK I. ALLISON | $984.00 |
| 23:32:26 | DANIEL L. ALLEN | $2,556.00 |
| 23:33:56 | RAYMOND J. ALVAREZ | $1,557.00 |
| 23:37:44 | ROSARIO V. ALTURA | $2,966.00 |
| 23:48:40 | SALLY M. BANDA | $1,549.00 |
| 23:52:18 | JAMES L. ALSUP | $2,260.00 |
| 23:57:18 | MANUEL S. ALLEN | $2,928.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 67.172.220.94, on June 5, 2008 as early as

6:06:42 a.m. GMT and as late as 7:06:36 a.m. GMT. Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

The AFDC reported the following fraudulent returns were filed on June 5, 2008, using IP address 67.187.119.170, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 00:13:58 | MELVIN G ARNOLD | $1,629.00 |
| 00:16:25 | CHRISTINE A ARENA | $934.00 |
| 00:18:11 | ANDREW L ALLISON | $2,886.00 |
| 00:28:37 | RACHELLE M BARROWS | $1,405.00 |
| 00:32:58 | CORLAINE R ALTO | $1,955.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account (obtained pursuant to an Order issued pursuant to 18 U.S.C. 2703(d)) showed the Travis Rupard account with multiple connections to IP address 67.187.119.170 on June 5, 2008, as early as 7:08:22 a.m. GMT and as late as 7:40:29 a.m. GMT. Therefore, it appeared that the Aircard was used to file each of these fraudulent returns.

13.    Analysis of Bank Accounts

The AFDC had identified refunds destined for the undercover bank accounts and continued to monitor the accounts for additional fraudulent returns. In addition, the AFDC used the information from the electronically filed returns to identify any additional fraudulent tax returns, IP addresses and/or accounts being used to facilitate the scheme. As of June 26, 2008, the following banks had been identified as being linked to this bulk filing scheme:

| Bank | No. of Accounts | No. of Returns |
| --- | --- | --- |
| Meridian Bank (Undercover Account) | 1 | 395 |
| Columbus Bank & Trust | 1 | 73 |
| Centennial Bank | 23 | 200 |
| GE Money Bank | 3 | 134 |
| Bancorp Bank | 9 | 53 |

23

| MetaBank | 30 | 156 |
|---|---|---|
| Arkansas State Bank | 3 | 10 |
| Bank of America (Undercover Account) | 1 | 249 |
| International Bank | 2 | 2 |

Centennial Bank was identified the Centennial Bank accounts noted in the chart immediately above as being related to a debit card program that was issued by Galileo Processing, an intermediary processor as discussed further below.

Bancorp Bank identified the Bancorp accounts noted in the chart immediately above as being related to prepaid debit cards where the funds are loaded to the card at authorized third party locations, or electronically by direct deposit. A representative of the bank advised an IRS-CI special agent that the tax refunds deposited into the account were listed in the names of people other than the account holder.

A representative of MetaBank had informed an IRS-CI special agent that the MetaBank accounts noted in the chart immediately above were related to debit cards. The representative further explained that cards with account numbers starting with a 5 were from Account Now, the account numbers starting with a 7 were from NetSpend, and the accounts beginning with 065 were from Galileo Processing Inc.

According to Account Now Inc's website, www.accountnow.net, they were a premier provider of financial solutions for the millions of consumers in the United States who did not have established credit or traditional banking relationships. Account Now offered prepaid Master Cards. Account Now stated their prepaid Master Cards were issued by MetaBank. Deposits could be made to the account by paycheck, direct deposit or MoneyGram Express Payment.

According to NetSpend Corporation's website, www.netspend.com, this company offered all access prepaid Visa and Master Card debit cards. The company's website stated that the cards worked like debit cards, without the hassle of a bank account and were accepted at millions of places worldwide. The website stated that a person could obtain a card without a credit check.

Funds were loaded on the card via direct deposit, by visiting a reload center or online with PayPal.  Cards could be purchased at certain reload centers or through the website.  NetSpend stated on their website that they were an authorized Independent Sales Organization of Inter National Bank and MetaBank and the cards were issued through these two banks.

According to Galileo Processing, Inc.'s website, www.galileoprocessing.com, the company offered partners, clients, and consumers solutions and support for financial payment processing.  According to the company's website, Galileo Processing, Inc., was an advanced processor for credit, debit, and prepaid card programs. The company offered multi purse technology, a proprietary bill payment service, integrated ACD and IVR, world class customer service, and real time connectivity to over 100,000 retail locations that accepted cash loads to prepaid cards.

14.     The California Death Index

The social security numbers listed on the 395 tax returns identified with refunds destined for the IRS controlled undercover bank account at Meridian Bank and the 249 tax returns identified with refunds destined for the IRS controlled undercover account at Bank of America were researched on the California Death Index.  The California Death Index contains millions of records with information for birth years 1940 through 1997.  All 654 corresponding social security numbers were located using this data base.  Research revealed that all of the individuals listed on these returns were deceased well before 2007, and therefore, did not receive taxable income in the form of wages in 2007.

15.     E-Mail Communications Between the "Hacker" and CI 2

In the course of the execution of a Search Warrant on April 15, 2008, of a computer used by CI 2, e-mail records were recovered which had been sent on or before April 15, 2008, by the Hacker.

In an e-mail sent on unknown date prior to April 15, 2008, the Hacker advised CI 2 that he produces fraudulent identification documents and that he has sold identification documents for many years without any problems.  The Hacker stated if he is raided by law enforcement, he

will use his keystroke kill switch to shut down the computer and then physically hold down the power button to turn off the computer in case the kill switch fails.  When the computer is shut down, all saved encryption keys will be deleted from the computer memory.  Moreover, the "Hacker's" entire hard drive is always encrypted.  (Fortunately for the investigation team, prior to the execution of SW 08-70460, the defendant was arrested nearby while outside of his apartment.  When entry was made pursuant to the search warrant, defendant's computer was found to be unsecured and logged on, no password was needed in this instance in order to access the files.)

In an e-mail sent on unknown date prior to April 15, 2008, the Hacker also advised CI 2 he uses a different IP address for each tax return and has filed returns with many different efilers. The Hacker believed filing the returns in this manner would prevent "them," (i.e., the IRS), to link them all.  The Hacker advised an e-filer "took some heat" from the IRS because of his automated filing scheme.  The Hacker stated the e-filer tried to stop him by use of a captcha, i.e. a box that appears on a webpage requiring the user to personally view a screen and then enter in a series of characters.  The purpose of a captcha is to prevent automated entry of data on a webpage.

In an e-mail sent on unknown date prior to April 15, 2008, the Hacker advised CI 2 he knew "everything there is to know about creating new identities in the USA and I know a lot about assumed identities."  The Hacker advised CI 2 he is an encryption expert and a privacy expert. Further, during a debriefing of CI 2 after April 15, 2008, he/she advised that the Hacker had obtained proceeds from the subject bulk filing scheme in the past through the receipt of encrypted electronic information regarding debit cards.  CI 2 also stated that he/she has sent related account information to the Hacker which he could then use to create his own debit cards using an electronic debit card reader/writer and then withdraw the funds from automatic teller machines. In the course of follow-up investigation with respect to this information, an unknown white male or males, average build, appearing to between the age of 20 and 29, had been observed making withdrawals, or attempting to make withdrawals, with multiple debit cards

from automatic teller machines on security camera photos obtained via Grand Jury subpoenas. In each case in March and April of 2008, the subject debit card accounts had previously received fraudulent tax refunds that had been obtained as part of the scheme.

On or about April 23, 2008, the Hacker advised CI 2 in an e-mail he had burned his identification document and his birth certificate. The Hacker stated to CI 2, "I am probably the single biggest threat to the US government currently living and they don't even know it. I can do things to the government that will make all these terrorist organizations look like sewing circles." In this same e-mail, the Hacker claimed to have a contact with an individual who was previously a United States Intelligence Agent who assisted the Hacker primarily with information on identities. The Hacker claimed he traded computer information with this former Intelligence Agent in exchange for information known to the former Intelligence Agent. The Hacker claimed this individual feared being accused of treason even though the former Intelligence Agent had not worked in the government for ten years.

On or about May 12, 2008, the Hacker e-mailed CI 2 and stated "I was thinking of starting with robotic aerial assassins that can be controlled from a computer over the internet. It would be essentially a flying handgun that no one would likely see. Perfect for taking out politicians. The controls would be military grade but designed by me. I was also thinking about making 50 mile range missiles without the warheads . . . I would only want to arm militias planning on standing up against the feds when the winner take all war takes place in the US . . . I am also trying to convince some old friends to help out with chemical and biological weapons as well. There will be no rules in this war. The government has already set the stage . . . " The Hacker added, "I have always wanted a small automatic weapon with a silencer similar to the one Bruce Willis used in Pulp Fiction to kill the Scientologist . . ." The Hacker advised CI 2, "If you can help me expand my arsenal then I would appreciate it" (The weapon used in the movie appears to be a handheld machine gun with a silencer.)

On or about May 14, 2008, the Hacker e-mailed CI 2 a list of numerous weapons to follow up on. In numerous subsequent e-mails, the Hacker engaged in discussions regarding

purchasing an unregistered MAC-10 with a silencer with CI 2 serving as a broker.  On or about June 2, 2008, the Hacker e-mailed CI 2 that, "I have a lot of money to spend on guns (100k+) but if this is what it is like to deal with illegal gun dealers then I will stick to making AR15s, AK47s and M4s in my garage."  The Hacker decided not to purchase the weapon at that time but advised he would consider purchasing a weapon in the future through CI 2.

On or about May 23, 2008, the Hacker sent an e-mail to CI 2 asking for access to the Social Security Administration internal "death master file".  The Hacker believed this death index contained information on deaths of persons for whom the Social Security Administration has not been able to verify the deaths and therefore cannot treat these persons as deceased for tax purposes.  The Hacker asked CI 2 for other personal identifying information in database format and access to information in a state death database for persons who died in the year 2008. It was believed that the Hacker sought and continued to seek personal identifying information on individuals that he could utilize to file fraudulent tax returns.  Since CI 2 successfully provided the Hacker with $68,000.00 in cash, the "Hacker's" opinion of CI 2's capabilities as a middleman were greatly enhanced.

On or about June 10, 2008, the Hacker sent an e-mail to CI 2 stating, "I funded other bank accounts at the same time from the same proxies and they all work out . . . " It was believed that the Hacker was referencing fraudulent tax returns sent to other accounts in addition to the Bank of America undercover bank account.

