# United States v. Daniel David Rigmaiden
## CR08-814-PHX-DGC
### Exhibit Index
## Fourth Submission Of Consolidated Exhibits
## Relating To Discovery And Suppression Issues

EXHIBIT 01:     Select documents provided by government to defense relating to "CI 2" being involved in a firearms trafficking scheme; (September 24, 2009 discovery set).

EXHIBIT 02:     USPIS Memorandum of Interview of "CI 2" RE: (1) "CI 2" providing information on his illegal gun running enterprise, and (2) "CI 2" admitting his involvement with the Gambino crime family out of New York state; (Interview date: April 15, 2008); (2/19/09 BATES Nos. 5013-5017 of February 20, 2009 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 03:     IRS-CI Memorandum of Interview of "CI 2" (relevant pages); RE: providing contact phone number for associate of CI 2 from the Gambino crime family; (Interview date: August 23, 2010); (ITEM No. 12 of November 29, 2010 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 04:     Transcripts of recorded phone conversations between "CI 1" and "CI 2" (a.k.a. "JP") prior to "JP" being arrested and becoming "CI 2"; RE: establishing that "CI 2" is the leader/organizer of the alleged scheme; (Phone conversation date: March 26, 2008); (2/19/09 BATES Nos. 5121, 5137-5140, and 5142 of February 20, 2009 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 05:     Transcripts of recorded phone conversations between "CI 1" and "CI 2" (a.k.a. "JP") prior to "JP" being arrested and becoming "CI 2"; RE: "CI 2"'s wife, who works at a bank, advised "CI 2" on banking practices for his planned withdrawal of illicit funds; (Phone conversation date: March 26, 2008); (2/19/09 BATES Nos. 5085-5089, and 5096 of February 20, 2009 discovery set).

EXHIBIT 06:     IRS-CI Agent Denise L. Medrano notes based on information provided by the ATF regarding the alleged requested purchase of firearms from "CI 2"; (ITEM No. 23 of March 23, 2010 discovery set).

EXHIBIT 07:     IRS-CI document regarding investigation (relevant pages); Note: document indicates that the the government's "the Hacker" alluded to the possibility that "CI 2" was a CI working with the government.; (10/6/11

BATES Nos. 000034 and 000036 of October 6, 2011 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 08:     Email summary by FBI Agent Richard J. Murray (relevant pages); Re: "[t]he cover team claim was pure smoke."; (Summarized email date: August 5, 2008); (ITEM No. 40 of November 24, 2010 discovery set).

EXHIBIT 09:     IRS-CI Memorandum of Interview of Daniel Rigmaiden's brother; RE: Daniel Rigmaiden is not super-violent, does not express anti-government sentiments, *etc.*; (Interview date: November 18, 2008); (3/2/09 BATES Nos. 6330-6332 of March 2, 2009 discovery set).

[Redacted by the defendant (for relevance and privacy) using white squares with black borders.]

EXHIBIT 10:     Summary of rough notes by AUSA Frederick A. Battista taken while he was involved in the investigation to locate the aircard: "Team Hacker is Law Enforcement officers Medrano, Fleischmann, Murray, Daun and Wilson." (Date: June 27, 2010); (ITEM No. 1 of September 24, 2010 discovery set [p. 1-2, 5]).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 11:     Text message from IRS-CI Agent Michael P. Fleischmann to FBI Agent Richard J. Murray; RE: "I just remembered the judge said this case could be a movie[.]"; Note: includes cover sheet and page Nos. 1, 2, 8, 9, and 15 of original assemblage of text messages provided by the government; (ITEM No. 6 of December 9, 2011 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 12:     Copy of Santa Clara police officer Dominic Sandoval's police report for August 3, 2008 arrest of Daniel Rigmaiden; Note: text of report corroborates that Daniel Rigmaiden was demobilized and arrested on the sidewalk in front of Buck Shaw Stadium in Santa Clara, CA;

Note: Contrary to the **many** false claims made in the police report, Daniel Rigmaiden did not resist arrest after being hit with the Santa Clara police cruiser. The story in the police report was concocted after Rigmaiden advised Santa Clara police officers that he would be suing them for hitting him with the police cruiser and for the police brutality that occurred *after* he was placed into handcuffs. Additionally, the Santa Clara fire department advised the Santa Clara police department and federal agents that Rigmaiden had suffered serious injuries and needed to go to the hospital. Law enforcement informed the fire department that Rigmaiden would be brought to the hospital after being taken to the police station and law enforcement signed a waiver provided to them by the fire department. However, law enforcement never took Rigmaiden to the hospital despite the fire department's recommendation and Rigmaiden's specific requests.

Instead, federal agents capitalized on the situation by attempting to interrogate Rigmaiden at the Santa Clara police station immediately after he suffered head injuries.  Later, at the Santa Clara county jail, an intake nurse made comments to USPIS Inspector James L. Wilson regarding Rigmaiden's abnormal vital signs.

Note: Contrary to the **many** false claims made in the police report, Rigmaiden was actually *hit* to the ground by the police cruiser and the cut on his hand and some of the abrasions were inflicted by Santa Clara police officer Dominic Sandoval.  Officer Sandoval's report has no account of him witnessing Rigmaiden fall to the ground so he is in no position to claim, as he falsely did in his report, that Rigmaiden "received [][his] injuries when he tripped and fell to the ground."

(2/12/09 BATES Nos. 301-303 and 308-310 of February 12, 2009 discovery set).

EXHIBIT 13:   Google Maps (website screenshot), Buck Shaw Stadium, 500 El Camino Real, Santa Clara, CA 95050, *available at* http://maps.google.com (last accessed Sept. 25, 2012) (google maps view of Buck Shaw Stadium (marked with red star), the Domicilio apartment complex (marked with green star), and Starbucks (marked with yellow star)); Note: using the distance legend embedded on the map, the approximate distance from the sidewalk measured from the center of Buck Shaw stadium to the entrance of the Domicilio apartment complex is 0.35 miles along El Camino Real.

EXHIBIT 14:   Paper print-out of email from IRS-CI Agent Tracy L. Daun to AUSA Frederick A. Battista RE: IRS-CI Agent Daun was able to get around encryption issue; (Email sent date: August 25, 2008 5:47am); (12/9/11 BATES Nos. 250-251 of December 9, 2011 discovery set).

EXHIBIT 15:   FBI FD-302 Report by FBI Agent Richard J. Murray RE: Zeljka Grabovcic is a witness who knows Daniel Rigmaiden as Steven Brawner; Note: the report contains a typo of "Travis Brawner" that should read "Steven Travis Brawner"; (Interview date: July 23, 2008); (2/12/09 BATES Nos. 143-144 of February 17, 2009 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

EXHIBIT 16:   Rental documents for storage unit No. A-47, CBD Indoor Mini Storage, 570 Cinnabar Street, San Jose, California 95110; Note: rented under the name of Daniel Aldrich; (2/19/09 BATES Nos. 4913-4920 of February 20, 2009 discovery set).

[Redacted by the defendant (for privacy) using white squares with black borders.]

EXHIBIT 17:   IRS-CI Memorandum of Interview by IRS-CI Agent Denise Medrano; RE: James Mathews, manager of CBD Indoor Mini Storage, is a witness who knows Daniel Rigmaiden as Daniel Aldrich; (Interview date: August 4, 2008); (ITEM No. 17 of July 23, 2010 discovery set).

EXHIBIT 18:       FBI FD-302 Report by FBI Agent Peter A. Jackson RE: Jeff Koche is a witness who knows Daniel Rigmaiden as Daniel Aldrich; (Interview date: September 10, 2008); (2/12/09 BATES Nos. 216-217 of February 17, 2009 discovery set).

                  [Redacted by the defendant (for relevance and privacy) using white squares with black borders.]

EXHIBIT 19:       Letters from Domicilio to Steven Brawner RE: lease for 431 El Camino Real, Apartment No. 1122, Santa Clara, CA. 95050.

EXHIBIT 20:       Paper print-out of email from FBI Agent Richard J. Murray to FBI agent who conducted ruse Chines food delivery at apartment No. 1122 RE: ruse Chinese food delivery at apartment No. 1122 on July 22, 2008; (Email sent date: August 13, 2009 4:32pm); (ITEM No. 56 of November 8, 2010 discovery set).

EXHIBIT 21:       Paper print-out of email from FBI Agent Richard J. Murray to AUSA Frederick A. Battista RE: menu was placed on door of apartment No. 1122 and later removed; (Email sent date: July 23, 2008 8:18am); (ITEM No. 2 of September 24, 2010 discovery set [p. 37]).

EXHIBIT 22:       Image of undercover FBI agent serving apartment No. 1122 with menu from a Chinese food restaurant; Note: PDF file was created from image extracted from the July 22, 2008 video camera footage of an FBI ruse Chinese food delivery at the Domicilio apartment complex, 431 El Camino Real, Apartment No. 1122, Santa Clara, CA 95050; (ITEM No. 9 of October 7, 2009 discovery set).

                  [Redacted by the defendant (to conceal undercover agent identity) using yellow frowny face.]

EXHIBIT 23:       Paper print-out of emails between FBI Agent Richard J. Murray and Christopher A. Calderon RE: menu placed on door of apartment No. 1122 was shortly thereafter removed; (Email sent dates: July 22, 2008 11:49pm; July 23, 2008 1:05am; July 23, 2008 1:47am); (ITEM No. 17 of November 8, 2010 discovery set).

EXHIBIT 24:       FBI FD-302 Report by FBI Agent Richard J. Murray RE: undercover agent placing food menu on door of apartment No. 1122; (Investigation date: July 22, 2008); (2/12/09 BATES No. 31 of February 17, 2009 discovery set).

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇

Select documents provided by government to defense relating to "CI 2" being involved in a firearms trafficking scheme; (September 24, 2009 discovery set).

**U.S. Department of Justice**

United States Attorney
District of Arizona

---

*Two Renaissance Square*                              Main: (602) 514-7500
*40 North Central Avenue, Suite 1200*              Main Fax: (602) 514-7693
*Phoenix, Arizona 85004-4408*                    Direct Line: (602) 514-7636
                                                  Direct Fax: (602) 514-7450

September 24, 2009

Philip A. Seplow
Attorney at Law
2000 North 7th Street
Phoenix, Arizona 85006

     Re:   <u>United States v. Daniel David Rigmaiden</u>
           CR-08-814-PHX-DGC

Dear Mr. Seplow::

    Enclosed please find additional discovery for your consideration in the above-cited case. This discovery relates to the participation of CI-2 in a firearms trafficking scheme while he was participating in the subject fraud scheme with Daniel David Rigmaiden. The materials have been redacted in order to protect the identity of CI-2.

    Additional discovery will continue to be released to your office as it becomes available. If I can be of further assistance, please do not hesitate to contact me at (602) 514-7636.

                Sincerely yours,

                DENNIS K. BURKE
                United States Attorney
                District of Arizona

                FREDERICK A. BATTISTA
                Assistant United States Attorney

Enclosure

Defendant's Copy 13444

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Recommendation for Prosecution





**Case Number:** 787045-08-0038

**Judicial District:** Western Judicial District of Washington
700 Stewart Street, Suite 5220
Seattle, WA 98104

**Case Agent:** Craig Howe

Telephone

**Approved by:** _for Cary T Diaz_
Signature    Date 10/14/08
Douglas R. Dawson
Type Name

Acting Special Agent in Charge
Title

# FOR OFFICIAL USE ONLY

ATF Form 3200.14
Revised September 2004

Defendant's Copy 13446



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

915 Second Avenue, Room 790
Seattle, Washington 98174

www.atf.gov

October 10, 2008

**Case Number: 787045-08-0038**

*CC1*   *CI2*

This recommendation for prosecution relates to a violations of Federal law by ▓▓▓▓▓▓▓ who between the dates of February 15, 2008 and April 28, 2008 did knowingly make interstate shipments, sell and/or transport multiple firearms to a non FFL, did knowingly deliver firearms to a common carrier without written notice, did knowingly transport or deliver *3rd Party* unregistered firearms and/or conspire with others to complete the above listed crimes, and that ▓▓▓▓▓▓▓, on and before April 28, 2008, did knowingly possess firearms while being an unlawful user of drugs, in King County, Western District of Washington. In addition, this recommendation for prosecution relates to the possible forfeiture of property seized from the above named individual for alleged violations for Federal firearms laws.

## DEFENDANTS AND ARREST STATUS

*CC1 —* ▓▓▓▓▓▓▓▓▓▓

*CI2 —* ▓▓▓▓▓▓▓▓▓▓

*3rd Party —* ▓▓▓▓▓▓

## STATUTES VIOLATED

| | |
|---|---|
| Title 18 U.S.C., Section 922 (a)(5) - | Transfer, Sale, or Transportation of a firearm by an unlicensed person to another unlicensed, out of state person. |
| Title 18 U.S.C., Section 922 (e) - | Delivery of a firearm to a common carrier without written notice. |
| Title 18 U.S.C., Section 922 (g)(3) - | Drug user in possession of a firearm |
| Title 26 U.S.C., Section 5861 (j) - | Transportation, delivery or receipt of an unregistered firearm. |

Defendant's Copy 13447

Title 18 U.S.C., Section 371 -     Conspiracy against the government

Title 18 U.S.C., Section 922(a)(1)(a) -   Engagement in firearms business without a
license.

## FORFEITURE POTENTIAL

### Description of Property Seized

1.  Assorted firearm and ammunition, described as Items 000018, 000020, 000022,
    000023, 000026, 000027, 000028, 000029, 000030, 000031, 000033, 000034,
    000035, 000036, 000037, 000038, 000045, 000046, 000047, 000048, 000049,
    000063 and 000073, on the attached Reports of Investigation and Property Detail
    Report.

### Statutory Forfeiture Authority

Title 18 U.S.C. Section 924(d)(1)- any firearm or ammunition involved in a knowing
violation of the Gun Control Act, Title 18 U.S.C. Chapter 44.