On or about June 11, 2008, the Hacker sent an e-mail to CI 2 asking for personal identifying information of third parties.  The Hacker again sought information on the Social Security Administration "internal death master file," the previous Choicepoint data compromise, and personal identifying information on Bank of America customers.  The Hacker further advised that, "I can and will bring this country into a "Mad Max" state if the government continues down their path.  I just hope there are enough people with enough guns spread through out the country to fight off the feds and split the country into new countries . . . " It was believed that the reference to Mad Max refers to the post-apocalyptic world depicted in the film "Mad

Max."   (During the execution of defendant's apartment pursuant to SW 08-70460 and a subsequent search of a storage locker rented by defendant under the additional false identity "Daniel Clifton Aldrich," pursuant to the execution of Northern District of California Search Warrant No. 08-70502-PVT, authorized on August 4, 2008, no firearms were found.)

On or about June 26, 2008, the Hacker warned CI 2 about the countermeasures he would use to take possession of a bulk currency delivery he was owed after June 30, 2008, which represented his percentage of the proceeds derived from fraudulent tax returns.   The Hacker advised that the courier who would retrieve the package containing the bulk currency from the mailing center would be armed with a concealed M4 assault rifle.   The Hacker stated the courier would scan the package for both analog and digital radio signals and with an ultraviolet black light.   The Hacker advised CI 2 that if the package was transmitting a radio frequency signal or the tape on the package had been replaced, the courier would run away and shoot anyone who tried to grab him.   According to the Hacker, a team would be in place to provide cover fire so all members of the pickup team could escape.   The Hacker advised if anything happened in the FedEx center, "everyone who works there will be dead."   The Hacker advised if anything happened outside the FedEx store, then anyone the pickup team saw would be dead and any cops would be dead.   The Hacker stated the pickup team would "make a point" by killing innocent people just to teach law enforcement a lesson.   On the chance that CI 2 was a CI, the Hacker planed on e-mailing unidentified reporters, in encrypted fashion, the exact details of the package pickup and the countermeasures in place to prove that CI 2 knew beforehand that people would die if law enforcement intervened.   If a law enforcement sting ensued at the FedEx store, the Hacker would then e-mail the passwords to the encrypted messages previously sent to the reporters so that the news would be, "Law Enforcement and CI knew about murderous rampage but did nothing to prevent it!"

16.   Historical Cell Tower Information and Other Investigative Techniques

Historical cell tower information for the Aircard and the records relating to the use of particular IP Addresses used by the card as described above, lead to the conclusion that the

Hacker had used the Aircard to commit offenses in violation of numerous federal statutes set forth in the affidavit as follows:

      a.    18 U.S.C. § 286 - Conspiracy to Defraud the Government;
      b.    18 U.S.C. § 287 - False, Fictitious or Fraudulent Claims;
      c.    18 U.S.C. § 371 - Conspiracy;
      d.    18 U.S.C. § 1028 - Fraud Related to Identity Information;
      e.    18 U.S.C. § 1028A - Aggravated Identity Theft;
      f.    18 U.S.C. § 1029 - Fraud with Access Devices;
      g.    18 U.S.C. § 1341 - Mail Fraud;
      h.    18 U.S.C. § 1343 - Wire Fraud;
      I.    18 U.S.C. § 1030 - Computer Abuse and Fraud

The affidavit further advised that historical cell tower information and other investigative techniques had led the investigation team to the location of the Aircard within the "Domicilio" apartment complex; 431 El Camino Real; Apartment 1122; Santa Clara, California, 95050.

On July 17, 2008, a Grand Jury subpoena was issued to Domicilio for the file information related to 431 El Camino Real, Apartment 1122, Santa Clara, California, 95050. The subpoena revealed the apartment was currently being rented by an individual claiming to be Steven Travis Brawner. The rental application indicated Brawner was a software engineer.

Brawner provided a California driver's license, license number D6870214. Further investigation revealed the California driver's license number was assigned to a female with a Chino Hills, California address.

In order to rent the apartment, Brawner was required by the rental company to provide a copy of the first page of what he claimed to be this 2006 tax return. The return purported to show an adjusted gross income of $110,314. The social security number on the return was 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. Internal records for the Internal Revenue Service were researched and revealed no tax return for 2006 was filed for Steven Travis Brawner. Additionally, Social Security Administration records for social security number 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 indicated that Steven Brawner died in 1997.

On July 21, 2008, Forensic Document Examiner William J. Flynn conducted a handwriting analysis of the original application documents for 431 El Camino Real, Apartment 1122 and the original application documents for the (Patrick Stout) Sacramento Post Office Box.

1   After conducting the analysis of the documents, Mr. Flynn advised that forensic evidence
2   indicated common authorship among the documents.

3          The Domicilio apartment complex located at 431 El Camino Real, Santa Clara, California
4   95050 was a gated community, with a unique "fob number" assigned per individual for key card
5   access.   In response to a Federal Grand Jury subpoena issued to the Domicilio apartment
6   complex, it was determined that fob number 58261 was assigned to the individual purporting to
7   be Steven Travis Brawner.   The investigation revealed the gate access system service was
8   provided by Quality Alarm.   In response to a Federal Grand Jury subpoena issued to Quality
9   Alarm regarding fob number 58261, records showed that the individual purporting to be Steven
10  Travis Brawner accessed the Domicilio apartment complex sixteen separate times between June
11  4, 2008 and July 23, 2008.  Of the sixteen separate accesses, nine of the accesses were made
12  between the hours of 10:00 pm until 6:00 am.

13         During the month of July 2008, daytime surveillance and spot check surveillance were
14  unable to observe any residents at the subject location.  On July 22, 2008, at approximately 7:20
15  pm, an FBI Special Agent acting in an undercover capacity knocked on the door using the ruse
16  of a fast food delivery.  No one answered the door.

17         This information set forth above is a summary of the information set forth in the affidavit
18  submitted in support of the application for SW 08-70460.

19         Shortly after the investigation team had narrowed down the focus of their investigation
20  to a particular apartment within the apartment complex, the rental agency allowed the team to
21  use a nearby vacant apartment in order to conduct surveillance.  From July 16, 2008, through the
22  afternoon of August 3, 2008, no one matching "Steven Brawner's" description was seen coming
23  into, or out of, the apartment occupied by defendant.  The rental agency continued to grant the
24  investigation team access to the apartment complex until well after the defendant's arrest and the
25  execution of SW 08-70460 in the late afternoon of August 3, 2008.

26

27

28

17.    The "Aircard Mission"

The tracking device warrant, CR 08-90330MISC (CR 470-1), was issued July 11, 2008, and was based on a finding of probable cause to believe that the use and monitoring of a tracking device would lead to evidence of crime and the identification of the perpetrator. The warrant also compelled Verizon Wireless to assist as necessary. The warrant specifically allowed monitoring of the aircard for up to 30 days, day or night, even if the aircard was located inside a private residence.

In order to locate the subject Aircard, FBI Special Agent Kevin Killigrew first used historical cell tower information obtained pursuant to Orders issued pursuant to Section 2703(d) related to the subject Aircard's account with Verizon Wireless, and information provided to him to the FBI from Verizon Wireless regarding the operation and range of the firm's cell towers and related equipment, and his personal training and experience in order to estimate the general location of where the Aircard may have been used in the passed based upon which cell towers the Aircard had communicated with and the estimated range of the subject cell towers.  Based upon this information, the investigation team was directed to commence further efforts to locate the Aircard within an area within Santa Clara, California.  In preparation for the next step in the Aircard Mission, the investigation team obtained the following orders in the Northern District of California, Order No. CR-08-90330, In the Matter of the Application of the United States of America for an Order Authorizing the Use and Monitoring of a Mobile Tracking Device and Order No. CR-08-90331 (CR 470-2), In Re Telephone Information Needed for a Criminal Investigation.

For the purpose or addressing defendant's motion to suppress, the United State made the following concessions in Government's Memorandum Re Motion For Discovery (CR 674, footnotes omitted).  First, the United States proposed that the Court assume, arguendo, for defendant's Motion for Discovery and any forthcoming Motion to Suppress, that the aircard tracking operation was a Fourth Amendment search or seizure.

Second, the United States agreed to rely solely on the Rule 41 tracking warrant, application and affidavit, No. CR-08-90330-MISC, to authorize the use of the equipment to communicate directly with the Aircard and determine its location.

Third, the United States agreed to allow the Court to factually assume, that, at the conclusion of the July 16, 2008, aircard tracking operation, the FBI located the aircard within Unit 1122 of the Domocilio Apartments.

Fourth, with respect to whether the equipment used to locate the Aircard was operated in a "man-in-the-middle" manner or caused a "disruption of service," the United States agreed to that the Court can assume, arguendo, that it did. In the affidavit attached to the Memorandum, FBI Special Agent Bradley Morrison noted that the equipment in this case did not capture any content and it did not act as a "man in the middle" collecting data and passing it on to Verizon Wireless. (CR 674-1, ¶ 4). [2/]

18.    The Arrest of the Hacker

On August 3, 2012, at approximately 4:15 p.m., two federal agents were conducting their ongoing surveillance of the exterior of the subject apartment. An unidentified person matching the description of the resident of the subject apartment, "Steven Brawner," was observed walking away from an area near the apartment. The agents started to follow the person in order to attempt to further identify him. At this time, the original indictment in this case was sealed and there was a companion outstanding arrest warrant for Steven Travis Brawner, a.k.a. Travis Rupard, a.k.a. Patrick Stout. While the unidentified person was being followed, he began to act in a manner that was suspicious to the agents. Fortuitously, one of the federal agents was able to flag down a local Santa Clara Police Department marked unit occupied by two uniformed officers. The local officers agreed to assist the federal agents in the apprehension of a federal

_____

[2/] Defendant notes that the last record of contact with the Aircard was at approximately 5:03 p.m., July 16, 2008. Mot. at 179-80. Defendant inadvertently concluded that the location mission continued until approximately 2:42 a.m., July 17, 2008, based upon a FBI text that was sent noting that the apartment had been located. Mot. at 180. The subject text records were prepared using Greenwich Mean Time, therefore the actual approximate date and time of the text (7 hours earlier) was 7:42 p.m., July 16, 2008.

fugitive. At least one other local police department marked unit was then also on its way to assist. The initial four law enforcement officers then attempted to locate the subject. One of the federal agents observed the subject as he appeared to be hiding near a coffee shop. The subject then appeared to be running through a parking lot and then eventually ran into a nearby street against traffic. The second marked unit approached the subject head on and he ran into the opposite lanes and was now running in the direction of the traffic. One of the marked units attempted to block the subject, he ran into the unit and was apprehended. The subject resisted arrest by rocking left to right and kicking with his feet. Once secured, the subject did not appear to have suffered any serious injuries. At this point, the subject refused to identify himself. A search of his person located a small amount of money and a set of keys. No form of identification was found on the subject. The subject appeared to match the image of the person in the driver's license photo that had been provided with the subject apartment's rental application. A third federal agent was summoned to the scene from the nearby apartment complex. The third agent took the keys which had been seized incident to arrest and went back to the subject apartment.