### Pending Administrative Forfeiture Actions

ATF has initiated administrative forfeiture under Title 18 U.S.C., Section 924d on
the firearms and ammunition listed as items number 000018, 000020, 000022,
000023, 000026, 000027, 000028, 000029, 000030, 000031, 000033, 000034,
000035, 000036, 000037, 000038, 000045, 000046, 000047, 000048, 000049,
000063 and 000073.

### Criminal Forfeiture – None recommended at this time.

## DOCUMENTS SUBMITTED IN SUPPORT OF PROSECUTION

0   1.  Computerized criminal history of ██████████████  CCI

1   2.  ATF Report of Investigation (ROI) dated 2/21/2008:  Receipt of information
        about potential firearms trafficking.

2   3.  ATF ROI dated 2/21/2008: Recorded phone call with "JP" about developing a
        relationship for doing business.

3   4.  ATF ROI dated 2/25/2008:  Package delivery to Newport Beach, CA.

4   5.  ATF ROI dated 2/28/2008:  Receipt of firearm from Newport Beach, CA.

5   6.  ATF ROI dated 3/3/2008:  Voicemail left by "JP" about firearm shipment.

Defendant's Copy 13448

6   7.   ATF ROI dated 3/3/2008:  Recorded phone call with "JP" about firearm shipment.

7   8.   ATF ROI dated 3/3/2008:  Recorded phone call with "JP" about the shipment of money.

8   9.   ATF ROI dated 3/3/2008:  Recorded phone call with "JP" about money shipment.

9   10.  ATF ROI dated 3/3/2008:  Recorded phone call with "JP" abou[CCI] and future business.

10   11.  ATF ROI dated 3/3/2008:  Recorded voicemails with "JP" checking on money shipment and business with CI.

11   12.  ATF ROI dated 3/3/2008:  Recorded voicemail and phone call with "JP" about business with CI and next firearm shipment.

12   13.  ATF ROI dated 3/10/2008:  Recorded phone call with "JP" about firearm shipment and [CCI]

13   14.  ATF ROI dated 3/10/2008:  Recorded phone call with "JP" about firearms shipment and future purchases.

14   15.  ATF ROI dated 3/12/2008:  Recorded voicemail and phone call with "JP" about new phone number and [CCI] [CCI]

15   16.  ATF ROI dated 3/14/2008:  Phone call from [CCI] about possible meeting.

16   17.  ATF ROI dated 3/14/2008:  Recorded voicemail to [CCI] about possible meeting. [CCI]

17   18.  ATF ROI dated 3/14/2008:  Recorded phone call with "JP" about possible meeting with [CCI]

18   19.  ATF ROI dated 3/17/2008:  Recorded phone call with [CCI] about possible meeting.

19   20.  ATF ROI dated 3/19/2008:  Recorded voicemail t[CCI] for meeting.

20   21.  ATF ROI dated 3/19/2008:  Recorded phone call with [CCI] about meeting.

21   22.  ATF ROI dated 3/19/2008:  Recorded audio from deal where [CCI] didn't show up.

Defendant's Copy 13449

CCI
22   23. ATF ROI dated 3/19/2008:  Recorded voicemail from ▓▓▓▓ apologizing for missing meeting.

CCI
23   24. ATF ROI dated 3/19/2008:  Recorded voicemail t ▓▓▓▓ about doing future business.

CCI
24   25. ATF ROI dated 3/19/2008:  Recorded voicemail to "JP" abou ▓▓▓▓ not showing up for meeting.

25   26. ATF ROI dated 3/19/2008:  Recorded voicemail from "JP" wanting SA Howe to call.

26   27. ATF ROI dated 3/24/2008:  Lab results from King County AFIS.

CCI
27   28. ATF ROI dated 3/24/2008:  Recorded voicemails from "JP" about ▓▓▓▓ and asks SA Howe to call.

28   29. ATF ROI dated 3/24/2008:  Recorded voicemail and phone call with "JP" about gun shipment.

29   30. ATF ROI dated 3/25/2008:  Firearm shipment.

30   31. ATF ROI dated 3/25/2008:  Recorded call to "JP" about firearm shipment and payment.

CCI
31   32. ATF ROI dated 3/25/2008:  Recorded voicemail to ▓▓▓▓ wanting him to call SA Howe.

32   33. ATF ROI dated 3/25/2008:  Recorded three way phone call between "JP", CI and SA Howe.

33   34. ATF ROI dated 3/25/2008:  Recorded four way phone call between "JP", ▓▓▓▓ CI and SA Howe.

CCI
34   35. ATF ROI dated 3/26/2008:  Recorded three way phone call between "JP", CI and SA Howe.

35   36. ATF ROI dated 3/28/2008:  Recorded voicemail and phone call to "JP" about money shipment, a future deal and ▓▓▓▓ CCI

36   37. ATF ROI dated 3/28/2008:  Recorded voicemails to "JP" about money shipment.

37   38. ATF ROI dated 4/2/2008:  Receipt of firearms from Newport Beach, CA.

Defendant's Copy 13450



39. ATF ROI dated 4/4/2008:  Receipt of evidence from Fed Ex Kinko's.

40. ATF ROI dated 4/22/08:  Recorded phone call from ▮▮▮ about purchase of future weapons purchases.   *CCI*

41. ATF ROI dated 4/23/2008:  Receipt of evidence from Fed Ex Kinko's.

42. ATF ROI dated 4/28/2008:  Recorded voicemail and phone call to ▮▮▮ about upcoming firearm purchase and meeting ▮▮▮   *CCI*   *CCI*

43. ATF ROI dated 4/28/2008:  Recorded voicemail from ▮▮▮ asking SA Howe to call him back.   *CCI*

44. ATF ROI dated 5/1/2008:  Recorded voicemail to ▮▮▮   *CCI*

45. ATF ROI dated 5/1/2008:  Recorded phone call with ▮▮▮ discussing business and vertical foregrips on firearms and future deal.   *CCI*

46. ATF ROI dated 5/1/2008:  Recorded phone call with ▮▮▮ about upcoming meeting.   *CCI*

47. ATF ROI dated 5/1/2008:  Recorded voicemail from ▮▮▮ about meeting and recorded voicemail to ▮▮▮ from SA Howe.   *CCI*   *CCI*

48. ATF ROI dated 5/1/2008:  Recorded call to ▮▮▮ after meeting wi ▮▮▮   *3rd party*   *CCI*

49. ATF ROI dated 5/1/2008:  Undercover meeting with ▮▮▮   *3rd Party*

50. ATF ROI dated 5/1/2008:  Identification of ▮▮▮   *3rd Party*

51. ATF ROI dated 5/2/2008:  Buy/bust operation, consent to search ▮ vehicle.

52. ATF ROI dated 5/5/2008:  Recorded voicemail and conversation with ▮▮▮ for upcoming firearm purchase (buy/bust).   *CCI*

53. ATF ROI dated 5/5/2008:  Multiple recorded phone calls with ▮▮▮ about firearms purchase (buy/bust).   *CCI*

54. ATF ROI dated 5/5/2008:  Buy/bust operation on April 28, 2008.

55. ATF ROI dated 5/6/2008:  Interview and consent search ▮▮▮   *3rd Party*

Defendant's Copy 13451

Attachments:  Property summary reports, Consent to search forms, list of
items seized from ████████partment and Notice of Abandonment and
Release of Claim.  *3rd Party*

*55* 56. ATF ROI dated 5/19/2008:  NFA Records Search.

*56* 57. ATF ROI dated 5/19/2008:  Interstate Nexus Determination.

*57* 58. ATF ROI dated 5/20/2008:  Receipt of firearms from California.

*58* 59. ATF ROI dated 10/9/2008:  Execution of federal arrest and search warrants.

*? 59* — 60. ATF ROI dated 10/9/2008:  Abandonment of ballistic vest.

*? 60* — 61. ATF ROI dated 10/9/2008:  Interview of █████████████

*? 61* — 62. ATF ROI dated 10/14/2008:  Federal Firearms License check.

*62 - ATF ROI 10/9/08 Digital Imaging*   *licensed*
*63 - ATF ROI 10/22/08 Proffer CC1*   *gun*
*64 - ATF ROI 11/4/08 Receipt of property*   *dealer*

Defendant's Copy 13452

| Title of Investigation: | Investigation Number:<br>787045-08-0038 | Report Number:<br>13 |
|---|---|---|

*CC1*

## SUMMARY OF EVENT:

RECORDED PHONE CALL:  On March 5, 2008, Special Agent (SA) Craig Howe made a recorded phone call
to _____    *CI2*

## NARRATIVE:

1.  On March 5, 2008, at approximately 1249 hours, SA Howe made a recorded phone call (item # E-000010) t_____    *CI2*
    _____ after he had left a message for SA Howe to call him back earlier in the day.

2.  *CI2* _____ said he talked to _____ *cc1* and said the package could be sent on Friday (3-7-08) but would
    likely be sent on Monday (3-10-08) because _____ *cc1* works a regular job.  SA Howe will be notified of the
    shipment with a tracking number, and after the package is received, then, SA Howe and _____ *cc1* will have a
    sit down with no deal taking place to get to know one another.

3.  *CI2* _____ said he is working on some other deals with the confidential informant (CI) and that _____ *cc1*
    LNU is supposed to be getting some "white" (meaning cocaine) and that is when he will get paid.  SA Howe asks
    him if it has to deal with some documents and he said _____ *cc1* has some documents but he also has another
    contact for "white powder" (meaning cocaine). _____ *CI2* said he normally stays away from that stuff, but
    he says if that is the last piece of the puzzle the CI needs, then he wants a piece of that action because it will be a
    big money thing, a huge payday. _____ *CI2* tells SA Howe he eventually wants to get out of the game,
    especially the little things and then just do some big stuff from time to time because he has some high end contacts.

4.  SA Howe then tells _____ *CI2* that he will owe _____ *cc1* some money and _____ *cc1* should be
    expecting it. _____ *CI2* said he told _____ *cc1* that SA Howe owes him $1600.00 and during the sit
    down meeting he and SA Howe can decide how the payment should be made.

5.  SA Howe an_____ *CI2* then talk about the CI _____ *CI2* said he thinks the CI might be a fed
    (meaning federal agent) because of things he has heard.  He further says he thinks if the CI is what he hopes he/she
    is, then the CI will be an outstanding contact.  SA Howe tells _____ he doesn't believe the CI is a fed
    and that his main contact is John (Officer Peterson) _____ *CI2* said he heard John is a Hispanic guy and SA
    Howe tells him he is white and that SA Howe and he go way back. _____ *CI2* wants to know if he is a

| Prepared by:<br>Craig A. Howe | Title:<br>Acting Resident Agent in Charge, Seattle I Field Office | Signature: | Date:<br>3/10/08 |
|---|---|---|---|
| Authorized by:<br>Craig A. Howe | Title:<br>Acting Resident Agent in Charge, Seattle I Field Office | Signature: | Date:<br>3/10/08 |
| Second level reviewer (optional):<br>Kelvin N. Crenshaw | Title:<br>Special Agent in Charge, Seattle Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

Defendant's Copy 13474

blonde surfer dude and SA Howe says no, but he hasn't seen him in awhile ▬▬▬ CI₂ then says the CI describes John as a surfer dude, and SA Howe says he lives in Southern California but he doesn't know him in that context. He then says he likes to ask people questions from time to time and SA Howe tells him that he is making SA Howe nervous and ▬▬▬ CI₂ says he is backing himself up to make sure everyone is OK. He then tells SA Howe a story about some undercover officers he once knew years ago and there is no way anyone could have picked them out to be law enforcement which is why he gets nervous. SA Howe tells ▬▬▬ CI₂ that he and John go back through the years through the military. SA Howe tells him that SA Howe's contact with the CI has been very limited and he usually goes through John for most things. SA Howe further tells ▬▬▬ CI₂ his relationship with the CI is all business, but the CI trusts him. ▬▬▬ CI₂ then says he is working on bigger things with the CI and there are things he can do for the CI that the CI can't even imagine. He says he has strong contacts in Canada, south of Mexico, New York and very strong Russian contacts. He says he hopes they can build the relationship stronger. He says he is working on some smaller stuff with the CI worth only $50,000.00 to $100,000.00 dollars. SA Howe tells ▬▬▬ CI₂ that it pays to be smart and he says he has been doing this for 11 years. SA Howe tells him that he is a small player and no one really knows his name. ▬▬▬ CI₂ adds that no one knows him and that is how he likes it. He also tells SA Howe if he needs help on anything to give him a call and he will try to help him. ▬▬▬ CI₂ later adds that he thinks there could be four or five alphabet agencies that would like to fight over him. He also said he doesn't do anything; he just puts the resources together and gets people what they need.

ATF EF 3120.2 (10-2004)
For Official Use Only

Defendant's Copy 13475

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number:<br>787045-08-0038 | Report Number:<br>35 |
| --- | --- | --- |

CCI

**SUMMARY OF EVENT:**

RECORDED PHONE CALL:  On March 26, 2008, Special Agent (SA) Craig Howe, working in an undercover role, made a recorded phone call to ▮  CI2

**NARRATIVE:**

1.  On March 26, 2008, at approximately 1719 hours, SA Howe, working in an undercover capacity made a recorded phone call (item # E-000029) to ▮  The call went to voicemail so SA Howe told him the package had been sent and the tracking number was 864714927823.