A this time, the investigation team had in its possession sealed SW 08-70460 for the subject apartment. Within a short time after the arrest, the third agent took the subject keys to the subject apartment and tested them in the apartment's front door lock. One of the keys turned the lock. The agent did not open the door or enter the apartment. The agent called one of the arresting federal agents who was still at the scene with the subject and advised that one of the keys fit the lock. The subject was transported for processing at that time. The third agent remained outside of the subject apartment and helped to maintain the security of the apartment until additional federal agents arrived and entry was made pursuant to the warrant at 5:20 p.m.

The subject was ultimately identified via fingerprint analysis as the defendant Daniel David Rigmaiden, a fugitive with a 2000 outstanding arrest warrant in an unrelated fraud case in Santa Cruz County, California. A plethora of evidence found in the apartment and in the

defendant's computer tied the defendant to his apartment, including numerous pieces of false identification bearing his defendant's photographic image.

Until defendant's arrest pursuant to an arrest warrant, the investigation team took no steps to interfere with his liberty interests due to the fact they had never fully identified or contacted prior to his arrest, and the only steps that could have possibly been taken to interfere with his possession of any item, in this case the Aircard (setting aside for the moment whether defendant had any reasonable expectation of privacy in the Aircard), were the efforts conducted by the FBI in the course of locating the Aircard on July 16, 2008; steps which were so insignificant they went undetected by defendant.

19.   The Defendant's Numerous False Identities Used to Procure and Maintain the Aircard and Its Aircard Account, the Apartment and the Laptop and Electricity Used to Operate the Aircard

By means of introduction, the investigation team has yet to uncover a single means by which the defendant had lawfully earned any money for many years prior to arrest.  Therefore, while defendant claims to have paid for things with "his money," there is no known lawful source for any of the money he used to purchase or maintain the Aircard, lease or maintain the apartment he used as the base of his criminal operations, and purchase the laptop and electricity he used to run the Aircard, all of which he used to commit the offenses listed above and in the superseding indictment.

A.   Travis Rupard, the Aircard and the Aircard Account

The Aircard was purchased from Verizon Wireless by defendant using the false identity of another living person, Travis Rupard, on or about May 23, 2006.  IRS-CI has determined that at the time of the Aircard's purchase, the true Travis Rupard was alive and the resident of a State other than California.  Defendant maintained an account with Verizon Wireless for cellular service for the Aircard under the same false identity at least until the day of his arrest.  In order to back- stop the false identity of Travis Rupard, defendant provided the actual Social Security Number for the true Travis Rupard and the address for a PO Box in San Jose, California, to Verizon Wireless.  The application for the San Jose PO Box was also made under the false

identity of Travis Rupard, and back-stopped with a false driver's license and false identification card for a university.  The PO Box was opened on March 13, 2006 and closed on August 31, 2006.

B.     Steven Brawner and the Apartment

Defendant applied for a lease for his apartment on October 18, 2007, using the false identity of Steven Brawner.  In order to obtain the lease, defendant provided a forged California driver's license and the first page of a forged Federal income tax return which bore the true social security number for Steven Brawner who was deceased.  The Brawner rental application, forged page of a tax return and driver's license were all back-stopped by a different PO Box in San Francisco, California.  The San Francisco PO Box was applied for on September 27, 2006 and back stopped by a different fraudulent driver's license and fraudulent student identification. At the time of his arrest, defendant was living in the apartment under the false Brawner identity with no means of traceability or recourse if he walked away from the terms of the lease or apartment.

C.     Andrew Johnson and the Laptop Used to Operate the Aircard

On September 13, 2007, defendant purchased the laptop used to operate the laptop from Lenovo with the false identity of Andrew Johnson, a deceased individual.  The purchase was made with a Galileo Processing Visa card with the false identity of Andrew Johnson. The application for the Visa card was back-stopped by the true Social Security Number for Andrew Johnson and a different PO Box in San Francisco opened under the false identity of Andrew Johnson.

20.     The Search of the Seized Computers

As stated above, the investigation team executed SW 08-70460-HRL for defendant's apartment on August 3, 2008.  Attachment C of the warrant consisted of a "Computer Search Protocol For The Northern District Of California," which detailed the procedures that the United States would follow for computer evidence. The protocol required, among other things, that the United States file a return within 10 days identifying the devices seized from the apartment. See

SW 08-70460HRL at 2 ¶ 4. The protocol also required the United States to complete an off-site search of the seized devices within 30 days, and within the following 60 days the United States must return any devices that do not contain contraband or evidence of crime. See id. at 2 ¶ 5. Finally, the protocol states that the United States "must use reasonable efforts" to delete non-responsive material within the next 60 days (i.e., within 120 days of executing the warrant):

> Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy—and to delete from any devices or storage media or copies that it has retained or made—copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime. The deadlines set forth in this paragraph may be extended by court order for good cause shown.

id.

The United States complied with the computer search protocol. The United States filed the return for the warrant on August 5, 2008, which is well within the 10-day time limit stated in the protocol. Moreover, the return included a detailed inventory of the devices and other items seized from the premises. The United States anticipates that IRS Special Agent Tracy Daun will testify that she personally conducted an initial review of the devices at the premises on the day the search warrant was executed, and on that day she found a file labeled filesalot.dcv that contained the bulk of the incriminating evidence. She will also testify that, within 30 days of the execution of the warrant, she created forensic copies, or "images," of the seized devices and determined which of those devices contained material responsive to the search warrant. The images of devices or storage media that did not contain responsive material were destroyed by approximately August 28, 2008, which is less than 30 days after the execution of the warrant. This, too, satisfies the protocol, which required the United States to return the devices within 60 days and delete images that do not contain responsive material within 120 days.

The United States retained forensic images of the devices that Agent Daun determined did contain evidence of crime, so that it could preserve the evidence and lay a proper foundation at trial. The United States also retained any devices that it determined contained contraband –

e.g., stolen financial or identity information.  With respect to the return of all of the devices or storage media that were not subject to seizure, the United States originally offered to return the items to defendant's prior defense counsel.  In light of the fact the they lacked storage space and defendant was in custody, the United States agreed to retain the items until further instructions were received from the defendant.  The items have been stored and secured since they were originally mirrored shortly after their seizure.  The items have not been searched since they were originally mirrored and remain available to be returned upon request.

Due to the volume of data on the devices, Agent Daun continued to analyze the seized evidence throughout 2009 and further identified information contained within the seized items.  Any further searches to be conducted by Agent Daun will be limited to the materials she identified via her 2009 analysis.  She will likely continue to analyze those digital materials pursuant to the warrant up through trial in this matter, much like a law enforcement agent continuing to analyze a firearm or other type of lawfully seized physical evidence.

**II.** **Law & Argument**

Defendant's challenges numerous portions of the investigation that led to his arrest, the search of his apartment, and the seizure of a wealth of incriminating evidence. Ultimately, however, he is presenting three questions for the Court to decide:

1) Was the United States' collection of historical records pursuant to subpoenas and court orders reasonable?

2) Were the FBI's efforts to locate the aircard pursuant to the tracking warrant reasonable?

3) Was the subsequent search of his apartment and computer pursuant to the search warrant reasonable?

As argued below, the answer to each of these questions is yes. Defendant's motion should therefore be denied.

1.    The United States' Collection Of Historical Records Pursuant To Subpoenas And Court Orders Was Reasonable.

1    Defendant challenges two categories of business records related to the account that the

2    United States obtained pursuant to subpoena or a court order issued pursuant to 18 U.S.C. §

3    2703(d) (a "2703(d) order"). (See, e.g., CR 824-1 ("Mot.") at 215-224, 239-249, 259-261, 283-

4    284.)  First, the United States obtained 2703(d) orders to compel Verizon Wireless to disclose

5    historical cell site information and destination IP addresses for the Aircard.  Second, the United

6    States used grand jury subpoenas to compel the Domicilio Apartment Complex to turn over a

7    copy of defendant's rental agreement file and Quality Alarm Service to disclose its records

8    regarding defendant's entries into or out of the Domicilio Apartment Complex.  Defendant

9    argues that the Fourth Amendment required the United States to obtain a warrant to compel

10   disclosure of this information.  This argument is mistaken: a customer has no reasonable

11   expectation of privacy in a corporation's business records, and there is no warrant requirement

12   for compulsory process.  Moreover, because the government obtained this information based on

13   good faith reliance on statutory and judicial authorization, as well as existing precedent,

14   suppression is not an available remedy.

15        A.      The Historical Records Were Properly Obtained Pursuant To Statute Or Rule.

16        A 2703(d) order may be used to compel disclosure of historical cell-site records or IP

17   address records because these records fall within the scope of 18 U.S.C. § 2703(c)(1).  In

18   particular, 18 U.S.C. § 2703(c)(1) requires "a provider of electronic communication service . .

19   . to disclose a record or other information pertaining to a subscriber to or customer of such

20   service (not including the contents of communications)" pursuant to a 2703(d) order.  IP address

21   records and cell-site records fall within the scope of this provision.  First, ISPs and cell phone

22   companies are providers of electronic communication service because they provide their users

23   with "the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

24   Second, an IP address record or a cell-site record is "a record or other information pertaining to

25   a subscriber or customer of such service (not including the contents of communications)."

26   Therefore, disclosure of IP address records and cell-site records may be obtained pursuant to 18

27   U.S.C. §§ 2703(c)(1) and (d).  See In re Application of the United States, 620 F.3d 304, 313 (3d

28

Cir. 2010) (holding that historical cell site location information is "obtainable under at § 2703(d) order"); United States v. Graham, 846  F. Supp. 2d 384, 396 (D. Md. 2012) ("It is well established that Section 2703(c)(1)(B) of the Stored Communications Act applies to historical cell site location data."); In re Applications of the United States, 509 F. Supp. 2d 76, 79-80 (D. Mass. 2007) (holding that historical cell site information "clearly satisfies" the definitional requirements of § 2703(c) and is therefore obtainable under § 2703(d)).