2.  A short time after SA Howe left the message to ▮ he called SA Howe back and SA Howe recorded the conversation (item # E-000029) ▮ told SA Howe he got the tracking number and SA Howe told him the package was shipped overnight so it would be there the following day ▮ told SA Howe he is shipping a lot of stuff through the address SA Howe sent the package to and it probably won't be good much longer.  SA Howe then described the package as a Fed Ex box with a magazine in it, and for ▮ to look in the magazine (for the money).  CI2

3.  SA Howe and ▮ discussed SA Howe's relationship with the CI for a little while and the fact that ▮ CCI hasn't met with SA Howe yet. ▮ then said he is trying to learn more about the organization SA Howe belongs to and said ▮ CCI is his problem.  He said he had warned the CI that things could end up the way they have with ▮ CCI  SA Howe then told ▮ that it will be interesting to see if ▮ CCI can fill the order the CI had made the day before. ▮ then stated he thought if everything went perfect in the next few weeks, that SA Howe will meet ▮ CCI and have a sit down with him. ▮ CI2 also said he will eventually want to talk to SA Howe and ask him questions about the CI, and then asked SA Howe to take a picture of ▮ CCI when he meets with him. ▮ then told SA Howe he has never met ▮ CCI face to face, and that is why he wanted a picture of him. ▮ CI2 further said he is going to have a sit down with the CI and that he wants to join the group SA Howe is in.  He also told SA Howe to call him if SA Howe needs anything because he does have some resources and he would not tell the CI about what was going on if that is what SA Howe wanted.

| Prepared by:<br>Craig A. Howe | Title:<br>Acting Resident Agent in Charge, Seattle I Field Office | Signature: | Date:<br>3/28/08 |
| --- | --- | --- | --- |
| Authorized by:<br>Craig A. Howe | Title:<br>Acting Resident Agent in Charge, Seattle I Field Office | Signature: | Date:<br>3/28/08 |
| Second level reviewer (optional):<br>Kelvin N. Crenshaw | Title:<br>Special Agent in Charge, Seattle Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

Defendant's Copy 13502

⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇
⬇ **EXHIBIT 02** ⬇

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

USPIS Memorandum of Interview of "CI 2" RE: (1) "CI 2" providing information on his illegal gun running enterprise, and (2) "CI 2" admitting his involvement with the Gambino crime family out of New York state; (Interview date: April 15, 2008); (2/19/09 BATES Nos. 5013-5017 of February 20, 2009 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

Interview of

CI 2

**MEMORANDUM OF INTERVIEW**

| | | |
|---|---|---|
| **CASE NUMBER** | : | 1219-1672940-IT(1) |
| **PERSON INTERVIEWED** | : | █████████ |
| **PLACE OF INTERVIEW** | : | █████████ |
| | | Salt Lake City, UT |

| | | |
|---|---|---|
| **DATE OF INTERVIEW** | : | April 15, 2008 |
| **TIME OF INTERVIEW** | : | Approximately 4:50 PM |
| **INTERVIEWED BY** | : | G.A. Freeman, U.S. Postal Inspector |
| | | J. Wilson, U.S. Postal Inspector |
| | | D. Medrano, Special Agent, IRS |

On the date listed above, █████████ was interviewed at the IRS offices in Salt Lake City, Utah, following his arrest and initial appearance in Federal District court. Also present for the interview was █████████ c ourt appointed public defender, Assistant United States Attorney Fred Battista, and other representatives from the Internal Revenue Service.

Page 1 of 4

█████ stated that Doug is the head of the organization, and that John is his right hand man. ████ stated that Doug and John deal in weapons and narcotics, and that their associate, Daniel LNU, was their contact within the banking industry. Daniel has been described to ████ as Doug's "financial guy." ████ stated that he has dealt with the group of individuals for approximately the past three years, and believes that they are operating out of California.

█████ stated that he has done previous "work" with the Gambino crime family out of New York State.

2/19/09 5015

2/19/09 5016

The interview ended at approximately 5:35 PM

G.A. Freeman                                    April 21, 2008
U.S. Postal Inspector                               Date

2/19/09 5017

↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓
↓ **EXHIBIT 03** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

IRS-CI Memorandum of Interview of "CI 2" (relevant pages); RE: providing contact phone number for associate of CI 2 from the Gambino crime family; (Interview date: August 23, 2010); (ITEM No. 12 of November 29, 2010 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

# DISCOVERY

## November 29, 2010

## ITEM NO. 12

**IRS-CI Memorandum of Interview, dated August 23, 2010, regarding a follow-up interview with CI-2.  (8 Pages)**

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



---

| | | |
|---|---|---|
| **In Re:** | ▓▓▓▓▓ *CI-2* | **Location:** United States Attorneys Office Phoenix, Arizona |
| **Investigation #:** | 1000218125 | |
| **Date:** | August 23, 2010 | |
| **Time:** | ~1:45pm-4:47pm | |
| **Participant(s):** | ▓▓▓▓ *-CI-2* | |

*CB - CI-2    CFM -*
*Business   CI-2 Family*
*member*
*cws - website*
*CI-2 associated*
*with.*

Michael Fleischmann, Special Agent, IRS-CI
Denise Medrano, Special Agent, IRS-CI

On the above mentioned date, Special Agents Medrano and Fleischmann met with ▓▓▓▓ *-CI-2* ▓▓▓▓ at the United States Attorneys Office in Phoenix Arizona. The purpose of the meeting was to discuss evidence that had been obtained during the search of ▓▓▓▓ *CI-2* residence on April 15, 2008. The agents and ▓▓▓▓ reviewed a notebook of information that contained copies of information obtained at the search warrant. The notebook is separated by item and distinguished by numbers, which are referenced. ▓▓▓▓ provided the following information:

*CI-2*

43. See agent handwritten notes on copies of information regarding number 43. The notes
    pages for item 43 are numbered 1 through 15 and described below:

*[handwritten]* ~~Buttan Man~~ associate of CI-2

- Page 2: Phone number related to ████ part of the Gambino family. ████ was
  involved in credit card fraud

*[handwritten]* CI-2 co-conspirator in Firearms case

- ████████ a reader writer; and a phone nu████

- Page 5: Information related to ████████ who sold guns, including the tracking
  number. ████████ had a weapon deal with an individual named Doug.

- Page 6: FedEx tracking number related to gun deal on page 5; contact
  information related to ████████████ brother-in-law; information
  related to the gun deal   *[handwritten]* CFM      CI-2

- Page 7: information related to the gun deal between ████ and Doug;

- Page 8: contact information related to ████████ niece; information related to
  the gun deal between Doug and ████████, contact phone number for ████ from
  NY (Gambino family); a "to-do" list from ████ and information related to
  ATM withdrawals   *[handwritten]* CI-2  CFM

*[handwritten]* associate of CI-2

U.S. Treasury Criminal Investigation

Memorandum Author

Michael Fleischmann
Special Agent

Denise Medrano
Special Agent

**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓** ◄
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**
**↓** __EXHIBIT 04__ **↓**

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Transcripts of recorded phone conversations between "CI 1" and "CI 2" (a.k.a. "JP") prior to "JP" being arrested and becoming "CI 2"; RE: establishing that "CI 2" is the leader/organizer of the alleged scheme; (Phone conversation date: March 26, 2008); (2/19/09 BATES Nos. 5121, 5137-5140, and 5142 of February 20, 2009 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

Phone Communications

CI 1 & CI 2

**■■■■**         This is **■■■■■**  Today's date is March 26th and the time is 1:05. I'll be
calling JP at the number **■■■■■■■■** I am the consensually consenting party to this
consensually monitored telephone conversation.

**Automated Voice:**  AT&T. please dial the number you are calling now.

Telephone ringing.

**JP:**         Hello

**■■■■■**         Hey what's going on buddy?

**JP:**        Well and and and something just between you and me, not him talking, between you and me. I don't give a shit how much trouble this guy gives me as long as we keep pulling.

█████        Right. We will.

**JP:**        Doesn't matter. He'll he'll scream, whine, cry the whole way, but if I keep paying him the whining will go away. The only the only downside about it is if he gets on his little  you know bitchmode and says I'm gonna chill on loading until I get a certain amount.

█████        Right.

**JP:**     All right.

███████     You know I I I've been through (inaudible). it took me a week to 2 weeks to get back to you about this guy. I drilled this guy up one side and the other. I I gave him all the scenarios that there is to give. You know what I'm saying, so I I and my whole thing is is just like yours I want all the money. I need all the money. I gotta have it. I can't have no hang ups. Can't do nothing. You know you're talking about.

**JP:**     All right I'll I'll completely lose my credibility with him if he doesn't get paid.

███████     Well, that's why

**JP:**     Even go so far as he's he's happy even at the first 9k. I I could almost feel it through an email. Literally through an email. Like a

███████     Yeah

**JP:**     Breathe of fresh air. Cause he cause he trusts me that I got it in my hand. Actually you sent me 9k exactly right?

███████     Yeah.

**JP:**     Ok. all right. I just wanted to make sure, cause I actually mixed other money in it and I miscounted. So thank you for telling me.

███████     No no no yeah. it was 9k and and we'll keep it you know we'll keep it flowing. And that's that's the deal.

**JP:**     You see I'm I I I've actually figured out how to get his cut to him you know suffieciently. I'm not gonna have problems. I'm not gonna hit you guys up for anymore of that. That's that's we're done with that.

███████     Ok

**JP:**     All you got to do is what you already did. You have the same address. So that that's cleared up. The sooner the better and my recommendation I would push with him, there is unless he can provide me with other information because the again he did the same clearing that I did. So your guy needs to say something if he's fucked up. We can't do it because of this reason. In in his opinion there's no reason why you can't on Tuesday pull 9k and and and then on Thursday um pull you know maybe 900.

███████     Yeah. and there is no reason why. You know there's no rhyme or reason, but there is something called being smart about this. Because last time we got burned. Time before that. Time before that. All we're trying to do is exercise a little caution, try to make it to april 15th, to get to the $75,000 where everybody gets a chunk of money. You

get $75,000 and I get 75,000, then you get 75 that is chunks and chunks of money coming. You you can't beat that.

JP:        Right.

███        And you know. and if you can beat that.

JP:        I I agree

███        That's crazy.

JP:        I'm I'm pushing him for patience. And the thing is I know the greed part is killing him. And that's where I'm still on point so so like I say when I present to you what he's saying. It's not actually coming from my mouth. I'm actually fine. If we did 9k a week, I'm perfectly happy. To be honest with you.

███:       All I'm doing is man I'm trying to not let this uh bite us in the ass. That that's the only thing I don't. just like you were trying to save face. Everybody's trying to save face right now. Everybody wants to go get paid and it's working.

JP:        I'll tell ya what. I know right now I'll be cool with this guy even with all his bitching. Which I'll always keep you updated on just so that you

███        Yeah ·

JP:        Are aware of what's going to happen on what's going in the account. And I mean that's important right?

███        Yeah it is. yeah it is. that that's very important so I know.

JP:        Bring that like I say if he doesn't get a certain amount in his hands by the 4th um he's he's gonna pull back.

███        Ok

JP:        He can't wait. Just so that you're aware. So it's not I mean let him have his temper tantrum. I even told him I said look. No problem actually why don't you go ahead and take because it sounds like he I mean he's working 12, 15 hours a day doing this. So that is not easy and I hope that you remember that too. I mean just just like your side isn't easy. Everybody everybody's putting a lot of work into this. So I give him that credit. I tell him I said you know what go ahead, take a week off.

███        Right.

JP:        So it's it's actually ok. but you know (inaudible) my greed side says keep sending fucking money but you know what if you want to go ahead and pull back and I

told him I said not as an insult I said but personally go ahead and take that week off. Until you get paid.

███████:        Right.

**JP:**        Take a week off. Get some sun. you know see the beach. Get some pussy. Whatever you got to do.

███████        Right.

**JP:**        That's fine. Go ahead and take that week off. Everybody will be fine. (inaudible) I'll tell them. I'll pass on your message to them. Um take the week off. That that's fine.

███████        Quick question. Is this guy younger or older because it seems like if he's been doing this awhile he should understand, so is he a younger guy?

**JP:**        Well, I I personally after after a lot of back and forth with him I think I think I really think he's pretty young.

███████        Yeah.

**JP:**        I think I think it's a punk kid. That's got some killer fucking hacker skills.

███████        Yeah. because he has to be young. Cause he he he's impatient and he doesn't understand.

**JP:**        Well, he he's gotten fucked over a lot.

███████        Right.

**JP:**        That I know for a fact. Because you know not that I participated but I was involved with him getting fucked.

███████        Yeah. I'm just saying because it's like you know all of that once you get a taste or you've been in this enough you know to be patient for your money. But when he sees the money coming and coming and coming. You know

**JP:**        Well I mean you and I both know how it is when you get fucked.

███████        Yeah.

**JP:**        Time and time and time again. After a lot of work. I mean you're like you know why should I do this if I'm not getting paid. So I mean I do respect I do respect where he's coming from. I do think he's a little impatient. But I do respect where he's coming from

**JP:**          All right take care

████          Thanks

████          The time is 1:40. I've concluded this conversation and will be turning off
the recorder.

↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Transcripts of recorded phone conversations between "CI 1" and "CI 2" (a.k.a. "JP") prior to "JP" being arrested and becoming "CI 2"; RE: "CI 2"'s wife, who works at a bank, advised "CI 2" on banking practices for his planned withdrawal of illicit funds; (Phone conversation date: March 26, 2008); (2/19/09 BATES Nos. 5085-5089, and 5096 of February 20, 2009 discovery set).

Phone communicatio

CI 1 2

CI 2

Tape Dated 3/07/2008

█████:          This is ████████ today's date March 7 and the time is 9:38. I'm going to be calling JP at number ██████ 5500. I am the consenting party to this consensual monitoring telephone conversation.

Telephone ringing.

**JP:**        Hello

█████          Hey what's going on man?

**JP:**        Not much. What's up?

**JP:**       I do have a concern and and it's not really a change of plan in my opinion. We we really haven't come up with a perfect plan yet on (inaudible). I'm concerned that you go in there and you pull 10 maybe 20 and then we get frozed up for some reason.

███████       Right but that's why we have the banker in place and he's guaranteeing that that won't happen. Everything goes

**JP:**       And my my guy's guaranteeing that I can pull whole thing and it won't hurt you're income. (Inaudible)

███████       Right but see we don't we one one thing that your guy doesn't understand is that when a bank has a an confirmed. I know you don't include your wife in nothing you do. But just ask her how how it's gonna look with that amount of cash coming out and how much they got to report and where they got to report it to.