Grand jury subpoenas were properly used to obtain records from the apartment rental company and alarm service because "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1).

B.    Defendant Has No Privacy Interest In Any Of The Historical Records Obtained By The United States in this Case.

The historical cell-site records, IP address records, and rental property and alarm service records obtained by the United States are all business records.  Setting aside for the moment that the Aircard, the Aircard account, and the apartment's services such as security and utilities, were all procured through the use of fraudulent identities, a customer has no privacy interest in business records that are not the customer's private papers.  Addressing a Fourth Amendment challenge to a third party subpoena for bank records, the Supreme Court held in United States v. Miller, 425 U.S. 435 (1976), that the bank's records "are not respondent's 'private papers'" but are "the business records of the banks" in which a customer "can assert neither ownership nor possession." Miller, 425 U.S. at 440.  The records "pertain to transactions to which the bank was itself a party."  Id. at 441.  As the United States Court of Appeals for the District of Columbia stated, "it has been consistently held by the Supreme Court and the Courts of Appeals that a person has no Fourth Amendment basis for challenging subpoenas directed at the business records of a third party." Reporters Committee for Freedom of Press v. AT&T, 593 F.2d 1030, 1044 (D.C. Cir. 1978) (citing cases).  In a case involving a subpoena for an electricity company's power records, the Ninth Circuit recently confirmed that "[a] customer ordinarily lacks a reasonable expectation of privacy in an item, like a business record, in which he has no

40

possessory or ownership interest." <u>United States v. Golden Valley Elec. Ass'n</u>, ___ F.3d ___, 2012 WL 3185827 (9th Cir. Aug. 7, 2012) (internal quotation marks omitted).

The reasoning of <u>Miller</u> applies to the historical records obtained by the United States. They are not the customer's private papers. Once a customer makes a call, communicates over the Internet, leases an apartment, or uses the services of an alarm company, he has no control over the business record made by the business of that transaction. Instead, the record created is a business record of the provider. The choice to create and store the record is made by the provider, and the provider controls the format, content, and duration of the records it chooses to create and retain. Indeed, because these records are not in the possession of a customer, a customer could not be expected to produce the records in response to a subpoena. Moreover, these records pertain to transactions to which the companies were a participant. The assignment of a particular cell tower to process a call is made by the cell phone company to facilitate the functioning of its network; the ISP uses the IP address to route Internet communications it transmits; the rental company maintains a rental file for each occupant; and an alarm service independently maintains records of the equipment it installs and maintains. Thus, under <u>Miller</u>, the business records obtained by the government are not protected by the Fourth Amendment.

The Supreme Court's reasoning in <u>Smith v. Maryland</u>, 442 U.S. 735 (1979), leads to the same result. In <u>Smith</u>, the Court held both that telephone users had no subjective expectation of privacy in dialed telephone numbers and also that any such expectation is not one that society is prepared to recognize as reasonable. <u>See</u> <u>Smith</u>, 442 U.S. at 742-44. The Court's reasoning applies equally to the business records in this case. First, the Court stated: "we doubt that people in general entertain any actual expectation of privacy in the numbers they dial. All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed." <u>Id</u>. at 742. Second, <u>Smith</u> held that "even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not one that society is prepared to recognize as reasonable." <u>Id</u>. at 743 (internal quotation omitted). It noted that "[t]his Court

41

consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Id. at 743-44. The user "voluntarily conveyed numerical information to the telephone company" and thereby "assumed the risk that the company would reveal to police the numbers he dialed." Id. at 744.

The Ninth Circuit has explicitly held that Smith applies to IP address information. See United States v. Forrester, 512 F.3d 500, 510 (9th Cir. 2008) ("Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information"). Similarly, cell phone users understand that they must send a radio signal which is received by a cell phone company's antenna if the company is going to route their call to its intended recipient. Indeed, cell phone users routinely experience the frustration associated with dropped calls and recognize they are caused when their phone's radio signal is having difficulty reaching a tower clearly. Cell phones also often display a cell tower icon, along with bars representing the strength of the signal between the phone and tower. Cell phone users also understand that the provider will know the location of its own cell tower, and that the provider will thus have some knowledge of the user's location. Furthermore, providers' terms of service and privacy policies make clear that the provider obtain this information. Security system users understand that they must present their identifying information to the security system in order for the system to verify that they are entitled to access the premises. Finally, defendant was clearly concerned that he could somehow be identified through the acquisition and maintenance of the Aircard account as evidenced by his assumption of the identity of another person prior to purchasing the Aircard and his herculean attempts to mask the Aircard's true IP address while committing a never ending series of crimes and communicating with his associates via encrypted e-mails. For example, in the months prior to his arrest, defendant traveled to another city in Northern California and was captured on a Verizon Wireless store's surveillance camera personally placing funds on his account at an automated kiosk. This conduct allowed defendant to not have to transmit or mail

1  any funds to Verizon Wireless, or personally interact face-to-face with any employees, while he

2  maintained the fraudulently obtained account.

3      Defendant makes various attempts to distinguish <u>Miller</u> and <u>Smith</u>, but these attempts are

4  unavailing.  For example, he argues that he "had no idea that Verizon Wireless collected

5  historical cell site location information on his aircard use." (Mot. 221.)  The Supreme Court

6  rejected this argument in <u>Smith</u>, where it held that "[t]he fortuity of whether or not the phone

7  company in fact elects to make a quasi-permanent record of a particular number dialed does not

8  in our view, make any constitutional difference." <u>Smith</u>, 442 U.S. at 745.  The Court explained

9  that "[r]egardless of the phone company's election, petitioner voluntarily conveyed to it

10 information that it had facilities for recording and that it was free to record." <u>Id.</u>  See <u>also</u>

11 <u>United States v. Skinner</u>, ___ F.3d ___, 2012 WL 3289801 at *4 (6th Cir. Aug. 14, 2012)

12 (holding that locating defendant through a phone's cell site records is not a 4th Amendment

13 search: "If a tool used to transport contraband gives off a signal that can be tracked for location,

14 certainly the police can track the signal. The law cannot be that a criminal is entitled to rely on

15 the expected untrackability of his tools."); <u>United States v. Gallo</u>, 123 F.2d 229, 231 (2d Cir.

16 1941) (L. Hand, Swan, A. Hand, JJ.) ("When a person takes up a telephone he knows that the

17 company will make, or may make, some kind of a record of the event, and he must be deemed

18 to consent to whatever record the business conveniences of the company requires.").

19     Defendant attempts to distinguish <u>Miller</u> by arguing that the historical cell site records

20 cannot be business records because they were produced to the United States in an Excel

21 spreadsheet, which is not how Verizon Wireless stores the data. (Mot. at 219.) There is no

22 requirement that the information produced pursuant to subpoena or court order be in the same

23 format that the business itself uses to store the records. <u>See, e.g.,</u> Fed. R. Civ. Proc. 45(a)(1)(C)

24 ("A subpoena may specify the form or forms in which electronically stored information is to be

25 produced."), (d)(1)(B) ("If a subpoena does not specify a form for producing electronically

26 stored information, the person responding must produce it in a form or forms in which it is

27 ordinarily maintained or in a reasonably usable form or forms.")

28

Defendant also argues that the records are invasive, suggesting that the third parties should not have created or maintained the records in the first place. (Mot. at 215-17 (discussing cell site information).)  As an initial matter, the business records obtained by the United States are not particularly invasive.  For example, historical cell site records reveal only past information about the general location of the aircard, and IP address records do not reveal the contents of communications.  But in any case, the Supreme Court has never limited the principle of <u>Miller and Smith v. Maryland</u> — that information revealed to a third party may subsequently be conveyed to the government — to information that is unrevealing or of limited use to law enforcement.  Indeed, <u>United States v. Miller</u> cites three cases for the proposition that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities," and all three of these cases involve the content of communications, rather than the kind of non-content business records that are at issue here.  <u>See Miller</u>, 425 U.S. at 443 (<u>citing</u> <u>United States v. White</u>, 401 U.S. 745 (1971) (content of conversation with informant), <u>Hoffa v. United States</u>, 385 U.S. 293 (1966) (content of conversations with or in presence of informant), and <u>Lopez v. United States</u>, 373 U.S. 427 (1963) (content of conversation with government agent)).  Obtaining the business records in this case was substantially less intrusive than obtaining the contents of communications.

<u>United States v. Jacobsen</u> further illustrates that the extent to which the third party business records are invasive however, that is not an appropriate basis for a Fourth Amendment challenge. 466 U.S. 109 (1984). In <u>Jacobsen</u>, a private freight carrier inspected a damaged package and found tubes full of white powder. <u>Id.</u> at 111. They turned the material over to law enforcement, who also inspected the package. <u>Id.</u> at 112. Jacobsen argued that opening the package and inspecting its contents violated the Fourth Amendment, but the Court explained that the search could not be a Fourth Amendment violation, even if it was unreasonable or invasive, because it was done by a private party:

> The initial invasions of respondents' package were occasioned by private action. . . . Whether those invasions were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character.

44

Id at 115.   Here, too, the cell site information that defendant worries will "allow[] the government to infer that the defendant was a consistent homebody who rarely leaves his apartment," (Mot. at 217), was collected and maintained by a private party. It does not become a Fourth Amendment search or seizure simply because the information is turned over to law enforcement.

Defendant cites no case, and the United States is aware of none, in which a federal court has ever suppressed cell-site records, IP address records, or security system records.   As previously noted, the Ninth Circuit has rejected a motion to suppress IP address records.  See United States v. Forrester, 512 F.3d 500, 510 (9th Cir. 2008).  And numerous federal courts have now applied these longstanding constitutional principles to deny motions to suppress cell-site records.  See United States v. Madison, 2012 WL 3095357 at *7-*9 (S.D. Fla. July 30, 2012); United States v. Graham, 846 F. Supp. 2d 384, 403-05 (D. Md. 2012); United States v. Dye, 2011 WL 1595255, at *9 (N.D. Ohio April 27, 2011); United States v. Velasquez, 2010 WL 4286276, at *5 (N.D. Cal. Oct. 22, 2010); United States v. Benford, 2010 WL 1266507, at *3 (N.D. Ind. Mar. 26, 2010); United States v. Suarez-Blanca, 2008 WL 4200156, at *8-*11 (N.D. Ga. Mar. 26, 2008).