**JP:**       I I've actually already spoke to her about it. I have.

██████       Ok

**JP:**       The question I asked I'll tell ya exactly the way I phrased it. The question I asked her I said do you have any any high high end clients at your bank that I preluded it. I said do they deposit anywhere between say 50-100,000 dollars a week. She said yes I do. I said how do they deposit. She said cash and money orders. I said has he ever come in and taken over a $100,000 in one shot. Yes. How did he do it? She said alls he does is calls us 48 hours ahead of time. She says everything (inaudible) some things it might take as high as you know 8 days or something like that. It just depends on the size of the bank. Since we know this client we're able to this. I said what if it's an unknown client, a new bank account. Um. New bank account obviously not the greatest idea. But I said what if you have somebody high up in the bank say hey somebody I know don't worry about it. She says well if they're high up in the bank then it's not a problem.

███:       Exactly.

**JP:**      So I said if I said is there any SARs or anything that's gonna be filled out cause somebody high in the bank, which he's telling me he's got. Somebody high in the bank says no it's one of my buddies. Uh check it out. Go ahead and make sure they got the funds and it's all ok.

███       Right

**JP:**      So I confirmed with her. I confirmed with her. I said now is there anything that the secrecy act or anything that you can tell me about. She said look I'm telling you. She actually got mad at me cause I asked her 3 times. So because I wanted to make sure I wasn't missing anything. I said you know and I rephrased the question so many ways to make sure I wasn't missing it. I said so if I go in there and I pull a 100 fricking thousand dollars as long as I call ahead and I get the okay from above. She said it could still be the tellers' discretion. In other words let's say some dude goes in there with ripped up Levis not wearing a suit. He goes in there to pull a 100 grand. Even if his signature matches she's gonna be weary. She or he I should say. Is going to be weary. She says but if the signatures match uh everything's the way it's supposed to be uh you know well dressed person. Some something if anything's outside the pattern then at the teller's discretion, yes something could be done.

███       Ok

**JP:**      That's that's the only (inaudible) to come out of her mouth. And she said but even at that she says if they get an okay from upstairs basically there shouldn't be no problems. She said that's it's legal. I mean you're at the bank it's you money.

███       Right

**JP:**      But they just have to only call ahead.

███       Yeah

**JP:**      You never get you can't just go in there which is. And then then I asked her I followed up with a question. This is actually um why I'm leaning on the idea. The final decision in my opinion is yours. You you handle it the way you want to. Cause that's your end. But then I I asked her I said what if that same account, you know good deposits, actually just a couple of major deposits per month and that's it. I said anywhere between 50-150,000 dollars. Um I go in there and I'm pulling out money. I said I do between 8-10,000 dollars every 3, 4 days. She said that's gonna red flags all over the place. Why? She says because it's it's if it's a new account and you're doing this and you're not getting an okay from upstairs you're gonna fill out a SAR for it. Which is that the uh suspicious activity report.

███       Mmhmm

**JP:** She said that's not in every case. But I mean that was her first response. So then I explained to her look you have let's say a regional manager of the bank who is making sure this doesn't happen. She says he would have to give the okay ahead of time. That this money's going to be coming out.

**█:** Exactly

**JP:** If he's taking down red flags after the fact the teller is supposed to fill out a SAR because something's going on.

**█:** Right. Yeah we we have our bases covered here. But you know our problem is this

**JP:** Ok

**█:** You and I we always try to outthink ourselves.

**JP:** Right

**█:** We always get to the point to where all right we're about to get paid and we do something stupid.

**JP:** Right.

**█:** And I I my mind my concerns are simple you know lets lets see how this goes. And and maybe use your guy at the end when your boy says okay I've gotten my money. Let's do one final big one before we do this. To ensure that we get all the money.

**JP:** Yeah.

**█:** My problem is similar to your problem. Cash on hands not my forte. Number 2 cause I've experienced and I don't like and I've explained that to you before. That I really don't like having. And then you want me to take a check or whatever and send them to you or cash (inaudible) and send it to you. You're asking me to do a bit much especially if your cash does not get there.

**JP:** Sorry

**█:** You know what I'm saying? With that amount of money ok. When FedEx walks the dog over the box or walks over all the boxes. With that amount of money, you're bound to have some type of money touched by narcotics (inaudible)

**JP:** Yeah I see what you're saying

**JP:**          All right

█████████     All right.

█████████     This is ████████ The time is 10 o'clock and I'm completing this conversation.

↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓
↓ **EXHIBIT 06** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

IRS-CI Agent Denise L. Medrano notes based on information provided by the ATF regarding the alleged requested purchase of firearms from "CI 2"; (ITEM No. 23 of March 23, 2010 discovery set).

DISCOVERY 3/23/10

**ITEM 23 – IRS-CI & ATF – Notes Re Firearms Prices Re Firearms Aspect of Case, May 2008.  (1 Page)**

**Medrano Denise L**

| From: | Battista, Fred (USAAZ) ▓▓▓▓▓▓ |
|---|---|
| Sent: | Wednesday, May 21, 2008 1:46 PM |
| To: | Medrano Denise L |
| Subject: | ATF Folks with ▓ Experience |

all them in this order and tell you are calling on my behalf and that I said it was important.

*Handwritten notes:*

MAC 9mm Machine Gun
w/ Silencer — Las Cruces
— obtainable.

MP5 machine gun
Oozie 9mm
on hand
not exact model

next to impossible to get
video game stuff / items.
— wants to know if you're the real deal.

Craig from ATF

▓▓▓▓▓ in Complaint
Swearing on Wednesday
only asking for Andrew + others
on Conspiracy
Referred to AUSA - will have

Agent #1

Greg Cowan    Agent #2

Agent #3

Will meet on Tuesday Regarding list
of prices - call in AM

Chris Gesuk  5/23 10am
└ checking w/ someone for monday

FBI holds onto Computer until morning
IRS will PICK up!

**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**
**⬇ EXHIBIT 07 ⬇**

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

IRS-CI document regarding investigation (relevant pages); Note: document indicates that the the government's "the Hacker" alluded to the possibility that "CI 2" was a CI working with the government.; (10/6/11 BATES Nos. 000034 and 000036 of October 6, 2011 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

**Background**

Information Obtained to Date

CI-2

1

10/6/11 000033

███████████ has provided multiple excuses to the "hacker" as to why he is not yet ready to ship the currency.  Further, he has attempted on multiple occasions to persuade the "hacker" to accept shipments of smaller amounts of currency.  However, those attempts failed.  The "hacker" is now demanding a single shipment of $68,000 in currency in the very near future.  We do not believe ███████████ will be able to stall the "hacker" much longer without further elevating his suspicions.  (He has already alluded to the possibility that ███████████ is a CI working with the government.)  Therefore, ***time is of the essence.***

CI-2

10/6/11 000036

↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓
↓ **EXHIBIT 08** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Email summary by FBI Agent Richard J. Murray (relevant pages); Re: "[t]he cover team claim was pure smoke."; (Summarized email date: August 5, 2008); (ITEM No. 40 of November 24, 2010 discovery set).

# DISCOVERY

# November 24, 2010

# ITEM NO. 40

**FBI-E-Mail summaries regarding internal communications prepared by Special Agent Richard Murray post arrest of Rigmaiden.  (2 Page Summary Released and 4 Pages Withheld)**

August 5, 2008
Internal email Communication prepared by
Special Agent Murray

The evidence collected is consistent that the primary subject picked up the first money
shipment and made some of the atm withdrawals. The cover team claim was pure smoke.

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

**↓ EXHIBIT 09 ↓**

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

IRS-CI Memorandum of Interview of Daniel Rigmaiden's brother; RE: Daniel Rigmaiden is not super-violent, does not express anti-government sentiments, *etc.*; (Interview date: November 18, 2008); (3/2/09 BATES Nos. 6330-6332 of March 2, 2009 discovery set).

[Redacted by the defendant (for relevance and privacy) using white squares with black borders.]

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**



---

| | | |
|---|---|---|
| **In Re:** | RIGMAIDEN, DANIEL | **Location:** |
| **Investigation #:** | 1000220515 | |
| **Date:** | November 18, 2008 | |
| **Time:** | 2:00pm-3:05pm | |
| **Participant(s):** | ☐ Rigmaiden, brother of DANIEL RIGMAIDEN | |
| | Michael Fleischmann, Special Agent, IRS-CI | |
| | William Green, Special Agent, IRS-CI | |

Special Agent Fleischmann contacted ☐ Rigmaiden (☐) via telephone on prior to November 18, 2008. As a result of the phone conversation, a personal interview was set up with ☐ on November 18, 2008.

On the above date, at the above time, and at the above location, Special Agents Fleischmann and Green introduced themselves to ☐ and provided their credentials. Special Agent Fleischmann provided his business card to ☐. ☐ provided the following information:

U.S. Treasury Criminal Investigation

3/2/09 6330

13. [_____]. [___] said RIGMAIDEN kept to himself, and has not expressed anti-government sentiments.

14. He said that RIGMAIDEN is not super-violent. [___] said they shot guns before, but he did not think that RIGMAIDEN had a gun and he definitely did not think he would have an AK-47.

Special Agent
Michael Fleischmann

Special Agent
William Green

I prepared this memorandum on December 15, 2008, after refreshing my memory from notes made during and immediately after the meeting with [___] Rigmaiden.

U.S. Treasury Criminal Investigation

3/2/09 6331

Special Agent
Michael Fleischmann

I certify that this memorandum has recorded in it a summary of all pertinent matter that occurred on November 18, 2008.

Special Agent
William Green

U.S. Treasury Criminal Investigation

3/2/09 6332

↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓
↓ **EXHIBIT 10** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Summary of rough notes by AUSA Frederick A. Battista taken while he was involved in the investigation to locate the aircard: "Team Hacker is Law Enforcement officers Medrano, Fleischmann, Murray, Daun and Wilson." (Date: June 27, 2010); (ITEM No. 1 of September 24, 2010 discovery set [p. 1-2, 5]).

[Redacted by the defendant (for relevance) using white squares with black borders.]

# DISCOVERY

# September 24, 2010

# ITEM NO. 1

**Redacted Summary of Personal Notes for AUSA Fred Battista from June 20, 2008 to August 4, 2008.  (4 Pages.)**

Redacted Summary of Personal Notes for AUSA Fred Battista From June 20, 2008 to August 4, 2008, Re: <u>United States v. Daniel David Rigmaiden, et al.</u>, CR-08-814-PHX-DGC.

6/27/10

1

Team Hacker & W. Ng - Gate analysis for Hacker Apt complex sent to team via e-mail.  (Team Hacker is Law Enforcement officers Medrano, Fleischmann, Murray, Daun and Wilson.)
7/25/08

⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇
⬇ **EXHIBIT 11** ⬇

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Text message from IRS-CI Agent Michael P. Fleischmann to FBI Agent Richard J. Murray; RE: "I just remembered the judge said this case could be a movie[.]"; Note: includes cover sheet and page Nos. 1, 2, 8, 9, and 15 of original assemblage of text messages provided by the government; (ITEM No. 6 of December 9, 2011 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

United States v. Daniel David Rigmaiden
CR-08-814-PHX-DGC

Discovery

December 9, 2011

Item 6

Item 6 - Text Messages from FBI Special Agent Murray related to the aircard mission for the time frame of April 16, 2008 through August 22, 2008.  Please note we are still in the process of attempting to locate and process any similar text messages for the tech agents and FBI Special Agent Ng.  (15 Pages)

Key for Text Messages for FBI SA Richard Murray

MF – Mike Flieschmann – IRS-CI

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Non-pertinent texts and duplicate pertinent texts removed on 10/12/2011. rjm | | | | | | |
| 2 | | | | | | | |
| 3 | App | Name/ID | Email | Message_Type | To | From | Callback_Number |



|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 252 | Blackberry_SMS | Murray, Richard J..11404 | Richard.Murray@ | Incoming | | | |
| 253 | Blackberry_SMS | Murray, Richard J..11404 | Richard.Murray@ | Incoming | | | |

All M.F.

| | H | I | J | K | L | M |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | Body | Send/Received_Date | Server_Log_Date | Message_Status | Command | UID |

| H | I | J | K | L | M |
|---|---|---|---|---|---|
| 252 | I | 8/6/2008 4:26 | 8/6/2008 1:28 Rx_Received | Update | |
| 253 | I just remembered the judge said this case could be a movie | 8/6/2008 18:52 | 8/6/2008 14:56 Rx_Received | Add | |

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

**↓ EXHIBIT 12 ↓**

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Copy of Santa Clara police officer Dominic Sandoval's police report for August 3, 2008 arrest of Daniel Rigmaiden; Note: text of report corroborates that Daniel Rigmaiden was demobilized and arrested on the sidewalk in front of Buck Shaw Stadium in Santa Clara, CA;

Note: Contrary to the **many** false claims made in the police report, Daniel Rigmaiden did not resist arrest after being hit with the Santa Clara police cruiser. The story in the police report was concocted after Rigmaiden advised Santa Clara police officers that he would be suing them for hitting him with the police cruiser and for the police brutality that occurred *after* he was placed into handcuffs. Additionally, the Santa Clara fire department advised the Santa Clara police department and federal agents that Rigmaiden had suffered serious injuries and needed to go to the hospital. Law enforcement informed the fire department that Rigmaiden would be brought to the hospital after being taken to the police station and law enforcement signed a waiver provided to them by the fire department. However, law enforcement never took Rigmaiden to the hospital despite the fire department's recommendation and Rigmaiden's specific requests. Instead, federal agents capitalized on the situation by attempting to interrogate Rigmaiden at the Santa Clara police station immediately after he suffered head injuries. Later, at the Santa Clara county jail, an intake nurse made comments to USPIS Inspector James L. Wilson regarding Rigmaiden's abnormal vital signs.

Note: Contrary to the **many** false claims made in the police report, Rigmaiden was actually *hit* to the ground by the police cruiser and the cut on his hand and some of the abrasions were inflicted by Santa Clara police officer Dominic Sandoval. Officer Sandoval's report has no account of him witnessing Rigmaiden fall to the ground so he is in no position to claim, as he falsely did in his report, that Rigmaiden "received [][his] injuries when he tripped and fell to the ground."

(2/12/09 BATES Nos. 301-303 and 308-310 of February 12, 2009 discovery set).