> ### C.   Compulsory Process Is Subject To A Reasonableness Requirement, Not A Warrant Requirement.

The compelled disclosure of business records in this case is supported not only by Miller and Smith v. Maryland, but also by the more general law applicable to subpoenas. The subpoena power is "the authority to command persons to appear and testify or to produce documents or things."   In re Subpoena Duces Tecum, 228 F.3d 341, 346 (4th Cir. 2000).  A 2703(d) order functions as a judicial subpoena.  It compels the recipient to produce specified information; the recipient may move to quash; and it remains at all times under the supervision of the issuing court.  See 18 U.S.C. § 2703(d).  Thus, cases addressing the Fourth Amendment principles applicable to subpoenas also apply to 2703(d) order.  Under these cases, no warrant or showing of probable cause is required to use a subpoena to compel disclosure of non-privileged evidence relevant to a criminal investigation.

A 2703(d) order may be used to compel disclosure of business records because the Fourth Amendment allows the United States to use a subpoena to compel disclosure of information relevant to a criminal investigation.  By its terms, the Fourth Amendment protects people against unreasonable searches and seizures, but it imposes a probable-cause requirement only on the issuance of warrants.  <u>See</u> <u>U.S. Const. amend. IV</u> ("and no Warrants shall issue, but upon probable cause").  The Supreme Court has explicitly rejected a probable-cause standard for subpoenas: "the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists."  <u>United States v. R Enterprises, Inc.</u>, 498 U.S. 292, 297 (1991).

Instead of a probable cause standard, the Supreme Court has repeatedly held that under the Fourth Amendment, subpoenas must satisfy only a reasonableness standard.  For example, in <u>Wilson v. United States</u>, 221 U.S. 361, 376 (1911), the Court held that "there is no unreasonable search and seizure when a [subpoena], suitably specific and properly limited in its scope, calls for the production of documents which, as against their lawful owner to whom the writ is directed, the party procuring its issuance is entitled to have produced."  The Court affirmed this rule in <u>Oklahoma Press Publishing Co. v. Walling</u>, 327 U.S. 186, 208 (1946), when it held that "the Fourth [Amendment], if applicable [to a subpoena], at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable."  <u>See</u> <u>also</u> <u>United States v. Palmer</u>, 536 F.2d 1278, 1281-82 (9th Cir. 1976) ("Palmer also contends that his fourth amendment rights were violated because he had a reasonable expectation of privacy in the items subpoenaed. We do not explore the issue of a reasonable expectation of privacy, however, because the use of a properly limited subpoena does not constitute an unreasonable search and seizure under the fourth amendment. . . . The standard for a subpoena is reasonableness."); <u>Paine v. McCarthy</u>, 527

F.2d 173, 177 (9th Cir. 1975) ("[a] reasonable court order to produce evidence ... is not a search or seizure within the meaning of the fourth amendment."). Thus, despite defendant's arguments to the contrary, the United States was not required to obtain a warrant to compel disclosure of historical business records in this case.

The subpoena power is grounded in the long-standing principle that the government has the right to every witness's testimony. The Supreme Court has repeatedly confirmed that "'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege." Branzburg v. Hayes, 408 U.S. 665, 688 (1972). The principle has remarkably deep roots. The Supreme Court has traced it to as early as 1562 and held that it "was considered an 'indubitable certainty' that 'cannot be denied' by 1742." Kastigar v. United States, 406 U.S. 441, 443 (1972) (citing Statute of Elizabeth, 5 Eliz. 1, c. 9, s. 12 (1562) and "parliamentary debate on the Bill to Indemnify Evidence, particularly the remarks of the Duke of Argyle and Lord Chancellor Hardwicke, reported in 12 T. Hansard, Parliamentary History of England 675, 693 (1812)."). Under this principle, the United States has the right to compel disclosure of the cell-site records, IP address records, and security system records because it has the right to every person's evidence and because the records are evidence relevant and material to a criminal investigation.

Thus, defendant cannot demonstrate a privacy interest in the material, and he cannot show that the United States' actions to obtain them were unreasonable. He therefore has no Fourth Amendment challenge to their use.

D.    Even If The Records Were Improperly Obtained, Suppression Is Not An Appropriate Remedy.

Even if the records were improperly obtained, suppression is not an appropriate remedy. In Weeks v. United States, the Supreme Court adopted the exclusionary rule for evidence unlawfully seized in violation of the Fourth Amendment. See 232 U.S. 383 (1914). Suppression of evidence, however, is the Court's last resort rather than its first impulse, because the exclusionary rule generates concomitant social costs by hindering the successful prosecution of dangerous criminals. Hudson v. Michigan, 547 U.S. 586, 591 (2006); United States v. Leon, 468

47

U.S. 897, 907 (1984). Therefore, courts have been "cautio[us] against expanding" the exclusionary remedy, <u>Colorado v. Connelly</u>, 479 U.S. 157, 166 (1986), and have likewise rejected "[i]ndiscriminate application" of the rule. <u>Leon</u>, 468 U.S. at 908. The mere fact that a constitutional violation has occurred does not necessitate suppression of the evidence thereby obtained; instead, "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" <u>Leon</u>, 468 U.S. at 906 (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 223 (1983)). Suppression should be employed only where the remedial objectives of the exclusionary rule are "efficaciously served"—i.e., where the prospect of exclusion to deter wrongful police conduct outweighs the substantial costs to society of potentially letting guilty defendants go free. <u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974).

Suppression is a particularly inappropriate remedy for violations of 18 U.S.C. § 2703, the Stored Communications Act (SCA). "The remedies and sanctions described in [the SCA, 18 U.S.C. §§ 2701-2712] are the only judicial remedies and sanctions for nonconstitutional violations of [the SCA]." 18 U.S.C. § 2708; <u>See also</u> <u>United States v. Smith</u>, 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act does *not* provide an exclusion remedy. It allows for civil damages . . . and criminal punishment . . . but nothing more.") (citations omitted).

Defendant argues that the evidence should be suppressed because the subpoenas and 18 U.S.C. § 2703(d) court order were insufficiently particular. (Mot. at 328-29.) Defendant cites no authority suggesting that lack of particularity is a basis for suppressing information obtained through a subpoena or 2703(d) order.

Moreover, suppression would be inappropriate because here law enforcement acted in good faith reliance on case law, statutes, and court orders. <u>See, e.g., Davis v. United States</u>, 131 S. Ct. 2419 (2011) (good faith reliance on case law); <u>Illinois v. Krull</u>, 480 U.S. 340 (1987) (good faith reliance on statute); <u>United States v. Leon</u>, 468 U.S. 897 (1984) (good faith reliance on

48

warrant).    For example, in <u>United States v. Warshak</u>, 631 F.3d 266, 288-92 (6th Cir. 2010), the

Sixth Circuit held that the government violated the Fourth Amendment when it used a 2703(d)

order to compel disclosure of the content of email from a commercial ISP, but it relied on Krull

to hold that the exclusionary rule did not apply.  In sum, the third-party doctrine of <u>United States</u>

<u>v. Miller</u> and <u>Smith v. Maryland</u> has been consistently applied by courts since the 1970s, 18

U.S.C. § 2703(d) permits law enforcement to obtain IP address and cell site records without a

warrant, and the United States relied on court orders and subpoenas to obtain the relevant

material. There is no wrongful police conduct to deter, and therefore no basis for suppression.

> 2.    <u>The Government's Efforts To Locate The Aircard Pursuant To The Tracking Warrant Were Reasonable.</u>

Defendant also challenges the United States' actions during the real-time aircard location

operation on July 16, 2008.  The United States obtained two Orders, CR 08-90330MISC and CR

08-90331MISC, but has agreed per the Government's Memorandum Re Motion for Discovery

(CR 674) to rely on Order CR 08-90330MISC for the FBI's use of the equipment to locate

Aircard.  The United States has agreed that the Court can assume, for purposes of the Motion

to Suppress, that the FBI's use of location equipment, including cell site simulators that can be

operated in a vehicle on or foot, constituted a search and seizure under the Fourth Amendment.

(CR 674.) As explained below, the tracking warrant authorized the FBI to locate the aircard, and

they executed the warrant reasonably.

> A.    <u>The FBI Located Defendant's Aircard Pursuant To A Warrant Based On Probable Cause.</u>

The tracking warrant at issue, CR 08-90330MISC, properly authorized the United States

to locate defendant's aircard.  The Fourth Amendment states that search warrants may be issued

only "upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched and the persons or things to be seized."  U.S. Const. Amend. IV.  As the

Supreme Court has emphasized, this language "require[s] only three things": a warrant must be

issued by a neutral magistrate, it must be based on a showing of "probable cause to believe that

'the evidence sought will aid in a particular apprehension or conviction' for a particular offense,"

1    and it must satisfy the particularity requirement.  <u>Dalia v. United States</u>, 441 U.S. 238, 255

2    (1979).   The warrant here, which authorized the government to determine the location of

3    defendant's aircard, satisfies these three requirements.

4          First, the warrant was issued by United States Magistrate Judge (now District Judge)

5    Richard Seeborg, a neutral magistrate, on July 11, 2008.

6          Second, Judge Seeborg found that the warrant established "probable cause to believe that

7    the use and monitoring of a mobile tracking device" for defendant's aircard "will lead to

8    evidence of violations" of specified crimes, "as well as to the identification of individuals who

9    are engaged in the commission of these offenses."  Warrant CR-08-90330 at 2. This finding is

10   amply supported by the seventeen page affidavit of Special Agent William Ng.  The affidavit

11   stated that the United States sought to use a device "to ascertain the physical location of [the

12   defendant's aircard]," described defendant's elaborate fraud scheme and techniques to evade

13   apprehension, connected defendant's aircard to use in the fraud scheme, and explained that the

14   equipment the government sought to use "ultimately generate[s] a signal that fixes the

15   geographic position" of the aircard. Affidavit for Warrant CR-08-90330 at ¶ 1, ¶ 3, ¶ 34 and ¶

16   42. Thus, the United States demonstrated "probable cause to believe that the use and monitoring

17   of the equipment would lead to evidence of the subject violations and the identification of the

18   individuals who were engaged in the commission of the offenses. Warrant CR-08-90330 at 2.