FD-340 (Rev. 4-11-03)

File Number  288A PX 82001 — 1A(23)

Field Office Acquiring Evidence  PX

Serial # of Originating Document _____

Date Received  8/12/08

From  SANTA CLARA POLICE DEPT.
(Name of Contributor/Interviewee)

_____
(Address)

_____
(City and State)

By  Richard J. Murray

To Be Returned  ☐ Yes  ☐ No

Receipt Given  ☐ Yes  ☐ No

Grand Jury Material - Disseminate Only Pursuant to Rule 6 (e)
Federal Rules of Criminal Procedure
☐ Yes  ☐ No

Federal Taxpayer Information (FTI)
☐ Yes  ☐ No

Title:

Reference:  Insert dated 8/12/08
(Communication Enclosing Material)

Description:  ☐ Original notes re interview of
SCPD arrest reports.

2/12/09 301

# Santa Clara Police Department
## Records Division
### 601 El Camino Real
### Santa Clara, California 95050



STEVEN D. LODGE
CHIEF OF POLICE

# FACSIMILE

Date: 8/12/08

Number of pages including cover sheet: 11

To: SA RICHARD MURRAY

Voice Phone: _____

Fax Phone: 602-294-4055

CC: _____

From:

RECORDS

Voice Phone:     (408) 615-4700

Fax Phone:       (408) 248-0276

REMARKS:     ☐ Urgent     ☐ For Your Review     ☐ Reply ASAP     ☐ Please Comment

RECEIVED
8/12/08

### CONFIDENTIALITY NOTICE

THIS FACSIMILE CONTAINS INFORMATION WHICH MAY BE LEGALLY PRIVILEGED AND WHICH IS INTENDED ONLY FOR THE USE OF THE RECIPIENT NAME ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY SUCH DISSEMINATION OR COPYING OF THIS INFORMATION MAY BE A VIOLATION OF LAW, IN SOME CASES, A FELONY. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE.

2/12/09 302

AUG 11,2008 16:08                                        000-000-00000
                                                                                    Page 1

**FD-448**
Revised
10-27-2004

FEDERAL BUREAU OF INVESTIGATION
## FACSIMILE COVER SHEET

### PRECEDENCE
○ Immediate            ○ Priority                              ● Routing

### CLASSIFICATION
○ Top Secret      ○ Secret      ○ Confidential      ● Sensitive      ○ Unclassified

### TO

| Name of Office: | Facsimile Number: | Date: |
|---|---|---|
| **Santa Clara Police Department** | 408-248-0276 | 08/11/2008 |
| Attn: | Room: | Telephone Number: |
| **Records Department** | | 408-615-4700 |

### FROM

| Name of Office: | Number of Pages: (including cover) |
|---|---|
| **FBI Phoenix** | **1** |
| Originator's Name: | Originator's Telephone Number: | Originator's Facsimile Number: |
| **SA Richard Murray** | **602-650-3092** | **602-294-4055** |
| Approved: | | |

### DETAILS

Subject:

**Please provide a copy of all reports on SCPD case number 08-8365 to Phoenix FBI SA Richard Murray . This case number documents the arrest of an individual using the name Steven Brawner on August 3, 2008 in the area near El Camino Real and Railroad Avenue, Santa Clara, CA.**

Special Handling Instructions:

**The requested reports may be returned via fax at 602-294-4055 or by mail to FBI, Attn: SA Richard Murray, 201 E Indianola Ave, Phoenix, AZ 85012.**

Brief Description of Communication Faxed:

**Records request**

### WARNING

Information attached to the cover sheet is U.S. Government Property. If you are not the intended recipient of this information disclosure, reproduction, distribution, or use of this information is prohibited (18.USC, § 641). Please notify the originator or local FBI Office immediately to arrange for proper disposition.

FD-448 (Revised 10-27-2004)              Page 1 of 1              FEDERAL BUREAU OF INVESTIGATION

2/12/09 303

# SANTA CLARA POLICE DEPT

**08-8365**

Supplement No
0002

601 EL CAMINO REAL

Nature of Call
WRNT ARR

Reported Date
08/04/2008

Officer
DOMINIC SANDOVAL

(408) 615-4700

## Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|
| SANTA CLARA POLICE DEPT | 08-8365 | 0002 | 08/04/2008 | 01:38 |

| Status | Nature of Call |
|---|---|
| REPORT TO FOLLOW | WARRANT ARREST - LOCAL AND OUT OF JURISD |

| Location | City | Zone | Area | Beat |
|---|---|---|---|---|
| EL CAMINO REAL ST/RAILROAD AV | SANTA CLARA | 036 | 03 | 3 |

| From Date | From Time | Officer |
|---|---|---|
| 08/03/2008 | 16:30 | S0825/DOMINIC SANDOVAL |

| Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|
| SPECIAL ENFORCEMENT TEAM | S0825 | SPECIAL ENFORCEMENT TEAM | Successful |

| Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | S7121 | 08/04/2008 | 10:33:46 |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | OUTFELWRNT | OUT FELONY WRNT | |

## Summary Narrative

On 08/03/08 I was flagged down by a plain clothes FBI agent. The agent told me he had located a wanted subject. He requested our (SCPD) assistance in taking the wanted suspect into custody. The suspect, Steven Brawner, fled on foot when we (SCPD) approached. After a foot pursuit, Brawner was caught. When caught he forcibly resisted arrest. Physical force was used to take Brawner into custody.

## REPORTING PARTY 1: KOBZANETS, ALEX

| Involvement | Invl No | Type | Name | SCID |
|---|---|---|---|---|
| REPORTING PARTY | 1 | Individual | KOBZANETS, ALEX | 341521 |

| Race | Sex | PRN |
|---|---|---|
| WHITE | MALE | 213660 |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 1919 SOUTH BASCOM AV | SAN JOSE |

| State | ZIP Code | Date |
|---|---|---|
| CALIFORNIA | 95008 | 08/04/2008 |

| Phone Type | Phone No | Date |
|---|---|---|
| BUSINESS | (408) 369-8900 | 08/04/2008 |

| Type | EMail |
|---|---|
| Business | aleksandr.kobzanets@ic.fbi.gov |

## Narrative

REPORT BY OFFICER SANDOVAL:

DETAILS:

On 08/03/08 at approximately 1625 hours I was on duty in full SCPD uniform. I was in a marked SCPD patrol car with Officer T. Luong.

Officer Luong was driving and I was seated in the front passenger seat. As we drove into the driveway at 495 El Camino Real a plain clothes FBI officer approached us on foot. The FBI agent, A. Kobzanets, told me he was following a wanted subject on foot.

Agent Kobzanets told me the FBI had an active arrest warrant for Steven Brawner. Agent Kobzanets told me he had just seen Brawner walking near the Starbucks coffee shop. I asked Agent Kobzanets what Brawner was wearing. Agent Kobzanets told me Brawner was wearing blue jeans and a dark colored shirt.

| Report Officer | Printed At | |
|---|---|---|
| S0825/DOMINIC SANDOVAL | 08/12/2008 10:31 | Page 1 of 3 |

2/12/09 308

# SANTA CLARA POLICE DEPT

08-8365

Supplement No 0002

**Narrative**

Agent Kobzanets then showed me a picture of Brawner on his PDA type device. I looked at the photo. Agent Kobzanets told me Brawner was considered to be "armed and dangerous."

Officer Luong then drove around the parking lot towards the Starbucks. As we continued to drive around the building I saw a white male who was wearing a dark top and blue jeans. The male was standing on the side of the building near some plants. The male was looking around side to side and "ducking down" behind the plants.

I told Officer Luong there was a male at the side of Starbucks who matched the suspect we were looking for. Officer Luong drove towards the Starbucks and the male started to run E/B very quickly.

Officer Luong drove E/B and I watched as the male sprinted into the underground parking garage East of the Starbucks. As we pulled along side the garage, the male looked in our direction and then turned right, running towards SCU.

I got out of the police car and ran after the suspect. Officer Luong continued in the police car to try and get ahead of the suspect. I continued running and I was approximately 15-20 yards behind the suspect as I was yelling at him to stop. I continued yelling this as I chased him. Officer Luong was on the police radio asking for more police units and updating our location(s).

The suspect kept running. As we crossed El Camino Real, going over the center median, the suspect looked back at me but he did not stop. Shortly thereafter I saw a marked SCPD police car E/B in front of us.

Brawner did not stop. He kept running as the police car was next to him. Brawner had now reached the sidewalk in front of Buck Shaw Stadium. He was still running as Officer Selberg pulled onto the sidewalk in an effort to get Brawner to stop. Brawner ran into the front fender of Officer Selberg's vehicle but he still did not stop. He continued to run.

As I came around Officer Selberg's vehicle I saw Officer N. Crescini approaching Brawner as Brawner was laying on his stomach, on the sidewalk. Officer Selberg was approximately 10-15 feet away from Brawner with his handgun drawn. Officer Selberg was yelling at Brawner to "show his hands."

At this time I could see Brawner's left hand was still under his body. His left arm was positioned in a way that Brawner's hand was directly under his waistband area. Brawner was wearing a long sleeve top that extended past his waistband.

Brawner was on his stomach and his left hand was not visible. At this time he had still not been pat searched.

From my training and experience, I know the waistband area is a part of the body where criminals commonly hide weapons. The waistband area allows ready access to weapons and the waistband area is easily concealed with a long shirt or jacket. This, the fact that Brawner fled, was refusing to show his hand, and the information from Agent Kobzanets that Brawner was armed and dangerous led me to believe Brawner could likely be armed and trying to get to a weapon.

I immediately kicked Brawner's left arm and dropped my knee on his shoulder. As I did this I yelled at him to "stop resisting." I then grabbed Brawner's left upper arm in an effort to immobilize it. Once Officer N. Crescini got a handcuff on Brawner's (R) wrist I pulled on his left arm, Brawner continued to resist by pulling his left arm under his body. In an effort to get control of Brawner's left arm I struck him (3) times with my (R) elbow on his left shoulder blade area. As I did this I was pulling on his left arm with my (L) hand.

After doing the strikes I was able to pull Brawner's left arm/hand out from under his body. Officer N. Crescini and I were able to finish putting handcuffs on Brawner. Brawner was then pat searched. No weapons were found on his person. Officer Blass assisted me by tracing Brawner's path. Officer Blass looked for any possible weapons that Brawner might have discarded as he fled. No weapons were found.

MEDICAL:
Once Brawner was safely taken into custody, SC Fire treated his injuries. Brawner had several abrasions to the side of his face. He also had a small (1") cut on one of his right hand. Brawner received these injuries when he tripped and fell to the ground. Brawner was uncooperative with SC fire and he refused any medical aid beyond a bandage on his right hand.

| Report Officer | Printed At | |
|---|---|---|
| S0825/DOMINIC SANDOVAL | 08/12/2008 10:31 | Page 2 of 3 |

2/12/09 309

# SANTA CLARA POLICE DEPT

**08-8365**

Supplement No
0002

## Narrative

Brawner was then transported to SCPD for processing. After processing Brawner was booked at County Jail for his arrest warrant. A copy of the arrest warrant is attached to this report.

NFI
D. Sandoval #41
SCPD

| Report Officer | Printed At | |
|---|---|---|
| S0825/DOMINIC SANDOVAL | 08/12/2008 10:31 | Page 3 of 3 |

2/12/09 310

↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓
↓ **EXHIBIT 13** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Google Maps (website screenshot), Buck Shaw Stadium, 500 El Camino Real, Santa Clara, CA 95050, *available at* http://maps.google.com (last accessed Sept. 25, 2012) (google maps view of Buck Shaw Stadium (marked with red star), the Domicilio apartment complex (marked with green star), and Starbucks (marked with yellow star)); Note: using the distance legend embedded on the map, the approximate distance from the sidewalk measured from the center of Buck Shaw stadium to the entrance of the Domicilio apartment complex is 0.35 miles along El Camino Real.





To see all the details that are visible on the
screen, use the "Print" link next to the map.



↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓
↓ **EXHIBIT 14** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Paper print-out of email from IRS-CI Agent Tracy L. Daun to AUSA Frederick A. Battista RE: IRS-CI Agent Daun was able to get around encryption issue; (Email sent date: August 25, 2008 5:47am); (12/9/11 BATES Nos. 250-251 of December 9, 2011 discovery set).

**Daun Tracy L**

**From:**     Daun Tracy L
**Sent:**     Thursday, August 28, 2008 4:40 PM
**To:**       Fred.Battista▓
**Subject:** FW: Computer Evidence - Followup

*Internal communications Redacted.*

Fred,

For the two items below that I hadn't had a chance to glance at, here is the status:

- Portable harddrive from storage unit - analysis has been started and evidence has been located. Analysis is not complete. (Contains an encrypted container backup of encrypted container from apartment.)
- Seagate 250 GB hard drive from apartment - no evidence was located - could be returned

Tracy L. Daun
Special Agent, CIS
IRS-CI
▓
Phoenix AZ 85012
▓

---

**From:** Daun Tracy L
**Sent:** Monday, August 25, 2008 5:47 PM
**To:** 'Fred.Battista▓
**Cc:** Medrano Denise L; Fleischmann Michael P; 'Richard.Murray▓        'JLWilson▓
**Subject:** Computer Evidence

Fred,

▓▓▓▓▓▓▓▓▓▓▓▓▓ Below is a summary of all computer evidence seized, the status of the analysis, etc. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ I was able to image each of the items and feel pretty confident that I have gotten around the encryption issue. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



## Storage Unit

- Portable Harddrive - I just noticed this on the Items Seized.  I received the drive today and will work on imaging it and checking it.  I've been told they believe it is blank.  I hope to have an answer for you on this by Wednesday morning.

## Apartment (Search #1)

Items in which analysis has been started, but have not identified any evidence yet - analysis not complete

- Seagate 250 GB hard drive - working on this item yet.  Hope to have this one done tomorrow.  I don't expect to find anything on it.  I believe it was a new drive.

Items which analysis has been started and evidence has been located.  Analysis is not complete.