19         Third, the warrant described with particularity the item to be located: "The Verizon

20   Wireless broadband access card/cellular telephone assigned Telephone Number (415)264-9596

21   and Electronic Serial Number (ESN) 005-00717190 (the Target Broadband Access Card/Cellular

22   Telephone)." Warrant CR-08-90330 at 1.  It also described with particularity the duration of the

23   authorized tracking: "a period not to exceed thirty (30) days."  Warrant CR-08-90330 at 2.  It

24   ordered monitoring transmissions related to defendant's aircard, "limited to transmissions needed

25   to ascertain the physical location" of the aircard.  Warrant CR-08-90330 at 3.

26         Defendant's numerous objections to the warrant are without merit.  First, defendant

27   argues that the execution exceeded the scope because the warrant did not specifically authorize

28

the FBI to use a cell site simulator and that the actions authorized by the warrant "were not supported by an applicable finding of probable cause." (Mot. at 292-96, 301-302). For example, he complains that the warrant did not list "the electricity being provided to the aircard." (Mot. at 294.) These objections fundamentally misunderstand the warrant requirement: the warrant must establish probable cause that locating the Aircard will lead to evidence of crime or apprehension of criminals, and it must specify what is to be located (the Aircard), but it need not specify how the Aircard is to be located or what actions will be taken to locate the Aircard.

In Dalia v. United States, the Supreme Court rejected the notion that a warrant must precisely describe the manner of its execution. 441 U.S. 238, 257 (1979). In Dalia, the government obtained a wiretap order to intercept the defendant's oral conversations in his law office. Id. at 242. To execute the order, FBI agents broke into his office at midnight and spent three hours installing a listening device; approximately 40 days later they entered again to remove the device. Id. at 245. At trial, Dalia challenged the United States' use of the intercepted communications because the wiretap order itself did not authorize the covert entry. Id. The district court rejected this argument, and the Supreme Court agreed:

> Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection "against unreasonable searches and seizures."
>
> . . . [Dalia's] view of the Warrant Clause parses too finely the interests protected by the Fourth Amendment. Often in executing a warrant the police may find it necessary to interfere with privacy rights not explicitly considered by the judge who issued the warrant. For example, police executing an arrest warrant commonly find it necessary to enter the suspect's home in order to take him into custody, and they thereby impinge on both privacy and freedom of movement. Similarly, officers executing search warrants on occasion must damage property in order to perform their duty.

Id. at 257-258.

Moreover, to the extent that the warrant itself was unclear, the application and supporting affidavit clearly show what the FBI intended to do: use mobile tracking equipment to find the

aircard. <u>Compare</u> CR 08-90330MISC (tracking warrant) at 1 ("This matter is before the Court pursuant to an Application . . . .") <u>with</u> <u>United States v. SDI Future Health</u>, 568 F.3d 684, 699-700 (9th Cir. 2009) (holding that language "noting 'the supporting affidavit(s)' as the 'grounds for application for issuance of the search warrant'" is sufficient to incorporate the affidavit by reference).

Defendant makes several arguments that the warrant is lacking in particularity, but these arguments are based on a misunderstanding of the particularity requirement for warrants. He argues that the "mobile tracking device" term lacks particularity, that the description of the place to be searched lacks particularity, and that the "all data, information, facilities, and technical assistance" phrase lacks particularity. (Mot. at 297-300, 302-303.) "The Fourth Amendment, however, does not set forth some general 'particularity requirement.' It specifies only two matters that must be 'particularly describ[ed] in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" <u>United States v. Grubbs</u>, 547 U.S. 90, 97 (2006). Thus, the particularity requirement simply does not extend to the definition of "mobile tracking device" or the warrant's technical assistance provision, as these concern how the warrant is to be executed, not the place to be searched or the person or things to be seized. It is true that the warrant does not describe the place to be searched, as the whole purpose of the warrant was to determine the then unknown location of the Aircard. But as the Supreme Court explained in the tracking device case <u>United States v. Karo</u>, 468 U.S. 705, 718 (1984), a warrant to locate an item need not specify the place to be searched:

> The Government contends that it would be impossible to describe the "place" to be searched, because the location of the place is precisely what is sought to be discovered through the search. However true that may be, it will still be possible to describe the object into which the beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, this information will suffice to permit issuance of a warrant authorizing beeper installation and surveillance.

468 U.S. at 718. The government here satisfied these <u>Karo</u> requirements, so the warrant here satisfies the Fourth Amendment.

Moreover, the execution of the warrant was reasonable. The touchstone of Fourth Amendment jurisprudence has always been reasonableness, "which is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 34 (1996); Samson v. California, 547 U.S. 843, 848 (2006); United States v. Knights, 534 U.S. 112, 118 (2001).

Defendant makes numerous allegations in his motion about what the United States did to locate his aircard — e.g., that it used triangulation techniques, drained power (a minute amount by any estimate) from the laptop, wrote data to the aircard, and interrupted his internet connection. (Mot. at 261-282.) Allegations in a motion are not evidence, though, see, e.g., United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995), and defendant has not shown that he is qualified to offer expert opinion testimony on these matters. Presumably he will present expert testimony at a suppression hearing in an attempt to prove his allegations.

Even if the United States did all of these things, the execution of the warrant would still be reasonable. Moreover, the United States did not do a number of the things defendant has alleged. Defendant was perpetrating a multi-million-dollar tax fraud scheme, and he hid his tracks through the use of encrypted e-mails, money mules, layers of false identities, forged documents, forged identification cards, and botnets and/or proxies. He also advised, via encrypted e-mails, that he was interested in procuring a machinegun armed with a silencer and would send armed couriers to cash pick-ups who would readily shoot people at the scene if things did not go as planned. The alleged inconvenience and intrusiveness of the aircard location operation (which went undetected by an individual who appeared to spend a significant portion every day seeking to avoid detection or identification) was reasonable under the circumstances. See, e.g., Los Angeles County v. Rettele, 550 U.S. 609, 611 (2007) (officers acted reasonably, even though they executed warrant at a home the suspects had left months before and ordered naked, sleeping residents out of bed at gunpoint); Avina v. United States, 681 F.3d 1127, 1129 (9th Cir. 2012) (officers acted reasonably, even though they knocked down front door with battering ram, entered with guns drawn, and forcefully pushed occupant to ground and

handcuffed him); United States v. Ankeny, 502 F.3d 829, 833 (9th Cir. 2007) (officers acted reasonably, even though 44 armed officers executed warrant at 5:30 a.m., used battering ram on front door, threw multiple flash-bangs that gave occupant first- and second-degree burns and set fire to bed, shot out ten windows, and caused extensive damage to home); United States v. Becker, 929 F.2d 442, 444 (9th Cir. 1991) (officers acted reasonably, even though they rented jackhammer to remove portions of the concrete slab to look for drugs); see also United States v. Dalia, 441 U.S. 238, 257-58 ("[O]fficers executing search warrants on occasion must damage property in order to perform their duty.").  The Supreme Court "has 'repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment.'" City of Ontario v. Quon, 130 S. Ct. 2619, 2632 (2010).  But it is noteworthy that defendant does not suggest that the United States could have located him through less intrusive means.  As the Sixth Circuit recently explained, "[w]hen criminals use modern technological devices to carry out criminal acts and to reduce the possibility of detection, they can hardly complain when the police take advantage of the inherent characteristics of those devices to catch them."  United States v. Skinner, ___ F.3d ___, 2012 WL 3289801, at *1 (6th Cir. Aug. 14, 2012).

Defendant complains that the tracking warrant did not comply with the return and notice requirements in Federal Rule of Criminal Procedure 41(f)(2).  (Mot. at 304-306.)  He is right.  The warrant stated (albeit perhaps improperly) that the agents were not required to make a return or serve a copy of the warrant on the person whose property was located.  Nevertheless, suppression is not an appropriate remedy for a failure to make a return or serve a copy of the warrant, or for other technical violations. See United States v. Hector, 474 F.3d 1150, 1155 (9th Cir. 2007) (holding that suppression is inappropriate remedy for failure to serve copy of search warrant); United States v. Motz, 936 F.2d 1021, 1025 (9th Cir. 1991) (holding that where defendants "were not prejudiced by the agents' failure to perform the ministerial requirements" of return and inventory, "[t]he district court was correct in refusing to suppress the evidence"); United States v. Hall, 505 F.2d 961, 963 (3rd Cir. 1974) (holding that suppression is

inappropriate remedy for failure to make return). Defendant claims that he would have fled if he knew law enforcement was tracking his aircard (Mot. CR 824-2 (Rigmaiden Dec.) at 4 ¶ 14), but the United States could have sought delayed notice for precisely that reason. See 18 U.S.C. § 3103a(b)(1).  Thus, the United States would have obtained the location of defendant's aircard even if it did not commit these technical violations, and the Supreme Court has held that "but-for causality" is a necessary condition for suppression.  See Hudson v. Michigan, 547 U.S. 586, 592 (2006).  Moreover, in this case the agents had no real opportunity to serve the owner of the aircard with a copy of the tracking warrant; defendant obtained it using a false identity, a non-existent address, and a driver's license number assigned to someone else.  Furthermore, there was a statutory basis for the magistrate judge's order regarding notice.  The warrant  was issued in part under 18 U.S.C. § 2703.  Warrant CR-08-90330 at 1.  Because it is a warrant to obtain non-content information associated with a customer or subscriber of an electronic communication service, it is a warrant under § 2703(c)(1).  Although § 2703(c)(1) warrants are in most respects like Rule 41 warrants (they are "issued using the procedures described in" Rule 41), § 2703 specifies a few differences from the procedures of Rule 41.  Significantly, 18 U.S.C. § 2703(c)(3) specifies that "[a] governmental entity receiving records or information under this subsection is not required to provide notice to a subscriber or customer."

Finally, defendant argues that the United States destroyed data generated by the FBI during the aircard tracking operation in bad faith, warranting suppression of all evidence. (CR 830-2 at 1.) The failure to preserve exculpatory evidence can violate a defendant's due process rights, but the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. 479, 489 (1984). If the evidence is only potentially useful, a defendant must show that the government acted in bad faith. Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

Defendant speculates that the destroyed data might confirm some of his allegations of what the United States did to locate his aircard, but this is (1) mere speculation (2) about material

that would not even be evidence at trial, (3) that would not demonstrate that the government acted unreasonably in executing the warrant, (4) that was required by the warrant to be expunged, and (5) that would have been destroyed pursuant to valid and reasonable FBI policy in any event. He also claims that it was done in bad faith, but he provides no proof. The FBI destroyed the data because it was not evidence and because FBI policy requires agents to clear the equipment of data prior to each operation. Defendant's wild conspiracy theories fail to demonstrate any basis for suppression. Cf. Trombetta, 467 U.S. at 490 (no due process violation in DUI prosecution because "chances are extremely low that preserved [breath] samples would have been exculpatory"); United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011) (no due process violation in child pornography prosecution when FBI accidentally corrupted data on defendant's computer); Phillips v. Woodford, 267 F.3d 966, 987-88 (9th Cir. 2001) (no due process violation in murder prosecution when police destroyed murder victim's car); Cooper v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir. 2001) (no due process violation in murder prosecution when police destroyed bloody overalls turned in by witness).