- 5 cell phones - phones have been sent to a CIS in San Diego who has received advanced cell phone forensic training -
- Cool Gear External HDD Model TBM 120
- Acer laptop Aspire
- Image of Craft External Hard Drive
- Craft External Hard Drive Enclosure - physical item of above image - seized physical drive due to unknown encryption issues
- WinRAR Archive - Live acquisition attempt of item above, that did not complete, but does contain evidence
- Image of Hitachi 100GB HDD
- IMB Thinkpad S/N LV-C4398 with mouse, keys, docking station and power cord - physical item of above image - seized physical laptop due to unknown encryption issues and for possible DNA and fingerprinting analysis)

Items which were seized as evidence themselves - not necessarily for the data on them.

- MSR206 Magnetic Strip Card Reader/Writer
- Keyboard - no analysis to do - seized for possible DNA or fingerprinting analysis.  Was not connected to any computer when seized, but was sitting on table in corner that the IBM laptop was sitting on
- Epson Stylus Photo R1900 S/N KBQE004967 - I don't believe this has internal memory, but I would need to look into.  This item was seized as equipment used to produce false identifications
- Epson Perfection V750 ProScanner S/N G77W001673 - I don't believe this has internal memory, but I would need to look into.  This item was seized as equipment used to produce false identifications
- Alps printer MD-1000 S/N B28C0948H - I don't believe this has internal memory, but I would need to look into.  This item was seized as equipment used to produce false identifications
- Epson Stylus Photo 960 S/N EPVY024944 - I don't believe this has internal memory, but I would need to look into.  This item was seized as equipment used to produce false identifications
- Family Tree Maker Manual and CDs including Social Security Death Index
- CDs for scanner software, Photoshop elements, and Lasersoft imaging - seized as equipment used to produce false identification

Items on which no evidence was located - could be returned:

01/20/2010

⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇
⬇ **EXHIBIT 15** ⬇

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

FBI FD-302 Report by FBI Agent Richard J. Murray RE: Zeljka Grabovcic is a witness who knows Daniel Rigmaiden as Steven Brawner; Note: the report contains a typo of "Travis Brawner" that should read "Steven Travis Brawner"; (Interview date: July 23, 2008); (2/12/09 BATES Nos. 143-144 of February 17, 2009 discovery set).

[Redacted by the defendant (for relevance) using white squares with black borders.]

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    07/26/2008

On July 23, 2008, Zelika Grabovcic (Protect Identity),
███████████████████████████████ was interviewed at the offices of ███████
█████████████████████████. California. After being
provided the identities of the interviewing agents and nature of
the interview, Grabovcic (PI) provided the following information:

Grabovcic (PI) was shown a photocopy of a California
Driver's License bearing the name Travis Brawner. Grabovcic (PI)
advised that she rented an apartment to the individual whose
picture appears on the driver's license.  Grabovcic (PI) stated
that Brawner rented the apartment immediately without Grabovcic
(PI) needing to convince Branwer to rent the apartment.  Brawner
informed Grabovcic (PI) that he was moving to Santa Clara from San
Francisco for a job.

Grabovcic (PI) described Brawner as short, skinny and
acne-scarred with dark hair and dark eyes.  Grabovcic (PI)
estimated Brawner's age as between 26 and 30 years old.  Brawner's
hair was slightly curly.  When asked about an accent, Grabovcic
(PI) stated that Brawner did not speak much.  Grabovcic (PI)
recalled his occupation to be business related.  Grabovcic (PI)
stated that she saw Brawner once after he rented.  Branwer did not
rent furniture for his apartment.

Investigation on    07/23/2008    at Santa Clara, California

File #  288A-PX-82001 -93

Date dictated

by   SA Richard J. Murray:rjm   IRS-CI SA Michael Fleischmann

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

12/09 143

FD-302a (Rev. 10-6-95)

288A-PX-82001

Continuation of FD-302 of ____Zeljka Grabovcic_____, On _07/23/2008_ , Page __2__

        United States Postal Inspector Quan P. Howard was present
and participated in this interview.

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ← ←**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

**↓ EXHIBIT 16 ↓**

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Rental documents for storage unit No. A-47, CBD Indoor Mini Storage, 570 Cinnabar Street, San Jose, California 95110; Note: rented under the name of Daniel Aldrich; (2/19/09 BATES Nos. 4913-4920 of February 20, 2009 discovery set).

[Redacted by the defendant (for privacy) using white squares with black borders.]

Rental Agreements &
Related Documents

# CBD INDOOR MINI STORAGE RENTAL AGREEMENT

A47

THIS AGREEMENT is executed in duplicate this 28th day of June 20 07 by and between CBD INDOOR MINI STORAGE (Landlord)

and Daniel Aldrich A47 (Occupant)

whose address is set forth below, for the purpose of renting that certain spaces being described as Number _____ , Size being

approximately 5 x 10 , located within that certain self-storage facility located at 570 Cinnabar
Street, San Jose, California, 95110, (408-292-4800) hereinafter referred to as the "premises", "storage space" or "unit" on the following terms and conditions:

1.   TERM: The term of this tenancy shall commence on June 28, 2007 and shall continue from the first day of the
month immediately following, on a month-to-month basis until terminated as hereinafter provided. The minimum rental term is one (1) month.

2.   RENT AND FEES: The monthly rent shall be $ 70.00 . Rent is due on the first day of each calendar month, in advance and without
demand. Landlord reserves the right to require that rent and other charges be paid in cash, certified check or money order. Landlord may change the monthly rent or other charges
by giving Occupant thirty (30) days advanced written notice at the address stated in this agreement. The new rent shall become effective on the next month rent is due. If Occupant
has made advanced rental payments, the new rent will be charged against such payments, effective upon giving notice of the new rate. In the event Occupant terminates and
vacates within the initial thirty (30) days of this Agreement, the rent shall NOT be prorated. In the event Landlord does not receive the rent as due within ten (10) days after the first
day of each and every subsequent month, Occupant agrees to pay Landlord a late fee of fifteen percent (15%) of the monthly rent but not less than $10.00 per unit. Occupant
agrees to pay to Landlord a twenty-five dollar ($25.00) returned check fee plus all bank charges for any dishonored check. Landlord does not waive Landlord's right to seek
damages as provided by California Civil Code sec. 1719 if Occupant fails to promptly make full payment on any dishonored check. These fees are liquidated damages to
compensate Landlord for labor and other costs of collection and are additional rent. Occupant also agrees to pay all lien charges and fees now in effect or put into effect by Landlord.

## NOTICE OF LIEN: PURSUANT TO THE CALIFORNIA SELF-SERVICE STORAGE FACILITY
## ACT (CALIF. BUSINESS AND PROFESSIONS CODE SECTION 21700 ET SEQ) OCCUPANT'S
## PROPERTY WILL BE SUBJECT TO A CLAIM OF LIEN FOR UNPAID RENT AND OTHER
## CHARGES AND MAY EVEN BE SOLD TO SATISFY THE LIEN IF RENT AND OTHER CHARGES
## DUE REMAIN UNPAID FOR FOURTEEN (14) CONSECUTIVE DAYS.

3.   DEPOSITS: Occupant agrees to pay, in advance, a security deposit of $ 25.00 upon execution of this agreement. Occupant agrees that Landlord need not
segregate this deposit from rent, and that no interest shall be paid. The deposit shall be returned to Occupant within fourteen (14) days of vacating the unit provided that the
rent is current, the storage space is left clean and lock removed. At Landlord's sole option, all or part of the security deposit may be withheld from the deposit to compensate the
Landlord for rent, damage to the storage unit or any other default under this rental agreement.

4.   ACCESS: Occupant's access to the premises may be conditioned in any manner deemed reasonably necessary by Landlord to maintain order on the premises. Such
measures may include, but are not limited to, limiting hours of operation, requiring verification of Occupant's identity, requiring Occupant to sign in and out upon entering and leaving
the premises and inspecting vehicles that enter the premises.

5.   PREMISES: Occupant's accepts the space as being in good condition and repair. Occupant will immediately notify Landlord of any defect in the storage space. Occupant's
will keep the premises in good condition and will pay Landlord for repairs necessary due to negligence or misuse while under Occupant's control.

6.   LANDLORD'S RIGHT TO ENTER: Landlord grants Occupant, Landlord's agents, or representatives of any governmental authority access to the storage space upon two (2)
days advanced written notice to Occupant mailed to the address provided by Occupant in this agreement. If Occupant fails to respond to such notice, permission shall be implied.  In
the event of an emergency, or to make necessary repairs, Landlord shall have the right to enter the storage space without notice to Occupant, and take such action to preserve the
premises, to comply with applicable law or to enforce Landlord's rights.

7.   TERMINATION: Thirty (30) days written notice given by Landlord or Occupant to the other party will terminate this tenancy. The actual date of termination shall be the latest
of the 30th day of the written notice or the date this Occupant shall personally report to the facility office, personnel that they have vacated the storage space completely. Occupant will
request a "Termination Report" to reflect the rent prorating, if any, and any security deposit to be refunded.  In the event Occupant fails to notify the facility's personnel of vacating the
space, Landlord shall estimate the actual date of Occupant's leaving the space and calculate rent prorating accordingly.

8.   NO ASSIGNMENT OR SUBLETTING: Occupant shall not assign or sublease the storage space without the written permission of the Landlord.

9.   SECURITY OF SPACE/LOCKS: Occupant shall lock the space upon execution of this rental agreement. Occupant shall provide, at Occupant's own expense, a lock for the
space that Occupant deems sufficient to secure the space.  Landlord is not responsible for taking any measures whatsoever to secure access to Occupant's space, regardless of
whether Occupant's security devices or locks used to secure access to the space are rendered ineffectual for their intended use from any cause, or where the space is rendered
insecure in any manner. Further, Landlord is under no duty to notify Occupant that access to the space has become insecure or that any locks or security devices have been
rendered ineffectual for their intended purpose from any cause. In the event Landlord takes any measures to re-secure the access to Occupant's space under this paragraph such
measures or action shall not constitute a bailment by Landlord or deposit of goods for safekeeping upon Landlord's part nor shall alter the limitations upon Landlord's liability as set
forth in paragraphs 14, 15, 16 or 17 of this Agreement, nor shall any such measures be deemed a conversion of Occupant's property. By placing Occupant's initials here
_____ , Occupant acknowledges that Occupant has read and understands this Paragraph 9.

10.   NOTICES: All notices required by this Rental Agreement shall be sent by first class mail postage pre-paid to Occupant's last known address. Notices shall be deemed
given when deposited in the United States mail. Occupant agrees that any such notice is conclusively presumed to have been received by Occupant five (5) days after mailing,
unless returned to Landlord by the U. S. Postal Service with statutory notices shall be sent as required by law. LANDLORD WILL NOT ACCEPT ANY CHANGES BY TELEPHONE
- NO EXCEPTIONS. By placing Occupant initials here _____ . Occupant acknowledges that Occupant has read and understands this Paragraph 10.

11.   NO ORAL AGREEMENTS: This Rental Agreement contains the entire Agreement between Landlord and Occupant, and no oral agreements shall be of any effect
whatsoever. Occupant agrees that he is not relying, and will not rely, upon oral representation made by Landlord or by Landlord's agents or employees purporting to modify or add to
this rental agreement. By placing Occupant initials here _____ . Occupant acknowledges that Occupant has read, agrees to and understands this paragraph
No. 11.

12.   USE OF STORAGE SPACE: Landlord is not engaged in the business of storing goods for hire and no bailment is created under this agreement. Landlord exercises neither
care, custody or control over Occupant's stored property.  Occupant agrees to use the storage space only for the storage of property owned by Occupant.  Occupant agrees
not to store collectibles, heirlooms, jewelry, works of art or any property having special or sentimental value to Occupant.  Occupant waives any claim for emotional or sentimental
attachment to the stored property.  Occupant agrees not to store perishable items, flammable materials, explosives or other dangerous property. Occupant agrees not to store
property with a total value in excess of $10,000.00 without the written permission of Landlord.  If such written permission is not obtained, the value of Occupant's property shall be
deemed not to exceed $10,000.00. Nothing herein shall constitute any agreement or admission by Landlord that Occupant's stored property has any value, nor shall anything after
the release of Landlord's liability set forth below. By placing Occupant's initials here _____ . Occupant acknowledges that Occupant has read and understands this
Paragraph 12.

13.   HAZARDOUS OR TOXIC MATERIALS PROHIBITED: Occupant is strictly prohibited from storing or using any materials in the storage space or in the facility classified as
hazardous or toxic under any local, state or federal law or regulation, and from engaging in any activity which produces such materials. Landlord may enter the storage space at any
time to remove and dispose of prohibited items at any time after date of discovery.

14.   INSURANCE: Occupant, at Occupant's expense, shall maintain a policy of fire, extended coverage endorsement, burglary, vandalism and malicious mischief insurance for
the actual cash value of stored property. Insurance on Occupant's property is a material condition of this agreement and is for the benefit of both Occupant and Landlord. Failure to
carry the require insurance is a breach of this agreement and Occupant assumes all risk of loss to stored property that would be covered by such insurance. Occupant expressly
agrees that the insurance company providing such insurance shall not be subrogated to any claim of Occupant against Landlord, Landlord's agent or employees for loss of or
damage to stored property. The provisions of this paragraph will not limit Landlord's rights under Paragraph Nos. 15, 16 and 17. By placing Occupant's initials here
_____ . Occupant acknowledges that Occupant has read and understands this Paragraph 14.

15.   RELEASE OF LANDLORD'S LIABILITY FOR PROPERTY DAMAGE: All personal property stored within or upon the storage space by Occupant shall be at Occupant's
sole risk.  Landlord and Landlord's agents and employees shall not be liable for any loss of or damage to any personal property at the self storage facility arising from any cause
whatsoever including, but not limited to, burglary, mysterious disappearance, fire, water damage, rodents, Acts of God, the active or passive acts or omissions or negligence of the
Landlord's, Landlord's agents or employees. By placing Occupant's initials here _____ . Occupant acknowledges that Occupant has read and understands this
Paragraph 15.

16.   RELEASE OF LANDLORD'S LIABILITY FOR BODILY INJURY: Landlord, Landlord's agents or employees shall not be liable to Occupant for injury or death as a result of
Occupant's use of the storage space or the self storage facility, even if such injury is caused by the active or passive acts or omissions or negligence of the Landlord, Landlord's
agent or employees.