> B.   **Defendant Cannot Show That His Expectation Of Privacy In The Location Of An Aircard Procured By Fraud And Used To Commit Crime Was Objectively Reasonable.**

To establish a Fourth Amendment violation, defendant must first prove that he had a genuine expectation of privacy in the place searched or the items seized, and that such an expectation was one that society is prepared to recognize as reasonable. Rakas v. Illinois, 439 U.S. 128, 143 (1978). In satisfying this burden, a legitimate expectation of privacy means more than the belief, "however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). Only searches and seizures that infringe upon the former implicate the Fourth Amendment. Id. Here, defendant is unable to demonstrate his expectation of privacy in the location of his aircard, as stated above, a device fraudulently purchased and maintained under the identity of another living person, and stored in an apartment fraudulently obtained and maintained under the identity of a second deceased person, was objectively reasonable. In this case, nothing could have stopped the true Travis

Rupard carrying a copy of <u>his</u> Social Security Card, from gaining access to the Aircard's account.  Therefore, even if the Court concludes that the search or seizure exceeded the scope of the tracking device warrant or was otherwise defective, there is no evidence that defendant's constitutional rights were breached, nor should he be afforded any under the circumstances of his possession and operation of the Aircard.

Defendant contends that he manifested a subjective expectation of privacy in his apartment, as well as in the laptop computer and aircard contained therein.  Memorandum Re: Fourth Amendment Violations at 208, <u>United States v. Rigmaiden,</u> (No. CR08-814-PHX-DGC). Defendant presents no evidence, however, that establishes that society is prepared to recognize, or should even seriously consider, that expectation as objectively reasonable. The Fourth Amendment should not shield a defendant from the search of property obtained by fraud, and defendant openly concedes he both rented his apartment and purchased his computer under an alias. <u>Id.</u> at 205, 210.  In <u>United States v. Caymen</u>, the Ninth Circuit held that the defendant had failed to establish a legitimate expectation of privacy in the contents of a laptop that he had purchased using a stolen credit card.  404 F.3d 1196 (9th Cir. 2005).  The court reasoned, "The Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of the stolen property, such an expectation is not one that society is prepared to accept as reasonable." <u>Id.</u> <u>But see</u> <u>United States v. Cunag</u>, 386 F.3d 888 (9th Cir. 2004) ("[I]n the Ninth Circuit, the rule is that even if the occupant of a hotel room has procured that room by fraud, the occupant's protected Fourth Amendment expectation of privacy is not finally extinguished until the hotel justifiably takes 'affirmative steps to repossess the room.'").

There is no reason to distinguish property obtained by fraud from property stolen by robbery or trespass.  In <u>United States v. Johnson</u>, for example, the court found that the defendant had no reasonable expectation of privacy in a storage container rented by the defendant's girlfriend using a stolen identity.  584 F.3d 995 (10th Cir. 2009).  The defendant in <u>Johnson</u> attempted to distinguish <u>Caymen</u> on the grounds that there was no evidence that a fraudulent

means of payment was used to rent the storage locker, an argument Rigmaiden also raises in his Motion (without ever identifying the origin of the funds).  Id. at 1002-03; Motion re: Fourth Amendment Violations at 211, Rigmaiden, (No. CR08-814-PHX-DGC).  Nevertheless, the Tenth Circuit explicitly rejected this logic: it explained that a "fraud" occurred notwithstanding the defendant's lawful payment of rent for the unit because his use of a third party's identity constituted a material misrepresentation to the storage company; thus, "the reasonableness of any privacy expectations [the defendant] might have had were undermined by his . . . decision to use [a stolen] identity" to obtain the unit.  Id. at 1001-02.  The court acknowledged that the "ultimate question of whether a privacy expectation is reasonable is a value judgment," and it concluded that whatever interest the defendant might have had in the storage locker was not the kind of interest the Fourth Amendment was intended to protect.  Id. at 1001, 1004 (quoting WAYNE R. LAFAVE, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(d) at 443 (4th ed. 2004)).  The court declared it would "not be a party to th[e] fraud by legitimizing [the defendant]'s interest in the storage unit."  Id.

Moreover, courts have repeatedly found that defendants lack standing to challenge searches of items that are registered or addressed to a fictitious name, explaining that defendants abandoned their objective expectation of privacy by using a false identity.  See, e.g., United States v. Lozano, 623 F.3d 1055, 1062-63 (9th Cir. 2010) (O'Scannlain, J., concurring) (citing cases from the Fifth, Seventh, and Eighth Circuits for the principles that a defendant has no "legitimate expectation of privacy in mail addressed to his public alias when that alias was used solely in a criminal scheme" and that "'wrongful' interests do not give rise to legitimate expectations of privacy."); United States v. Pitts, 322 F.3d 449 (7th Cir. 2003) (Evans, J., concurring); United States v. Daniel, 982 F.2d 146 (5th Cir. 1993);  United States v. Lewis, 738 F.2d 916, 920 n.2 (8th Cir. 1984); United States v. Davis, No. 10-339-HA, 2011 WL 2036463, at *2-3 (D. Or. May 24, 2011) ("Although an individual may have a subjective expectation of privacy in property that is attached to a fictitious name, that is not a privacy interest that society recognizes as reasonable."); United States v. Coverson, No. 3:9-CR-00075-TMB-DMS, 2011

WL 1044632, at *4-5 (D. Alaska Mar. 22, 2011) (holding that defendant had no reasonable expectation of privacy in a package addressed to the defendant's alias, a fictitious name "used for a one-time purpose . . . to further a criminal scheme"); United States v. Suarez-Blanca, No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *6-7 (N.D.Ga. Apr. 21, 2008) ("The use of a fictitious name or names of a third party indicates that [the defendant] does not have a privacy interest."). In this case, the aircard was registered with Verizon Wireless to "Travis Rupard," a different living person, while defendant simultaneously rented and used the apartment and electricity obtained via a second fraudulent identity, the deceased "Steven Brawner," and operated the laptop via a third fraudulent identity "Andrew Johnson."

This not a situation where an individual, such as an author, has a lawful reason for using a nom de plum. See Pitts, 322 F.3d at 461. The herculean extent of defendant's efforts to conceal his true identity makes it exceedingly clear that "Travis Rupard" was truly the fraudulent assumption of another person's identity which defendant used to conceal his location and ongoing criminal enterprise. Nor is this case like United States v. Villarreal or United States v. Richards, two Fifth Circuit cases not cited by defendant but which support his position that the use of aliases does not necessarily preclude the assertion of a Fourth Amendment violation, because unlike those cases defendant has no publicly-established connection to his alias. In Richards, the defendant was the owner of a company to which a package of heroin was addressed, and on the that basis the Fifth Circuit found that the defendant had sufficient standing to challenge officers' warrantless opening of the box. 638 F.2d 765, 769-770 (5th Cir. 1981). Similarly, in Villarreal the defendant was known by at least one witness by the fictitious name connected to two shipping drums full of marijuana that Customs agents opened without court authorization. 963 F.2d 770, 772-73 (5th Cir. 1992). Conversely, defendant went to great lengths to have no public connection to "Travis Rupard" or any of his other aliases, so it follows that he does not have a legitimate expectation of privacy in the broadband access card registered in Rupard's name. See Lozano, 623 F.3d at 1064 (O'Scannlain, J., concurring).

Finally, defendant's reliance on United States v. Issacs for the precept that his reasonable expectation of privacy in his apartment extended also to the laptop and aircard is misplaced. In Issacs, Secret Service agents found several journals inside the defendant's safe marked up with notions related to repeated drug transactions. 708 F.2d 1365, 1366 (9th Cir 1983). The defendant was convicted of possession with intent to distribute based on the evidence in the journals, which the court admitted despite the defendant's motion to suppress. Id. On appeal, the government contended that the defendant's disclaimer of ownership at trial precluded his efforts to contest the admission of the books, even though it had previously argued that the defendant's possession of the journals demonstrated his guilt for the alleged offenses. Id. at 1367-68. The Ninth Circuit found this "distinction the government [sought] to draw. . . untenable," and the court held that the government could not simultaneously charge possession and dispute the defendant's expectation of privacy when the underlying facts made such positions "necessarily inconsistent." Id. at 1368.

Here, the defendant is attempting to capitalize on the government's concession that the defendant was the actual occupant of the apartment to prove by proxy that he had a legitimate privacy interest in the Aircard found there. The government has never conceded that defendant had a valid expectation of privacy in anything that he had obtained, possessed, or maintained through the use of a fraudulent identity; what it has maintained is simply that he personally possessed, obtained, or maintained the items. In this case there is no allegation that the government is contradicting a prior finding of fact. The Ninth Circuit was troubled in Issacs by what it perceived to be the government's discrepant positions on appeal, arguing on one hand that the defendant's denial of ownership at trial foreclosed a Fourth Amendment challenge to the search and seizure of the journals but, on the other, that the defendant possessed the ledger for purposes of guilt. See Issacs, 708 F.2d at 1368. There is no question here that the defendant purchased the Aircard and maintained the account through the assumption and false use of the identity of another, defendant also spends several pages of his Motion articulating his possessory and property interests in it. See Motion re: Fourth Amendment Violations at 197-98, Rigmaiden,

(No. CR08-814-PHX-DGC).  However, it is well established that "while property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry" because possession does not "invariably represent the protected Fourth Amendment interest." United States v. Salvucci, 448 U.S. 83, 91 (1980); see also United States v. Karo, 468 U.S. 705, 722 (1984) (O'Connor, J., concurring) ("A privacy interest in . . . a closed container that enters a home with the homeowner's position cannot be inferred mechanically by reference to the more general privacy interests in the home itself."). Thus, there is nothing inconsistent about the government's position that defendant had physical possession of the aircard and maintained the account, yet was not subject to a Fourth Amendment deprivation when it was searched.  Even under Issacs defendant must still put forth a factual predicate that he had a legitimate expectation of privacy in the aircard itself.