17.   INDEMNIFICATION: Occupant agrees to indemnify, hold harmless and defend Landlord from all claims, demands, actions or causes of action (including attorney's fees and
all costs) that are hereinafter brought by others arising out of the Occupant's use of the storage space and common areas, including claims for Landlord's active negligence. By
placing Occupant's initials here _____ . Occupant acknowledges that Occupant has read, understands and agrees to this Paragraph 17.

18.   PROPERTY LEFT ON PREMISES: Landlord may dispose of any property left on the premises by Occupant after Occupant has terminated his or her tenancy. Occupant
shall be responsible for paying all costs incurred by Landlord in disposing of such property.

19.   WAIVER OF JURY TRIAL: Landlord and Occupant waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross complaint in any action
brought by either Landlord against Occupant or Occupant against Landlord on any matter arising out of or in any way connected with this rental agreement, Occupant's use of
occupancy of the storage space or any claim of bodily injury or property damage or the enforcement of any remedy under any law, statute or regulation. By placing Occupant's initials
here _____ . Occupant's acknowledges that Occupant's has read and understands this Paragraph 19.

20. **CHANGE OF ADDRESS:** Occupant shall notify Landlord, in writing, of a change of address. The address change shall become effective when acknowledged by Landlord in writing. All notices required by this agreement or by law shall be sent only to the address provided in this agreement or written change delivered by Occupant and acknowledged by Landlord in writing.

21. **VALIDITY:** If any part of this lease is unenforceable for any reason whatsoever, it shall not affect the balance of the Agreement otherwise found to be valid and enforceable. The captions of this Rental Agreement are for convenience only, and are not a part of this Agreement, and do not in any way limit or amplify the terms or provisions of this Agreement, and shall not have any effect on its interpretation.

22. **CHANGE OF TERMS:** Landlord may change any of the terms of this rental agreement by giving Occupant thirty (30) days advanced written notice as provided for in the NOTICE paragraph above.

23. **TIME:** Time is of the essence of this Rental Agreement.

24. **NO WARRANTIES:** No expressed or implied warranties are given by Landlord, Landlord's agents or employees as to the suitability of the storage space for Occupant's intended use. Landlord disclaims and Occupant waives any implied warranties or suitability or fitness for a particular use.

25. **SUCCESSION:** All provisions of this Agreement shall inure to the benefit of and be binding on the heirs, executors, administrators, representatives, successors and assigns of the parties hereto.

26. **RULES AND REGULATIONS:** Landlord has established and posted rules and regulations for the safety, care and cleanliness of the storage space or the preservation of good order on the facility. Occupant agrees to follow all rules and regulations now in effect, or Landlord may put that into effect from time to time.

**DO NOT SIGN THIS AGREEMENT UNTIL YOU HAVE READ IT AND FULLY UNDERSTOOD IT. THIS AGREEMENT LIMITS THE LANDLORD'S LIABILITY FOR LOSS OR DAMAGE TO YOUR STORED PROPERTY. IF YOU HAVE ANY QUESTIONS CONCERNING ITS LEGAL EFFECT, CONSULT YOUR LEGAL ADVISOR.**

IN WITNESS WHEREOF, the parties hereto have executed this Rental Agreement the day, month and year first above written.

**CBD INDOOR MINI STORAGE**

By: _____
   AUTHORIZED AGENT

OCCUPANT: DANIEL ALDRICH
         NAME (PLEASE PRINT)

SIGNATURE: David Aldrich

ADDRESS: PO BOX 4626

CITY: CHICO       STATE: CA      ZIP: 95928

HOME PHONE #:(408) 224 - 5103      WORK PHONE #(_____)

SOCIAL SECURITY #: 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      DRIVERS LIC #: D7113902

ACCESS LIST: NONE

**ALTERNATE ADDRESSEE:** PLEASE PROVIDE THE NAME AND ADDRESS OF ANOTHER PERSON TO WHOM ANY WRITTEN NOTICES MAY BE MAILED OR OTHERWISE CONTACTED IN YOUR ABSENCE. PLEASE INDICATE IF THIS PERSON IS ALLOWED ACCESS TO YOUR UNIT.

NAME/S: NONE _____      PHONE #:(_____)

ADDRESS: _____      CITY: _____      ST/ZIP: _____

ACCESS TO UNIT (YES or NO): _____

DEPARTMENT OF THE TREASURY
Internal Revenue Service
Criminal Investigation

DENISE MEDRANO
SPECIAL AGENT
86-17433

Office: (480) 503-7341
Fax: (480) 503-7333

1818 East Southern Avenue
Suite 15, Mail Stop 9130-MES
Mesa, AZ 85204

2/19/09 4915





CBD Indoor Mini Storage
570 Cinnabar St
San Jose CA 95110
408-292-4800

**New Contract Receipt**

Customer:

Daniel Aldrich
P. O. Box 4626
Chico, CA 95928

| | |
|---|---|
| Date: | 6/28/2007 |
| Contract: | |
| Effective: | 6/28/2007 |
| Salesperson: | JAM |
| Reference: | 22473 |

Unit(s):   A047                                    $70.00 Monthly Rent

| Date | Unit | Description | Amount | Tax | Balance |
|---|---|---|---|---|---|
| 6/28/2007 | A047 | Security Deposit | $25.00 | $0.00 | $25.00 |
| 6/28/2007 | A047 | Move-In rent charge 6/28 To 7/27 | $70.00 | $0.00 | $95.00 |
| 6/28/2007 | | Payment - Cash | ($244.03) | $0.00 | ($149.03) |
| 7/28/2007 | A047 | Rent Charge 7/28 To 7/31 | $9.03 | $0.00 | ($140.00) |
| 8/1/2007 | A047 | Rent Charge 8/1 To 8/31 | $70.00 | $0.00 | ($70.00) |
| 9/1/2007 | A047 | Rent Charge 9/1 To 9/30 | $70.00 | $0.00 | $0.00 |
| 10/1/2007 | A047 | Rent Charge 10/1 To 10/31 | $70.00 | $0.00 | $70.00 |

Balance:   $70.00

Next payment:   **$70.00**

Due on:   **10/1/2007**

Thank You

2/19/09 4917

CBD Indoor Mini Storage
570 Cinnabar St
San Jose CA 95110
408-292-4800

To:    Daniel Aldrich                          Date:        8/4/2008
       P. O. Box 4626
       Chico, CA 95928

       Address Service Requested

Customer:   Daniel Aldrich

# Customer Ledger

| Date | Unit | Description | Amount | Tax | Balance |
|------|------|-------------|--------|-----|---------|
| 6/28/2007 | A047 | Unit Movein | $0.00 | | $0.00 |
| 6/28/2007 | A047 | Security Deposit | $25.00 | $0.00 | $25.00 |
| 6/28/2007 | A047 | Move-in rent charge 6/28 To 7/27 | $70.00 | $0.00 | $95.00 |
| 6/28/2007 | | Payment - Cash | ($244.03) | $0.00 | ($149.03) |
| 7/28/2007 | A047 | Rent Charge 7/28 To 7/31 | $9.03 | $0.00 | ($140.00) |
| 8/1/2007 | A047 | Rent Charge 8/1 To 8/31 | $70.00 | $0.00 | ($70.00) |
| 9/1/2007 | A047 | Rent Charge 9/1 To 9/30 | $70.00 | $0.00 | $0.00 |
| 10/1/2007 | A047 | Rent Charge 10/1 To 10/31 | $70.00 | $0.00 | $70.00 |
| 10/1/2007 | | Payment - Cash | ($399.00) | $0.00 | ($329.00) |
| 11/1/2007 | A047 | Rent Charge 11/1 To 11/30 | $70.00 | $0.00 | ($259.00) |
| 12/1/2007 | A047 | Rent Charge 12/1 To 12/31 | $70.00 | $0.00 | ($189.00) |
| 1/1/2008 | A047 | Rent Charge 1/1 To 1/31 | $70.00 | $0.00 | ($119.00) |
| 2/1/2008 | A047 | Rent Charge 2/1 To 2/29 | $70.00 | $0.00 | ($49.00) |
| 3/1/2008 | A047 | Rent Charge 3/1 To 3/31 | $70.00 | $0.00 | $21.00 |
| 3/1/2008 | A047 | Discount  6 Mos. <5%> | ($21.00) | $0.00 | $0.00 |
| 3/13/2008 | | Payment - Cash | ($399.00) | $0.00 | ($399.00) |
| 4/1/2008 | A047 | Rent Charge 4/1 To 4/30 | $70.00 | $0.00 | ($329.00) |
| 5/1/2008 | A047 | Rent Charge 5/1 To 5/31 | $70.00 | $0.00 | ($259.00) |
| 6/1/2008 | A047 | Rent Charge 6/1 To 6/30 | $70.00 | $0.00 | ($189.00) |
| 7/1/2008 | A047 | Rent Charge 7/1 To 7/31 | $70.00 | $0.00 | ($119.00) |
| 8/1/2008 | A047 | Rent Charge 8/1 To 8/31 | $70.00 | $0.00 | ($49.00) |
| 8/4/2008 | | Sale + 8.25% Tax | $10.67 | $0.88 | ($37.45) |
| 8/4/2008 | | Payment - Cash | ($11.55) | $0.00 | ($49.00) |

                                                      Balance:     ($49.00)



Page 1

CBD INDOOR MINI STORAGE
Payment History and Current Charges Report

Monday
08-04-08

---

Lease#: 6848                    Status: Active                    Balance as of 08-04-08 is $70.00 advance credit.

---

Customer...... 6128 -- ALDRICH, DANIEL
Address....... P.O. BOX 4626, CHICO, CA 95928

Units..... 1) .A*047*1
Std Rent.. $75.00
SizeCode.. 050*1
UnitDesc.. 5 X 10 DW

Phone#........... 408-228-5103          Moved-in Date...... 06-28-07
Ident-No......... XXX-XX-1157           Monthly Rent....... $70.00
License-No....... D7113902              Deposit............ $25.00
# Active Leases.. 1                     Billing-Option..... Y
Other Leases.....                       Delinquent Status..

| Due-date | Due-amt | Pay-date | Amt-Paid | New-Bal | Slmn | Type | Check# | Deposit | Other | Late | Discount | Rent | Tax |
|----------|---------|----------|----------|---------|------|------|--------|---------|-------|------|----------|------|-----|
| 06-28-07 | 95.00 | 06-28-07 | 95.00 | .00 | JAM | CASH | | 25.00 | .00 | .00 | .00 | 70.00 | .00 |
| 07-01-07 | 9.03 | 06-28-07 | 9.03 | .00 | JAM | CASH | | .00 | .00 | .00 | .00 | 9.03 | .00 |
| 08-01-07 | 70.00 | 06-28-07 | 70.00 | .00 | JAM | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 09-01-07 | 70.00 | 06-28-07 | 70.00 | .00 | JAM | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 10-01-07 | 70.00 | 10-01-07 | 70.00 | .00 | PTK | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 11-01-07 | 70.00 | 10-01-07 | 70.00 | .00 | PTK | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 12-01-07 | 70.00 | 10-01-07 | 70.00 | .00 | PTK | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 01-01-08 | 70.00 | 10-01-07 | 70.00 | .00 | PTK | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 02-01-08 | 70.00 | 10-01-07 | 70.00 | .00 | PTK | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 03-01-08 | 70.00 | 10-01-07 | 70.00 | .00 | PTK | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 03-01-08 | .00 | 10-01-07 | -21.00 | .00 | PTK | CASH | | .00 | .00 | .00 | 21.00 | .00 | .00 |
| 04-01-08 | 70.00 | 03-13-08 | 70.00 | .00 | JW | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 05-01-08 | 70.00 | 03-13-08 | 70.00 | .00 | JW | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 06-01-08 | 70.00 | 03-13-08 | 70.00 | .00 | JW | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 07-01-08 | 70.00 | 03-13-08 | 70.00 | .00 | JW | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 08-01-08 | 70.00 | 03-13-08 | 70.00 | .00 | JW | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 09-01-08 | 70.00 | 03-13-08 | 70.00 | .00 | JW | CASH | | .00 | .00 | .00 | .00 | 70.00 | .00 |
| 09-01-08 | .00 | 03-13-08 | -21.00 | .00 | JW | CASH | | .00 | .00 | .00 | 21.00 | .00 | .00 |
| 08-04-08 | 11.55 | 08-04-08 | 11.55 | .00 | ADM | CASH | | .00 | 10.67 | .00 | .00 | .00 | .88 |
| 10-01-08 | 70.00 | | | | | | | .00 | .00 | .00 | .00 | 70.00 | .00 |

---



MON-SAT 8AM-7PM
SUNDAY 10AM-6PM

**JAMES MATHEWS**
Facility Manager
**(408) 292-4800**
Fax **292-4841**

www.cbdindoorstorage.com

570 Cinnabar Street
San Jose, CA 95110

*Near Stockton and Julian*
*Off Montgomery*

2/19/09 4920

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇
⬇ **EXHIBIT 17** ⬇

IRS-CI Memorandum of Interview by IRS-CI Agent Denise Medrano; RE: James Mathews, manager of CBD Indoor Mini Storage, is a witness who knows Daniel Rigmaiden as Daniel Aldrich; (Interview date: August 4, 2008); (ITEM No. 17 of July 23, 2010 discovery set).

# DISCOVERY

# June 23, 2010

# ITEM NO. 17

**IRS-CI – Memorandum of Conversation prepared Special Agent Denise Medrano, relating to a conversation on August 4, 2008, concerning Storage Unit A-47 at CBD Indoor Storage in San Jose, California.  (1Page).**



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
### Criminal Investigation

## Memorandum of Conversation

| | | Location: | CBD Indoor Storage |
|---|---|---|---|
| **Investigation #:** | 1000220515 | | 570 Cinnabar St. |
| **Investigation Name:** | Daniel D Rigmaiden | | San Jose, CA 95110 |
| **Date:** | August 4, 2008 | | |
| **Time:** | ~ 10:45 a.m. | | |
| **Participant(s):** | James Mathews, Facility Manager | | |
| | Denise Medrano, Special Agent | | |
| | Nick Haney, Special Agent | | |

On August 4, 2008, Special Agents Denise Medrano and Nick Haney contacted CBD Indoor Storage regarding a unit being rented under the name Daniel Clifton Aldrich (Aldrich). James Matthews (Matthews) is the Facility Manager for CBD Indoor Storage and confirmed the renter of unit number A-47 as Aldrich. Matthews stated Aldrich does not come in often and has not seen him in awhile.