Society has no interest in protecting the Aircard in this case from a warrantless search. On the contrary, society's interests would be better served by a policy that gave no protection to the privacy interests of individuals in defendant's position, a thief and fugitive who concealed his true identity and location in order to operate a sophisticated and complex tax fraud scheme with a fraudulently obtained Aircard, apartment and laptop, and regularly invaded the computers, privacy and financial records of innocent victims.  Whatever subjective privacy expectations defendant had in the Aircard are not justifiable, and, thus, the agents in this case were not required to obtain a warrant to search the device.

C.    Defendant Did Not Have Reasonable Expectation of Privacy In The Area Immediately Outside Of The Apartment He Occupied.

Particularly with respect to the operation of equipment by the FBI during the Aircard mission, defendant appears to contends that he had a reasonable expectation of privacy in the common areas around the apartment he occupied due to the overall security features of complex. See Declaration Under Penalty of Perjury (824-2) at 1, ¶ 2, and Motion (CR 824-1) at 204.  The Ninth Circuit is quite clear that occupants of multi-unit apartment complexes with common hallways, staircases, doorways, etc., do not enjoy a reasonable expectation of privacy outside

61

of their own units regardless of extensive security features.  See, United States v. Nohara, 3 F.3d

1239, 44-41 (9th Cir. 1993) (The Ninth Circuit joined the First, Second, and Eighth Circuits

which have rejected claims of expectations of privacy in common areas and held an apartment

dweller has no reasonable expectation of privacy in the secured common areas of a building

whether an officer trespasses or not.)

       D.    <u>Suppression Is Not An Appropriate Remedy For Any Technical Deficiencies In The Warrant.</u>

Finally, suppression would be an inappropriate remedy for any technical deficiencies in

the warrant. The tracking warrant issued by U.S. Magistrate Judge (now District Judge) Richard

Seeborg was similar to numerous cell phone tracking warrants issued across the United States

by other U.S. magistrate judges, including U.S. magistrate judges here in the District of Arizona.

The FBI located defendant's aircard after demonstrating to a U.S. magistrate judge that it had

probable cause to believe that locating the aircard would lead to evidence of crime and the

identification of the perpetrator. There was no wrongful police conduct, so there is no reason for

suppression.

Suppression is inappropriate in this case under the reasoning of the concurring opinion

of Judge Donald in <u>United States v. Skinner</u>, ___ F.3d ___, 2012 WL 3289801 (6th Cir. Aug.

14, 2012).  In <u>Skinner</u>, the United States obtained prospective GPS location information of a

defendant's phone using a 2703(d) order; the Sixth Circuit held that the defendant had no

reasonable expectation of privacy in that information.  <u>Id.</u> at *4.  Judge Donald disagreed with

the court regarding whether the defendant had a reasonable expectation of privacy; she stated

that "officers should have obtained a warrant authorizing them to collect GPS real-time location

information." <u>Id.</u> at *14.  Nevertheless, she held that suppression was not warranted based on

<u>United States v. Leon</u>, 468 U.S. 897 (1984).  She explained that "[t]here is no evidence that

officers in this case engaged in any intentional misconduct; rather, it appears they made a

procedural error."  She further explained that "officers had probable cause to conduct the search,

and the information establishing that probable cause was presented to the magistrate judge in the

affidavits supporting the application for a court order."  To the extent officers made procedural

errors in this case, Judge Donald's reasoning is equally applicable here. There is no evidence of intentional misconduct. Instead, agents were using a relatively new technology, and they faced a lack of legal precedent regarding the proper form of a warrant to obtain the location information they sought. Indeed, the agents in this case actually sought a warrant, and the affidavit made clear that it sought authorization "to ascertain the physical location" of defendant's aircard. Affidavit for Warrant CR-08-90330 at ¶ 1. In these circumstances, they were entitled to rely in good faith on the warrant to determine the location of defendant's aircard.

> 3.   The Search Of Defendant's Apartment And Computer Pursuant To Search Warrant Was Reasonable.

Defendant also challenges the searches of his apartment and computer pursuant to search warrant. (CR 830-1.) As explained below, the United States conducted the searches pursuant to warrants issued by neutral U.S. magistrate judges based on a finding of probable cause, the searches were reasonable, and the agents acted in good faith. Accordingly, there is no reason to suppress any of the evidence obtained.

First, defendant argues that the second warrant to search his apartment was invalid, because the first warrant to search the same location had already been returned unexecuted. The second warrant was issued properly, after a U.S. magistrate judge again made a finding of probable cause to believe that the location would contain evidence of crime. See Sgro v. United States, 287 U.S. 206, 211 (1932) ("The new warrant must rest upon a proper finding and statement by the commissioner that probable cause then exists."). Defendant cites no authority for the striking proposition that law enforcement cannot seek a second warrant after the first is returned unexecuted. As stated above, the only reason the first warrant was not executed was because the agents did not want to tip off the yet-to-be-observed occupant of the apartment.

Second, defendant argues that the search warrant application failed to demonstrate probable cause. "Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.' 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act.'" <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983) (finding probable cause based on corroborated anonymous tip) (quoting <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76 (1949)). Here, the affidavit, as set forth above in detail, explained that FBI, IRS and USPIS agents traced the criminal activity to the Aircard located in defendant's apartment complex, and found that the handwriting on the rental agreement for defendant's apartment matched other documents tied to the scheme. (There were other indicia included in the search warrant affidavit, such as defendant's use of a false identity, stolen driver's license number, and fraudulent tax return in the rental application.) "[S]o long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." <u>Id.</u> at 236. Even if the U.S. magistrate judge issued the search warrant in error, the FBI and IRS agents executed it in good faith. <u>United States v. Leon</u>, 468 U.S. 897 (1984) (good faith reliance on warrant).

Third, defendant argues that the use of the key found on his person was a search regulated by the Fourth Amendment, Motion (CR 824-1) at 284-85, and later contends that the search was warrantless. Motion at 355. The agents clearly had authority to use the key in this case. As noted above, first, the key was located on defendant during a search incident to an arrest pursuant to a federal arrest warrant shortly after 4:15 p.m., on August 3, 2008; second, the agents were authorized by the rental company to access the apartment complex at that time; third, the agents had a sealed search warrant for the apartment in hand; and fourth, once the key was inserted into the lock and turned the lock, the unoccupied apartment was secured by the investigation team until the full entry and search teams were gathered and entry was made pursuant to the warrant at 5:20 p.m.

Fourth, defendant argues that the United States violated the terms of the search warrant by continuing to review digital material seized pursuant to the search warrant. To determine whether the execution of the search warrant was reasonable, the Court considers the totality of the evidence and not just whether the agents complied with all of the warrant's explicit terms. <u>See</u> <u>Richards v. Wisconsin</u>, 520 U.S. 385, 395 (1997).

In <u>Richards</u>, the Supreme Court held that officers' unannounced entry into a defendant's motel room was reasonable under the Fourth Amendment, even though the magistrate judge had specifically refused to issue a "no-knock" warrant. <u>Id.</u> Writing for a unanimous Court, Justice Stevens explained that the defendant's unusual behavior after opening the door reinforced the officers' reasonable suspicion that he would have run or disposed of the drugs if he had known police were closing in. <u>Id.</u>. The Court found that the magistrate's initial rejection of a no-knock warrant did "not alter the reasonableness of the officers' decision" to proceed without knocking and announcing, "which must be evaluated as of the time they entered the motel room." <u>Id.</u> The Court reasoned that the issuing magistrate could not know of the actual circumstances the officers' would encounter when he denied the agents' request for a special warrant. <u>Id.</u> at 395-96. As such, "a magistrate's decision not to authorize a no-knock entry should not be interpreted to remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed." <u>Id.</u> at 396 n.7.

Here, too, the United States' actions were reasonable. The investigative agents filed a return two days after the execution of the search warrant detailing the devices seized from the premises, and within approximately 30 days after the execution of the warrant Agent Daun destroyed any forensic images of devices that did not contain material responsive to the search warrant. The physical devices that did not contain responsive material or contraband have been segregated for return to defendant and have not been searched.

On the same day the search warrant was executed, Agent Daun found a file labeled "filesalot.dcv" that contains the bulk of the incriminating information in this case. Due to the volume of data involved, Agent Daun spent considerable time identifying particular files and pieces of data within files that the search warrant commands law enforcement to seize. The images that Agent Daun continues to review were all promptly determined to contain evidence or contraband, and the scope of the search has not expanded beyond the contours of the search warrant. Defendant cites no case for the remarkable proposition that law enforcement can no longer look at evidence of crime once it has been properly seized. Such a rule would be wholly

impractical and entirely inconsistent with how physical evidence is handled. See, e.g., United States v. Prime, 431 F.3d 1147, 1151 (9th Cir. 2004) (admitting testimony regarding handwriting analysis of documents used in crime); United States v. Sherwood, 98 F.3d 402, 408 (9th Cir. 1996) (admitting testimony regarding fingerprint analysis of parking ticket). Here, the length of time that the United States has spent analyzing the lawfully seized material is reasonable in light of the amount of incriminating data seized and the defendant's efforts at concealing his crimes through encryption, false identities, and other methods. Similarly, defendant provides no authority to support his motion to order the United States to digitally and then physically destroy the devices and forensic images lawfully seized as evidence pursuant to search warrant. See Mot. Order Re Data Deletion (CR 847) at 6-7.

## III.   Conclusion.

As argued above, the United States' collection of historical records pursuant to subpoenas and court orders was reasonable, the FBI's efforts to locate the Aircard pursuant to Warrant CR-08-90330 were reasonable, and the searches of defendant's apartment and computers pursuant to the search warrant were reasonable. Moreover, under all of the facts and circumstances of this case, defendant, a person with no known lawful source of income, had no reasonable expectation of privacy in the Aircard and Aircard account he purchased and maintained through the fraudulent assumption of another living person's identity. Accordingly, defendant's motion to suppress and all related motions should be denied.

Respectfully submitted this 20th day of August, 2012.

JOHN S. LEONARDO
United States Attorney
District of Arizona


S/Frederick A. Battista
FREDERICK A. BATTISTA

S/James R. Knapp
JAMES R. KNAPP

PETER S. SEXTON
Assistant U.S. Attorneys

66

**Certificate of Service**

I hereby certify that on August 20, 2012, I filed the attached document via electronic transmission to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Phil Seplow
Shadow Counsel for Defendant

On August 21, 2012, copy of the attached document will also be mailed to:

Daniel David Rigmaiden
Agency No. 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

S/James R. Knapp

JAMES R. KNAPP
Assistant U.S. Attorney