Matthew reviewed the rental application and confirmed the following information:

- Name: Daniel Clifton Aldrich
- SSN:        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
- DL #:        7113902

Matthews escorted SA Medrano and Haney to the location of Unit A-47. The unit rented by Aldrich is 5 x 10. The lock on the unit was a combination lock. SA Medrano purchased a key lock from Matthews and placed the lock on the unit. SA Medrano informed Matthews the combination lock currently on the unit would need to be cut if the combination number law enforcement had did not work.

SA Medrano advised Matthews law enforcement was in the process of obtaining a search warrant for the unit.

I prepared this memorandum on June 15, 2010, after refreshing my memory from notes made during and immediately after the conversation with James Matthews.

Memorandum Author        *Denise L Medrano* E

Denise L. Medrano
Special Agent

⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇
⬇ **EXHIBIT 18** ⬇

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

FBI FD-302 Report by FBI Agent Peter A. Jackson RE: Jeff Koche is a witness who knows Daniel Rigmaiden as Daniel Aldrich; (Interview date: September 10, 2008); (2/12/09 BATES Nos. 216-217 of February 17, 2009 discovery set).

[Redacted by the defendant (for relevance and privacy) using white squares with black borders.]

FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    09/15/2008

JEFF KOCHE, date of birth ▮▮▮▮▮▮▮, social security
account number ▮▮▮▮▮▮ was interviewed in a parking lot
adjacent to ▮▮▮▮▮▮▮▮▮▮▮ Chico, California (CA). KOCHE
resides at 1▮▮▮▮▮▮▮▮▮▮▮ and his telephone numbers
are ▮▮▮▮▮▮▮▮▮▮ at home and ▮▮▮▮▮▮▮▮ on cellular. After
being advised of the identities of the interviewing agents and the
nature of the interview, KOCHE provided the following information:

KOCHE confirmed DAN CALVIN ALDRICH rented ▮▮▮▮▮▮▮▮▮▮▮
Chico, CA, from KOCHE from approximately December, 2003 to June,
2004. KOCHE looked at seven photocopied photographs provided by
the interviewing agents and identified ALDRICH in Photograph One, a
copy of which is attached to, and made part of, this FD-302. KOCHE
was unsure if he still had any lease paperwork from ALDRICH, but if
he could locate any, he would provide it to the interviewing agents
at a later date. KOCHE confirmed he wrote a handwritten receipt to
ALDRICH for $950 dated November 20, 2003, as shown to him by the
interviewing agents.

ALDRICH belonged to the ▮▮▮▮▮▮▮▮▮▮▮▮ located
between ▮▮▮▮▮▮▮▮▮▮ in Chico, CA, and was a ▮▮▮▮▮▮
▮▮▮▮▮▮ with ▮▮▮▮▮▮▮▮. ALDRICH seemed computer savvy with his
laptop. KOCHE characterized ALDRICH as a good renter. KOCHE was
unaware if ALDRICH ▮▮▮▮▮▮▮▮▮▮▮▮▮. KOCHE was
unaware of any nicknames for ALDRICH or any activities by ALDRICH
involving fraudulent identification documents.

---

Investigation on    09/10/2008    at   Chico, California

File #   288A-PX-82001 -1▮▮         Date dictated   _____
         SA Peter A. Jackson
by       SA Andrew D. Forristel

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

2/12/09 216

Note

Witness shown
multiple photos of

Def. Rigmaiden.

Def. ID'd

This
one



Photograph 1

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇
⬇ **EXHIBIT 19** ⬇

Letters from Domicilio to Steven Brawner RE: lease for 431 El Camino Real, Apartment No. 1122, Santa Clara, CA. 95050.



October 21, 2008

To:     Steven Brawner #10966111
        CCA-CADC
        PO Box 6300
        Florence, AZ 85232

From:   Victor Nguyen, Assistant Property Manager
        Domicilio
        431 El Camino Real
        Santa Clara, CA 95050

Steven Brawner,

In response to your recent inquiry regarding the move-out statement of your apartment home, we have attached the original documents mailed out to you when possession of the unit was restored to us. The original documents were unable to be forwarded to your new location and were returned to us. To remit payment on your outstanding balance of $1,758.90, please refer to the enclosed documents.

Please feel free to contact me at this address should you have any further questions. I have enclosed my business card for contacting purposes. Thank you for your prompt reply given your current situation.

Regards,

Victor Nguyen
Assistant Property Manager

2



To:     Steven Brawner, PFN #DYP515
        885 North San Pedro Street
        San Jose, CA 95110

Fr:     Victor Nguyen, Assistant Property Manager
        Domicilio Apartments
        431 El Camino Real
        Santa Clara, CA 95050

Re:     Final account statement for #1122

Steven Brawner,

     This is in response to your recent notice to vacate. The eviction process
began after the Three-Day Notice to Pay Rent or Quit was served and went into
effect. After receiving your notice in the mail that you wished to relinquish
possession of your unit back to Domicilio, the eviction process was immediately
stopped. At this time no additional attorney fees or court filings had been
processed. As a result, the only balance owed to us is the unpaid rent for
September rent and general cleaning fees. Upon receiving your notice to vacate
the premises, we were able to enter the unit and assess for damages, charges, or
abandoned possessions. The unit was completely clean with all possessions
removed. As a result, the only cleaning and damage related charges were for a
touch-up cleaning for small missed spots and a prorated charge for a carpet
shampoo. Please let me know if you have any other questions. Enclosed you will
find your Final Account Statement and move-out information from Domicilio
Apartments.

Regards,

Victor Nguyen
Assistant Property Manager
Domicilio Apartments



**PROMETHEUS**

*Building the future today*

DATE: **09/16/2008**

Steven Brawner
Steven Brawner, PFN #DYP515 885 North San Pedro Street
San Jose  CA  95110

Postmaster – Address Correction Requested

RE:   **Domicilio**
      431 El Camino Real #1122
      Santa Clara, CA 95050-4366

**BALANCE DUE: $1758.9**

Dear Steven Brawner,

Enclosed for your information is your Statement of Security Deposit Account.  This statement
indicates that you have an outstanding balance.  These charges are attributed to one or more of
the following: rent, damages, and/or refurbishing costs.  A written statement (from the
resident(s) mentioned above) disputing the validity of the debt, or any portion there of must be
sent to the address listed below within 30 days after receipt of this notice, otherwise the debt will
be assumed to be valid by the debt collector.  In conforming with your Rental Agreement, we
applied your deposit against the charges; however, a balance is still due.

We would appreciate a check for the above amount made payable to the apartment community
and sent to Elizabeth Wells, c/o Prometheus Real Estate Group, Inc., 1900 S. Norfolk Street,
Suite 150, San Mateo, CA  94403

If you have any questions regarding the enclosed information, please write this office
immediately or contact us at (650) 931-3525.

Thank you for your cooperation.

Sincerely,

Elizabeth Wells
Collection Supervisor

EW/md
Enclosure

↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓
↓ **EXHIBIT 20** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Paper print-out of email from FBI Agent Richard J. Murray to FBI agent who conducted ruse Chines food delivery at apartment No. 1122 RE: ruse Chinese food delivery at apartment No. 1122 on July 22, 2008; (Email sent date: August 13, 2009 4:32pm); (ITEM No. 56 of November 8, 2010 discovery set).

# DISCOVERY

## November 8, 2010

## ITEM NO. 56

**FBI - E-Mail, dated August 13, 2009, regarding the request of the FBI undercover agent who performed a ruse Chinese food delivery at Daniel David Rigmaiden's apartment that his actual name not be released.  (1 Page)**

**Murray, Richard J.**

| | |
|---|---|
| **From:** | Murray, Richard J. |
| **Sent:** | Thursday, August 13, 2009 4:32 PM |
| **To:** | |
| **Subject:** | Re: Discovery in PX case |

10-4. I don't think your true name appears on anything to do with that approach.

----- Original Message -----
From:
To: Murray, Richard J.
Sent: Thu Aug 13 18:20:05 2009
Subject: Re: Discovery in PX case

No. The only thing is DO NOT disclose my true name. Use my UC name. Thanks

----- Original Message -----
From: Murray, Richard J.
To:
Sent: Thu Aug 13 18:09:35 2009
Subject: Discovery in PX case

Hey          fyi:  I am doing discovery on the Phoenix 288A that SJ assisted on last year. You did a chinese delivery at the apt of subject with negative results. I will be providing that audio/video to the ausa tomorrow for discovery. If there is any special handling of that at your request, pls let me know. Thanks. Rich

*UC AGENT TRUE NAME*

*Note — this is Def. Rigmaiden's Apt.*

1

↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓
↓ **EXHIBIT 21** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Paper print-out of email from FBI Agent Richard J. Murray to AUSA Frederick A. Battista RE: menu was placed on door of apartment No. 1122 and later removed; (Email sent date: July 23, 2008 8:18am); (ITEM No. 2 of September 24, 2010 discovery set [p. 37]).

Battista, Fred (USAAZ)

| | |
|---|---|
| **From:** | Murray, Richard J. (FBI) |
| **Sent:** | Wednesday, July 23, 2008 8:18 AM |
| **To:** | Battista, Fred (USAAZ) |
| **Subject:** | SJ update |

During the ruse last night, the agent placed a menu in door of 1122. That menu was later removed. The dim light observed on during the previous night's surveillance was not on late last night. There is a chance that there is an occupant.

⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇
⬇ **EXHIBIT 22** ⬇

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Image of undercover FBI agent serving apartment No. 1122 with menu from a Chinese food restaurant; Note: PDF file was created from image extracted from the July 22, 2008 video camera footage of an FBI ruse Chinese food delivery at the Domicilio apartment complex, 431 El Camino Real, Apartment No. 1122, Santa Clara, CA 95050; (ITEM No. 9 of October 7, 2009 discovery set).

[Redacted by the defendant (to conceal undercover agent identity) using yellow frowny face.]

This exhibit is missing because AUSA Frederick A. Battista did not follow the defendant's instruction to provide him
with copies of the **<u>exact discovery CDs</u>** previously lost by court-appointed shadow counsel, Philip Seplow, before the defendant began representing himself.  Because AUSA Battista did not follow the defendant's instruction and instead provided copies
of multiple CDs on a single CD, the undercover video as provided to the defendant in a different form is not viewable and the defendant cannot gain access to this vital exhibit.  *See also* yet another *Motion For Leave To File Motion For Discovery RE: AUSA Battista's Failure To Follow The Defendant's Instruction Or, In
The Alternative, To Dismiss The Case With Prejudice*.

↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓
↓ **EXHIBIT 23** ↓

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

Paper print-out of emails between FBI Agent Richard J. Murray and Christopher A. Calderon RE: menu placed on door of apartment No. 1122 was shortly thereafter removed; (Email sent dates: July 22, 2008 11:49pm; July 23, 2008 1:05am; July 23, 2008 1:47am); (ITEM No. 17 of November 8, 2010 discovery set).

# DISCOVERY

## November 8, 2010

## ITEM NO. 17

**FBI – E-Mail, dated July 22, 2008, regarding survillance of Daniel David Rigmaiden's apartment.  (1 Page)**

## Unknown

**From:**         Calderon, Christopher A.
**Sent:**         Tuesday, July 22, 2008 11:49 PM
**To:**           Murray, Richard J.
**Subject:**      Re: Light

**Categories:**   Printed

Yes. The menu was in the door earlier now it is gone.


----- Original Message -----
From: Murray, Richard J.
To: Calderon, Christopher A.
Sent: Wed Jul 23 01:47:59 2008
Subject: Re: Light

Did u see it before? I want to make sure the menu was visible from outside.

----- Original Message -----
From: Calderon, Christopher A.
To: Murray, Richard J.
Sent: Wed Jul 23 01:41:30 2008
Subject: Re: Light

Menu is gone.


----- Original Message -----
From: Murray, Richard J.
To: Calderon, Christopher A.
Sent: Wed Jul 23 01:05:11 2008
Subject: Light

Is light on in apt?

*ATTACHED EXHIBITS*
*FOURTH SUBMISSION OF CONSOLIDATED EXHIBITS*
*RELATING TO DISCOVERY AND SUPPRESSION ISSUES*
*CR08-814-PHX-DGC*

⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇
⬇ **EXHIBIT 24** ⬇

FBI FD-302 Report by FBI Agent Richard J. Murray RE: undercover agent placing food menu on door of apartment No. 1122; (Investigation date: July 22, 2008); (2/12/09 BATES No. 31 of February 17, 2009 discovery set).

FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    09/11/2008

On July 22, 2008, surveillance was conducted in the area
of 431 El Camino Real, Apartment 1122, Santa Clara, California.
The following observations were made at the approximate times
listed:

| | |
|---|---|
| 7:20 p.m. | FBI Undercover Agent (UC) observed entering Domicilio Apartment complex |
| 7:27 p.m. | FBI UC Agent observed departed apartment complex |
| 8:40 p.m. | Food menu observed in door of Apartment 1122 |
| 10:15 p.m. | No light is observed on in Apartment 1122 |
| 10:45 p.m. | Food menu is not in door of Apartment 1122 |
| 12:35 a.m. | No light is observed on in Apartment 1122 |
| 12:37 a.m. | No activity observed at Apartment 1122 |

---

Investigation on    07/22/2008    at  Santa Clara, California

File #  288A-PX-82001 -15            Date dictated

SA William T. Ng       SA Christopher Calderon
by   SA Richard J. Murray  IRS-CI SA Michael Fleischmann

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

2/12/09 31