# 1xEV-DO Rel. 0, CELL SITE EMULATOR, & GEOLOCATION EXPERT REPORT

RE:

*The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.)*

By:

*Daniel David Rigmaiden*

*May 29, 2013*

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

# Table of Contents

I.   Introduction...........................................................................................................1

II.  Summary Of Conclusions.................................................................................3

III. Technical Explanations......................................................................................11

    A.   Electromagnetic radiation in the radio frequency band...............................11

    B.   The 1xEV-DO cellular communications system deployed by Verizon Wireless.........15

        1.   Origins of the 1xEV-DO cellular communications system................................15

        2.   Basic hardware elements of a 1xEV-DO Rel. 0 compatible cellular data network..........................................................................................23

            a.   The Access Terminal (AT)...........................................................23

            b.   The Access Network (AN).............................................................27

            c.   Access Networks (a.k.a. cell sites) in the geolocation context...................30

        3.   How relevant 3GPP2 technical standards dictate communications between a 1xEV-DO Rel. 0 Access Terminal and a 1xEV-DO Rel. 0 Access Network........32

            a.   Over-the-Air Service Provisioning (OTASP) and Over-the-Air Parameter Administration (OTAPA)................................................32

            b.   Access Terminal Initialization State procedures: identifying and acquiring a 1xEV-DO Rel. 0 Access Network after initial power-on...........................38

                i.   Network Determination Substate...............................................39

                 ii.  Pilot Acquisition Substate.......................................................41

                 iii. Synchronization Substate.........................................................45

             c.   Access Terminal Idle State procedures: preparing to open a connection and opening a connection with a 1xEV-DO Rel. 0 Access Network.................47

                i.   Receiving, processing, and storing to internal storage the Access

|  |  | Network's Overhead Messages | 47 |

| | ii. | Transmission of Access Probes to the Access Network to initiate session establishment and open a connection | 51 |
| | iii. | Establishing an open session with the Access Network | 56 |
| | iv. | Application of encryption and authentication keys for use in the security layer | 60 |
| | v. | Obtaining identifying information from Access Terminal hardware using the HardwareIDRequest message | 68 |
| | vi. | Opening a connection with the Access Network | 69 |
| d. | | Using the Default Route Update Protocol to scan for additional pilots, facilitate sector Route Updates, and send Route Update messages | 76 |
| | i. | Operations of the Default Route Update Protocol specific to the Idle State | 78 |
| | ii. | Operations of the Default Route Update Protocol specific to the Connected State | 81 |
| e. | | Open-loop and closed-loop power control of Access Terminal transmissions | 84 |
| | i. | Reverse Access Channel power control | 85 |
| | ii. | Reverse Traffic Channel power control | 87 |
| f. | | Synchronization and timing of transmitted signals | 89 |
| g. | | Relevant miscellaneous 1xEV-DO Rel. 0 cellular data network operations | 91 |
| | i. | Signal interference | 91 |
| | ii. | Hybrid Access Terminal operations for non-telephones, e.g., aircards | 93 |

C. Explanation of the term "triangulation" applicable to geolocation of radio frequency (RF) signals ........................................................................97

D. Cell site information and its use in geolocating wireless devices............................101

1. Explanation of the term "cell site information." ...............................................101

2. Use of statistical databases containing historical cell site location information to determine a wireless device location signature.................................103

3. Cell site triangulation of a wireless device using cell site location information................................................................................................106

E.  Global Positioning System (GPS)........................................................................109

F.  Explanation of the term "mobile tracking device."...........................................112

G.  Air interface surveillance equipment with an emphasis on geolocation of wireless
    devices..............................................................................................................113

    1.  Detailed description of the Harris RayFish line of portable/transportable wireless
        device locators, i.e., the StingRay, KingFish, and related equipment................118

        a.  Geolocation measurement techniques used by the StingRay and KingFish
            while triangulating the location of a wireless device................................125

            i.   Signal time-of-flight (TOF) measurements to calculate distance (a.k.a.
                 range)........................................................................................125

            ii.  Signal strength measurements to calculate distance (a.k.a. range)....128

            iii. Signal angle-of-arrival (AOA) measurements to calculate direction
                 (via a phased array antenna)..........................................................130

            iv.  Weighting collected geolocation data and using statistical functions
                 (e.g., average, mean, median, mode, etc.)......................................134

            v.   Data fusion of calculated geolocation measurements......................135

        b.  Radio signal and data collection methods used by the StingRay and
            KingFish while triangulating the location of a wireless device................136

            i.   Base station surveys..................................................................136

            ii.  Cell site emulation and forced connection handoff..........................137

            iii. Downloading data from wireless device internal storage.................139

            iv.  Transmitting interrogation signals in order to force reply signals.....141

            v.   Approach method for triangulation...............................................142

            vi.  Forced transmission power increase...............................................144

H.  The FBI Digital Collection Program...................................................................145

    1.  Digital Collection Systems.............................................................................146

    2.  DCSNET.......................................................................................................148

    3.  The technical specifications outlined in the Telecommunications Industry
        Association, TIA/EIA/J-STD-025A, Lawfully Authorized Electronic
        Surveillance.................................................................................................152

    4.  Digital Collection System 3000 (DCS-3000) server.........................................155

    5.  DCS-3000 CDNRS Files.................................................................................160

6.      Telephone Applications System...........................................................162

7.      FBI Cell Site Database.......................................................................163

8.      FBI Wireless Intercept and Tracking Team (WITT)...........................166

IV.  How The Aircard Was Intruded Upon...............................................................170

A.      Prerequisite background information.........................................................171

1.      General background information on the aircard, host laptop computer, aircard account, and aircard service...............................................................171

2.      Basis for concluding that the government used the Harris StingRay, KingFish, and related equipment to locate the aircard and its user....................................174

a.      The government admitted that FBI technical agents used the Harris StingRay to locate the aircard.................................................................174

b.      Heuristics and process of elimination confirms that FBI technical agents used the Harris StingRay, KingFish and AmberJack to locate the aircard..............................................................................................178

B.      The government's mission to locate the aircard and its user within a private home residence.........................................................................................................181

1.      The government identified the aircard and seized destination IP addresses relating to the aircard user's Internet activity.......................................181

2.      The government seized aircard historical cell site location information and conducted historical triangulation / location signature techniques....................184

3.      The primary case agents flew from Arizona to California to triangulate the precise location of the aircard and its user.......................................192

4.      The FBI technical agents began the real-time portion of the aircard locating mission by conducting base station surveys of all cell sites located in the area covered by the cell tower range chart/map.......................................193

5.      The FBI technical agents had Verizon Wireless reprogram and write data to the aircard so that it would be compatible with the Harris StingRay and KingFish......................................................................................................195

6.      The FBI used the SF-Martinez DCS-3000 Pen/Trap device to obtain real-time cell site sector location information to narrow the geographical area of where to use the StingRay, KingFish, and related equipment.........................................201

7.      The FBI obtained additional real-time aircard data from Verizon Wireless through means other than the SF-Martinez DCS-3000 Pen/Trap device.....................206

8.      The FBI's surreptitious phone calls booted the aircard off the Internet so that the

FBI's StingRay and related equipment could hijack the aircard's signal from Verizon Wireless.................................................................................................207

9. The FBI technical agents used the Harris StingRay, KingFish, and related equipment to locate the aircard precisely inside apartment No. 1122................211

    a. Cell site emulation and forced connection handoff....................................211

    b. The FBI repeatedly wrote data to the aircard using its StingRay.............212

    c. The StingRay deactivated 1xEV-DO Rel. 0 security layer encryption during session establishment causing the aircard's signals to be transmitted in plaintext and exposed to third-parties........................................................214

    d. The FBI used its StingRay to download data stored on the aircard's internal storage device (i.e., the aircard's Electronic Serial Number (ESN)).........215

    e. The FBI used the StingRay to send location finding interrogation signals into apartment No. 1122 and into the aircard in order to search out the location of the aircard and its user.............................................................216

    f. The FBI collected the aircard's signal transmissions sent in response to the location finding interrogation signals sent to the aircard by the FBI via the StingRay..................................................................................................218

    g. In order to determine the location of the aircard and its user, the FBI conducted triangulation techniques on the aircard's location finding response signals collected by the StingRay................................................218

    h. The FBI technical agents used the KingFish within the Domicilio apartment complex to pinpoint the exact location of the aircard and its user within apartment No. 1122...................................................................................221

    i. Whenever the aircard was connected to either the StingRay or KingFish, the FBI denied the aircard access to the Internet (i.e., a denial-of-service attack).....................................................................................................222

    j. The FBI's StingRay and KingFish relied upon the electricity provided to the aircard by its user.................................................................................223

    k. The FBI's StingRay and KingFish sent the aircard commands instructing it to increase its signal transmission power to facilitate more effective geolocation..............................................................................................224

V. Daniel Rigmaiden's Expert Qualifications.........................................................225

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

I, Daniel David Rigmaiden, declare[1] the following [May 29, 2013]:

## I.      **Introduction**

I am the defendant in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz.  "[A]
party who is otherwise qualified as an expert may testify as an expert witness in his own case
regardless of concerns that the party is plainly self-interested."[2]  This declaration explains the
independent operations of the FBI's cell site emulators, *etc.* used to intrude upon and locate the
UTStarcom PC5740 1xEV-DO aircard in <u>United States v. Rigmaiden</u>.  The need for this
declaration arises from the government's withholding of discoverable evidence relating to the
cell site emulators used during the investigation leading to <u>United States v. Rigmaiden</u>.  This
declaration is separated into five sections: (1) Introduction, (2) Summary Of Conclusions, (2)
Technical Explanations, (3) How The Aircard Was Intruded Upon, and (4) Daniel Rigmaiden's
Expert Qualifications.  Other than for Section V, the information provided in this declaration is
taken from the *Technical Explanations* and *General Facts* section of my *Motion To Suppress*
(Dkt. #824-1, Jun. 4, 2012), in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz.

The noted information is now being provided in declaration form considering the district
court in <u>United States v. Rigmaiden</u> refused to apply (1) the government's concession that "the

---

1.      This declaration is being submitted under the protections of *Simmons*.  *See* <u>Simmons v.</u>
<u>United States</u>, 390 U.S. 377, 394 (1968) (Holding that "when a defendant testifies in support of
a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter
be admitted against him at trial on the issue of guilt unless he makes no objection.").  I object to
the government attempting to introduce this declaration as evidence at trial.

2.      <u>Masterson Marketing, Inc. v. KSL Recreation Corp.</u>, 495 F. Supp. 2d 1044, 1050
(S.D.Cal. 2007).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

aircard tracking operation was a Fourth Amendment search and seizure[,]"[3] and (2) the government's concession and agreement to not contest my identification and classification of the various **independent** operations conducted by the StingRay and KingFish as being **separate** Fourth Amendment searches and/or seizures.[4]  Rather than having applied the government's concessions when ruling on suppression issues,[5] the Court instead found that the FBI's use of the StingRay and KingFish to locate the aircard "was not a 'severe intrusion[,]'" *id.*, p. 13, and that the independent Fourth Amendment searches and seizures that I identified were merely "details of the device's operation [][and] clearly concern the manner in which the search was to be executed, something that need not be stated with particularity in the warrant." *Id.*, p. 27.  In other words, the Court refused to apply the established "general assumption going into this motion... that intrusiveness is not an issue[]"[6] and that the government would not be permitted to make arguments to the likes of, "[w]ell, **that part** of what we did isn't a search because it's not intrusive."[7]  Rather than find that each **part** was sufficiently intrusive to be a **separate** Fourth Amendment search and/or seizure—as was agreed on January 27, 2012—the Court instead found that my "efforts to parse the warrant requirement further are no more

---

3.    <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., *Government's Memorandum Re Motion For Discovery* (Dkt. #674, p. 1).

4.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, *January 27, 2012 Status Conference, Partial Transcript of Proceedings*, p. 13-23.

5.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., *Court's May 8, 2013 Order* (Dkt. #1009).

6.    <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, *January 27, 2012 Status Conference, Partial Transcript of Proceedings*, [THE COURT], p. 25.

7.    *Id.* (emphasis added).

- 2 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

persuasive here than were the defendants' similar efforts in *Dalia* and *Brooks*."[8]

Because the Court ignored the established concessions and is effectively requiring me to meet a higher burden of proof, I am submitting this declaration for the record[9] in support of **(1)** *Motion To Suppress* (Dkt. #824-1), **(2)** *Motion For Reconsideration Of Portions Of Court's Order At Dkt. #1009 RE: Fourth Amendment Suppression Issues* (Dkt. #1033), **(3)** *Motion For Reconsideration Of Portions Of Court's Order At Dkt. #723 RE: Discovery Of StingRay And KingFish Evidence* (Dkt. #1037), and **(4)** *Motion Requesting Evidentiary Hearing To Settle Contested Issues Of Fact RE: Motions For Reconsideration Of Motion To Suppress And Motion For Discovery* (Dkt. #1038) in United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.

## II.    **Summary Of Conclusions**

Based on Sections III and IV, *infra*, of this declaration, I was able to make the following summarized technical conclusions relating to the government intrusions upon the aircard, *etc.*:

1.    The aircard (*i.e.*, the UTStarcom PC5740 Broadband Connection Card) is a High Rate Packet Data (HRPD) 1xEV-DO Rel. 0 Access Terminal with hybrid 1xRTT text message and 1xRTT low rate data service capabilities.

---

8.    United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Court's May 8, 2013 Order* (Dkt. #1009, p. 27).

9.    The Court also denied my *Ex Parte Motion To Appoint 1xEV-DO Rel. 0, Etc. Expert To Defense* (Dkt. #866, CR08-814-PHX-DGC).  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Court's August 10, 2012 Order*, p. 1 (Dkt. #871) (denying motion for appointment of expert because, among other reasons, the proposed expert "has confirmed that Defendant's detailed technical arguments in the motion to suppress are correct[.]").

- 3 -

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

2.      The aircard hardware is incapable of ringing or alerting to an incoming call and it does not allow for placing or receiving telephone calls (*i.e.*, wire communications).  The aircard is not able to receive incoming voice calls or react to incoming voice pages under its factory configuration.

3.      When accessing cell sites to receive wireless service, the aircard does not engage in "registration" as do cellular phones; instead, the aircard engages in "session establishment" and conducts "route updates,"

4.      The aircard is a computer hardware "add-on card" that can only function when plugged into the PCMCIA slot of a host laptop computer.

5.      In order to function, the aircard draws power from the host laptop computer, stores data on the hard drive of the host laptop computer, and its functions and operations are accessed through software installed on the host laptop computer.

6.      The aircard was used to access the Verizon Wireless 1xEV-DO Rel. 0 data network and Verizon Wireless 1xRTT data network.

7.      The aircard was not capable of generating real-time cell site location information when accessing the Verizon Wireless 1xEV-DO Rel. 0 and 1xRTT data networks.

8.      Under its factory configuration, the aircard could not access the Verizon Wireless 1xRTT voice network.

9.      Case agents identified the aircard hardware by tracing IP addresses that were temporarily assigned to the aircard by Verizon Wireless for the purpose of accessing the Internet through a Verizon Wireless aircard account.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

10.    Once identified, agents obtained 38 days of the aircard's historical cell site
location information from Verizon Wireless and then used it to narrow the location of the
aircard to an area covering *105,789,264 ft²*.

11.    Using the historical cell site location information as the input data, the FBI
employed triangulation techniques and location signature techniques to reduce the *105,789,264
ft²* location estimate by 93.9%, *i.e.*, to a *6,412,224 ft²* area.

12.    After narrowing the historical aircard location to a *6,412,224 ft²* area, FBI
technical agents had Verizon Wireless reprogram and write data to the aircard so that it would
(1) recognize and connect to the FBI's cell site emulators, and (2) respond to the FBI's silent
phone calls intended to force the aircard to drop its 1xEV-DO Rel. 0 data connection and
generate real-time cell site sector location information via a 1xRTT voice connection.

13.    After the reprogramming of the aircard, FBI technical agents made 32 silent
phone calls (*i.e.*, pings) to the aircard over a six hour period.  Considering the aircard is not a
telephone and does not have telephone service or telephone hardware, the FBI's silent phone
calls did not cause the aircard to "ring" and otherwise did not cause the aircard to notify the
user that the FBI was calling the aircard.

14.    Each of the FBI's 32 silent voice calls (over the noted six (6) hour period) forced
the aircard to drop its 1xEV-DO Rel. 0 data connection (*i.e.*, a denial-of-service attack).  After
each silent voice call, the aircard was denied access to the Internet until a reconnection to the
1xEV-DO Rel. 0 data network could be attempted and established by the aircard user via the
host laptop computer.

- 5 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

15.     Each of the FBI's 32 silent voice calls also caused the aircard to generate and transmit real-time cell site sector location information to a 1xRTT Verizon Wireless cell site over a 1xRTT voice connection.  Verizon Wireless then forwarded the real-time geolocation data to the FBI's SF-Martinez DCS-3000 Pen/Trap device via a connection from a Verizon Wireless network switch to the FBI DCS network.

16.     Verizon Wireless buffered the aircard's real-time cell site sector location information prior to transmission but did not first record and store the data prior to forwarding it to the FBI, *i.e.*, there was no transmission "after receipt and storage."

17.     FBI technical agents used the aircard's real-time cell site sector location information to narrow the geographical area of where to precisely search for the aircard.  In order to pinpoint the exact location of the aircard, FBI technical agents used the Harris brand StingRay (vehicle-transportable cell site emulator), Harris brand KingFish (hand-held man-portable cell site emulator), Harris brand AmberJack (phased array beam-forming antenna), and related cell site emulator equipment.

18.     After each silent voice call placed to the aircard, FBI technical agents operated the vehicle-transportable StingRay with AmberJack antenna in the geographical area identified by the aircard's real-time cell site sector location information.  Using the StingRay, FBI technical agents broadcast an emulated 1xEV-DO Rel. 0 data network signal in hopes that the aircard would detect the network as preferable and conduct an Idle State Route Update (*i.e.*, handoff) to the StingRay during one of the reconnect attempts following each dropped Verizon Wireless 1xEV-DO Rel. 0 data connection caused by the FBI's silent phone calls.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

19.     After the 32nd silent voice call, the aircard's attempt to reestablish the dropped Verizon Wireless 1xEV-DO Rel. 0 data connection resulted in the aircard establishing a 1xEV-DO Rel. 0 data connection with the FBI's StingRay.  The StingRay was able to hijack the aircard's signal from Verizon Wireless and secretly send/receive signals to/from the aircard while portraying itself as a Verizon Wireless cell site.

20.     FBI technical agents had the StingRay write data to the aircard's internal storage device.  The data written to the aircard corresponded directly to the StingRay and would not have been written to the aircard by the Verizon Wireless network.

21.     FBI technical agents had the StingRay deactivate 1xEV-DO Rel. 0 security layer encryption while communicating with the aircard.  Because the FBI failed to implement standard security layer encryption over the air interface, the aircard's signals containing private information (*e.g.*, the ESN via the HardwareIDRequest message, geolocation data, *etc.*) were exposed to third-parties over the air interface.

22.     FBI technical agents used the StingRay to download data stored on the aircard's internal storage device (*i.e.*, the aircard's Electronic Serial Number (ESN)).

23.     FBI technical agents used the StingRay to send location finding interrogation signals through the walls of private areas and into the aircard in order to search out the location of the aircard and its user.  The StingRay transmitted specially crafted location finding interrogation signals to the aircard.  In response to the location finding interrogation signals, the aircard responded by sending location finding response signals which were used by the StingRay for geolocation calculations.

- 7 -

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
        UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
        DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

24.     While using the StingRay during interrogation, FBI technical agents used the
AmberJack phased array beam-forming antenna to transmit a highly directional and
concentrated beam of location finding interrogation signals into apartment No. 1122 and other
private areas.  The AmberJack antenna is different from cell site antennas in the effect that it is
capable of facilitating highly precise angle-of-arrival measurements in order to obtain a line-
bearing to a target wireless device.

25.     FBI technical agents collected the aircard's signal transmissions sent in response
to the location finding interrogation signals sent to the aircard by the FBI via the StingRay.  The
signals in question were generated and transmitted by the aircard upon the StingRay's specific
instruction (via the location finding interrogation signals) and would not have been transmitted
during the aircard's communications with actual Verizon Wireless cell sites.

26.     In order to determine the location of the aircard and its user, FBI technical agents
conducted triangulation techniques on the aircard's location finding response signals collected
by the StingRay.  FBI technical agents engaged in active approach to facilitate triangulation of
the collected location finding response signals transmitted by the aircard.  The active approach
method involves using the StingRay in cell site emulator mode to collect and measure location
finding response signals at one location and then repeatedly moving the StingRay to new
locations for additional collection and measurement.

27.     FBI technical agents conducted numerous geolocation measurements on collected
aircard signals.  The geolocation measurement techniques included time-of-flight, power-
distance, angle-of-arrival, statistical functions, and data fusion.  The geolocation measurement

- 8 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

techniques used by FBI technical agents meet the definition of triangulation in the geolocation context.

28.      Shortly before 4:45pm on July 16, 2008, FBI technical agents were able to triangulate the location of the aircard and its user as being somewhere within the Domicilio apartment complex in Santa Clara, CA.

29.      Once the location of the aircard and its user was narrowed to a geographical area including the Domicilio apartment complex, FBI technical agents stopped using the StingRay and began using the second cell site emulator, *i.e.*, the hand-held man-portable KingFish.

30.      Because geolocation evidence was destroyed by the FBI, the precise geographical and temporal point at which FBI technical agents stopped using the StingRay and started using the KingFish in unknown.  It is known, however, that the StingRay first narrowed the location of the aircard to a geographical area which included the Domicilio apartment complex.  This area may have been larger or smaller than the entirety of the Domicilio property.

31.      The KingFish operates nearly identical to the StingRay with the only relevant difference being that it is a man-portable wireless device locator, as apposed to a vehicle-transportable wireless device locator, and is capable of locating wireless devices more accurately than the StingRay.  Therefore, all of the independent operations conducted during use of the StingRay were repeated by FBI technical agents during use of the KingFish.

32.      The KingFish was used by FBI technical agents on foot within the the Domicilio property.  Using the KingFish, FBI technical agents were able to pinpoint the precise location of the aircard and its user as being within apartment No. 1122 of the Domicilio apartment

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

complex.

33.    Whenever the aircard was connected to either the StingRay or KingFish, FBI

technical agents denied the aircard access to the Internet (*i.e.*, a denial-of-service attack).

Because the StingRay and KingFish are not capable of forwarding communications content to

Verizon Wireless, the aircard user was not provided with any Internet access service.  Using the

StingRay and KingFish, FBI technical agents conducted a denial-of-service attack on the

aircard for nearly 10 hours.

34.    The StingRay and KingFish relied upon the electricity provided to the aircard by

its user.  Because FBI technical agents were forcing the aircard to generate and transmit radio

waves that were subsequently collected and decoded by their surveillance equipment, the FBI

was relying upon (*i.e.*, using) the electricity being provided to the aircard.

35.    FBI technical agents had the StingRay and KingFish send the aircard commands

instructing it to increase its signal transmission power to facilitate more effective geolocation.

In order to more precisely search for and locate the aircard while using the StingRay and

KingFish, FBI technical agents sent RPC bits to the aircard causing it to transmit at a higher

power.  This increase in transmission power increased the amount of electricity hijacked from

the host laptop computer and ultimately from apartment No. 1122.

36.    Approximately 18 days after the aircard was located, *i.e.*, shortly after my arrest,

FBI technical agents destroyed all of the real-time geolocation data and other data collected by

the StingRay and KingFish.

- 10 -

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

**III.    <u>Technical Explanations</u>**

The proceeding subsections provide detailed technical information on communications
protocols, geolocation techniques, surveillance equipment, surveillance programs, and
investigative methods used by the government to intrude upon and locate wireless devices.[10]
This background information is required in order to sufficiently understand how the
UTStarcom PC5740 aircard was, searched, seized, and located in the investigation leading to
<u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz.

**A.    Electromagnetic radiation in the radio frequency band.**

Radio waves are one type of electromagnetic radiation within the electromagnetic
spectrum.  "The electromagnetic spectrum contains radio waves, microwaves, light, x-rays, and
gamma rays."[11]  "Every wave has three different properties: (1) wavelength (a spatial
measurement), (2) frequency (a temporal measurement), and (3) energy (or equivalently
mass)."[12]  "We can always find the frequency of a wave if we know its wavelength.  Or, if we
know the frequency, we can find its wavelength.  The reason is that the frequency multiplied by
the wavelength of a wave must always give a product equal to the velocity of light.  This is true

---

10.    The facts contained in this section are meant to reflect a "snapshot" of how the
technology existed as of July of 2008—even while some newer technical sources are cited.

11.    The Southwestern Company, *The Volume Library: A Modern, Authoritative Reference
for Home and School Use*, "Wave theory" (Nashville, TN: The Southwestern Company, 1989),
p. 460 (diagram labeled "Electromagnetic Spectrum").

12.    Boatmun, Dewey L., *Quantum World: The Wave Nature of Our Universe* (Xlibris
Corporation, 2010), p. 63.

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

of all electromagnetic waves."[13]  In radio communications, electromagnetic waves are

classified in terms of frequency.[14]  For example, the specific radio frequencies licensed to

Verizon Wireless for its cdma2000 based cellular network (*e.g.*, 1xRTT, 1xEV-DO, *etc.*) in the

San Jose, CA market area are (1) 835 - 845 MHz paired with 880 - 890 MHz and 846.5 - 849

MHz paired with 891.5 - 894 MHz;[15] and (2) 1850 - 1865 MHz and 1930 - 1945 MHz.[16][17]

---

13.      Lapp, Ralph E., "Radiation," *The World Book Encyclopedia*, Q-R, Volume 15 (Chicago,
IL: Field Enterprises Educational Corporation, 1962), p. 76.

14.      For a "spectrum activity"chart showing *some* electromagnetic frequencies used by
modern day radio communication systems, *see* Thales [PDF presentation], "New solutions for
massive monitoring", *ISS World Europe*, p. 4 (Oct. 3, 2008), *available at*
http://wikileaks.org/spyfiles/files/0/40_200810-ISS-PRG-THALES.pdf (last accessed: Apr. 10,
2012); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 058 of
*2nd Consolidated Exhibits* (Dkt. #821-3) ("spectrum activity" chart attached).

15.      *See* FCC [website], *ULS License - Cellular License - KNKA211 - GTE MOBILNET OF
CALIFORNIA LIMITED PARTNERSHIP*,
http://wireless2.fcc.gov/UlsApp/UlsSearch/license.jsp?licKey=12154 (last accessed: Mar. 4,
2012); FCC [website], *ULS License - Cellular License - KNKA211 - GTE MOBILNET OF
CALIFORNIA LIMITED PARTNERSHIP – Frequencies*,
http://wireless2.fcc.gov/UlsApp/UlsSearch/frequenciesCell.jsp?
licKey=12154&channelBlock=B (last accessed: Mar. 4, 2012); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 059 of *2nd Consolidated Exhibits* (Dkt.
#821-3) (license documents attached).

16.      *See* FCC [website], *ULS License - PCS Broadband License - WQIQ264 - Verizon
Wireless Telecom Inc.*, http://wireless2.fcc.gov/UlsApp/UlsSearch/license.jsp?licKey=3003123
(last accessed: Apr. 9, 2012); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC,
D.Ariz., EXHIBIT 060 of *2nd Consolidated Exhibits* (Dkt. #821-3) (license document attached).

17.      Although Verizon Wireless' license data indicates a small number of listed cell site
locations, "[a] licensee may operate additional transmitters at additional locations on the same
channel or channel block as its existing system without obtaining prior Commission approval
provided: [] (1) The interfering contours of the additional transmitter(s) must be totally
encompassed by the composite interfering contour of the existing station (or stations under
common control of the applicant) on the same channel..." 47 CFR § 22.165 *et seq.*

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

[18]  Radio waves, as well as all other electromagnetic radiation, "propagate at the speed of

light: 186,282 miles per second."[19]  Radio wave propagation can be in the form of either

omnidirectional radio waves or directional radio waves.  "Omnidirectional ('all directions')

radio-frequency propagation can be compared to the waves created by throwing a pebble into a

pond.  The waves made by the pebble emanate in all directions equally."[20]  Directional radio

frequency propagation by contrast have more gain (*i.e.*, signal coverage area) in certain

directions and less in others.[21]  Directional radio frequency propagation can therefore be

thought of as a "ray" or "beam" of radio waves directed at a certain area.

   In addition to wave like properties, radio waves also have particle like properties.[22]

---

18.     Although Verizon Wireless' cdma2000 based mobile network operates on both the
"Cellular" spectrum (KNKA211) and "PCS" spectrum (WQIQ264), the network itself remains
constant with the only difference being the range of frequencies used over the air interface.  For
simplicity purposes, Verizon Wireless' cdma2000 based mobile network will be referred to as a
cellular network regardless of any possible spectrum in use.

19.     Bedell, Paul, *Cellular/PCS Management: A Real World Perspective*, (New York, NY:
McGraw-Hill Professional Publishing, Mar. 31, 1999), p. 38.

20.     *See id*.

21.     *See* United States Army, *Communications-Electronics Fundamentals: Wave
Propagation, Transmission Lines, and Antennas,* Training Circular 9-64 (Washington, DC: July
2004), *available at* http://www.cbtricks.com/miscellaneous/tech_publications/neets/tc9_64.pdf
(last accessed: April 10, 2012), p. 4.11 (PDF, p. 177) ("Some antennas are highly directional;
that is, more energy is propagated in certain directions than in others.  The ratio between the
amount of energy propagated in these directions compared to the energy that would be
propagated if the antenna were not directional is known as its gain.  When a transmitting
antenna with a certain gain is used as a receiving antenna, it will also have the same gain for
receiving. ").

22.     Lapp, "Radiation," *The World Book Encyclopedia*, Q-R, Volume 15, p. 78 ("We no
longer worry about trying to pin down a radiation and ask whether it is a wave or a particle. We
know that it may behave as both."); *see also* Levi, A. F. J., *Applied Quantum Mechanics*, 2nd
ed. (Cambridge, NY: Cambridge University Press, 2006), p. 76 ("Using what we know from

- 13 -

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

"Light rays, heat radiation, radio waves, X rays, cosmic rays, and gamma rays produced by

splitting atoms are all streams of photons."[23]  Electromagnetic radiation can therefore be

visualized as a stream of photons[24] traveling at the speed of light.  A photon is an atomic

particle[25] produced when an electron changes from a high energy level to a low energy level.

[26]  Although a photon cannot be weighed, streams of photons still exhibit an observable mass.

"For one thing, light produces a definite pressure when it falls on an object.  As a comet moves

around the sun, its great gaseous tail is always streaming out away from the sun.  This can be

satisfactorily explained only by assuming that the light from the sun pushes the tail away."[27]

Photons also carry energy which is directly proportional to frequency.[28]  This photon energy

can be converted into electricity for practical applications.  For example, when transmitted

_____

classical mechanics and electrodynamics and considering the ramifications of the Young's slits
experiment and the photoelectric effect forced us to create the concept of particles with wavy
character.").

23.     Lapp, "Radiation," *The World Book Encyclopedia*, Q-R, Volume 15, p. 74.

24.     *Id.* ("Radiation is the term used to describe any stream of photons.").

25.     Lapp, Ralph E. (critically reviewed by Glenn T. Seaborg), "Atom," *The World Book
Encyclopedia*, A, Volume 1  (Chicago, IL: Field Enterprises Educational Corporation, 1962), p.
705 (table of "Known Atomic Particles" with photon listed).

26.     *See id.*, p. 706 ("This energy-level theory serves to explain how atoms can give off
radiant energy, such as light.  The amount of energy given off by an electron in changing to a
lower energy level produces a *photon*, or unit, of a certain energy." (internal citation omitted)).

27.     Lapp, "Radiation," *The World Book Encyclopedia*, Q-R, Volume 15, p. 78.

28.     "[T]he larger the frequency of the light beam, the more energy in each photon of light."
Bewick, Sharon, *et al.*, CK-12 Foundation, *CK-12 Chemistry* (FlexBook, Feb. 15, 2012),
*available at* http://www.ck12.org/flexbook/pdf/6d8f3b870516db645033c94b3bf9fe31.pdf (last
accessed: May 6, 2012), p. 161.  "The full spectrum of electromagnetic radiation has radio
waves as its lowest energy, lowest frequency, longest wavelength end and gamma rays as its
highest energy, highest frequency, shortest wavelength end." *Id.*, p. 152.

- 14 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

radio waves reach a receive antenna,[29] the photon energy induces a voltage in the antenna

producing a current of electricity which transfers the radio signals from the antenna to the

receiver.[30]  The photon energy produced by radio waves is small when compared to other

electromagnetic radiation but it is still strong enough to power, for example, an AM radio

receiver and speaker—without a separate power source—if close enough to an AM transmitter.
[31]

> **B.  The 1xEV-DO cellular communications system deployed by Verizon Wireless.**
>
> **1.  Origins of the 1xEV-DO cellular communications system.**

The 1xEV-DO cellular communications system is defined within the cdma2000 family

of standards developed by the 3rd Generation Partnership Project II (3GPP2).[32]  These

---

29.    "An antenna is a conductor or a set of conductors used either to radiate electromagnetic energy into space or to collect this energy from space."  United States Army, *Communications-Electronics Fundamentals: Wave Propagation, Transmission Lines, and Antennas*, p. 1.34 (PDF, p. 46). "After an RF signal has been generated in a transmitter, some means must be used to radiate this signal through space to a receiver.  The device that does this job is the antenna. The transmitter signal energy is sent into space by a transmitting antenna; the RF signal is then picked up from space by a receiving antenna."  *Id.*, p. 4.4 (PDF, p. 170).

30.    "The RF energy is transmitted into space in the form of an electromagnetic field.  As the traveling electromagnetic field arrives at the receiving antenna, a voltage is induced into the antenna (a conductor).  The RF voltages induced into the receiving antenna are then passed into the receiver and converted back into the transmitted RF information."  *Id*.

31.    Hayes, Arthur H., "Radio," *The World Book Encyclopedia*, Q-R, Volume 15  (Chicago, IL: Field Enterprises Educational Corporation, 1962), p. 88, Diagram labeled "A Simple Radio Set" ("A Crystal Set is a simple radio that does not use electricity."); Tymony, Cy, *Sneaky Uses for Everyday Things* (Kansas City, MO: Andrews McMeel Publishing, 2003), p. 60 ("Even now, many parents show their kids how to make a radio at home that doesn't require AC power or batteries.").

32.    *See* Etemad, Kamran, *cdma2000 Evolution: System Concepts and Design Principles*

- 15 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

standards define a set of specifications that cellular device manufacturers and cellular service providers must follow to ensure compatibility across hardware and networks.[33]  The cdma2000 family of standards, including 1xEV-DO, is based on a communications protocol[34] called code division multiple access (CDMA) originally designed for military use[35] due to it being nearly impossible to intercept a CDMA signal.[36]  In the United States, there are various CDMA cellular service providers including "Alaska Communications System, Carolina West, CellCom/nSight, Bluegrass Cellular, Leap Wireless, Sprint, U.S. Cellular, and Verizon Wireless."[37]

"CDMA employs what is known as wideband *spread spectrum* technology to carry

---

(Hoboken, NJ: John Wiley & Sons, Inc., 2004), p. xiii, 4 and 9.  *See also* http://www.3gpp2.org.

33.     *See* Telecommunications Industry Association, TIA-2000.1-E, *Introduction to cdma2000 Spread Spectrum Systems* (Arlington, VA: Oct. 2009), § 1.1.1, p. 1.1.

34.     "Protocol: A standard set of definitions governing how communications are formatted in order to permit their transmission across networks and between devices."  CTIA [website], *Wireless Glossary of Terms N-P*, http://www.ctia.org/media/industry_info/index.cfm/AID/10407 (last accessed: Aug., 30, 2011).

35.     *See* Levine, R.C., *Digital Switching: Cellular & PCS Lectures April 17 & 24, 2001*, Beta Scientific Laboratory, Inc., (Richardson, TX: 1996-2000), *available at* http://www.privateline.com/levine/CELPCS4.PDF (last accessed: Sept. 29, 2010), p. 59 ("CDMA was first developed for military point-to-point communications.").

36.     *See* Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 225 ("CDMA was originally deployed as a battlefield communications system because it is very hard if not completely impossible to intercept CDMA transmissions.").

37.     CTIA [website], Glossary of Terms C-D, http://www.ctia.org/media/industry_info/index.cfm/AID/10321 (last accessed: Aug., 30, 2011) (defining CDMA).

- 16 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

digitized voice and data transmissions."[38][39]  Spread spectrum technology spreads "the radio

signal over a wide frequency range by modulating it with a code word unique to the radio."[40]

The receiver "distinguishes [the] sender's signal from other signals by examining the wide

spectrum band with a time synchronized duplicate of the spreading code word."[41]  In simple

terms, CDMA in cellular telephony is "[a] technology used to transmit wireless calls by

assigning them codes[]"[42] allowing for each CDMA transmitter to transmit simultaneously to a

single cell site without having the signals conflict with each other.[43] On the reverse link,

"[t]his process is analogous to each mobile speaking a different language and the base station

_____

38.     Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 226.

39.     Issued in 1942, "[t]he U.S. patent for spread-spectrum technology was held jointly by
actress Hedy Lamarr and music composer George Antheil."  Muller, Nathan J., *Bluetooth
Demystified* (New York, NY: McGraw-Hill, Sept. 8, 2000), p. 61 (figure note omitted).
"Spread spectrum has two modes of operation: frequency hoping and direct sequencing.
*Frequency hoping* spreads its signals by 'hoping' the narrowband signal over the entire radio
band as a function of time.  *Direct sequencing* spreads its signal by expanding the signal all at
once over the entire radio band."  *Id.*, p. 63.  CDMA uses direct sequencing.

40.     Katz, Randy H., Professor at U.C. Berkeley, CS 294-7: Media Access—TDMA and
CDMA, p. 13 (1996), *available at* http://www.sss-mag.com/pdf/1tdmacdma.pdf (last accessed:
Aug. 31, 2010); *see also* Etemad, *cdma2000 Evolution: System Concepts and Design
Principles*, p. 11 ("The basic idea of spread spectrum communications is based on transmitting
information over channels much wider than required by the original signal bandwidth.  The
spread spectrum term is used to reflect the fact that the system spreads the energy of the
information signal over a much wider band channel, allowing signal transmission at very low
power spectral densities.").

41.     *Id*.

42.     CTIA [website], Glossary of Terms C-D,
http://www.ctia.org/media/industry_info/index.cfm/AID/10321 (last accessed: Aug., 30, 2011)
(defining CDMA).

43.     Katz, CS 294-7: Media Access—TDMA and CDMA, p. 19.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

interpreting each of the languages it receives."[44]  In all CDMA based cellular systems, the

term "reverse link" refers to the signal path leading from the wireless device to the cell site and

the term "forward link" refers to the signal path leading from the cell site to the wireless

device.[45]

CDMA was first introduced in cellular systems in the early 1990s with the cdmaONE

family of standards.[46]  Cellular communications systems based on cdmaONE began with

"voice only" services (*see* IS-95A) with limited data services added later (*see* IS-95B).[47]  After

commercial use of cdmaONE throughout the 1990s, the cellular communications industry

developed cdma2000 beginning with the IS-2000 Release 0 technical standard, which is also

referred to as 1xRTT.[48]  1xRTT, first commercially deployed in the year 2000,[49] provides

both voice and data services[50] with performance increases over cdmaONE technology.  Later

that year, 3GPP2 set out to improve upon 1xRTT by drafting and publishing the cdma2000

High-Rate Packet Data (HRPD) standard referred to as IS-856 or 1xEV-DO (an acronym for

_____

44.   Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 226.

45.   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 31, Fig.
3.4.

46.   *See id.*, p. 6.

47.   *See id.*, p. 6-7.

48.   *See id.*, p. 7-8.

49.   *See id.*, p. 8.

50.   *See* eogogicsinc (website), *cdma2000 Technologies: 1xRTT, EVDO, UMB, and EVDV*,
"cdma2000 Technology Family: 1xRTT, EVDO, UMB, and EVDV: What Is cdma2000?,"
http://www.eogogics.com/talkgogics/tutorials/cdma2000 (last accessed: Jun. 9, 2011) (showing
a diagram with 1xRTT supporting "High Capacity Voice" and "Packet Data").

- 18 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

EVolution Data-Optimized).[51][52]  The original release of 1xEV-DO, first commercially

deployed in the year 2002,[53] is referred to as "Release 0" (or "Rel. 0") and subsequent releases

are referred to as "Revision A," "Revision B," and "Revision C" with each revision adding

features and increasing data rates[54]  All versions of 1xEV-DO use cellular networks to provide

broadband Internet access to Access Terminals such as aircards.  Unlike 1xRTT, 1xEV-DO does

not allow for placing voice calls and is strictly limited to data services.[55]

        The remainder of the technical explanations contained in this section are presented in the

context of 1xEV-DO Rel. 0—the version of 1xEV-DO used by the UTStarcom PC5740 1xEV-

DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.).  All cell sites,

including FBI cell site emulators, that wish to send or receive radio signals to/from a 1xEV-DO

Rel. 0 based Access Terminal **must** follow the detailed instructions outlined in the cdma2000

technical standards applicable to 1xEV-DO Rel. 0.  "The technical requirements contained in

cdma2000 form a compatibility standard for CDMA systems.  They ensure that a mobile station

---

51.    *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 9.

52.    *See* Qualcomm Inc., EV-DO Rev. A and B: Wireless Broadband for the Masses
(whitepaper), *The History of Mobile Broadband*, p. 3 ("With EV-DO, consumers experienced
400-600 Kbps of average downlink throughput with bursts up to 2.4 Mbps - 4 to 10 times faster
than data over CDMA2000 1X (also referred to as 1xRTT) or UMTS networks.").

53.    *See id.*

54.    *See* eogogicsinc (website), *cdma2000 Technologies: 1xRTT, EVDO, UMB, and EVDV.*

55.    *See* Chuah, Mooi Choo and Zhang, Qinqing, *Design And Performance Of 3G Wireless
Networks And Wireless LANs* (New York, NY: Springer Science+Business Media, Inc., 2006),
p. 66 ("The network architecture of 1xEV-DO is very similar to the 3G1x network architecture
except that the components associated with voice traffic are absent.").

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

can obtain service in a system manufactured in accordance with the cdma2000 standards."[56]

The primary technical standards relevant to 1xEV-DO Rel. 0 are listed below:

1.      Telecommunications Industry Association, TIA/EIA/IS-856-1 (Addendum No. 1

to TIA/EIA/IS-856), *cdma2000 High Rate Packet Data Air Interface Specification* (Arlington,

VA: Jan. 2002); **Note:** IS-856-1 sets forth standards dictating the technical requirements for

HRPD "Release 0" (*i.e.*, 1xEV-DO Rel. 0) systems and is primarily oriented toward

requirements necessary for the design and implementation of Access Terminals.  The original

cdma2000 HRPD technical standard is IS-856, released by 3GPP2 in November of 2000.[57]

However, in January of 2002, 3GPP2 released IS-856-1[58] and in March of 2004, IS-856-2[E]

[59]—all of which expanded upon the original IS-856 specification as applicable to 1xEV-DO

Rel. 0.[60]  For the technical explanations outlined in this section, IS-856-1 is referenced.

2.      Telecommunications Industry Association, ANSI/TIA-878-2 (Addenda to TIA-

878), *Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access

Network Interfaces with Session Control in the Access Network* (Arlington, VA: May 2008);

**Note:** IS-878-2 sets forth standards dictating Access Terminal authentication, handoffs, Hybrid

---

56.      *See* TIA-2000.1-E, *Introduction to cdma2000 Spread Spectrum Systems*, § 1.1.1, p. 1.1.

57.      *See* Telecommunications Industry Association, TIA/EIA/IS-856, *cdma2000 High Rate Packet Data Air Interface Specification* (Arlington, VA: Nov. 2002).

58.      *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*.

59.      *See* Telecommunications Industry Association, TIA-856-2[E], *cdma2000 High Rate Packet Data Air Interface Specification – Addendum 2* (Arlington, VA: Mar. 2004).

60.      The differences between the three noted cdma2000 HRPD "Release 0" standards are negligible in the context of the aircard locating mission in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC (D.Ariz.).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Access Terminal (HAT) operations, *etc.* in an HRPD system.  The original cdma2000 HRPD

Interoperability standard is IS-878, released by 3GPP2 in December of 2001.[61]  However, in

May of 2003, 3GPP2 released IS-878-1[62] and IS-1878,[63] and in May of 2008, IS-878-2[64]

and IS-1878-1[65]—all of which expanded upon the original IS-878 specification as applicable

to 1xEV-DO.[66]  For the technical explanations outlined in this section, IS-878-2 is referenced.

      3.     Telecommunications Industry Association, TIA-683-D (Revision to TIA-683-C),

*Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, (Arlington,

VA: May 2006); **Note:** IS-683-D sets forth standards dictating the Over-the-Air Service

---

61.    *See* Telecommunications Industry Association, ANSI/TIA-878, *Inter-Operability
Specification (IOS) for High Rate Packet Data (HRPD) Network Access Interfaces* (Arlington,
VA: Dec. 2001); Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 265
("The enhanced 1X-EV DO network supports enhancements in IOS interface, captured in
IS878, allowing access authentication and interface between two access networks.").

62.    *See* Telecommunications Industry Association, ANSI/TIA-878-1 (Addendum No. 1 to
TIA-878), *Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Access
Network Interfaces – Addendum 1* (Arlington, VA: May 2003).

63.    *See* Telecommunications Industry Association, ANSI/TIA-1878, *Interoperability
Specification (IOS) for High Rate Packet Data (HRPD) Access Network Interfaces –
Alternative Architecture* (Arlington, VA: May 2003).

64.    *See* Telecommunications Industry Association, ANSI/TIA-878-2 (Addenda to TIA-878),
*Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access Network
Interfaces with Session Control in the Access Network* (Arlington, VA: May 2008).

65.    *See* Telecommunications Industry Association, ANSI/TIA-1878-1 (Addendum to TIA-
1878), *Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access
Network Interfaces with Session Control in the Packet Control Function* (Arlington, VA: May
2008).

66.    Considering the differences between these standards are negligible in the context of the
aircard locating mission in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.), IS-
878-2 (May 2008) will be used as the primary technical reference in this section.

- 21 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Provisioning (OTASP) of Mobile Station and HRPD (*i.e.*, 1xEV-DO) Access Terminal

operational parameters.  The original Over-the-Air Service Provisioning standard is IS-683,

which was subsequently updated by 3GPP2 via IS-683-A in June of 1998.[67]  However, in

December of 2001, 3GPP2 released IS-683-B,[68] in March of 2003, IS-683-C,[69] and in May of

2006, IS-683-D.[70]  For the technical explanations outlined in this section, IS-683-D is

referenced.

　　　　The remainder of this section will cite to the above 3GPP2 technical standards and to

other relevant technical references.  Some technical references will be specific to older cellular

technology (*e.g.*, 1xRTT or IS-95A/B) but are only cited to the effect they provide information

that remains constant through later CDMA technology, *i.e.*, 1xEV-DO Rel. 0.[71][72]  In those

---

67.　　*See* Telecommunications Industry Association, TIA-683-A (Revision of TIA/EIA/IS-683), *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, (Arlington, VA: Jun. 1998).

68.　　*See* Telecommunications Industry Association, TIA-683-B (Revision of TIA/EIA-683-A), *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems* (Arlington, VA: Dec. 2001).

69.　　*See* Telecommunications Industry Association, TIA-683-C (Revision of TIA/EIA-683-B), *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems* (Arlington, VA: Mar. 2003).

70.　　*See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*.

71.　　*See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, Forward, p. xlix ("This standard is evolved from and is a companion to the cdma2000 standards."); Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 264 ("The network architecture in HRPD is similar to the IS2000 system with some variations in network elements, functionalities, and interface protocols.").

72.　　Proceed with caution if references addressing older CDMA technology are pulled and studied for further information.  1xEV-DO, being a pure data network, does not adopt the

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

cases, the term "Mobile Station" should be read as "Access Terminal," and the term "Base

Station" should be read as "Access Network."

### 2.  Basic hardware elements of a 1xEV-DO Rel. 0 compatible cellular data network.

#### a.  The Access Terminal (AT).

The basic hardware elements of a 1xEV-DO Rel. 0 cellular data network have both

similarities and differences when compared to a 1xRTT cellular voice network.  A 1xEV-DO

Rel. 0 data network begins with the Access Terminal (AT), which consists of a radio

transmitter/receiver (transceiver), antenna, and other hardware used for communicating with

Access Networks.[73]  The Access Terminal is the equivalent of a Mobile Station (MS) (*i.e.*,

cellular telephone) in 1xRTT.[74]  The Access Terminal "may be a self-contained data device

such as a personal digital assistant (PDA) or a detachable module that is connected to a

computing device such as a laptop personal computer."[75]  From a legal perspective, the

difference between an Access Terminal and a Mobile Station is that the former facilitates the

sending/receiving of electronic communications[76] while the later facilitates the

---

majority of the subject matter specific to IS-95A/B, 1xRTT, *etc.*

73.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 11 of *1st Consolidated Exhibits* (Dkt. #587-1) (example of an Access Terminal).

74.    *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 264.

75.    *Id*.

76.    *See* 18 U.S.C. § 2510(12) ("'electronic communication' means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric or photooptical system that affects interstate or foreign commerce, but does not include--(A) any wire or oral communication; (B) any communication made through a tone-only paging device; (C) any communication from a

- 23 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

sending/receiving of wire communications.[77]  However, most 1xEV-DO Rel. 0 based wireless

devices are "Hybrid mobile stations / Access Terminals (HATs),"[78] *i.e.*, they support both

1xRTT wire communications and 1xEV-DO Rel. 0 electronic communications.[79]  "Hybrid

mode device[s]... support cdma20001x and HRPD by periodic[ly] monitoring the paging

channel of cdma20001x[] [(*i.e.*, 1xRTT)]"[80] but cannot maintain 1xEV-DO and 1xRTT traffic

channels simultaneously.  If a Hybrid Access Terminal lacks the hardware required to place

voice calls,[81] such as a PCMCIA broadband Internet access card (*i.e.*, aircard), the 1xRTT

service only facilitates SMS text messages[82] and a low rate data service as a backup to the

---

tracking device (as defined in section 3117 of this title [18 USCS § 3117]); or (D) electronic
funds transfer information stored by a financial institution in a communications system used for
the electronic storage and transfer of funds;").

77.    *See* 18 U.S.C. § 2510(1) ("'wire communication' means any aural transfer made in whole
or in part through the use of facilities for the transmission of communications by the aid of
wire, cable, or other like connection between the point of origin and the point of reception
(including the use of such connection in a switching station) furnished or operated by any
person engaged in providing or operating such facilities for the transmission of interstate or
foreign communications or communications affecting interstate or foreign commerce.;").

78.    *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 265-267.

79.    *See* Telecommunications Industry Association, TIA-1157-A, *Signaling Conformance
Test Specification for Interworking of CDMA2000 1X and High Rate Packet Data Systems,
Revision A* (Arlington, VA: Aug. 2010), § 1.6, p. 1.2 ("Hybrid AT – An AT capable of operating
on both a cdma2000 1x and HRPD system.").

80.    *Id.*, § 1.2, p. 1.1.

81.    By definition, cell phone hardware consists of "a compact speaker, a microphone, a
keyboard, a display screen and a powerful circuit board with microprocessors."  CTIA
[website], *How Wireless Works*, http://www.ctia.org/consumer_info/index.cfm/AID/10324 (last
accessed: Dec. 7, 2011).

82.    "SMS: Short Messaging Service enables users to send and receive short text messages
(usually about 140-160 characters) on wireless handsets.  Usually referred to as 'text messaging'
or 'texting.'"  CTIA [website], Glossary of Terms Q-S, http://www.ctia.org/media/industry_info/

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

---

1xEV-DO Rel. 0 data service.

Each 1xEV-DO Rel. 0 Access Terminal has either an Electronic Serial Number (ESN) or Mobile Station Equipment Identifier (MEID) that uniquely identifies it among other Access Terminals and Mobile Stations.[83][84]  The ESN consists of a unique 32-bit number[85] assigned to the wireless device by the manufacturer.[86]  The ESN is stored on the Access Terminal's internal storage as a Permanent Access Terminal Indicator[87] and cannot be changed absent

---

index.cfm/AID/10406 (last accessed: Aug. 30, 2011).

83.    *See* Telecommunications Industry Association, TIA-2000.5-D (Revision to TIA/IS-2000.5-C), *Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread Spectrum Systems* (Arlington, VA: Mar. 2004), § 2.3.2, p. 2.6 ("The ESN or MEID is used to uniquely identify a mobile station in a wireless system.").

84.    The majority of Access Terminals operating in 2008 had assigned ESNs.  Newer Access Terminals have assigned MEIDs.  Because there were/are so many wireless devices in existence, the wireless industry began to run out of unique assignable ESNs.  *See* Telecommunications Industry Association, TIA-158, *Over-the-Air Service Provisioning for MEID-Equipped Mobile Stations in Spread Spectrum Systems* (Arlington, VA: Jan. 2005), § 1, p. 1.1.  To fix this problem, the 56-bit MEID was introduced as the alternative to the ESN for new wireless devices.  *See* TIA-158, *Over-the-Air Service Provisioning for MEID-Equipped Mobile Stations in Spread Spectrum Systems*, § 1, p. 1.1; Telecommunications Industry Association, TIA-1082, *MEID for cdma2000 Spread Spectrum Systems* (Arlington, VA: Sept. 2005), § 1.2, p. 1.2.

85.    *See* Telecommunications Industry Association, *Electronic Serial Number Manufacturer's Code Assignment Guidlines And Procedures, Ver. 2.0* (Arlington, VA: Aug. 2008), *available at* http://ftp.tiaonline.org/wcd/WCD%20Meeting%20Sept.%204%202008/WCD-20080904-002_ESN_Guidelines_v2.0.pdf (last accessed: Feb. 20, 2012), p. 6.

86.    *See id.*, p. 12 ("The ESN shall be factory set...").

87.    *See* TIA-2000.5-D, *Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread Spectrum Systems*, Annex F, § F.2.1, p. F.2 (Listing the ESN as a Permanent Mobile Station Indicator).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

physical access to internal hardware.[88]  Each Access Terminal has one or more internal

electronic storage devices in the form of either an integrated memory chip or Removable User

Identity Module (R-UIM).[89]  A section of the Access Terminal's internal storage is called the

Number Assignment Module (NAM)[90] used to store a copy of the ESN and the Mobile

Identification Number (MIN).[91]  In addition to storing the ESN and MIN, the NAM also stores

other numeric indicators and parameters used for Access Terminal operation.[92]  For example,

among other categories of data, each Access Terminal NAM also stores: (1) the Preferred

---

88.     *See* TIA, *Electronic Serial Number Manufacturer's Code Assignment Guidlines And
Procedures, Ver. 2.0*, p. 7 ("The manufacturer will exercise due diligence in the design and
manufacture of the MS to ensure that alteration of the factory set ESN is not possible outside of
an authorized service center.); TIA-683-D, *Over-the-Air Service Provisioning of Mobile
Stations in Spread Spectrum Systems*, Notes, p. xviii ("Each mobile station is assigned either a
single unique 32-bit binary serial number (ESN) or a single unique 56-bit binary serial number
(MEID) that cannot be changed by the subscriber without rendering the mobile station
inoperative.").

89.     *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 214.

90.     *See* CTIA [website], Glossary of Terms C-D,
http://www.ctia.org/media/industry_info/index.cfm/AID/10321 (last accessed: Aug., 30, 2011)
("NAM (Number Assignment Module): The NAM is the electronic memory bank in the
wireless phone that stores its specific telephone number and electronic serial number.").

91.     *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread
Spectrum Systems*, § 1.2.1, p. 1.3 ("Mobile Identification Number (MIN).  The 34-bit number
that is a digital representation of the 10-digit number assigned to a mobile station."); *compare
also id.* ("Mobile Directory Number.  A dialable directory number which is not necessarily the
same as the mobile station's air interface identification, *i.e.*, MIN, IMSI_M or IMSI_T.").

92.     *See id.*, § 3.1, p. 3.1 ("The NAM indicators are parameters that can be assigned values
using Over-the-Air Service Provisioning are specified in 4.5.2, 4.5.3, 4.5.4 and 4.5.6.").

- 26 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Roaming List,[93] (2) the Extended Preferred Roaming List,[94] (3) Shared Secret Data (SSD),[95]

[96] and (4) manufacturer-specific NAM parameters.[97]  The numeric indicators and parameters

stored on the NAM can be updated by the wireless carrier by writing and/or deleting data on

the NAM via Over-the-Air Parameter Administration (OTAPA) or other similar methods.[98]

*See Technical Explanations*, Section III(B)(3)(a), *infra*, for a full explanation of OTAPA.  The

four categories of NAM data listed above are further explained in proceeding subsections.

### b.   The Access Network (AN).

In order to provide data services to Access Terminals, a 1xEV-DO Rel. 0 cellular data

network uses a set of hardware and software called the Access Network (AN).  The Access

---

93.    *See id.*, § 4.5.3, p. 4.38 *et seq.* (explaining the NAM Preferred Roaming List and
Extended Preferred Roaming List parameter blocks); *id.*, § 3.5.5, p. 3.93 (Explaining the
Preferred Roaming List and Extended Preferred Roaming List stored on the NAM).

94.    *See* fn. No. 93, *supra*.

95.    *See id.*, § 3.1, p. 3.1 ("The standard NAM indicators, stored in the mobile station's
permanent and semi-permanent memory, are defined in F.3 of [1, 7]." (referring to TIA-2000.5-
D)); *See* TIA-2000.5-D, *Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread
Spectrum Systems*, Annex F, § F.3, p. F.4 (Listing A-Key, Shared Secret Data A, and Shared
Secret Data B as NAM indicators.).

96.    *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread
Spectrum Systems*, § 3.5.8.14, p. 3.158 ([RE: reverse link] HRPD Access Authentication CHAP
SS Parameters); *id.*, § 4.5.7.10, p. 4.56 ([RE: forward link] HRPD Access Authentication
CHAP SS Parameters).

97.    *See id.*, § 3.1, p. 3.1 ("Manufacturer-specific NAM parameters may be defined within a
Parameter Block Type reserved for manufacturer-specific parameter definitions." (internal table
references omitted)).

98.    *See id.*, § 1.2.1, p. 1.4 ("Over-the-Air Parameter Administration (OTAPA).  Network
initiated OTASP process of provisioning mobile station operational parameters over the air
interface.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Network is responsible for providing "data connectivity between the packet-switched data

network (typically the PDSN and Internet) and the ATs."[99]  The Access Network is the

equivalent of a Base Station (BS) in a 1xRTT network.[100]  Both Access Networks and Base

Stations are more commonly known as cell sites.[101][102]  The Access Networks belonging to a

1xEV-DO Rel. 0 data network communicate with Access Terminals via radio waves transmitted

through the air, *i.e.*, over the air interface.  The radio waves sent between Access Terminals and

Access Networks consist of signals that communicate data to/from the Access Terminal users

and the Internet. A 1xEV-DO Rel. 0 Access Network consists of two main hardware/software

elements: (1) the Base Transceiver Station (BTS),[103] and (2) the Base Station Controller[104]

(BSC) which is sometimes "referred to as the radio network controller, or RNC."[105]  "The

BTS is an entity, composed of radio devices, antenna, and equipment, that provides

99.    *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 264-265.

100.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
1.11, p. 1.12 ("An access network is equivalent to a base station...").

101.   In basic terms, a cell site is defined as "[t]he location where a wireless antenna and
network communications equipment is placed in order to provide wireless service in a
geographic area."  CTIA [website], Glossary of Terms C-D,
http://www.ctia.org/media/industry_info/index.cfm/AID/10321.

102.   The remainder of the technical explanations contained in this section will refer to 1xEV-
DO Rel. 0 cell sites as Access Networks when used in the context of 1xEV-DO Rel. 0 cellular
data networks.

103.   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 264, Fig.
10.23, "Basic network structure for 1X-EV DO."

104    *See id*.

105.   *Id.*, p. 265.

- 28 -

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

_____

transmission capabilities across the air interface (Um)."[106]  In a 1xRTT network, "[t]he BSC is an entity that provides control and management for one or more BTSs and exchanges messages with its connected BTSs and the MSC [(*i.e.,* Mobile Switching Center)]."[107]  In a 1xEV-DO network, the Base Station Controller (*i.e.*, the Radio Network Controller) performs the same function but instead of exchanging messages with a Mobile Switching Center, which is absent in a 1xEV-DO data network,[108] the BSC/RNC exchanges messages with (1) the "Access Network-Authentication, Authorization, and Accounting" (AN-AAA) server, and (2) the Packet Data Serving Node (PDSN).[109]

The first primary function performed by the BSC/RNC, exchanging messages with the AN-AAA server, is done to authenticate the Access Terminal to the Access Network and to collect data used for billing the wireless customer.[110]  The AN-AAA authentication process, further explained in Section III(B)(3)(c)(vi), *infra*, prevents unauthorized wireless devices (*e.g.*, cloned wireless devices) from accessing data service through Access Networks while service is not authorized.  Once the authentication process is complete, the BSC/RNC performs its second

_____

106.    *Id.*, p. 202.

107.    *Id.* ("The MSC switches circuit-mode MS-originated or MS-terminated traffic and provides processing and control for calls and services.").

108.    *See* Mishra, Ajay R., *Cellular Technologies for Emerging Markets: 2G, 3G and Beyond* (West Sussex, England: John Wiley & Sons, 2010), p. 113 ("...EV-DO uses an IP network and does not require a SS7 network and complex network switches such as a mobile switching center (MSC).").

109.    *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 266, Fig. 10.24, "Radio and core network interfaces protocols in 1X-EV DO."

110.    *See id.*, p. 205 ("This function of AAA involves collecting and storing the billing-related data concerning the offered services...").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

primary function, *i.e.*, exchanging data between the Access Network and the Packet Control

Function (PCF),[111] which in turn relays the data to/from the Packet Data Serving Node[112]

providing connectivity to the Internet.[113]

### c.  Access Networks (a.k.a. cell sites) in the geolocation context.

From a geolocation perspective, a 1xEV-DO Rel. 0 cellular data network provides

service through a series of "cells" with each designating a geographical area located within the

network coverage area.[114]  Each cell, which is served by multiple cell **sites** (*i.e.*, Access

Networks) pointing inward from the cell's borders, "is usually depicted as a hexagon, but in

reality the actual shape varies according to the geographic environment and radio

propagation."[115]  A cell site in 1xEV-DO typically consists of three sets of multiple antennas,

referred to as sectors, positioned atop an antenna tower, rooftop, or other structure allowing the

---

111.    *See id.*, p. 204 ("The PCF is an entity... that manages the buffering and relay of packets
between the BS and the PDSN....  The PCF also collects radio link (air interface)-related
accounting information to be used by the AAA.").

112.    *See id.*, p. 264, Fig. 10.23, "Basic network structure for 1X-EV DO."

113.    *See id.*, p. 265 (The PDSN is "the network equipment providing data connectivity
between the radio access network and a packet-switched data network.  The PDSN provides
connectivity to the Internet independent of the type of radio access network.")

114.    *See* Chuah *et al.*, *Design And Performance Of 3G Wireless Networks And Wireless
LANs*, p. 1 ("Today, the cellular systems consist of a cluster of base stations with low-power
radio transmitters.  Each base station serves a small cell within a large geographic area.").

115.    *Id.*, p. 2.

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

---

antennas to operate across the earth's surface.[116][117]  Cell site sectors "are created by installing multiple antenna sets at the base location, each with shielding on the 'back.'  Each set of antennas is directional rather than omnidirectional."[118]  The geographical signal coverage area of each sector depends on various factors such as power output of antenna amplifiers, antenna design,[119] and physical obstructions within the signal path area.[120]  Sectors belonging to the

---

116.    Although these "typical" cell sites are designed to cover relatively large sections of populated areas, other types of cell sites are becoming more common—even ones "designed to serve very small areas, such as particular floors of buildings or even individual homes and offices."  Hearing Before the Subcommittee on the Constitution, Civil Rights, and Civil Liberties of the Committee On The Judiciary, House Of Representatives: *ECPA Reform and the Revolution in Location Based Technologies and Services*, 111th Cong. 2nd sess. (Jun. 24, 2010) (Prepared Statement of Matt Blaze, Associate Professor, University of Pennsylvania), p. 25, *available at* http://judiciary.house.gov/hearings/printers/111th/111-109_57082.PDF (last visited: Jan. 5, 2012 ),  p. 29.

117.    The Verizon Wireless cell sites that were being accessed by the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.) were the typical tri-sectored type.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of *1st Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map of cell sites accessed by the aircard).  Therefore, the remainder of this subsection will focus on the antenna design applicable to the actual Verizon Wireless cell sites accessed by the aircard in United States v. Rigmaiden.

118.    Levine, *Digital Switching: Cellular & PCS Lectures April 17 & 24, 2001*, p. 11 ("Sectored cells have two advantages over omnidirectional cells.  First, by limiting the radio reception/transmission to the 'front' of the angular sector and not transmitting or receiving a signal from the 'back' they reduce the level of interference by a ratio of 3/1 or 6/1 for 3 and 6 sectors, respectively.  This improves the signal quality, which is manifested as a lower BER in a digital system.").

119.    *See* Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 38 ("Actual RF coverage is mainly determined by three key factors: the height of the cellular antenna (tower) at the base station, the type of antenna used at the cell base station, and the RF power level emitted.").

120.    *See*, *e.g.*, CTIA [website], *How Wireless Works Pg 2*, http://www.ctia.org/consumer_info/index.cfm/AID/10539 (last accessed: Dec. 13, 2011)

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

most common type of cell site are positioned in a 360° circular formations with each sector

covering an approximate 120° signal path area across the earth's surface.[121]  The horizontal

antenna angles designate the direction of each sector's 120° signal path area.  In addition to

having a physical location address (street address plus latitude and longitude), each cell site

sector also has its own identification number.  "This arrangement essentially divides the

carrier's coverage area into a mosaic of local 'sectors', each served by an antenna at the nearest

base station [(*i.e.*, cell site serving a cell)]."[122]

    3.  **How relevant 3GPP2 technical standards dictate communications
        between a 1xEV-DO Rel. 0 Access Terminal and a 1xEV-DO Rel. 0
        Access Network.**

        a.  **Over-the-Air Service Provisioning (OTASP) and Over-the-Air
            Parameter Administration (OTAPA).**

As explained in Section III(B)(2)(a), *supra*, each Access Terminal NAM stores various

data parameters such as the Preferred Roaming List, Extended Preferred Roaming List, Shared

_____

("Since the shape and size or cells vary, there might also be empty spaces between the coverage
areas of two or more cells.  These gaps or dead spots can also be caused by trees, tall buildings
or other obstructions that block your wireless signal from reaching a nearby antenna.").

121.  *See* Levine, *Digital Switching: Cellular & PCS Lectures April 17 & 24, 2001*, p. 11
(diagram showing 120° tri-sectored cell site radiation pattern); *see also* O'Connor, Terrence P.,
*Provider Side Cell Phone Forensics*, Small Scale Digital Device Forensics Journal, Vol. 3, No.
1, June 2009 ISSN# 1941-6164, p. 1 ("The [][various] directional antennas on the cell tower
nominally divide the 360 degree circumference around the tower into three 120 degree areas,
one area for each antenna." (technical correction added in brackets)).

122.  *ECPA Reform and the Revolution in Location Based Technologies and Services*, 111th
Cong. 2nd sess. (Jun. 24, 2010) (Prepared Statement of Matt Blaze), p. 23 (PDF, p. 27)
("Network based location enables a cellular provider to identify the sector in which a user's []
[wireless device] is located, and, in some cases, to pinpoint their location within a sector.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Secret Data (SSD), and manufacturer-specific NAM parameters.[123]—all of which can be

surreptitiously updated by the wireless carrier through Over-the-Air Service Provisioning

(OTASP).[124][125]  OTASP is the process of reading,[126] writing,[127] and/or deleting[128] data

to/from the internal storage device (*e.g.*, NAM) of an Access Terminal using commands sent by

---

123.   The Preferred Roaming List, Extended Preferred Roaming List, and Shared Secret Data
(SSD) are further explained in this subsection and in proceeding subsections.

124.   *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread
Spectrum Systems*, § 1.1, p. 1.1 (listing features that can be provisioned over-the-air); *id.* § 3.3,
p. 3.12 (listing programming procedures for OTASP).

125.   Another method used by wireless carriers to update wireless devices over-the-air is IP
Based Over-the-Air Device Management (IOTA-DM) using the Open Mobile Alliance Device
Management (OMA DM) protocol.  *See* 3rd Generation Partnership Project 2, 3GPP2 C.S0064-
0, *IP Based Over-the-Air Device Management (IOTA-DM) for cdma2000 Systems, Release 0*
(Sept. 6, 2012).  "OMA DM provides an integrated and extensible framework for the OTA
management needs of 3G mobile devices and beyond.  The standard includes the OMA DM
protocol specification, which is based on the SyncML DM protocol."  *Id.*, § 1, p. 1.1 (internal
citation omitted).  "A method for updating firmware over the air (FOTA) based on OMA DM is
also specified."  *Id.* (citation omitted).  "Firmware over-the-air (FOTA) is the process of
**updating mobile station firmware over-the-air**.  Primary use of firmware update capability is
to rectify critical defects, that may compromise the end user safety, through updating firmware.
It may be used to update new version of firmware to the mobile station."  *Id.*, § 8, p. 8.1
(emphasis added).  OMA DM is intended to replace OTASP but it is still backward compatible
with the OTASP standard.  *See id.*, § 1.4, p. 1.6 ("For backward compatibility with
OTASP/OTAPA, the mobile and the server shall support converting IOTA-DM data to OTASP/
OTAPA data." (internal citation omitted)).

126.   *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread
Spectrum Systems*, § 3.5, p. 3.48 *et seq.* (explaining the data sent to Access Networks by Access
Terminals via reverse link messages during OTASP).

127.   *See id.*, § 4.5, p. 4.9 *et seq.* (explaining the data sent to Access Terminals by Access
Networks via forward link messages during OTASP).

128.   *See id*.

- 33 -

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

the Access Network to the Access Terminal over the air interface.[129]  OTASP "allows a potential wireless service subscriber to activate (*i.e.*, become authorized for) new wireless service, and allows an existing wireless subscriber to make changes in existing services without the intervention of a third party [(*i.e.*, physical access to the user's device by a human)]."[130]  OTASP can be initiated by either the Access Terminal or Access Network.[131]  When initiated by the Access Network, the wireless carrier conducts Over-the-Air Parameter Administration (OTAPA)[132] to update the NAM or other operational parameters in the Access Terminal over-the-air.[133]  "OTAPA sessions are initiated autonomously by the network, and proceed without any subscriber involvement or knowledge and with no limitation on the subscriber's ability to receive telecommunications services."[134]  In order to read data from a specific NAM, the Access Network transmits a Configuration Request Message to the Access Terminal.[135]  In

129.   *See id.*, § 1.2.1, p. 1.4 ("Over-the-Air Service Provisioning (OTASP).  A process of provisioning mobile station operational parameters over the air interface.").

130.   *See* Telecommunications Industry Association, TIA-41.000-E-4[E], *Introduction to Mobile Application Part (MAP)* (Arlington, VA: Sept. 2007), § 3.1, p. 000.22.

131.   TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 3.2, p. 3.2 ("Over-the-air service provisioning (OTASP) can be initiated in two ways: by the user and by the network.").

132.   *See id.*, § 1.2.1, p. 1.4 ("Over-the-Air Parameter Administration (OTAPA). Network initiated OTASP process of provisioning mobile station operational parameters over the air interface."); *id.* § 3.2, p. 3.2 ("The network-initiated procedure... is also built upon the over-the-air programming protocol and procedures that support the OTASP feature.").

133.   *See id.* § 3.2, p. 3.2 ("OTAPA provides a tool for the wireless service provider to update NAM indicators and parameters.").

134.   *See* TIA-41.000-E-4[E], *Introduction to Mobile Application Part (MAP)*, § § 3.1, p. 000.21.

135.   *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

response to the Configuration Request Message, the Access Terminal transmits a Configuration

Response Message providing the Access Network with its stored NAM parameters.[136]  In

order to write data to an Access Terminal NAM, the Access Network transmits a Download

Request Message containing the NAM parameter blocks sought to be written.[137]  In order to

cause the Access Terminal to commit the parameter blocks to permanent NAM memory, the

Access Network transmits a Commit Request Message to the Access Terminal.[138]  A newly

purchased Access Terminal will receive an initial NAM provisioning[139] and, throughout the

course of service, the Access Network will periodically update the data stored on the NAM via

OTAPA according to relevant protocols.

     Prior to reading, writing, and/or deleting data to/from an Access Terminal NAM, the

Access Network must first complete SPC/SPL and SPASM security procedures to unlock and

gain access to the NAM.  The Service Programming Code (SPC)[140] and Service Programming

Lock (SPL) parameter[141] contained on the NAM "prevents the over-the-air provisioning of

---

*Spectrum Systems*, § 3.3.1, p. 3.12-3.13.

136.  *See id.*

137.  *See id.*, § 3.3.1, p. 3.13-3.14.

138.  *See id.*, § 3.3.1, p. 3.14-3.16.

139.  *See id.*, § 4.2.1, p. 4.1.

140.  *See id.*, § 1.2.1, p. 1.5 ("Service Programming Code (SPC).  A secret code assigned to
the mobile station and known to the authorized network entity.")

141.  *See id.* ("Service Programming Lock (SPL). A protection provided for preventing the
over-the-air provisioning of certain mobile station parameters by unauthorized network entity
by way of verifying the Service Programming Code (SPC).").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

certain mobile station parameters by an unauthorized network entity."[142]  The SPL parameter

contains the SPC, taking a numeric value of 1 to 999,999,[143] "used for unlocking the mobile

station parameters for programming or reprogramming."[144]  Due to the weak security of the

SPC/SPL "combination lock" type mechanism,[145] an Access Terminal NAM also uses the

Subscriber Parameter Administration Security Mechanism (SPASM).  SPASM serves the same

purpose as SPC/SPL[146] but, instead of a simple numeric code, SPASM utilizes the Shared

Secret Data (SSD) stored on the NAM and known only to the Access Terminal and home AN-

AAA server.[147]  SPASM uses cryptographic keys and mathematical equations to conduct a

type of challenge-response between the Access Terminal and Access Network so that the

Access Terminal can verify that it is having its NAM provisioned by an authorized entity.[148]

Most commonly, the wireless carrier uses OTAPA to set the NAM's Preferred Roaming

List and Extended Preferred Roaming List with values that (1) designate which radio

frequencies to scan in order to acquire a system (*i.e.*, groups of wireless carrier cell sites), and

---

142.   *Id.*, § 1.1, p. 1.1.

143.   *Id.*, § 3.3.6, p. 3.43, Table 3.3.6-1 (Service Programming Code Values).

144.   *Id.*, § 3.3.6, p. 3.42.

145.   A numeric security code or combination having only 999,999 possible values is
susceptible to a "brute force" attack, *i.e.*, a security code "guessing" attack.

146.   *See id.*, § 1.2.1, p. 1.5 ("Subscriber Parameter Administration Security Mechanism
(SPASM).  Security mechanism protecting parameters and indicators of active NAM from
programming by an unauthorized network entity during the OTAPA session.")

147.   *See id.*, § 3.3.7, p. 3.43 (explaining how SPASM works).

148.   *See id*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

(2) designate which systems are authorized for providing service.[149]  "The preferred roaming

list consists of two tables: the system table and the acquisition table."[150]  The Acquisition

Table lists Acquisition Records consisting of "parameters that the mobile station can use to

acquire a system.  Each type of acquisition record is tailored for use in acquiring a particular

kind of system."[151]  The System Table lists System Records containing "parameters that the

mobile station can use for identifying an acquired system, for determining whether an acquired

system is the optimal system on which to operate and for determining the mobile station's

roaming status."[152]  In basic terms, the Acquisition Table contains a list of radio

frequencies[153] the Access Terminal may scan in order to locate transmitting Access Networks,

---

149.   "Two categories of the preferred roaming list are defined: The Preferred Roaming List
and the Extended Preferred Roaming List."  *Id.*, § 3.5.5, p. 3.93.  When accessing 1xEV-DO
Access Networks, a High Rate Packet Data (HRPD) (*i.e.*, 1xEV-DO) Access Terminal uses its
*Extended* Acquisition Records and *Extended* System Records contained in its *Extended*
Preferred Roaming List.  *See id.*, § 3.5.5.3.2, p. 3.114-3.120 and 3.5.5.2.2.11, p. 3.112.
However, because the Extended Preferred Roaming List is considered a category of the
Preferred Roaming List (*see id.*, § 3.5.5, p. 3.93), the "Extended" prefix will be omitted and the
terms "Preferred Roaming List," "Acquisition Table," "Acquisition Record," "System Table,"
and "System Record" will be used from this point forward for sake of simplicity.

150.   *Id.*, ANNEX C, p. C.1.

151.   *Id.*, § 3.5.5.2, p. 3.98.

152.   *Id.*, § 3.5.5.3, p. 3.112.

153.   *See id.*, § 3.5.5.2.2.11, p. 3.112 (Generic Acquisition Record for HRPD (*i.e.*, 1xEV-DO
Rel. 0) containing band-class and channel number).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

and the System Table contains a list of HRPD IPv6[154] subnets[155] acting as unique

identification numbers for groups of Access Networks (*i.e.*, systems) authorized for providing

service.[156]  In addition to the subnet information identifying a system, each record in the

System Table also contains "an indicator of whether the system is preferred or negative, the

roaming status that should be indicated by the mobile station, the relative priority of the system

and its geographic region."[157]  "The records in the acquisition table are in order of priority

(highest priority first) according to desired mobile station system selection scan order."[158]

    **b.  Access Terminal Initialization State procedures: identifying
and acquiring a 1xEV-DO Rel. 0 Access Network after initial
power-on.**

The first step of identifying and acquiring an Access Network is to place the Access

---

154.   In 1xEV-DO Rel. 0, Access Network sectors are identified by 128-bit Internet Protocol
Version 6 (IPv6) addresses.  *See* TIA-856-2[E], *cdma2000 High Rate Packet Data Air Interface
Specification – Addendum 2*, § 10.9, p. 10.11 (section from more recent version of IS-856
covering "SectorID Provisioning"); *see also* IETF RFC 2373, *IP Version 6 Addressing
Architecture*.  The subnet corresponding to any given Access Network IPv6 address identifies
the system to which the Access Network belongs.  In other words, the 1xEV-DO subnets take
the place of the System Identification numbers (SIDs) and Network Identification numbers
(NIDs) used to identify groups of cell sites.

155.   *See id.*, § 3.5.5.3.2-3.5.5.3.2.1, p. 3.118-3.20 (indicating that the system ID record for
HRPD (*i.e.*, 1xEV-DO Rel. 0) System Table contains the following data fields used to deduce
the IPv6 subnet identifying the 1xEV-DO system: SUBNET_COMMON_INCLUDED,
SUBNET_LSB_LENGTH, SUBNET_LSB, SUBNET_COMMON_OFFSET,
SUBNET_COMMON_LENGTH, and SUBNET_COMMON.).

156.   *See Technical Explanations*, Section III(B)(3)(c)(i), *infra* (explaining use of the System
Table).

157.   *See TIA-683-D, Over-the-Air Service Provisioning of Mobile Stations in Spread
Spectrum Systems*, ANNEX C, p. C.1.

158.   *Id*.

- 38 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Terminal into the Initialization State by powering it on.[159]  In the case of an aircard, this is

accomplished by plugging the device into the PCMCIA slot of a host laptop computer.  Once

plugged in, the Access Terminal receives power from the laptop's power source and its radio

transceiver is automatically initiated.  Once powered on, the Access Terminal is considered to

be in the Inactive Substate of the Initialization State.[160]  Prior to any interaction by the human

user, the Access Terminal begins the process of identifying radio signals belonging to available

Access Networks[161] authorized to provide 1xEV-DO Rel. 0 data service.  In order to

accomplish this task, the Access Terminal hardware transitions out of the Inactive Substate and

into the Network Determination Substate.[162]

### i.   Network Determination Substate.

While in the Network Determination Substate, "the access terminal selects a CDMA

Channel on which to try and acquire the access network."[163]  Considering Access Networks

can transmit on any number of radio frequencies,[164] the Access Terminal must first select a

---

159.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.2.6.1.2.1, p. 6.12 ("The access terminal shall enter the Initialization State when the Default
Air-Link Management Protocol is instantiated.  This may happen on events such as network
redirection and initial power-on.")

160.   *See id.*, § 6.3.1, p. 6.18 ("In this state the protocol waits for an *Activate* command.").

161.   *See id.*, § 6.2.6.1.2, p. 6.11 ("In the Initialization State the access terminal has no
information about the serving access network.  In this state the access terminal selects a serving
access network and obtains time synchronization from the access network.").

162.   *See id.*, § 6.3.1, p. 6.18 ("Network Determination State: In this state the access terminal
chooses an access network on which to operate.").

163.   *See id.*, § 6.3.6.1.3, p. 6.22 (internal reference omitted).

164.   *See id.*, § 9.2.1.1.1, p. 9.6 *et seq.* (Channel Spacing and Designation).

- 39 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

frequency to monitor using its Preferred Roaming List[165] (stored on the Access Terminal

NAM) through a process called System Selection for Preferred Roaming (SSPR).  "The goal of

System Selection for Preferred Roaming (SSPR) is for the mobile station to acquire the most

preferred system using the information from the preferred roaming list [] stored in the mobile

station []."[166]  As previously explained, "[t]he preferred roaming list consists of two tables: the

system table and the acquisition table."[167]  While in the Network Determination Substate, the

Access Terminal initiates System Selection for Preferred Roaming (SSPR) by reading from the

Acquisition Table to obtain either CDMA frequency blocks or specific CDMA channels within

frequency blocks of which to scan for available Access Networks.[168]  In the case of 1xEV-DO

Rel. 0 or other High Rate Packet Data (HRPD) service, the Acquisition Table will have one or

more "Generic Acquisition Record for HRPD" consisting of a "Band Class number

corresponding to the frequency assignment of the channel" and a "channel number

corresponding to the Band Class[.]"[169]  The various Preferred Roaming List "Generic

Acquisition Record for HRPD" entries are listed according to selection preference.[170]  The

---

165.  *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 1.2.2, p. 1.7 ("PR_LIST s-p - Preferred Roaming List.  Contains information to assist the mobile station system selection and acquisition process.  Retained by the mobile station when the power is turned off.").

166.  *See id.*, § 3.3.5, p. 3.42 (internal reference and NAM indicator name omitted).

167.  *Id.*, ANNEX C, p. C.1.

168.  *See id.*, § 3.5.5.2.1, p. 3.100 *et seq.* (listing Acquisition Record Formats).

169.  *See id.*, § 3.5.5.2.2.11, p. 3.112.

170.  *See id.*, § 3.5.5.2, p. 3.100 ("If ACQ_TABLE contains more than one acquisition record, these records should be listed in priority order (highest priority first) according to the desired

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Access Terminal will begin by selecting the entry having the highest preference and then it will

copy the relevant channel(s) to be scanned into a temporary Channel Record maintained on its

internal storage.[171]  Once the Access Terminal makes a Channel Record, it transitions from the

Network Determination Substate to the Pilot Acquisition Substate.[172]

### ii.  Pilot Acquisition Substate.

"In the Pilot Acquisition S[ubs]tate the access terminal acquires the Forward Pilot

Channel of the selected CDMA Channel."[173]  The pilot channel is an "unmodulated direct

sequence spread spectrum signal continuously transmitted at a fixed power"[174] by each Access

Network sector.  The pilot channel "is continually transmitting an all zero signal, which is

covered by a Walsh code 0,"[175] and is only identifiable because the "all-zero baseband stream

is [] multiplied by a pair of quadrature PN sequences."[176]  Because of the all-zero baseband

mobile station system selection scanning priorities.").

171.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.3.6.1.3, p. 6.22 ("In the Network Determination State the access terminal selects a CDMA
Channel (see 10.1) on which to try and acquire the access network."); § 10.1, p. 10.1 ("The
Channel record defines an access network channel frequency and the type of system on that
frequency.").

172.   *See id.*, § 6.3.6.1.3, p. 6.23 ("Upon selecting a CDMA Channel the access terminal shall
enter the Pilot Acquisition State.").

173.   *Id.*, § 6.3.6.1.4, p. 6.23.

174.   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 38.

175.   Langton, Charan (complextoreal.com), *CDMA Tutorial: Intuitive Guide to Principles of
Communications* (2002), *available at* http://www.complextoreal.com/CDMA.pdf (last
accessed: Sept. 29, 2010), p. 12; *see also* Etemad, *cdma2000 Evolution: System Concepts and
Design Principles*, p. 235 ("The pilot channel carries all '0's, that is, no upper layer
information.").

176.   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 39.

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

stream, "the pilot channel has very good SNR [(Signal to Noise Ration)] making it easy for mobiles to find it."[177]  "The pilot is the first broadcast physical channel that is searched and acquired by the mobile stations immediately after the mobile is powered on."[178]  "The main functions of the pilot channel [in 1xEV-DO Rel. 0] are the same [as] those of forward common pilot channels in cdma2000 or IS95."[179]  The pilot channel is used to broadcast a unique signature (etymologically referred to as a PN sequence, short code, PN offset, or PN code) used by Access Terminals to identify and differentiate between all Access Network sectors in a given area.  "The PN sequence, with a specific offset, forms a short code, which uniquely identifies the pilot and thereby the particular sector that is transmitting that pilot signal."[180]  Each CDMA transmit frequency, corresponding to a band class CDMA channel number, supports a total of 512 unique PN sequences of which short codes can be derived for any given area.[181]

In addition to using the short code to identify the Access Network, the Access Terminal also uses the short code to identify and decode all other forward link radio channels transmitted by the Access Network.  This is required because the Access Network uses the short code "to

---

177.   Langton, *CDMA Tutorial: Intuitive Guide to Principles of Communications*, p. 12; *see also* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 39 ("As a result, the pilot is an easy-to-capture signal, which mainly reflects the phase of the PN sequence used as the base station's short code.").

178.   *Id.*, p. 38.

179.   *Id.*, p. 235.

180.   *Id.*, p. 39.

181.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 9.3.1.3.4, p. 9.90 ("Pilot Channels shall be identified by an offset index in the range from 0 through 511 inclusive.").

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

spread [(*i.e.*, encode)] the composite signal (containing all code channels) that is transmitted to the users in a cell."[182]   "[T]he base station-specific short codes serve as the base stations' signatures, allowing differentiation and de-spreading of desired base stations' signals in the presence of other-cell interference."[183]   Aside from physical layer identification and decoding, the Access Terminal also uses the "power and timing of the pilot channel"[184] to simplify the determination of the best serving Access Network[185] and to help in "acquiring the system timing and fast synchronization."[186][187]   Although the pilot channel does not transmit system time, the nature of the PN sequence transmission[188] allows the Access Terminal to synchronize

---

182.    Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 18; *see also* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 9.3.1.3.1, p. 9.60 fig. 9.3.1.3.1-1, "Forward Channel Structure" (showing composite Walsh channels labeled "A" and "B" being fed into the Quadrature Spreading block prior to output of Forward Modulated waveform).

183.    Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 31-32.

184.    *Id.*, p. 235.

185.    *See id.*, p. 249 ("The AT uses the measured SINR [(Signal to Interference and Noise Ration)] of the strongest pilot and the thresholds defined by the AN to determine the highest data rate it can reliably decode as well as the identity of the corresponding best serving sector.").

186.    *Id.*

187.    "An additional function of the pilot [(specific to 1xEV-DO)] is to provide the access terminal with a means of predicting the receive C/I for the purpose of access-terminal-directed forward data rate control (DRC) of the Data Channel transmission."  TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 9.3.1.3.1, p. 9.56 fn. 54.

188.    *See id.*, § 9.3.1.3.4, p. 9.90 ("The chip rate for the pilot PN sequence shall be 1.2288Mcps.  The pilot PN sequence period is 32768/1228800 = 26.666… ms, and exactly 75 pilot PN sequence repetitions occur every 2 seconds."); *id.* ("The zero-offset pilot PN sequence shall be such that the start of the sequence shall be output at the beginning of every even second in time, referenced to access network transmission time.").

- 43 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

its clock ticks to the clock ticks of the Access Network.[189]  This synchronization is required

because all forward link channels are placed into time slots "aligned to the PN rolls of the zero-

offset PN sequences and... to system time on even-second ticks."[190]

     "Upon entering the Pilot Acquisition S[ubs]tate, the access terminal shall tune to the

selected CDMA Channel and shall search for the pilot."[191]  If the Access Terminal is unable to

acquire at least one pilot signal from the selected CDMA channel within a set amount of time,

the Access Terminal makes a new channel record using the next highest priority entry from the

Preferred Roaming List Acquisition Table.[192]  For example, assume a scenario where the

highest priority entry in the Acquisition Table contains a band class and channel number

equating to 880.020−880.650 MHz radio frequency for the Access Network and the second

highest priority entry in the Acquisition Table contains a band class and channel number

equating to 891.510−893.370 MHz radio frequency for the Access Network.  Under this

scenario, the Access Terminal will first monitor 880.020−880.650 MHz for a pilot signal and if

no pilot is detected, the Access Terminal will then monitor 891.510−893.370 MHz for a pilot

signal.  This process will continue for each entry in the Acquisition Table of the Preferred

---

189.   In other words, the noted synchronization causes the "second hand" of the Access
Terminal's internal clock to tick in unison with the "second hand" of the Access Network's
internal clock but the absolute system time is still unknown to the Access Terminal.

190.   *Id.*, § 9.3.1.3.1, p. 9.57; *see also id.*, § 9.3.1.3.6.1, p. 9.93 ("Each sector shall use a time
base reference from which all time-critical transmission components, including pilot PN
sequences, slots, and Walsh functions, shall be derived.").

191.   *Id.*, § 6.3.6.1.3, p. 6.23.

192.   *See id.* ("If the access terminal fails to acquire the pilot within [][a specified amount of]
seconds of entering the Pilot Acquisition State, it shall enter the Network Determination State.
").

- 44 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Roaming List until an initial Access Network pilot signal is detected.[193]  Once the Access

Terminal has acquired the pilot channel, derived the short code, and synchronized its clock

ticks to the system timing, it transitions out of the Pilot Acquisition Substate and into the

Synchronization Substate.[194]

### iii.  Synchronization Substate.

In the Synchronization Substate, "the access terminal synchronizes to the Control

Channel cycle, receives the Sync message, and synchronizes to system time."[195]  In 1xEV-DO

Rel. 0, the Sync message is transmitted on the Control Channel,[196] a forward link traffic

channel, which takes the place of the Sync Channel used in 1xRTT and in other earlier CDMA

communications systems.[197]  "The access network broadcasts the Sync message to convey

basic network and timing information."[198]  The "broadcast" addressing for the Sync message

means all Access Terminals are sent the same Sync message at the same time.[199]  The Access

---

193.   Through the Route Update Protocol, additional pilot signals for additional Access
Network sectors are detected and logged after the Access Terminal acquires the initial Access
Network.  The details of this process are explained in the *Technical Explanations*, Section
III(B)(3)(d)(i), *infra*.

194.   *See id.*, § 6.3.6.1.4, p. 6.23 ("If the access terminal acquires the pilot, it shall enter the
Synchronization State." (footnote omitted)).

195.   *See id.*, § 6.3.1, p. 6.18.

196.   *See id.*, § 6.3.6.1, p. 6.22 ("The access network shall broadcast the Sync message
periodically in a synchronous Control Channel capsule.").

197   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 39
(discussing the Sync Channel in IS-95A) & p. 144 (discussing the Sync Channel in 1xRTT).

198.   TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.3.6.2.1, p. 6.23.

199.   *See id.* (the "addressing" table entry is set to "broadcast" for the Sync message) & §

- 45 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Network uses the Sync message to write network specific data to the internal storage devices of

all Access Terminals attempting to acquire the network.  In 1xEV-DO, the Sync message

contains five parameters (*i.e.*, data fields) sent to the Access Terminal: (1) MessageID, (2)

MaximumRevision, (3) MinimumRevision, (4) PilotPN, and (5) SystemTime.[200][201]  Upon

receiving the Sync message, the Access Terminal "reads and stores all the parameters in the

message that are defined in the mobile protocol revision and ignores the rest."[202]  After storing

the data contained in the Sync message, the Access Terminal checks to see if its protocol

revision number is between the MinimumRevision and MaximumRevision fields of the Access

Network.[203]  If the Access Terminal's revision number is not within the specified range then

the Access Terminal and Access Network are not compatible and the Access Terminal

transitions back to the Network Determination Substate.[204]  If the Access Terminal's revision

number is within the specified range then the Access Terminal and Access Network are

compatible and the Access Terminal sets its "time to the time specified in the message[.]"[205]

---

6.3.6.1, p. 6.22 ("The access network shall broadcast the Sync message periodically in a
synchronous Control Channel capsule.").

200.   Unlike the pilot signal that provides clock tick synchronization, the SystemTime
parameter of the Sync message provides the Access Terminal with an absolute system time
value.

201.   *See id.* § 6.3.6.2.1, p. 6.24.

202.   Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 144.

203.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.3.6.1.5, p. 6.23.

204.   *See id*.

205.   *Id.*, § 6.3.6.1.5, p. 6.23.

- 46 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

At this point, the Access Terminal has acquired the network and transitions out of the

Initialization State[206] and into the Idle State.

### c.   Access Terminal Idle State procedures: preparing to open a connection and opening a connection with a 1xEV-DO Rel. 0 Access Network.

While in the Idle State, the Access Terminal's actions are primarily dictated by the

Default Idle State Protocol, which "provides the procedures and messages used by the access

terminal and the access network when the access terminal has acquired a network and a

connection is not open."[207]  There are seven primary functions performed by the Access

Terminal while in the Idle State:[208] (1) receiving, processing, and storing to internal storage

the Access Network's Overhead Messages, (2) transmission of Access Probes to the Access

Network to initiate session establishment and open a connection, (3) establishing an open

session with the Access Network, (4) application of encryption and authentication keys for use

in the security layer, (5) obtaining identifying information from Access Terminal hardware

using the HardwareIDRequest message, and (6) opening a connection with the Access

Network.  The above listed functions are fully explained in the subsections immediately below.

---

206.   Inactive, Network Determination, Pilot Acquisition, and Synchronization were all
substates of the Initialization State.

207.   *Id.*, § 6.4.1, p. 6.26.

208.   There are other functions relevant to this state but, unless otherwise noted in later
subsections, they are immaterial to the operation of the FBI's cell site emulators (as used to
locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-
PHX-DGC (D.Ariz.)) and will not be addressed.

- 47 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

### i.   Receiving, processing, and storing to internal storage the Access Network's Overhead Messages.

Upon entering the Idle State, the Access Terminal is in an Inactive Substate and proceeds
into the Monitor Substate.  "When the access terminal is in the Monitor S[ubs]tate, it
continuously monitors the Control Channel."[209]  In this substate, "[t]he access terminal shall
monitor the overhead messages as specified in the Overhead Messages Protocol []."[210]  The
Overhead Messages are the QuickConfig message and the SectorParameters message.[211]
"These messages are broadcast by the access network over the Control Channel."[212]  The
"broadcast" addressing for the Overhead Messages means all Access Terminals are sent the
same Overhead Messages at the same time.[213]  The QuickConfig and SectorParameters
messages contain numerous categories of essential data communicated to Access Terminals.[214]
[215]  "The QuickConfig message is used to indicate a change in the overhead messages'

---

209.   *Id.*, § 6.4.6.1.5, p. 6.35.

210.   *Id.*, § 6.4.6.1.5.1, p. 6.35.

211.   *See id.*, § 6.8.1, p. 6.113.

212.   *Id*.

213.   *See* 6.8.6.1.5, p. 6.118.

214.   *See id.*, § 6.8.6.2.1, p. 6.120 (Listing the following data fields for the QuickConfig
message: MessageID, ColorCode, SectorID24, SectorSignature, AccessSignature, Redirect,
RPCCount, ForwardTrafficValid, and a Reserved field.).

215.   *See id.*, § 6.8.6.2.2, p. 6.122 (Listing the following data fields for the SectorParameters
message: MessageID, CountryCode, SectorID, SubnetMask, SectorSignature, Latitude,
Longitude, RouteUpdateRadius, LeapSeconds, LocalTimeOffset, ReverseLinkSilenceDuration,
ReverseLinkSilencePeriod, ChannelCount, Channel, NeighborCount, NeighborPilotPN,
NeighborChannelIncluded, NeighborChannel, NeighborSearchWindowSizeIncluded,
NeighborSearchWindowSize, NeighborSearchWindowOffsetIncluded,
NieghborSearchWindowOffset, and a Reserved field.).

- 48 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

contents and to provide frequently changing information."[216]  "The SectorParameters message

is used to convey sector specific information to the access terminals."[217]  The Access Network

uses the Overhead Messages to write network specific data to the internal storage devices of all

Access Terminals that have acquired the network but are yet to establish a connection.  "When

a mobile station receives an overhead message, it should update all of its related stored

information accordingly."[218]  The Access Terminal will also "store the signature associated

with the message for future comparisons."[219]  By comparing the signature of the previous

Overhead Message to the signature of the new Overhead Message, the Access Terminal can

determine if it needs to update its stored data sent to it by the Access Network.[220]  The

Overhead Message parameters written to the Access Terminal by the Access Network are

"essential parameters" that are "shared by protocols in the Connection Layer as well as

protocols in other layers."[221]

Immediately after receiving the SectorParameters message, the Access Terminal uses the

SectorID and SubnetMask[222] data parameters to determine the subnet of the system to which

_____

216.   *Id.*, § 6.8.6.2.1, p. 6.120.

217.   *Id.*, § 6.8.6.2.2, p. 6.121.

218.   Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 153.

219.   TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.8.6.1.6, p. 6.119.

220.   *See id.*, § 6.8.6.1.6, p. 6.118 (explaining the signature comparison process).

221.   *Id.*, § 6.1.1, p. 6.2.

222.   *See id.*, § 1.11, p. 1.15 (Explaining the IPv6 SubnetMask to be "[a] 128-bit value whose
binary representation consists of *n* consecutive '1's followed by 128-*n* consecutive '0's.").

- 49 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

the Access Network belongs.  The SectorID of the SectorParameters message contains a 128-bit

Internet Protocol Version 6 (IPv6) address that identifies the sector.[223]  The SubnetMask of the

SectorParameters message contains "the number of consecutive 1's in the subnet mask of the

subnet to which th[e] sector belongs."[224]  In order to calculate the IPv6 subnet from the

SectorParameters message, the Access Terminal conducts a mathematical bitwise logical AND

using the SectorID and the SubnetMask.[225]  As explained in Section III(B)(3)(a), *supra*, the

subnet of the serving sector acts as the unique identification number identifying the particular

1xEV-DO system being accessed by the Access Terminal.  No two 1xEV-DO systems have the

same subnet and all Access Networks belonging to any given system will have identical subnet

values as calculated using the SectorID and SubnetMask.  Once the Access Terminal deduces

the subnet of the serving system, it checks its locally stored Preferred Roaming List System

Table[226] to determine if the subnet is listed as corresponding to a group of Access Networks

(*i.e.*, a system) authorized for providing wireless service.  If the subnet is not authorized, the

---

223.  *See id.*, § 6.8.6.2.2, p. 6.123 (Defining the SectorID as the "Sector Address Identifier[]"
and that "[t]he access network shall set this field to the 128-bit IPv6 address of th[e] sector."
(internal citation omitted)); *see also* IETF RFC 2373, *IP Version 6 Addressing Architecture*.

224.  *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.8.6.2.2, p. 6.123.

225.  *See* Becker, Ralph, IP Address Subnetting Tutorial (Sept. 7, 1999), *available at*
http://www.firstnetsecurity.com/library/misc/TutorialMaster.PDF (last accessed: Feb. 20, 2012)
(explaining IPv4 subnetting techniques); DSLReports.com, [website], *How to Calculate the
Subnet of an ip for your network. IPv6 FAQ | DSLReports.com, ISP Information*,
http://www.dslreports.com/faq/16362 (last accessed: Feb. 20, 2012) ("To subnet the IPv6
address space, you use same ipv4 subnetting techniques to divide... different portions of an
IPv6 intranet.").

226.  *See Technical Explanations*, Section III(B)(3)(a), *supra* (explaining the Preferred
Roaming List System Table and its purpose).

- 50 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Access Terminal ignores the Access Network and transitions back to the Network

Determination Substate.  If the subnet is authorized, the Access Terminal begins the access

probe process to initiate session establishment with the Access Network.

### ii.  Transmission of Access Probes to the Access Network to initiate session establishment and open a connection.

Prior to the initial Access Probe process explained in this subsection, all radio signal

transmissions are broadcast by the Access Network to the Access Terminal.  Immediately after

network acquisition, the Access Terminal is yet to transmit signals and the Access Network is

yet to be made aware of the Access Terminal's presence.[227]  In order to establish a session and

open a connection with the Access Network, the Access Terminal initiates an Access Attempt

over the Reverse Access Channel belonging to the sector serving the Access Terminal.[228]

"Each access attempt may consist of one or more sub-attempts, each consisting of repeated

transmissions of the same message.  Each message transmission is called an *access probe*."[229]

All Access Channel transmissions are spread (*i.e.*, encoded)[230] using a long code created from

---

227.   *See id.*, p. 52 ("When the mobile first attempts to access the system, the base station has
no information about the location of the mobile...").

228.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
9.2.1.3.2, p. 9.33 ("The Access Channel is used by the access terminal to initiate
communication with the access network...").

229.   *See* Korowajczuk, Leonhard *et al.*, *Designing cdma2000 Systems*, John Wiley & Sons,
(West Sussex, England: 2004), p. 254; *see also* Etemad, *cdma2000 Evolution: System Concepts
and Design Principles*, p. 247 ("The transmissions on the access channel are in the form of
access probes, each consisting of a preamble followed by one or more access channel physical
layer packets." (internal figure note omitted)).

230.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
8.3.6.1.4.1.1, p. 8.25 ("The access terminal shall use the Access Channel long codes to cover
the entire probe.").

- 51 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

stored data received via the Overhead messages.[231][232]  A 1xEV-DO Access Probe

transmission "consist[s] of a preamble followed by one or more access channel physical layer

packets."[233]  "During the preamble transmission, only the Pilot Channel is transmitted."[234]

"During the Access Channel physical layer packet transmission, both the Pilot Channel and the

Data Channel are transmitted."[235]  The physical layer packet transmissions contain higher

layer Protocol Data Units[236] used for establishing a session and opening a connection with the

Access Network.[237]  A transmission sent on the Access Channel by the Access Terminal is

always part of an Access Attempt dictated by the Access Probe process.

---

231.   *See id.*, § 8.3.6.1.4.1.2, p. 8.26, Table 8.3.6.1.4.1.2-1, Access Channel Long Code Masks
(showing that the long code mask for the Access Channel is comprised, in part, by the
ColorCode and SectorID); *id.*, § 8.3.6.1.4.1.2, p. 8.27 ("SectorID is given as public data of
Overhead Messages Protocol and corresponds to the sector to which the access terminal is
sending the access probe. [] ColorCode is given as public data of Overhead Messages Protocol
and corresponds to the sector to which the access terminal is sending the access probe.").

232.   The entire forward link channel, which includes the Access Channel spread by the
Access Channel long code, is also collectively spread by the Access Network short code as
explained in the *Technical Explanations*, Section III(B)(3)(b)(ii), *supra*.

233.   Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 247 (internal
figure note omitted).

234.   TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
9.2.1.3.2, p. 9.33; *see also* Etemad, *cdma2000 Evolution: System Concepts and Design
Principles*, p. 33 ("The preamble does not carry any m[e]ssages and it is transmitted to help
[the] base station capture the phase and timing of [the] user's transmission in the uplink.  Once
the preamble is detected the base station can demodulate the message capsule and process [the]
MS's request.").

235.   TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
9.2.1.3.2, p. 9.33-9.34.

236.   *See id.*, § 8.3.3, p. 8.18 (defining the Protocol Data Unit for the Default Access Channel
MAC Protocol).

237.   *See id.*, § 8.3.6.1, p. 8.21 and Fig. 8.3.6-1. Access Channel MAC Packet Structure.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

In 1xEV-DO, "[t]he access procedure performed by the access channel MAC protocol is
similar to that used in basic access mode of IS-2000."[238]  "Namely, the AT keeps transmitting
access probes at increasing power levels until it gets an acknowledgement back from the
AN."[239]  The 1xEV-DO Access Probe process adopted from earlier CDMA technology solves
the power control[240] problem inherent with initial reverse link transmissions: "When the
mobile first attempts to access the system, the base station has no information about the
location of the mobile and thus the power at which the mobile should access the system"[241]
An Access Attempt involves transmitting Access Probes "starting with a low initial power
estimated by open-loop power control followed by power increments on every successive

238.   Yang, Samuel C., *3G CDMA2000: Wireless System Engineering* (Norwood, MA: Artech
House, 2004) p. 229; *see also* Etemad, *cdma2000 Evolution: System Concepts and Design
Principles*, p. 247 ("In 1X-EV DO the access channel structure and protocols are very similar
to those of IS95/cdma2000 Release 0.").

239.   Yang, *3G CDMA2000: Wireless System Engineering*, p. 229; *see also* Etemad,
*cdma2000 Evolution: System Concepts and Design Principles*, p. 52 ("The mobile attempts to
access the system by transmitting a series of access probes.  The first access probe is
transmitted at a relatively low power and is followed by a series of successive probe
transmissions of progressively higher power until an acknowledgment is received.").

240.   1xEV-DO and other CDMA based technologies are dependent on strict power control
across the various transceivers making up the network.  *See*, *e.g.*, Levine, *Digital Switching:
Cellular & PCS Lectures April 17 & 24, 2001*, p. 58 ("When multiple transmitters send signals
with different PN codes to a common receiver, the RSSI of all the signals must be very close to
equal, or the strongest one will dominate all the others and only it can be decoded without
errors.  This was a major problem which caused malfunctions of a trial CDMA system used in
tests by the Groupe Spécial Mobile in 1986 in Paris.  Qualcomm revived the idea of CDMA for
cellular in 1989 with an improved closed- loop feedback power control to keep all the received
signals from deviating in individual power levels.").

241.   Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 52.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

probe within an access attempt."[242]  "Similar to IS95 and cdma2000, the access terminal sends a series of access probes until it receives a response from the access network or the timer expires."[243]  "The transmission of request or response messages through the air interface does not assure successful access to the system.  The process is only complete after the same message is sent a certain number of times or when the MS receives a reception acknowledgement (ACK)."[244]  In other words, the Access Terminal transmits the same message over and over, each time increasing the transmission power, until the Access Network responds with an acknowledgement that the message was received.  Once the Access Terminal receives the acknowledgement, it will begin transmitting the next message using the same Access Probe process.  As long as the Access network continues to respond to Access Probes, the process will continue until the Access Attempt is successfully completed (*i.e.*, a session is established and a connection is open).

Before the Access Terminal can begin transmitting Access Probes, it first needs to receive and process the AccessParameters message[245] broadcast by the Access Network.[246]

---

242.   *Id.*, p. 247.

243.   *Id*.

244.   Korowajczuk, *Designing cdma2000 Systems*, p. 254; *see also* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 8.3.3.6.1.4.1.1,  p. 8.25 ("The access terminal shall not change the probe data contents in between probes.").

245.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 8.3.6.1.4.1.1, p. 8-25 ("Prior to sending the first probe of the probe sequence, the access terminal shall verify that the last AccessParameters message it received is current...").

246.   *See id.*, § 8.3.6.2.6, p. 8-33 (the "addressing" table entry is set to "broadcast" for the AccessParameters message).

- 54 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

The "broadcast" addressing for the AccessParameters message means all Access Terminals are

sent the same message at the same time.  The Access Network uses the AccessParameters

message to write network specific data to the internal storage devices of all Access Terminals

that are attempting to access the network after network acquisition.[247]  The AccessParameters

message contains numerous categories of essential data communicated to Access Terminals for

use in power control and formatting of Access Probe transmissions.[248]  Upon receiving the

AccessParameters message, the Access Terminal reads and stores all data fields contained in

the message.  The Access Terminal uses the stored data fields,[249] along with stored data fields

from the Overhead Messages,[250] to configure Access Probe transmissions and to facilitate

Access Attempts.[251]

247.  *See id.*, § 8.3.6.2.6, p. 8-31 ("The AccessParameters message is used to convey Access
Channel information to the access terminals.").

248.  *See id.*, § 8.3.6.2.6, p. 8-31 (Listing the following data fields for the AccessParameters
message: MessageID, AccessCycleDuration, AccessSignature, OpenLoopAdjust,
ProbeInitialAdjust, ProbeNumStep, PowerStep, PreambleLength, CapsuleLengthMax,
Apersistence, and a Reserved field.).

249.  *See, e.g., id.*, § 8.3.6.1.4.1.1, p. 8-25 (using the OpenLoopAdjust and ProbeInitialAdjust
data fields of the AccessParameters message for Access Probe power control).

250.  *See, e.g., id.*, § 8.3.6.1.4.1.1, p. 8-25 (using the SectorID and ColorCode data fields of
the Overhead Messages for Access Channel long code mask).

251.  During Access Attempts, in addition to configuring transmissions using data fields
contained in the AccessParameters message and Overhead Messages, the Access Terminal also
uses various well known fall-back data values or data values as designated by the Access
Network via ConfigurationRequest messages (sent according to the the Generic Configuration
Protocol) containing complex attributes including the InitialConfiguration Attribute and the
PowerParameters Attribute (both of which contain numerous data fields and records sent to and
stored by the Access Terminal).  *See id.*, § 8.3.7, p. 8.36-8.38.

- 55 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

### iii.  Establishing an open session with the Access Network.

As noted in Section III(B)(3)(c)(ii), *supra*, the access channel physical layer packets
initially sent by the Access Terminal during the Access Probe process contain data used to
establish a session.  Prior to establishing a session, "there are no communications between the
access terminal and the access network."[252]  The Access Network "may be unaware of the
access terminal's existence within its coverage area."[253]  "Other than to open a session, an
access terminal cannot communicate with an access network without having an open
session."[254]  "An HRPD session refers to a shared state between the access terminal and the
access network.  This shared state stores the protocols and protocol configurations that were
negotiated and are used for communications between the access terminal and the access
network."[255]  A session should not be confused with a connection.[256]  In order to
communicate with the Access Network over the air interface, the Access Terminal opens a
session.  In order to communicate with the Internet, the Access Terminal uses the established
session to open a connection with the underlying Packet Data Serving Node linked to the

---

252.  *Id.*, § 5.3.7.1.4, p. 5.23.

253.  *Id.*

254.  *Id.*, § 1.9, p. 1.12.

255.  ANSI/TIA-878-2, *Interoperability Specification (IOS) for High Rate Packet Data
(HRPD) Radio Access Network Interfaces with Session Control in the Access Network*, § 1.4.2,
p. 1.4.

256.  *See id.* ("An air interface connection is a particular state of the air-link in which the
access terminal is assigned a Forward Traffic Channel, a Reverse Traffic Channel and
associated Medium Access Control (MAC) Channels.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Access Network.[257]  "During a single session the access terminal and the access network can

open and close a connection multiple times[.]"[258]  For session establishment, a powered-on

Access Terminal will automatically initiate a session with a trusted Access Network without

intervention or action from the user of the device.[259]

The first step to establishing a session where no prior session exists is for the Access

Terminal to enter the Setup State[260] of the Default Address Management Protocol.[261]  Once in

the Setup State, the Access Terminal requests a Unicast Access Terminal Identifier (UATI)

using the UATIRequest message.[262]  For the Access Network, the UATI allows for

"distinguishing among the different packets and [for] finding out which packet is from which

---

257.    *See Technical Explanations*, Section III(B)(3)(c)(vi), *infra* (explaining the 1xEV-DO
Rel. 0 connection establishment process).

258.    TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
5.11, p. 5.1.

259.    The automatic nature of session establishment is unlike connection establishment which
requires direct action by the Access Terminal user.  *See Technical Explanations*, Section III(B)
(3)(c)(vi), *infra* (explaining the 1xEV-DO Rel. 0 connection establishment process).

260.    *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
5.3.7.1.5, p. 5.24 ("In this state, the access terminal sends a request to the access network
asking for a UATI and waits for the access network's response.").

261.    *See id.*, § 5.3.1, p. 5.17 ("The Default Address Management Protocol provides the
following functions: [] Initial UATI assignment[, and] Maintaining the access terminal unicast
address as the access terminal moves between subnets.").

262.    *See id.*, § 5.3.7.1.5.1, p. 5.24 ("Upon entering the Setup State the access terminal shall...
send a UATIRequest message."); 5.3.7.2.1, p. 5.28 ("The access terminal sends the
UATIRequest message to request that a UATI be assigned or re-assigned to it by the access
network.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

AT."[263]  More precisely, the UATI is a unique 32-bit numerical address[264] used by the Access

Terminal and Access Network MAC layer protocols to label and identify transmissions during

the current session.[265][266]  When the Access Network receives the UATIRequest message, it

transmits a UATIAssignment message that assigns a UATI to the Access Terminal for the

session.[267]  The UATIAssignment message is a unicast transmission containing numerous data

fields that are written to the Access Terminal's internal storage.[268]  The Access Terminal uses

263.  Yang, *3G CDMA2000: Wireless System Engineering*, p. 229 ("[W]hen an AN receives
an access channel MAC packet, it checks the *access terminal identifier record* field of the
MAC layer header and performs address matching").

264.  *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
10.2, p. 10.2 ("The Access Terminal Identifier record provides a unicast, multicast, or broadcast
access terminal address.").

265.  *See, e.g., id.*, § 8.2.6.1.4.2.4, p. 8.13 (Under a heading titled "Address Matching"
applicable to transmission received from the Forward Control Channel, the standard explains
that the "Access terminal shall forward the Security Layer packet along with the
SecurityLayerFormat and the ConnectionLayerFormat fields to the Security Layer if... the
ATIType field and the ATI field of the ATI Record in the MAC Layer header of a Security
Layer packet is equal to the ATIType and ATI fields of any member of the Address
Management Protocol's ReceiveATIList."); *id.*, 8.2.6.2.1, p. 8.14 (All MAC Layer Headers
placed in front of Access Network transmitted Security Layer packets must contain the Access
Terminal's "ATI Record.").

266.  The UATI is also sent by the Access Terminal to the new Access Network (target) during
a Connected State Route Update so that "the source AN [][can lookup] the session
configuration parameters that are requested by the target[]" over the A13 interface.  ANSI/TIA-
878-2, *Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access
Network Interfaces with Session Control in the Access Network*, § 2.4, p. 2.3; *see also
Technical Explanations*, Section III(B)(3)(d) *et seq., infra* (explaining Route Updates, *i.e.*,
handoffs).

267.  *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
5.3.7.1.5.2, p. 5.24-5.25.

268.  *See id.*, § 5.3.7.2.2, p. 5.29 (Listing the following data fields for the UATIAssignment
message:  MessageID, MessageSequence, Reserved1, SubnetIncluded, UATISubnetMask,

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

the data transmitted via the UATIAssignment message, to deduce its assigned 32-bit UATI[269] [270] and adds the UATI to its internally stored ReceiveATIList.[271]   Once the Access Terminal adds its assigned UATI to its ReceiveATIList, it stops using the Default Address Management Protocol and begins using the Default Session Configuration Protocol.  This second protocol is used to negotiate and configure a set of additional protocols to be used during the session.[272] For example, the Default Session Configuration Protocol is used to negotiate and configure the Security Layer protocols discussed in Section III(B)(3)(c)(iv), *infra*.  Once all relevant protocols are negotiated and configured, the session is open and "the access terminal and the access network use the negotiated protocols to exchange data and signaling in accordance with the requirements of each protocol."[273]   In other words, once a session is established, the Access Terminal can initiate a connection with the Access Network for the ultimate purpose of gaining access to the Internet.  *See Technical Explanations*, Section III(B)(3)(c)(vi), *infra* (explaining the connection establishment process).

---

UATI104, UATIColorCode, UATI024, UpperOldUATILength, and a Reserved2 field).

269.   *See id.*, § 5.3.7.1.5.1, p. 5.24-5.25.

270.   The UATI is unrelated to the Access Terminal's internally stored ESN.

271.   *See id*.

272.   *See id.*, § 5.4.1, p. 5.35 ("The Default Session Configuration Protocol provides for the negotiation and configuration of the set of protocols used during a session.").

273.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 5.4.6.1.6, p. 5.44.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

### iv.  Application of encryption and authentication keys for use in the security layer.

During session establishment, the Access Terminal and Access Network negotiate and configure the security layer protocols so that a session key may be created for use in data integrity, authentication, and encryption in the MAC layer.  The session key is created using a session key exchange process, which "[p]rovides the procedures followed by the access network and by the access terminal to exchange security keys for authentication and encryption."[274]  The authentication keys are used "by the access network and the access terminal for authenticating traffic [(*i.e.*, data)]."[275]  Traffic authentication is done through a cryptographic authentication process[276] allowing for the Access Network and Access Terminal to ensure that transmissions being received are not coming from a man-in-the-middle who may be altering data or impersonating either the Access Network or Access Terminal.[277]

274.  *Id.*, § 7.1.1, p. 7.1.

275.  *Id.*

276.  "Authentication is a service that is used to establish the origin of information.  That is, authentication services verify the identity of the user or system that created information (*e.g.*, a transaction or message).  This service supports the receiver in security relevant decisions, such as 'Is the sender an authorized user of this system?' or 'Is the sender permitted to read sensitive information?'  Several cryptographic mechanisms may be used to provide authentication services...."  National Institute of Standards and Technology, NIST Special Publication 800-57, *Recommendations for Key Management -- Part 1: General (Revised)* (Mar. 2007), p. 30.

277.  The type of man-in-the-middle attack protection provided in the 1xEV-DO Rel. 0 security layer is limited to scenarios where the attacker attempts to mimic a party *after* session establishment.  Other types of 1xEV-DO Rel. 0 man-in-the-middle attacks, such as those launched *prior* to session establishment, are not prevented by the MAC payload authentication provided in the security layer.  As explained later in this subsection, the various authentication keys are ultimately derived from Hash-based Key Derivation Function using a shared secret (*i.e.*, the the session key or "SKey") created through the Diffie-Hellman Pair-Wise Key Establishment Scheme.  "The Diffie-Hellman key exchange is vulnerable to a man-in-the-middle attack.  In this attack, an opponent Carol intercepts Alice's public value and sends her

- 60 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

The encryption keys are used "by the access network and the access terminal for encrypting traffic [(*i.e.*, data)]."[278]  Traffic encryption is done through a cryptographic encryption process[279] allowing for the Access Network and Access Terminal to exchange data that cannot be read by third-party eavesdroppers even if they gain full access to all transmissions.  The noted encryption keys are used to encrypt all data content and signaling information in the MAC layer payload, which contains all higher layer protocol data units.[280]  In other words, if encryption is invoked by the Access Network, all forward and reverse link

_____

own public value to Bob.  When Bob transmits his public value, Carol substitutes it with her own and sends it to Alice.  Carol and Alice thus agree on one shared key and Carol and Bob agree on another shared key.  After this exchange, Carol simply decrypts any messages sent out by Alice or Bob, and then reads and possibly modifies them before re-encrypting with the appropriate key and transmitting them to the other party.  This vulnerability is present because Diffie-Hellman key exchange does not authenticate the participants."  RSA Laboratories [website], *RSA Laboratories - 3.6.1 What is Diffie-Hellman?*, http://www.rsa.com/rsalabs/node.asp?id=2248 (last accessed: Mar. 23, 2012).  Applying the above scenario to 1xEV-DO Rel. 0 with its use of Diffie-Hellman without supplementary two-party authentication, Carol operates a cell site emulator to become a man-in-the-middle between Bob's Access Terminal and Alice's legitimate wireless carrier cell site.

278.  TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 7.1.1, p. 7.1.

279.  "Encryption is used to provide confidentiality for data.  The data to be protected is called plaintext when in its original form.  Encryption transforms the data into ciphertext. Ciphertext can be transformed back into plaintext using decryption.  The Approved algorithms for encryption/decryption are symmetric key algorithms: AES and TDEA...."  NIST Special Publication 800-57, *Recommendations for Key Management -- Part 1: General (Revised)*, p. 35.

280.  *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 8.1.2, p. 8.2-8.4, Fig. 8.1.2-1 ("Control Channel MAC Layer Packet Encapsulation"), Fig. 8.1.2-2 ("Access Channel MAC Layer Packet Encapsulation"), Fig. 8.1.2-3 ("Forward Traffic Channel MAC Layer Packet Encapsulation"), and Fig. 8.1.2-4 ("Reverse Traffic Channel MAC Layer Packet Encapsulation").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

data content and signaling information are protected from eavesdroppers over the air interface.
[281]

During the session key exchange process, the Access Network and Access Terminal use

the DH Key Exchange Protocol outlining "a method for session key exchange based on Diffie-

Hellman (DH)."[282]  "The Diffie-Hellman (DH) key exchange protocol provides a method for

session key exchanges based on the DH key exchange algorithm."[283]  The Diffie-Hellman key

exchange algorithm is an asymmetric key algorithm[284] allowing for "two users to exchange a

secret key over an insecure medium without any prior secrets."[285]  In Diffie-Hellman, "both

parties contribute information to the key agreement process."[286]  The Diffie-Hellman session

---

281.   Although the MAC layer payload is encrypted, the MAC layer header, which is neither
encrypted nor authenticated, contains the Access Terminal Identifier (*e.g.*, the UATI) in
plaintext.  *See id.*, § 8.6.2.1, p. 8.14.  However, as explained in the *Technical Explanations*,
Section III(B)(3)(c)(iii), *supra*, the UATI is a randomly assigned value used for MAC layer
addressing purposes and it cannot be used by an eavesdropper to identify Access Terminal
hardware.

282.   *Id.*, § 7.6.1., p. 7.22.

283.   Rhee, Man Y., *Mobile Communication Systems and Security*, John Wiley & Sons (Jin
Xing Distripark, Singapore: 2009), p. 222.

284.   "Asymmetric key algorithms, commonly known as public key algorithms, use two
related keys (*i.e.*, a key pair) to perform their functions: a public key and a private key.  The
public key may be known by anyone; the private key **should** be under the sole control of the
entity that "owns" the key pair.  Even though the public and private keys of a key pair are
related, knowledge of the public key does not reveal the private key."  NIST Special
Publication 800-57, *Recommendations for Key Management -- Part 1: General (Revised)*, p. 35
(footnote omitted).

285.   RSA Laboratories [website], *RSA Laboratories - 3.6.1 What is Diffie-Hellman?*,
http://www.rsa.com/rsalabs/node.asp?id=2248 (last accessed: Mar. 23, 2012).

286.   National Institute of Standards and Technology, NIST Special Publication 800-131A,
*Transitions: Recommendation for Transitioning the Use of Cryptographic Algorithms and Key*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

key created by the Access Network and Access Terminal is referred to as the SKey and is either

a 768-bit key or 1024-bit key.[287] After the Skey is created, the Access Network and Access

Terminal separately split their SKey copies into "eight sub-fields within the SKey. These sub-

fields are of equal length."[288] The eight sub-fields are then used with Hash-based Key

Derivation Functions (HKDFs)[289] to create four pairs of 160-bit authentication and encryption

key values for use on each of the forward and reverse link channels transmitted/received by the

Access Network and Access Terminal.[290] Each of the four 160-bit authentication keys are

used to authenticate packets on their respective channels[291] via Keyed-Hash Message

---

*Lengths* (Jan. 2011), p. 7.

287.  *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
7.6.7, p. 7.48, Tab. 7.6.7-1.

288.  *Id.*, § 7.6.5.1.3, p. 7.28.

289.  "Cryptographic hash functions can be used as building blocks in key derivation
functions (KDFs).... KDFs using cryptographic hash functions as their building blocks are
called Hash-based Key Derivation Functions (HKDFs). The main purpose of an HKDF is to
generate (*i.e.*, derive) secret keys from a secret value (*e.g.*, a shared key, or a shared secret in a
key agreement scheme) that is shared between communicating parties. The security strengths
of the derived secret keys are limited to the security strength of the secret value. The security
strength of the secret value shall meet or exceed the desired security strengths of the derived
secret keys." National Institute of Standards and Technology, NIST Special Publication 800-
107, *Recommendation for Applications Using Approved Hash Algorithms* (Feb. 2009), p. 14.

290.  *Id.*, § 7.6.5.1.3, p. 7.28-7.29 and Fig. 7.6.5.1-1 ("Message Bits for Generation of
Authentication and Encryption Keys").

291.  IS-856 only defines procedures "for authentication of access channel MAC layer packets
by applying the SHA-1 hash function to message bits (ACPAC - Access Channel MAC Layer
Packet Authentication Code)." Korowajczuk, *Designing cdma2000 Systems*, p. 338. However,
data integrity and authentication of packets sent over traffic channels and the control channel
can also be implemented by any 1xEV-DO Rel. 0 network considering authentication keys are
defined and generated for "the Forward Traffic Channel" (*i.e.*, FACAuthKey), "the Reverse
Traffic Channel" (*i.e.*, RACAuthKey), and "the Control Channel" (*i.e.*, FPCAuthKey).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Authentication Codes (HMACs)[292] derived from the SHA-1 cryptographic hash function.[293]

For encryption purposes, each of the four 160-bit encryption keys are truncated into 128-bit

AES (based on Rijndael)[294] encryption keys which are used for encrypting packets on their

respective channels[295] via the AES symmetrical key algorithm.[296]

———————

TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 7.6.3.2, p.
7.22.

292.   "Message authentication codes (MACs) provide data authentication and integrity
protection....  MAC algorithms that are based on cryptographic hash functions[] [are] called
HMAC algorithms...  The HMAC output is generated from the secret key and the string of 'text'
to be MACed (*e.g.*, a message to be sent) using the HMAC algorithm.  The MacTag is provided
to the MacTag verifier, along with the 'text' that was MACed (*e.g.*, the sender transmits both the
MacTag and the 'text' that was MACed to the intended receiver).  [] The verifier computes an
HMAC output on the received 'text' using the same key and HMAC algorithm that was used by
the HMAC generator, generates a MacTag (either a full or truncated HMAC output), and then
compares the generated MacTag with the received MacTag.  If the two values match, the 'text'
has been correctly received, and the verifier is assured that the entity that generated the MacTag
is a member of the community of users that share the key."  NIST Special Publication 800-107,
*Recommendation for Applications Using Approved Hash Algorithms*, p. 12.

293.   SHA-1, as well as SHA-224, SHA-256, SHA-384, SHA512, SHA-512/224 and SHA-
512/256, are all "iterative, one-way hash functions that can process a message to produce a
condensed representation called a message digest.  These algorithms enable the determination
of a message's integrity: any change to the message will, with a very high probability, result in
a different message digest.  This property is useful in the generation and verification of digital
signatures and message authentication codes, and in the generation of random numbers or bits."
National Institute of Standards and Technology, FIPS PUB 180-4, *Federal Information
Processing Standards Publication: Secure Hash Standard (SHS)* (Mar. 2012), p. 3.

294.   AES, based on Rijndael, is "a symmetric block cipher that can process data blocks of
128 bits, using cipher keys with lengths of 128, 192, and 256 bits.  Rijndael was designed to
handle additional block sizes and key lengths, however they are not adopted in [][the AES]
standard."  National Institute of Standards and Technology, FIPS PUB 197, *Announcing the
Advanced Encryption Standard (AES)* (Nov. 26, 2001), p. 5.

295.   *See* Telecommunications Industry Association, TIA-925-1 [E] (Addendum to TIA-925),

- 64 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

If attempting to crack 1xEV-DO Rel. 0 security layer encryption via cryptanalysis,[297]

the 1024-bit Diffie-Hellman asymmetrical keys and the 128-bit AES symmetrical keys are

considered secure for the year 2008.[298]  In general terms, the protections provided by

encryption are primarily based on current computer technology being unable to quickly

compute values using factoring algorithms and discrete logarithm attacks.  "The first successful

factorization of a 768-bit RSA modulus was not reported until December 2009.  This effort

required six months of computations using highly sophisticated equipment.  According to the

paper's authors, factoring a 1024-bit modulus would be 'one thousand times harder' than a 768-

bit one.  This means that another 6-7 years are likely to pass before 1024-bit numbers could

---

*Enhanced Subscriber Privacy for cdma2000 High Rate Packet Data - Addendum 1* (Arlington,
VA: Sept. 2007), § 3, p. 3-1 ("The AES Encryption Protocol uses the AES (a.k.a. Rijndael)
procedures defined in [][3GPP2 S.S0055-A] in order to encrypt the Connection Layer packets
and decrypt the Authentication Protocol packets."); § 3.5.1.1, p. 3.3-3.6 ("Constructing the
Encryption Key").

296.   "Symmetric key algorithms (sometimes known as secret key algorithms) transform data
in a way that is fundamentally difficult to undo without knowledge of a secret key.  The key is
"symmetric" because one key is used for all operations (*e.g.*, encryption and decryption).
Symmetric keys are often known by more than one entity; however, the key shall not be
disclosed to entities that are not authorized access to the data protected by that algorithm and
key."  NIST Special Publication 800-57, *Recommendations for Key Management -- Part 1:
General (Revised)*, p. 34.

297.   Cryptanalysis: "Operations performed in defeating cryptographic protection without an
initial knowledge of the key employed in providing the protection." *Id.*, p. 20.

298.   *See* NIST Special Publication 800-131A*, Transitions: Recommendation for
Transitioning the Use of Cryptographic Algorithms and Key Lengths* (Jan. 2011), p. 3-4, "Table
1: Encryption Transitions" (listing use of AES 128-bit encryption keys as "Acceptable"); *id.*, p.
7-8, "Table 4: SP 800-56A Key Agreement (DH and MQV)" (listing use of Diffie-Hellman
1024-bit encryption keys as "Acceptable through 2010[;] Deprecated from 2011 through
2013[;] Disallowed after 2013").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

realistically be factored."[299]  The 768-bit number factored in December of 2009 was in the context of RSA—an asymmetrical cryptographic algorithm using integer factorization cryptography as apposed to the discrete logarithm cryptography used in Diffie-Hellman.[300] However, NIST issues the same key length "comparable strengths" recommendations for Diffie-Hellman as it does for RSA[301] and the required computational requirements for cryptanalysis under each cryptographic scheme are similar.[302]  Therefore, 1024-bit encryption keys in the context of Diffie-Hellman will be uncrackable at least until the year 2017.  In comparison to Diffie-Hellman, the 128-bit AES keys used in 1xEV-DO Rel. 0 offer an even less likely entry point for an attacker.  Seagate Technology, LLC took a simplistic approach to a difficult cryptanalysis question and determined that it would take 70 billion computers 77,000,000,000,000,000,000,000,000 (77 trillion trillion) years to crack one 128-bit AES encryption key using computer technology and cryptanalysis techniques available in the year

299.   NIST Special Publication 800-131A, *Transitions: Recommendation for Transitioning the Use of Cryptographic Algorithms and Key Lengths*, Appendix A: Decision Rationale, § A.2.

300.   *Compare* NIST Special Publication 800-56B, *Recommendation for Pair-Wise Key Establishment Schemes Using Integer Factorization Cryptography* (Aug. 2009) *with* NIST Special Publication 800-56A, *Recommendation for Pair-Wise Key Establishment Schemes Using Discrete Logarithm Cryptography (Revised)* (Mar. 2007).

301.   *See* NIST Special Publication 800-57, *Recommendations for Key Management -- Part 1: General (Revised)*, p. 63, "Table 2: Comparable strengths."

302.   Pornin, Thomas, "How to calculate the time it'll take to crack RSA or DH?," online posting, Oct. 6, 2011, *diffie hellman - How to calculate the time it'll take to crack RSA or DH? - Cryptography - Stack Exchange*, http://crypto.stackexchange.com/questions/913/how-to-calculate-the-time-itll-take-to-crack-rsa-or-dh (last accessed: Apr. 9, 2012) (explaining how cracking discrete logarithm cryptographic keys has the same, or slightly greater, asymptotic complexity as cracking integer factorization cryptographic keys).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

2008.[303]

        Regardless of available key strengths, 1xEV-DO Rel. 0 encryption will only protect data

if it is implemented by the Access Network.  At the beginning of session establishment and

prior to the session key exchange process, the Access Network and Access Terminal use the

Default Encryption Protocol, which provides no encryption for signals transmitted over the air

interface.[304][305]  The Access Network and Access Terminal will continue to use the Default

Encryption Protocol until the Access Network initiates the session key exchange process.[306]

[307]  However, initiation of the session key exchange process is not required[308][309] and the

---

303.    Seagate [technical paper], *128-Bit Versus 256-Bit AES Encryption: Practical business reasons why 128-bit solutions provide comprehensive security for every need*, p. 4, *available at* http://www.seagate.com/staticfiles/docs/pdf/whitepaper/tp596_128-bit_versus_256_bit.pdf (last accessed: Apr. 9, 2012).

304.    TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 7.9, p. 7.68 ("The Default Encryption Protocol does not alter the Security Layer packet payload (i.e., no encryption/decryption) and does not add an Encryption Protocol Header or Trailer; therefore, the Cipher-text for this protocol is equal to the Connection Layer packet.").

305.    Likewise, the "Default Authentication Protocol does not provide any services except for transferring packets between the Encryption Protocol and the Security Protocol."  *Id.*, § 7.7.1, p. 7-56.

306.    *See id.*, § 7.6.5.1.2, p. 7.26 ("The access network shall initiate the key exchange by sending a KeyRequest message.").

307.    If following good security practices, a wireless carrier Access Network will initiate the session key exchange process (in order to "turn on" encryption and authentication) as soon as possible, *i.e.*, after the UATI is assigned to the Access Terminal.

308.    *See* Korowajczuk, *Designing cdma2000 Systems*, p. 359 ("[E]ven though a single layer may contain multiple protocols, each of them can be individually negotiated to better accommodate network requirements and availability.").

309.    There is no logical reason why a wireless carrier would not implement the encryption procedures provided via the security layer.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Default Encryption Protocol can be used during the entire session if the Access Network

chooses to not use encryption.  If the Access Network chooses to not initiate the session key

exchange, all communications content and signaling information contained in the MAC

payload will not be encrypted via the security layer.[310]  If security layer encryption is not used,

"end-to-end encryption can be provided at the application layer"[311] to protect communications

content contained in higher layer protocol data units sent over Traffic Channels.  However, the

security layer encryption explained in this section is still the only mechanism that will protect

Access Channel and Control Channel signaling information from being intercepted over the air

interface.  An Access Network's failure to initiate the session key exchange process will result

in signaling information, such as the Access Terminal's ESN transmitted in response to a

HardwareIDRequest message, being exposed to third-party eavesdroppers.

### v.   Obtaining identifying information from Access Terminal hardware using the HardwareIDRequest message.

Once a session is established, the Access Network can obtain the Access Terminal's

identifying information by transmitting a HardwareIDRequest message.[312]  By transmitting a

HardwareIDRequest message, the Access Network asks the Access Terminal to transmit a

HardwareIDResponse message[313] containing its ESN or other "unique ID that has been

---

310.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
7.9, p. 7.68.

311.   *Id*.

312.   *See id.*, § 5.3.7.1.3, p. 5.23; *see also id.*, § 5.3.7.2.4, p. 5.31.

313.   *See id.*, § 5.3.7.2.5, p. 5.31 ("The access terminal sends this message in response to the
HardwareIDRequest message.").

- 68 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

assigned to the terminal by the manufacturer."[314]  Prior to receiving the HardwareIDResponse

message, the Access Network identifies the Access Terminal generically via reverse link PN

codes and the Access Terminal's UATI assigned by the Access Network.[315]  The Access

Terminal's HardwareIDResponse message provides its absolute identity, which can be used to

determine the customer who's wireless account is associated with the Access Terminal.

Although not precisely articulated in the relevant standards, the main purpose served by the

HardwareIDRequest message is to provide the Access Network with an initial Access Terminal

identity verification mechanism.[316]  If the ESN or MEID contained in the

HardwareIDResponse message does not belong to a device authorized for service then the

wireless carrier can direct the Access Terminal away from the Access Network prior to any

attempt to open a connection.  By severing the air link with the unauthorized Access Terminal

during the session but prior to establishing a connection, network resources are conserved.

### vi.  Opening a connection with the Access Network.

Once a session is established, the user of the Access Terminal can initiate the connection

process with the Access Network.  In the case of an aircard, the connection process is initiated

---

314.   *Id.*

315.   *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra* (UATI used to identify the
Access Terminal).

316.   *See, e.g.*, Nortel Networks, PN-4875/IS-856 Ballot Comments, *AT Authentication in
1xEV-DO*, p. 1 ("In this comment, AT hardware authentication is added as a part of the Address
Management Protocol (ADMP) in the Session Layer.  This allows an operator to perform
terminal authentication, based on a hardware identifier (such as the IMSI) over the common
channels before the AT is assigned a traffic channel.").

- 69 -

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

via software installed on the host laptop computer paired with the aircard.[317]  For example, an aircard user may initiate the connection process by clicking a "connect" button on companion software bundled with the aircard.  Once the user has initiated the connection process, the Access Terminal transitions into the Connection Setup Substate of the Idle State.  In this substate, "the access terminal and the access network setup a connection[]"[318] via the previously explained Access Attempt process.  Using Access Probes, "[t]he access terminal sends the ConnectionRequest message to request a connection."[319]  Once the ConnectionRequest message is sent, indicating that the Access Terminal "is ready to exchange data on the access stream, the AN shall initiate PPP procedures..."[320]  PPP is an acronym for "Point-to-Point Protocol" and provides a standard method for the Access Network and Access terminal to communicate.[321]  "PPP also defines an extensible Link Control Protocol, which allows negotiation of an Authentication Protocol for authenticating its peer before allowing

---

317.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 11 of *1st Consolidated Exhibits* (Dkt. #587-1) (government web research on UTStarcom PC5740 aircard indicating that it is bundled with "VZAccess Manager software for easy connection management.").

318.  TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 6.4.1, p. 6.26.

319.  *Id.*, § 6.4.6.2.2, p. 6.39.

320.  ANSI/TIA-878-2 (Addenda to TIA-878), *Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access Network Interfaces with Session Control in the Access Network*, § 2.3.1.1, p. 2.2.

321.  *See* RFC 1994, *PPP Challenge Handshake Authentication Protocol (CHAP)* (Aug. 1996), p. i.

- 70 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Network Layer protocols to transmit over the link."[322]  In basic terms, PPP, as used in the

Connection Setup Substate, allows the Access Network to positively authenticate the Access

Terminal and determine if it is authorized to access 1xEV-DO Rel. 0 service.[323]  In order to

accomplish this task, 1xEV-DO Rel. 0 employs the Challenge-Handshake Authentication

Protocol (CHAP)—an element of PPP.[324]  CHAP is "used to periodically verify the identity of

the peer using a 3-way handshake."[325]  In 1xEV-DO Rel. 0, the peer is the Access Terminal

and the Access Network is the authenticator ensuring that the peer is authorized to access the

cellular data network.[326]  CHAP depends on the peer (*i.e.*, the Access Terminal) and the

authenticator (*i.e.*, the Access Network) having a previously shared secret that is not

transmitted or exchanged during the CHAP process.[327]  In 1xEV-DO Rel. 0, the shared secret

is the Shared Secret Data (SSD)[328] stored within the Access Terminal's internal storage device

---

322.  *Id*.

323.  It was previously explained how the Access Network can *identify* an Access Terminal by
obtaining its stored ESN via a HardwareIDRequest message.  *See Technical Explanations*,
Section III(B)(3)(c)(v), *supra*.  However, obtaining an Access Terminal's ESN is only a
preliminary identification mechanism and it is not sufficient for *authenticating* an Access
Terminal for receiving service.  Because an ESN can be copied by an attacker who has physical
access to the Access Terminal, a more secure authentication mechanism using Shared Secret
Data (SSD) (*i.e.*, PPP as explained in this subsection) is employed to positively authenticate the
Access Terminal prior to receiving service.

324.  *See* RFC 1994, *PPP Challenge Handshake Authentication Protocol (CHAP)*, p. 2.

325.  *Id*.

326.  Although CHAP can also be used by the Access Terminal to authenticate the Access
Network, this is not done in 1xEV-DO Rel. 0.

327.  *See id.*, p. 3 ("This authentication method depends upon a 'secret' known only to the
authenticator and that peer.  The secret is not sent over the link.")

328.  "Shared Secret Data (SSD) is a 128-bit pattern stored in the MS and readily available to

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

(NAM)[329] with an exact copy stored in a database maintained by the Access Terminal's home

"Access Network-Authentication, Authorization, and Accounting" (AN-AAA) server within

the wireless carrier network.[330]

Once a PPP connection is established between the Access Network and Access Terminal,

"[t]he AN generates a random challenge and sends it to the AT in a CHAP Challenge

message..."[331]  Once the Access Terminal receives the CHAP challenge, it concatenates some

of the data contained in the challenge with its stored Shared Secret Data and then uses a

cryptographic hashing algorithm to create a message digest[332] (i.e., a "one-way hash") of the

---

the network.  This Shared Secret Data is not passed across the air interface between the MS and
the network..."  Telecommunications Industry Association, TIA/EIA/IS-2001-A (Revision of
TIA/EIA/IS-2001), *Interoperability Specifications (IOS) for cdma2000 Access Network
Interfaces* (Arlington, VA: Aug. 2001), § 4.2.1, p. 290.

329.   *See* TIA-683-D (Revision to TIA-683-C), *Over-the-Air Service Provisioning of Mobile
Stations in Spread Spectrum Systems*, § 3.5.8, p. 3.141, Table 3.5.8-1 3GPD Parameter Block
Types (listing "HRPD Access Authentication CHAP SS Parameters" for the Access Terminal
NAM (footnote omitted)); *id.*, § 3.5.8.14, p. 3.158 (showing the "SS" field of the "HRPD
Access Authentication CHAP SS Parameters" as containing "Shared Secret Data").

330.   *See* fn. No. 328, *supra*.

331.   ANSI/TIA-878-2 (Addenda to TIA-878), *Interoperability Specification (IOS) for High
Rate Packet Data (HRPD) Radio Access Network Interfaces with Session Control in the Access
Network*, § 3.1.1(d), p. 3.2.

332.   Cryptographic hashing algorithms and message digests are generally explained in
footnotes contained in the *Technical Explanations*, Section III(B)(3)(c)(iv), *supra* (MAC
payload encryption and authentication in the security layer).  However, use of a hashing
algorithm for authentication and integrity checks of MAC layer payloads (as explained in the
*Technical Explanations*, Section III(B)(3)(c)(iv), *supra*) is different from the authentication
explained in this section.  Previously, it was explained how a hashing algorithm is applied to
message bits contained in MAC layer payloads.  In this section, a hashing algorithm is
employed so that the Access Network will be able to authenticate (*i.e.*, identify and authorize)
the Access Terminal prior to providing it service.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

result.[333]  The resulting message digest is used in the CHAP challenge response message.[334]

The "one-way hash" is essentially a unique signature taken of the concatenated data used to

create the CHAP response.  The Access Terminal then transmits its CHAP response message to

the Access Network containing the calculated "one-way hash."[335]  When the Access Network

receives the CHAP response message, it forwards it to the AN-AAA server connected directly

to the Access Network using an Access-Request message over the A12 interface.[336]  If the AN-

AAA server is not the Access Terminal's home AN-AAA, it will be unable to verify the CHAP

response because it will not have a stored copy of the Access Terminal's Shared Secret Data.  In

this case, the visited AN-AAA forwards the CHAP response to the home network AN-AAA.[337]

Once the appropriate AN-AAA receives the Access-Request message, it retrieves the Access

Terminal's Shared Secret Data from its database and concatenates it with some of the data

contained in the Access-Request message to create a "one-way hash" in the same fashion

---

333.  *See* RFC 1994, *PPP Challenge Handshake Authentication Protocol (CHAP)*, p. 8 ("The
Response Value is the one-way hash calculated over a stream of octets consisting of the
Identifier, followed by (concatenated with) the 'secret', followed by (concatenated with) the
Challenge Value.").

334.  *See id*.

335.  *See id.*, p. 7 ("Whenever a Challenge packet is received, the peer MUST transmit a
CHAP packet with the Code field set to 2 (Response).").

336.  *See* ANSI/TIA-878-2 (Addenda to TIA-878), *Interoperability Specification (IOS) for
High Rate Packet Data (HRPD) Radio Access Network Interfaces with Session Control in the
Access Network*, § 3.1.1(e), p. 3.2.

337.  *See id.*, § 2.3.3, p. 2.3 ("If the AN-AAA does not have the authority to accept/deny the
request, it forwards the request to the home network...").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

explained for the Access Terminal.[338]  If the "one-way hash" created by the AN-AAA matches the "one-way hash" contained in the CHAP response message (created by the Access Terminal), the AN-AAA sends the Access Network an Access-Accept message.[339]  Otherwise, the AN-AAA sends the access Network an Access-Reject message indicating that the Access Terminal is not authorized for 1xEV-DO Rel. 0 service.[340]

In the case of an Access-Reject message, "[t]he AN returns an indication of CHAP access authentication failure to the AT[]"[341] and "sends a SessionClose message to the AT to close the HRPD session."[342]  In the case of an Access-Accept message, "[t]he AN returns an indication of CHAP access authentication success to the AT[]"[343] and then begins other steps to register the Access Terminal on the network so that Internet access service can be provided by the Packet Data Serving Node (PDSN).  In order to register the Access Terminal for Internet access, the Access Network establishes a connection with the Packet Control Function (PCF). [344]  The Packet Control Function then "sends an A11-Registration Request message to the

---

338.  *See* RFC 1994, *PPP Challenge Handshake Authentication Protocol (CHAP)*, p. 7 ("Whenever a Response packet is received, the authenticator compares the Response Value with its own calculation of the expected value.")

339.  *See* ANSI/TIA-878-2 (Addenda to TIA-878), *Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access Network Interfaces with Session Control in the Access Network*, § 3.1.1(f), p. 3.2.

340.  *See id.*, § 3.1.2(f), p. 3.3.

341.  *Id.*, § 3.1.2(g), p. 3.3.

342.  *Id.*, § 3.1.2(h), p. 3.3.

343.  *Id.*, § 3.1.1(g), p. 3.2.

344.  *See id.*, § 3.1.1(j), p. 3.2.

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

PDSN..."[345]  "The A11-Registration Request message is validated and the PDSN accepts the connection by returning an A11-Registration Reply message with an accept indication..."[346]

[347]  Once the Packet Data Serving Node accepts the connection through the registration process, the Packet Control Function notifies the Access Network,[348] a "PPP connection establishment procedure is performed between the AT and the PDSN...,"[349] and "the connection is established and packet data [(i.e., Internet traffic)] can flow between the AT and the PDSN."[350]  Once the connection is established, the Access Terminal transitions from the Idle State to the Connected State.[351]

---

345.  *Id.*, § 3.1.1(k), p. 3.2.

346.  *Id.*, § 3.1.1(l), p. 3.2.

347.  In other words, the "registration" process in 1xEV-DO Rel. 0 occurs between the PCF and PDSN—not between the Access Terminal and Access Network.  *See also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 055 of *2nd Consolidated Exhibits* (Dkt. #821-3) (diagram from ANSI/TIA-878-2 (Addenda to TIA-878) showing 1xEV-DO registration process occurring between PCF and PDSN over the A11 interface, *i.e.*, not between the Access Terminal and Access Network).

348.  *See id.*, § 3.1.1(m), p. 3.2.

349.  *Id.*, § 3.1.1(n), p. 3.2.

350.  *Id.*, § 3.1.1(o), p. 3.2.

351.  Other than power control and route updates, the numerous complex operations applicable to the 1xEV-DO Rel. 0 Connected State are beyond the scope of the aircard locating mission in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.) and are therefore not discussed in the *Technical Explanations*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

### d. Using the Default Route Update Protocol to scan for additional pilots, facilitate sector Route Updates, and send Route Update messages.

In addition to searching for pilots during the Pilot Acquisition Substate,[352] the Access

Terminal also searches for pilots to facilitate use of the Default Route Update Protocol.  "The

Default Route Update Protocol provides the procedures and messages used by the access

terminal and the access network to keep track of the access terminal's approximate location and

to maintain the radio link as the access terminal moves between the coverage areas of different

sectors."[353]  In order to serve the goals of the Default Route Update Protocol, "[t]he access

terminal shall continually search for pilots in the Connected State and whenever it is

monitoring the Control Channel in the Idle State."[354]  During the searching process, "[t]he

access terminal estimates the strength of the Forward Channel transmitted by each sector in its

neighborhood."[355]  "The access terminal shall measure the strength of every pilot it

searches."[356]  When the Access Terminal finds additional pilots transmitting in its

neighborhood, it stores the pilots in sets according to signal strength.[357]  In addition to

searching for pilots in its neighborhood, the Access Terminal "should also be capable of

_____

352.  *See Technical Explanations*, Section III(B)(3)(b)(ii), *supra*.

353.  TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 6.6.1, p. 6.55.

354.  *Id.*, § 6.6.6.1.2.2, p. 6.64.

355.  *Id.*, § 6.6.6.1.2, p. 6.62.

356.  *Id.*, § 6.6.6.1.2.3, p. 6.64.

357.  *See id.*, § 6.6.6.1.2, p. 6.62.

- 76 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

searching for pilots in frequencies and band classes other than its current frequency."[358]  In

order to locate the maximum amount of available Access Networks, the Access Terminal will

search all listed frequencies in its Preferred Roaming List Acquisition Table for additional

pilots and it may also receive additional frequencies to search via channel records provided by

the Access Network in real-time.[359]  If a transmitted pilot "is on a different frequency

assignment from that of the mobile station, this target frequency should be included in the

search criteria."[360]

The Access Terminal maintains the following continuously updated sets of searched

pilots: (1) Active Set, (2) Candidate Set, (3) Neighbor Set, and (4) Remaining Set.[361]  The

Active Set is "[t]he set of pilots [] associated with the sectors currently serving the access

terminal."[362]  "When a connection is open [(*i.e.*, in the Connected State)], a sector is

considered to be serving an access terminal when there is a Forward Traffic Channel, Reverse

Traffic Channel and Reverse Power Control Channel assigned to the access terminal.  When a

connection is not open [(*i.e.*, in the Idle State)], a sector is considered to be serving the access

---

358.    Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 154.

359.    *See, e.g.*, TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface
Specification*, § 6.8.6.2.2, p. 6.125 (Indicating that the "NeighborChannel" parameter for the
SectorParameters message consists of the "Channel record specification for the neighbor
channel.").

360.    Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 154.

361.    *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.6.6.1.2, p. 6.62-6.63.

362.    *Id*.

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

terminal when the access terminal is monitoring that sector's control channel."[363]  The

remaining three sets of pilots are categorized according to various rules and are maintained for

conducting Route Updates where appropriate, *i.e.*, Access Terminal handoffs[364] from one

Access Network to another.

### i.  Operations of the Default Route Update Protocol specific to the Idle State.

While in the Idle State, the Access Terminal maintains the Active Set of pilots on its own

without receiving instructions from any Access Network.[365]  "The access terminal shall

initially keep an Active Set of size one when it is in the Idle State.  The Active Set pilot shall be

the pilot associated with the Control Channel the access terminal is currently monitoring."[366]

The Access Terminal continuously compares the pilots maintained in the four pilot sets and

---

363.   *Id*.

364.   A handoff is "[t]he act of transferring communication with an access terminal from one
sector to another."  Telecommunications Industry Association, TIA-866-A (Revision of TIA-
866), *Introduction to cdma2000 Spread Spectrum Systems* (Arlington, VA: Jan. 2006), § 1.2.1,
p. 1.3.  In 1xEV-DO, the term "route update" is typically used in place of "handoff."  There are
two primary types of handoffs in 1xEV-DO Rel. 0 that occur various states: the "hard handoff"
and the "soft handoff."  A hard handoff is "characterized by a temporary disconnection of the
Traffic Channel.  Hard handoffs occur when the access terminal changes to a new CDMA
frequency."  *Id.*, § 1.2.1, p. 1.5.  In contrast, a soft handoff is "a handoff occurring while the
access terminal is in the Connected State of the Default Route Update Protocol.  This handoff is
characterized by pointing the DRC from one sector to another on the same CDMA frequency
assignment."  *Id.*, § 1.2.1, p. 1.8.

365.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.6.1, p. 6.55 ("In [][the Idle] State, the access terminal autonomously maintains the Active
Set.").

366.   *Id.*, § 6.6.6.1.5.1, p. 6.69.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

uses "pilot strengths to decide which sector's Control Channel it monitors."[367]  For example, if the pilot of the Access Network acquired by the Access Terminal after initial power-on has a lower signal strength compared to a newly searched pilot then the Access Terminal will stop monitoring the first Access Network sector Control Channel and it will begin monitoring the new Access Network sector Control Channel.[368]  This process is called an Idle State Route Update (*i.e.*, idle handoff)[369] and is initiated by the Access Terminal without direct involvement from any Access Network.[370]

Idle State Route Updates occur under two scenarios: (1) before session establishment, and (2) after session establishment but before connection establishment.  An Access Terminal conducting an Idle State Route Update prior to session establishment can seamlessly switch to any Access network, even if part of a different system (*i.e.*, subnet), without having to send transmissions to any Access Network.[371]  However, an Access Terminal conducting an Idle

---

367.   *Id.*, § 6.6.6.1.2, p. 6.62.

368.   While monitoring the Control Channel of the new Access Network, the Access Terminal receives and processes the new Access Network's Overhead Messages as explained in the *Technical Explanations*, Section III(B)(3)(c)(i), *supra*.  As long as the new Access Network belongs to a preferred system, as listed on the Access Terminal's Preferred Roaming List System Table, the Idle State Route Update completes.

369.   An idle handoff is "[t]he act of transferring reception of the Control Channel from one sector to another, when the access terminal is in the Idle State of the Default Route Update Protocol."  TIA-866-A (Revision of TIA-866), *Introduction to cdma2000 Spread Spectrum Systems*, § 1.2.1, p. 1.5.

370.   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 154 ("During this search, if the mobile station detects a pilot channel signal from another base station that is sufficiently stronger than that of the current base station, the mobile station determines that an idle handoff should occur.").

371.   An Access Terminal can initiate an autonomous Idle State Route Update prior to session

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

State Route Update after session establishment, but before connection establishment, needs to

either close the current session and open a new session with the new Access Network or the

wireless carrier needs to use the A13 interface to transfer authentication and session

configuration parameters similar to what is implemented for Connected State Route Updates.

[372]  While in the Idle State, if a session is established or is being established, the Access

Terminal sends the Access Network "RouteUpdate messages to update its location with the

access network."[373][374]  The Access Terminal transmits RouteUpdate messages either when

"the computed value $r$ is greater than the value provided in the RouteUpdateRadius field of the

SectorParameters message transmitted by the sector in which the access terminal last sent a

RouteUpdate message[,]"[375] or "whenever it transmits on the Access Channel."[376]

establishment because the Default Session Management Protocol is in the Inactive State until
the Access Probe process.  "In this state there are no communications between the access
terminal and the access network.  The access terminal does not maintain any session-related
state and the access network may be unaware of the access terminal's existence within its
coverage area when the access terminal's Session Management Protocol is in this state."
TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 5.2.6.1.4,
p. 5.9.

372.  *See Technical Explanations*, Section III(B)(3)(d)(ii), *infra*.

373.  TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
6.6.6.1.5.4, p. 6.70.  In other words, while in the Idle State, "RouteUpdate messages from the
access terminal are based on the distance between the sector where the access terminal last sent
a RouteUpdate message and the sector currently in its active set."  *Id.*, § 6.6.6.1.5, p. 6.69.

374.  *See id.*, § 6.6.6.2.1, p. 6.76 (Listing the following data fields for the RouteUpdate
message: MessageID, MessageSequence, ReferencePilotPN, ReferencePilotStrength,
ReferenceKeep, NumPilots, PilotPNPhase, ChannelIncluded, Channel, PilotStrength, Keep,
and a Reserved field.).

375.  *Id.*, § 6.6.6.1.5.4, p. 6.71.

376.  *Id.*, § 6.6.6.1.5.4, p. 6.70.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

### ii.  Operations of the Default Route Update Protocol specific to the Connected State.

While in the Connected State, the Access Network dictates the Access Terminal's Active Set of pilots.[377]  "The access network determines the contents of the Active Set through TrafficChannelAssignment messages."[378]  These messages contain various data fields[379] including the pilots (labeled as PilotPN field) belonging to the Access Networks the Access Terminal must access for receiving Internet access service.  "If the access terminal receives a valid TrafficChannelAssignment message, it shall replace the contents of its current Active Set with the pilots specified in the message."[380]  In other words, while a connection is established, the Access Network dictates the list of additional Access Networks the Access Terminal must choose from when conducting Route Updates (*i.e.*, handoffs).  While in the Connected State, and unlike in the Idle State, the Access Terminal sends "RouteUpdate message[s] to the access network... to request addition or deletion of pilots from its Active Set."[381]  The Access Terminal transmits RouteUpdate messages when there are "changes in the radio link between the access terminal and the access network, obtained through pilot strength measurements at

---

377.  *See id.*, § 6.6.1, p. 6.55 ("In [][the Connected] state the access network dictates the access terminal's Active Set.").

378.  *Id.*, § 6.6.6.1.6, p. 6.71.

379.  *See id.*, § 6.6.6.2.2, p. 6.78 (Listing the following data fields for the TrafficChannelAssignment message: MessageID, MessageSequence, ChannelIncluded, Channel, FrameOffset, DRCLength, DRCChannelGain, AckChannelGain, NumPilots, PilotPN, SofterHandoff, MACIndex, DRCCover, RABLength, RABOffset and a Reserved field.).

380.  *Id.*, § 6.6.6.1.6.3.2, p. 6.72.

381.  *Id.*, § 6.6.6.1.6.5, p. 6.73.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

the access terminal."[382]  "The access network should send a TrafficChannelAssignment

message to the access terminal in response to changing radio link conditions, as reported in the

access terminal's RouteUpdate messages."[383]  "The access network should only specify a pilot

in the TrafficChannelAssignment message if it has allocated the required resources in the

associated sector.  This means that the sector specified by the pilot is ready to receive data from

the access terminal and is ready to transmit queued data to the access terminal should the

access terminal point its DRC at that sector."[384]  The process of an Access Terminal selecting a

new Access Network is called a Connected State Route Update (*i.e.*, soft and hard handoffs)[385]

and requires significant collaboration between the Access Terminal, the serving Access

Network, the new Access Network, and the underlying packet data network.[386]

In order to not interrupt the Access Terminal user's Internet connection during a

Connected State Route Update, the wireless carrier needs to use the A13 interface to transfer

authentication and session configuration parameters from the current Access Network to the

---

382.   *Id.*, § 6.6.6.1.6, p. 6.71.

383.   *Id.*, § 6.6.6.1.6.3.1, p. 6.72.

384.   *Id*.

385.   *See* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 255 ("In
1X EV-DO the soft handoff is only supported in the reverse link and it follows a procedure very
similar to cdma2000.  In the forward link, however, there is no soft handoff and the network
transmits the data only on the best sector selected by the AT on the DRC channel.").

386.   *See id.*, p. 256 (explaining the Connected State Route Update process in the context of
the air interface); ANSI/TIA-878-2, *Interoperability Specification (IOS) for High Rate Packet
Data (HRPD) Radio Access Network Interfaces with Session Control in the Access Network*
(explaining the Connected State Route Update process in the context of the "underlying
network," *i.e.*, the A13 interface).

- 82 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

new Access Network.[387]  The A13 interface is a direct link between the current serving Access

Network and the Access Network of which the Access Terminal is having its signal routed over

the air interface.[388]  The A13 interface is separate from the air interface used by the Access

Network and Access Terminal to communicate via radio waves.[389]  "The procedure for the

A13 interface is a message flow to exchange AT and PDSN information between the ANs[]"[390]

involved in a Connected State Route Update (*i.e.*, handoff).  During a handoff, "[w]hen the

target AN receives a packet from an AT that contains a UATI that is not in a subnet that is

associated with the target AN, the target AN attempts to retrieve session related information

from the source AN for the AT.  The target AN sends an A13-Session Information Request

message to the source AN to indicate the information requested.  The target AN shall include

the determined UATI, Security Layer Packet and Sector ID."[391]  "When the source AN

receives an A13-Session Information Request message it checks if the session information for

---

387.   *See id.*, p. 265 ("In an enhanced 1X-EV DO system; different access networks can be
connected to each other with an IOS-A13 interface defined within IOS [[*i.e.*, IS-878-2 )]. This
interface is required to support mobility procedures when the AT moves from one AN to
another.  The A13 interface allows the transfer of authentication and session configuration
parameters from the old AN to the new AN.  The interface is based on the UDP/IP and uses
messages defined in the IOS.").

388.   *See* ANSI/TIA-878-2, *Interoperability Specification (IOS) for High Rate Packet Data
(HRPD) Radio Access Network Interfaces with Session Control in the Access Network*, § 3.6.1,
Figure 3.6.1-1, "Inter-PCF/Intra-PDSN Dormant AN-AN HO - Successful Operation," p. 3.15
(Connected State Route Update diagram showing the A13 interface directly linking two
different Access Networks separate from the air interface).

389.   *See id.*, § 2.4.1, p. 2.4 ("The IOS application is independent of the underlying physical
transport medium, which is left to the discretion of operators and manufacturers.").

390.   *Id.*, § 2.4.2, p. 2.4.

391.   *Id.*, § 2.4.2.1.1, p. 2.5.

- 83 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

the requested AT exists and if it can authenticate the target AN request.  After the source AN

has successfully authenticated the message contained in the A13-Session Information Request

message and has the requested session state information, it sends an A13-Session Information

Response message to the target AN with the requested information."[392][393]  Once the target

AN receives the A13-Session Information Response message, the handoff is complete when

"[t]he AT and the target AN complete the establishment of the HRPD session.  Depending on

the state of the AT and the target AN, either an existing HRPD session may be re-established, or

a new HRPD session may be initiated if required."[394]

### e.   Open-loop and closed-loop power control of Access Terminal transmissions.

Regardless of implementation, all "CDMA base stations control the power of all mobiles

for interference reduction purposes.  All mobile signals must arrive at the base station at the

same power level so that the signals can be properly coded.  Power control is a required

operational parameter of CDMA digital system operations."[395]  In 1xEV-DO Rel. 0, "[t]he

access terminal shall provide two independent means for output power adjustment: an open-

loop estimation performed by the access terminal and a closed-loop correction involving both

---

392.   *Id.*, § 2.4.2.2.1, p. 2.5.

393.   In the alternative, if the source Access Network does not respond to the  A13-Session
Information Request message then "the target AN may begin a new session establishment with
the AT."  *Id.*, § 2.4.2.1.2, p. 2.5.

394.   *Id.*, § 3.6.1(d), p. 3.16.

395.   Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 227.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

the access terminal and the access network."[396]  "In closed-loop power control, based on the measurement of the link quality, the base station sends a power control command instructing the mobile to increase or decrease its transmission power level.  In open-loop power control, the mobile adjusts its transmission power based on the received signaling power from the base station."[397]  The proceeding subsections explain the open-loop and closed-loop power control utilized by Access Terminals while sending reverse link transmissions to Access Networks.

### i.  Reverse Access Channel power control.

When establishing a session and opening a connection using the Access Probe process, open-loop power control is used to determine the power at which the Access Terminal transmits signals to the Access Network.  As explained in Section III(B)(3)(c)(ii), *supra*, each Access Probe is an independent signal sent by the Access Terminal using both a pilot channel and data channel.  In this context, the pilot channel and data channel make up the two part Reverse Access Channel with the pilot channel being sent first for a period of time (*i.e.*, the preamble) followed by the pilot channel and data channel being sent together for a period of time.[398]  In order to calculate the mean transmit power used for the overall Reverse Access Channel, the Access Terminal measures the mean receive power of forward link signals broadcast by the Access Network and adds the negative of the resulting value to the values contained in the

396.    TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 9.2.1.2.4, p. 9.23.

397.    Chuah *et al.*, *Design And Performance Of 3G Wireless Networks And Wireless LANs*, p. 7.

398.    *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 9.2.1.3.2, p. 9.34, Figure 9.2.1.3.2-1,  "Example of an Access Probe."

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

OpenLoopAdjust and ProbeInitialAdjust data parameters broadcast by the Access Network via

the AccessParameters message.[399][400][401]  In order to determine the transmit power for each

individual Access Probe sent as part of an Access sub-attempt, the Access Terminal multiplies

the Access Probe number by the PowerStep value (provided to the Access Terminal via the

AccessParameters message) and adds that value to the previously calculated mean transmit

power used for the overall Reverse Access Channel.[402][403]  During the preamble portion of any

given Access Probe, the pilot channel is transmitted at the full calculated transmit power used

for the Reverse Access Channel considering no data channel is transmitted.[404]  During the data

transmission portion of any given Access Probe, the Access Terminal uses the DataOffsetNom

and DataOffset9k6 data parameter values (provided as public data of the Access Channel MAC

Protocol) to determine the power at which to transmit the pilot channel and data channel.[405]

---

399.   *See id.*, § 8.3.6.1.4.1.1, p. 8.25, No. 4 (providing mathematical equation).

400.   The OpenLoopAdjust value sent to the Access Terminal by the Access Network contains
"the nominal power to be used by access terminals in the open loop power estimate..." *Id.*, §
8.3.6.2.6, p. 8.32.

401.   The ProbeInitialAdjust value sent to the Access Terminal by the Access Network
contains "the correction factor to be used by access terminals in the open loop power estimate
for the initial transmission on the Access Channel..." *Id.*

402.   *See id.*, § 8.3.6.1.4.1.1, p. 8.25, No. 4 (providing mathematical equation).

403.   The PowerStep designates "the increase in power between probes, in resolution of 0.5
dB." *Id.*, § 8.3.6.2.6, p. 8.32.

404.   *See id.*, § 9.2.1.3.2, p. 9.34 ("The output power of the Pilot Channel during the preamble
portion of an access probe is higher than it is during the data portion of the probe by an amount
such that the total output power of the preamble and data portions of the access probe are the
same as shown in Figure 9.2.1.3.2-1.").

405.   *See id.*, § 9.2.1.2.4.1, p. 9.23-9.24.

- 86 -

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

When data is being transmitted, the combined transmit power of the pilot channel and data channel total the full calculated transmit power used for the Reverse Access Channel.[406] While engaging in Access Attempts as explained in Section III(B)(3)(c)(ii), *supra*, the Access Terminal uses the open-loop power control process explained above.

### ii.   Reverse Traffic Channel power control.

After a connection is open and a Reverse Traffic Channel assigned to the Access Terminal by the Access Network,[407] a combination of open-loop and closed-loop power control is used to determine the power at which the Access Terminal transmits signals to the Access Network.[408]  "When the access terminal is transmitting the Reverse Traffic Channel, the access terminal transmits the Pilot Channel, the DRC Channel, the ACK Channel when acknowledging received physical layer packets, and the Data Channel when transmitting physical layer packets.  These channels shall be transmitted at power levels according to open-loop and closed-loop power control."[409]  For the initial open-loop power estimate, "[t]he initial mean output power of the Pilot Channel of the Reverse Traffic Channel shall be equal to the

---

406.   *See id*.

407.   While communicating with the Access Network after a Reverse Traffic Channel is assigned, the Access Terminal configures its transmissions using various well known fall-back data values or data values as designated by the Access Network via ConfigurationRequest messages (sent according to the the Generic Configuration Protocol) containing attributes including the PowerParameters Attribute and the RateParameters Attribute (both of which contain numerous data fields and records sent to and stored by the Access Terminal). *See id.*, § 8.5.7, p. 8.79-8.84.

408.   *See id.*, § 9.2.1.2.1.2, p. 9.22 ("When the access terminal is transmitting the Reverse Traffic Channel, the access terminal shall control the mean output power using a combination of closed-loop and open-loop power control...").

409.   *Id.*, § 9.2.1.2.1.2, p. 9.22-9.23.

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

mean output power of the Pilot Channel at the end of the last Access Channel probe minus the difference in the forward link mean received signal power from the end of the last Access Channel probe to the start of the Reverse Traffic Channel transmission."[410]  "During the transmission of the Reverse Traffic Channel, the determination of the output power needed to support the Data Channel, the DRC Channel, and the ACK Channel is an additional open-loop process performed by the access terminal."[411][412]  This process utilizes the DataOffsetNom, DataOffset9k6, DataOffset19k2, DataOffset38k4, DataOffset76k8, DataOffset153k6, DRCChannelGain, and ACKChannelGain data parameter values (provided as public data of the Reverse Traffic Channel MAC Protocol) to determine the power at which to transmit the various noted channels relative to the mean output power of the pilot channel.[413]  The subsequent mean output power of the reverse link pilot channel is dictated by the Access Network through closed-loop power control.  "For closed-loop correction (with respect to the open-loop estimate), the access terminal shall adjust the mean output power level of the Pilot Channel in response to each power-control bit received on the Reverse Power Control (RPC)

---

410.   *Id.*, § 9.2.1.2.4.1, p. 9.24.

411.   *Id.*

412.   *See also* Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 255 ("The reverse power control is directly applied to the pilot/RRI channel only, and the power levels allocated to the DRC, ACK, and data channels are adjusted by a fixed gain relative to the pilot/RRI channel.  The channel gains are defined based on the coding gain, the target reliability, and the data rate for each channel to achieve the desired performance.").

413.   *See* TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, § 9.2.1.2.4.1, p. 9.24-9.25.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Channel."[414]  Whenever a connection is open, "the access network continuously transmits '0'

(up) or '1' (down) RPC bits to the access terminal, based on measurements of the reverse link

signal quality.  If the received quality is above the target threshold, a '1' bit is transmitted.  If

the received quality is below the target threshold, a '0' bit is transmitted."[415]  Through

commands sent to the Access Terminal over the air interface, the Access Network is able to

increase or decrease the Access Terminal transmit power at least ±24 dB around the Access

Terminal's open-loop transmit power estimate.[416]

### f.   Synchronization and timing of transmitted signals.

"All sector air interface transmissions are referenced to a common system-wide timing

reference that uses the Global Positioning System (GPS) time, which is traceable to and

synchronous with Universal Coordinated Time (UTC)."[417][418]  Based on the GPS time

maintained by the Access Network, the Access Terminal establishes "a time reference that is

_____

414.  *Id.*, § 9.2.1.2.4.2, p. 9.25.

415.  *Id.*, § 9.2.1.4, p. 9.53.

416.  *See id.*, § 9.2.1.2.4.2, p. 9.26.

417.  *Id.*, § 1.14, p. 1.17.

418.  *See also* USDOD, *Global Positioning System Standard Positioning Service
Performance Standard* (4th ed. 2008), Appendix C, p. C-2 ("GPS Time.  A continuous time
scale maintained by the GPS Control Segment which began at midnight on the night of 5/6
January 1980 on the Coordinated Universal Time (UTC) scale as established by the U.S. Naval
Observatory (USNO)"); Smithsonian: National Air and Space Museum [website], *How Does
GPS Work?*, http://www.nasm.si.edu/exhibitions/gps/work.html (last accessed: Dec. 1, 2011)
("GPS operations depend on a very accurate time reference, which is provided by atomic
clocks at the U.S. Naval Observatory.  Each GPS satellite has atomic clocks on board.").

- 89 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

used to derive timing for the transmitted chips, symbols, slots, frames, and system timing."[419]

"The access terminal initial time reference shall be established from the acquired Pilot Channel

and from the Sync message transmitted on the Control Channel."[420]  In other words, through

the Pilot Channel and Sync message, the Access Network instructs the Access Terminal to

transmit signals only at specific time intervals.  Because the Access Terminal time reference is

"used as the transmit time reference of the Reverse Traffic Channel and the Access

Channel[,]"[421]  the Access Network always knows the time at which the Access Terminal

transmits a signal.  For example, "The Access Channel Cycle specifies the time instants at

which the access terminal may start an access probe."[422]  Similarly, the Access Network

transmits to the Access Terminal at specified times.[423]  For example, "[t]he AN sends the

broadcast and common channel messages on the control channel slots in every 256 slots =

426.67 ms."[424]

---

419.   TIA/EIA/IS-856-1, *cdma2000 High Rate Packet Data Air Interface Specification*, §
9.2.1.6, p. 9.54.

420.   *Id*.

421.   *Id*.

422.   *Id.*, § 8.3.6.1.2, p. 8.22.

423.   *See* Korowajczuk, *Designing cdma2000 Systems*, p. 396 ("The AN (sector) also uses the
system time as a reference for all its time-critical transmission components, including pilot PN
sequences, slots and Walsh functions.").

424.   Etemad, *cdma2000 Evolution: System Concepts and Design Principles*, p. 238.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

**g.  Relevant miscellaneous 1xEV-DO Rel. 0 cellular data network operations.**

**i.  Signal interference.**

All cellular systems, including those supporting 1xEV-DO Rel. 0, are susceptible to signal interference on the air interface.  The FCC defines signal interference as "[t]he effect of unwanted energy due to one or a combination of emissions, radiations, or inductions upon reception in a radiocommunication system, manifested by any performance degradation, misinterpretation, or loss of information which could be extracted in the absence of such unwanted energy."[425]  "Interference usually occurs between two radio signals whose frequencies are too close together, or even identical."[426]  Two common types of interference in a cellular network are cochannel interference and adjacent channel interference.  "Cochannel interference occurs when there are two or more transmitters within a cellular system, or even a neighboring cellular system, that are transmitting on the *same* frequency (channel).  This type of interference is usually generated because channel sets have been assigned to two cells that are *not far enough apart*; their signals are strong enough to cause interference to each other."[427]  "Adjacent channel interference is caused by the *inability* of a mobile phone to filter out the signals (frequencies) of adjacent channels assigned to side-by-side cell sites []."[428]  "There are other types of interference that occasionally plague cellular systems.  The most common form of interference, other than cochannel and adjacent channel interference, is

---

425.  47 C.F.R. § 2.1(c).

426.  Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 43.

427.  *Id*.

428.  *Id.*, p. 45.

- 91 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

*intermodulation* interference (IM)."[429]  "Intermodulation interference describes the effect of

several signals mixing together to produce an unwanted signal, or even no signal at all."[430]

In order to avoid signal interference on the air interface, wireless carriers implement

frequency coordination defined as "the effort to assign frequencies to cellular channels in such

a way as to minimize interference within your *own* cellular system and *neighboring* systems of

different wireless carriers."[431]  Wireless carriers use both intramarket and intermarket

frequency coordination.  Intramarket frequency coordination is done internally by each wireless

carrier and "is based on a frequency-reuse growth plan using the hex grid."[432]  "The

configuration and planning of [][each cell within the hex grid] is chosen to minimize the

interference from another cell and thus maximum capacity can be achieved."[433]  Intermarket

frequency coordination "is external to a wireless carrier's cellular system, and involves

coordinating frequency assignments with neighboring cellular systems[]."[434]  "The FCC

dictates that all reasonable actions must be taken to limit and/or reduce interference between

two cellular systems."[435]  For example, the FCC requires that "[l]icensees in the Cellular

Radiotelephone Service must coordinate, with the appropriate parties, channel usage at each

429.  *Id.*

430.  *Id.*

431.  *Id.*

432.  *Id.*, p. 42.

433.  Chuah *et al.*, *Design And Performance Of 3G Wireless Networks And Wireless LANs*, p.
2.

434.  Bedell, *Cellular/PCS Management: A Real World Perspective*, p. 42.

435.  *Id.*

- 92 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

transmitter location within 121 kilometers (75 miles) of any transmitter locations authorized to

other licensees or proposed by tentative selectees or other applicants, except those with

mutually exclusive applications."[436]  Additionally, the FCC has strict guidelines that must be

followed by wireless carriers to prevent and correct network issues that cause interference with

800mhz Public Safety Radio Service,[437] *i.e.*, radios used by ambulances, firefighters, police

officers, *etc*.

### ii.   Hybrid Access Terminal operations for non-telephones, *e.g.*, aircards.

As explained in Section III(B)(2)(a), *supra*, most Access Terminals are hybrid Access

Terminals (HATs) meaning they are capable of communicating with both 1xEV-DO cellular

data networks and 1xRTT cellular data/voice networks.  An example of a HAT that supports all

connection types across both networks (*i.e.*, 1xEV-DO high speed Internet, 1xRTT low speed

Internet, 1xRTT telephone calls, and 1xRTT SMS text messages) is a "smart phone."[438]  An

example of a HAT that supports 1xEV-DO data connections and 1xRTT data connections (but

---

436.   47 C.F.R. § 22.907; *see also* 47 C.F.R. § 22.351 ("All applicants for, and licensees of,
stations in the Public Mobile Services shall cooperate in the selection and use of channels in
order to minimize interference and obtain the most efficient use of the allocated spectrum.").

437.   *See* 47 C.F.R. § 22.970 *et seq.*;  47 C.F.R. § 22.971(a) ("Any licensee who, knowingly or
unknowingly, directly or indirectly, causes or contributes to causing unacceptable interference
to a non-cellular part 90 [(*i.e.*, Public Safety Radio Service)] of this chapter  licensee in the 800
MHz band, as defined in § 22.970, shall be strictly accountable to abate the interference, with
full cooperation and utmost diligence, in the shortest time practicable.").

438.   "Smart Phone: Wireless phones with advanced data features and often keyboards. What
makes the phone 'smart' is its ability to better manage data and Internet access."  CTIA
[website], *Wireless Glossary of Terms Q-S*, http://www.ctia.org/media/industry_info/index.cfm/
AID/10406 (last accessed: Aug., 30, 2011).

- 93 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

not voice connections) is an aircard that plugs into a host laptop computer.[439]  In the context of

an aircard, support for 1xRTT provides an SMS text message service and low speed Internet

access in places where 1xEV-DO High Rate Packet Data (HRPD) service is unavailable.

Hybrid Access Terminals should not be confused with SVDO Access Terminals.[440]  Hybrid

Access Terminals allow for data connections via 1xEV-DO air links or a data and/or voice

connection via 1xRTT air links, but not at the same time.[441]  In contrast, SVDO Access

Terminals allow for *simultaneous* 1xEV-DO and 1xRTT air links with traffic channels assigned

for each link.[442][443]  In the context of an SVDO Access Terminal consisting of hardware

capable of supporting voice calls, if a 1xEV-DO data connection is open during the time of an

incoming voice page, the Access Terminal stays in the connected state (*i.e.*, no impact on

1xEV-DO data session) while it utilizes separate radio channels to connect the incoming voice

call.[444]  In contrast, a voice capable Hybrid Access Terminal under the same scenario will drop

---

439.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 11 of *1st Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard).

440.  SVDO Access Terminals were not being marketed in the year 2008.

441.  *See* TIA-1157-A, *Signaling Conformance Test Specification for Interworking of CDMA2000 1X and High Rate Packet Data Systems, Revision A*, § 1.2, p. 1.1 (A Hybrid Access Terminal is a "[h]ybrid mode device that can support cdma20001x [(*e.g.*, 1xRTT)] and HRPD [(*e.g.*, 1xEV-DO)] by periodic monitoring [of] the paging channel of cdma20001x.").

442.  *See id*.

443   The simultaneous voice and data operation of an SVDO Access Terminal should not be confused with the "concurrent services" operation of a Hybrid Access Terminal using solely 1xRTT to concurrently access low speed Internet and a voice call.

444.  *See id.*, § 3.6, p. 3.4-3.5 (Outlining test guidelines to "verif[y] a voice call termination in active HRPD mode for SVDO capable AT.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

the 1xEV-DO air link (if the user chooses to answer the call) so that resources are freed to connect the incoming voice call on the 1xRTT system.[445]

The technical standard labeled IS-878-2 provides instructions on how a Hybrid Access Terminal handles incoming 1xRTT voice calls (via pages) under various scenarios while in "Active Mode," i.e., having an open 1xEV-DO data connection.[446][447]  Under a scenario applicable to "concurrent services," if a voice capable Hybrid Access Terminal receives a 1xRTT page from a Base Station (indicating an incoming voice call) while engaged in an open 1xEV-DO data connection with an Access Network, the Access Terminal will (1) stop transmitting to the Access Network, (2) respond to the page by communicating with the Base Station over the air interface, (3) receive an "Alert with Info" message from the Base Station instructing the telephone hardware to ring, and (4) have its 1xEV-DO packet data session handed off to the 1xRTT system for concurrent call/data services (i.e., low speed Internet and voice simultaneously).[448]  During the above explained process, the Base Station will establish a 1xRTT packet data session to take the place of the previous 1xEV-DO packet data session so

---

445.   See id., § 3.2, p. 3.1-3.2 (Outlining test guidelines to "verif[y] a voice call termination when in HRPD Active Mode.").

446.   See ANSI/TIA-878-2, Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access Network Interfaces with Session Control in the Access Network, § 4.2 et seq., p. 4.7.

447.   An Access Terminal "is in Active Mode when it has a session established with an HRPD system, a PPP session established and an air-interface connection open with the HRPD system."  TIA-1157-A, Signaling Conformance Test Specification for Interworking of CDMA2000 1X and High Rate Packet Data Systems, Revision A, § 1.6, p. 1.2.

448.   See ANSI/TIA-878-2, Interoperability Specification (IOS) for High Rate Packet Data (HRPD) Radio Access Network Interfaces with Session Control in the Access Network, § 4.2.1, p. 4.7-4.9 & Fig. 4.2.1-1.

- 95 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

that Internet access will be maintained while the voice call is in progress.[449]  Under a similar

scenario but applicable to Access Terminals with **no** support for "concurrent services," the

same first three steps are completed but no request will be made to handoff the 1xEV-DO

packet data session to the 1xRTT network.[450]  Under this variant, the Access Network starts a

"$T_{airdrop}$" timer and releases the entire 1xEV-DO session if it does not receive a 1xEV-DO

transmission from the Access Terminal within a period of time ranging from 0.1 to 60.0

seconds as set by the wireless carrier.[451]  If the user of the Hybrid Access Terminal answers the

ringing phone, the Access Network's timer eventually runs out and it closes the Access

Terminal's PPP session established with the PDSN and its HRPD session established with the

Access Network.[452]  If the call is not answered by the Access Terminal user, the Access

Terminal resumes transmissions over the 1xEV-DO air link and the 1xEV-DO connection

resumes.

Regardless of whether concurrent services are supported, none of the above applies to

Hybrid Access Terminals that do not support voice calls (*e.g.*, aircards).  A factory set Hybrid

Access Terminal lacking telephone hardware will ignore 1xRTT pages resulting from typical

incoming voice calls and the 1xEV-DO data connection will not be disrupted.  Under both

---

449.  *See id.*

450.  *See id.*, § 4.2.2, p. 4.10-4.11 & Fig. 4.2.2-1.

451.  *See id.*, § 5.3, p. 5.10 (Showing $T_{airdrop}$ timer with s default value of 5 seconds and a
possible range of 0.1-60.0 seconds);  § 5.3.1.1 ($T_{airdrop}$ is an Access Network timer indicating
"when an HRPD connection has been lost.  The timer is started by the AN when it determines
that it is not receiving any transmissions from the MS/AT and stopped when the AN resumes
receiving transmissions from the MS/AT or upon receipt of the A9-Disconnect-A8 message.").

452.  *See id.*, § 4.2.2, p. 4.10-4.11 & Fig. 4.2.2-1.

- 96 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

scenarios explained above, the IS-878-2 technical standard states that "[t]he MS/AT may ignore this Page Message to continue the HRPD session.  If the MS/AT ignores the message, the following steps are not performed."[453]  Because non-telephone Hybrid Access Terminals have no reason to respond to 1xRTT pages for voice calls, let alone issue connect orders for the calls, they ignore all incoming telephone calls and never even reach the first step of ceasing transmissions to the Access Network.

       C.    Explanation of the term "triangulation" applicable to geolocation of
             radio frequency (RF) signals.

     "In navigation, surveying, and civil engineering, triangulation is a technique for precise determination of a ship's or aircraft's position, and the direction of roads, tunnels, or other structures under construction.  It is based on the laws of plane trigonometry, which state that, if one side and two angles of a triangle are known, the other two sides and angle can be readily calculated."[454]  However, in the context of geolocating wireless devices via radio signals,[455] the meaning of triangulation has evolved into a generically used term encompassing any

453.  *See id.*, § 4.2.1, p. 4.8 (a); *id.* § 4.2.2, p. 4.10 (a);

454.  Hosch, William L., ed., *The Britannica Guide to Algebra and Trigonometry*, (New York, NY: Britannica Educational Publishing, 2011), p. 266-67.

455.  "*Geolocation* of RF signals is defined as the problem of precise localization (or geolocation) of spatially separated sources emitting electromagnetic energy in the form of *radio signals* within a certain frequency bandwidth by observing their received signals at spatially separated sensors (or array elements) of the geolocation of RF signals system... *Geolocation of RF signals* is of considerable importance occurring in many fields, including radar, sonar, mobile communications, radio astronomy, seismology, unmanned air vehicle (UAV) for intelligence gathering information, emergency and rescue personnel, mining and agriculture, drilling, aviation, ground transportation, naval, *etc.*"  Progri, Ilir, *Geolocation of RF Signals: Principles and Simulations* (New York, NY: Springer, 2011), p. 5.

- 97 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

number of radio signal measurements taken at two or more collection points (simultaneity is

**not** required) where radio signals are received from a wireless device.[456]  Triangles, angles,

and stationary measurement points (as are needed in traditional triangulation) are not necessary

elements of radio signal triangulation.  Inventors of wireless device locating technology use the

term "triangulation" to generically refer to any number of geolocation measurement techniques

used to locate wireless devices.[457]  For example, Bromhead *et al.*, inventors of wireless device

geolocation technology, applied the term "triangulate" in reference to using signal power levels

and signal timing measurements as a way to locate a wireless device.[458]  Hildebrand *et al.*

(Harris), inventors of wireless device geolocation technology, explained "triangulation" as

using two receivers to determine radio signal angle of arrival and time difference of arrival to

locate a cellular device.[459]  Dupray *et al.*, inventors of *Geographic Location Using Multiple*

---

456.    *See*, *e.g.*, *ECPA Reform and the Revolution in Location Based Technologies and
Services*, 111th Cong. 2nd sess. (Jun. 24, 2010), APPENDIX, "Materials Submitted for the
Hearing Record" (Written Responses of Matt Blaze), p. 138 (PDF, p. 142) ("'Triangulation' in
this context refers to a range of techniques for more precisely locating a cellular subscriber
handset by comparing the radio signal received from the handset at multiple vantage points.").

457.    Even traditional "triangulation" sometimes adopts a broader generic meaning that
encompasses "trilateration."  *See* Morris, Christopher G., ed., *Academic Press Dictionary of
Science and Technology*, (San Diego, CA: Gulf Publishing Group, 1992), p. 2265 (Defining
"**trilateration**" as "a method of land surveying that uses triangulation to measure the distance
between a series of points on the earth's surface.").

458.    *See* Bromhead, Nicholas and McCarthy, Mathew N., *Sub-Sector Timing Advance
Positions Determinations*, U.S. Patent App. No. 2004/0203921 (Thornbury, AU: Oct. 14,
2004), *available at* http://www.freepatentsonline.com/y2004/0203921.html (last accessed: Sept.
29, 2010), p. 2, ¶ 12 ("**Signal power** level and **signal timing** measurements between the mobile
terminal and three or more base stations are used to **triangulate**." (emphasis added)).

459.    *See* Hildebrand, Robert C., *et al.*, Harris Corp., *Geolocation Of Cellular Phone Using
Supervisory Audio Tone Transmitted From Single Base Station*, U.S. Patent No. 6,292,665
(Indialantic: Sept. 18, 2001), *available at* http://www.freepatentsonline.com/6292665.html (last

- 98 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

*Location Estimators*, used the term "triangulation" while explaining GPS.[460][461]  Recent

technical texts and papers also use "triangulation" to refer to measurements of distance, time,

signal power, and signal direction.[462][463]  In sum, triangulation refers to use of one or more of

the following geolocation techniques: (1) time-of-flight (TOF) (a.k.a time-of-arrival), (2) time-

_____

accessed: Feb. 16, 2011),  p. 1, ln. 46-49 ("Other proposals include the use of a phased array
antenna and a pair of receiver stations to determine **angle of arrival** and difference in **time of
arrival** for **triangulation** purposes." (emphasis added)).

460.   *See* Dupray, Dennis J., *et al.*, TracBeam, LLC, *Geographic Location Using Multiple
Location Estimators*, U.S. Patent No. 7,298,327 (Golden, CO (US): Nov. 20, 2007), *available
at* http://www.freepatentsonline.com/7298327.html (last accessed: Feb. 22, 2011), p. 1, ln. 60-
63 ("Another example of a location system using time of arrival and **triangulation** for location
are satellite-based systems, such as the military and commercial versions of the Global
Positioning Satellite system ('GPS')." (emphasis added)).

461.   Pop-culture fiction novelist, Tom Clancy, also entertains his readers with a generic
triangulation concept that encompasses GPS.  *See* Preisler, Jerome, *Tom Clancy's Power Play:
Zero Hour*, (New York, NY: Berkley Publishing Group, 2003) p. 239 ("Bottom-of-the-line
[GPS] units lock on to three sats and provide a two-dimensional fix on position—latitude and
longitude.  The coordinates are arrived at by simple **triangulation**...the travel time of the
satellite signals beamed to the receiver times the speed of light [(*i.e.*, **time-of-flight**)]."
(emphasis added)).

462.   *See*, *e.g.*, Dwivedi, Himanshu *et al.*, *Mobile Application Security*, (McGraw-Hill (USA)
2010), p. 332 (Explaining "Tower **Triangulation**" as using the "relative **power levels** of radio
signals between a cell phone and a cell tower of a known location..." (emphasis added)).

463.   *See*, *e.g.*, The House Committee on Energy and Commerce, Subcommittee on
Commerce, Trade, and Consumer Protection and Subcommittee on Communications,
Technology, and the Internet, *The Privacy Implications of Commercial Location-Based
Services*, 111th Cong. (Feb. 24, 2010) (Statement by John B. Morris, Jr., General Counsel, and
Director of CDT's Internet Standards, Center for Democracy & Technology), *available at*
hhttp://democrats.energycommerce.house.gov/Press_111/20100224/Morris.Testimony.2010.02.
24.pdf (last accessed: Apr. 9, 2012), p. 4. ("[I]f two or three cell towers can detect a mobile
device at the same time, the carrier can triangulate from the towers to determine the
approximate location of the phone... [and] if needed, make calculations based on the **strength**

- 99 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

difference-of-arrival (TDOA), (3) angle-of-arrival (AOA), and (4) power-distance.[464]  Various

geolocation techniques are further discussed *infra*.

  For radio wave collection purposes, the traditional triangulation requirement of needing

two stationary points taking measurements simultaneously can also be written out of the

triangulation equation through use of the "approach" method.[465]  Instead of using multiple

stationary wireless device locators, such as wireless carrier cell sites, a portable/transportable

wireless device locator can use the approach method to take numerous triangulation

calculations from multiple vantage points.  In referencing this method, the USDOJ Electronic

Surveillance Manual states that "[l]aw enforcement possesses electronic devices that allow

agents to determine the location of certain cellular phones[, and b]y **shifting the location of**

**the device**, the operator can determine the phone's location more precisely using

**triangulation**."[466]  Through a different method using multipath signals, a stationary wireless

device locator, such as a wireless carrier cell site, can autonomously triangulate the location of

a wireless device.[467]  A single stationary wireless device locator can triangulate by collecting

and **direction** of a phone's signal..." (emphasis added)).

464.  Other elements of geolocation involve applying received signal measurements, statistical
functions, and data fusion to multiple triangulation calculations for increased accuracy; and
Doppler measurements for ascertaining velocity of a wireless device.  Each of these
geolocation elements is further discussed *infra*.

465.  The approach method is further explain in the *Technical Explanations*, Section III(G)(1)
(b)(v), *infra*.

466.  U.S. Dep't of Justice, *Electronic Surveillance Manual*, p. 45 (emphasis added).  *See also*
United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 052 of *2nd Consolidated
Exhibits* (Dkt. #821-3) (section on cell site emulators, *etc.*, p. 40-41 and 44-45).

467.  *See* Holt, Brian, Harris Corp., *Method And System For Calibrating Wireless Location*

- 100 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

and measuring multipath signals reflected from proxy receivers such as water towers, hillsides,
or other natural or man-made objects.[468]  The proxy receiver method is unique in that it allows
for a single wireless device locator in a stationary position to conduct triangulation
measurements on radio signals as if being done by multiple wireless device locators in
stationary positions or by a single portable/transportable wireless device locator engaged in the
approach method.

### D.   Cell site information and its use in geolocating wireless devices.

### 1.   Explanation of the term "cell site information."

Cell site information may be generated by a wireless carrier when a wireless device
accesses a cell site over the air interface.  The term "cell site information" is an ambiguous
catch-all phrase referring to many different subsets of data generated in response to a wireless
device accessing a cell site such as a 1xEV-DO Rel. 0 Access Network.[469]  The different
subsets of data making up cell site information are dictated by various elements such as cellular

_____

*Systems*, U.S. Patent No. 6,795,019 (Melbourne, FL: Sept. 21, 2004), *available at*
http://www.freepatentsonline.com/6795019.html (last accessed: Feb. 16, 2011),  p. 4, ln. 52-54
("The present invention is advantageous and allows the use of **one** receiver at a receive site to
determine the location of a mobile transmitting unit..." (emphasis added)).

468.   *See id.*, p. 4 ln. 56-66 ("The system uses a proxy receiver (or passive reflector) for Time
of Arrival and/or Time of Difference of Arrival calculations.  Throughout the description, the
term proxy receiver is used for a reflector/refractor located at a location called a proxy receive
site (PRS) and also used to describe any type of passive reflector, such as a building, mountain,
or hill, water tower, or any other natural or man-made object that would reflect and/or refract
(or diffract) the signal from a transmitting mobile unit or other radio transmitter to a receiver
that could be fixed or mobile.").

469.   A wireless carrier may generate and store cell site information for later law enforcement
use (*i.e.*, historical cell site information) or forwarded it to law enforcement in real-time (*i.e.*,
real-time cell site information).

- 101 -

## DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

network infrastructure, service features, wireless device type, and cell site design.  In the context of historical cell site information, the subset of cell site information making up *location* information is not standardized across wireless carriers.  "Some providers may collect only information about the nearest tower [(either with or without sector information)]... [and] how revealing th[at] is depends on the density of the area in which the subscriber is located.  Other providers, however, may collect more precise information and may collect location records at more frequent intervals, which might reveal, for example, not only a subscriber's individual locations but also his or her direction and rate of travel, travel habits, and other patterns of behavior."[470]

An analysis of historical cell site information provided by wireless carriers in three separate cases demonstrates the ambiguous, catch-all nature of the term.  In United States v. Luis Soto, Sprint Nextel Corporation provided historical cell site information consisting of the following data fields: (1) Date; (2) Time; (3) Duration (sec); (4) FromUrbanArea NetworkCode; (5) FromACGId; (6) Destination UFMI; and (7) Direct Connect Number.  *See id.*, Case No. 3:09-cr-00200-AWT, Doc. #112-1 (D. Conn., Jun. 28, 2010); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 110 of *2nd Consolidated Exhibits* (Dkt. #821-6) (cell site information record attached).  In The Matter Of An Application Of The United States Of America For An Order Authorizing The Release Of Historical Cell-

---

470.  *ECPA Reform and the Revolution in Location Based Technologies and Services*, 111th Cong. 2nd sess. (Jun. 24, 2010), APPENDIX, "Materials Submitted for the Hearing Record" (Written Responses of Matt Blaze, Associate Professor, University of Pennsylvania, on ECPA Reform, August 20, 2010), p. 135 (PDF, p. 139).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Site Information, an unknown wireless carrier provided historical cell site information

consisting of the following data fields: (1) Customer PTN; (2) Date; (3) Call Initiation Time;

(4) Duration (sec); (5) Type; (6) Forwarded; (7) 911; (8) International; (9) Caller / Called PTN;

(10) Originating Cell Site; and (11) Terminating Cell Site.  *See id.*, Case No. 1:10-mc-00550-

RRM-JO, Doc. #004-2 (E.D.N.Y., Aug. 24, 2010); *see also* United States v. Rigmaiden, CR08-

814-PHX-DGC, D.Ariz., EXHIBIT 111 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-6) (cell site

information record attached).  Finally, in the present case, Verizon Wireless provided historical

cell site information consisting of the following data fields: (1) Details; (2) MDN; (3) MSID;

(4) Cell Start Date/Time; (5) Event Stop Date/Time; (6) Duration (seconds); (7) MOU; (8)

KBU; (9) SID; (10) Mscid; (11) Cell; (12) Switch; (13) Cell #; (14) LAT; (15) LONG; (16)

ADDRESS; (17) CITY; (18) STATE; and (19) ZIP.  *See* United States v. Rigmaiden, CR08-

814-PHX-DGC, D.Ariz., EXHIBIT 03 of *1ˢᵗ Consolidated Exhibits* (Dkt. #587-1).[471]

**2.   Use of statistical databases containing historical cell site location
information to determine a wireless device location signature.**

There are various ways to use statistical databases containing historical cell site location

information to determine the past, present, and future location of a wireless device.  By using

information about the terrain and received signals collected over time (*i.e.*, historical cell site

---

471.    *See also* In Re Application For Pen Register And Trap/trace Device With Cell Site
Location Authority, 396 F.Supp.2d 747, 749 (S.D.Tex. 2005) ("Smith (mj) 2005 Opinion")
(Defining *real-time* (*i.e.*, prospective) cell site information as "the location of cell site/sector
(physical address) at call origination (for outbound calling), call termination (for incoming
calls)..." and "information regarding the strength, angle, and timing of the caller's signal
measured at two or more cell sites, as well as other system information such as a listing of all
cell towers in the market area, switching technology, protocols, and network architecture.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

location information), a wireless carrier or law enforcement can use heuristics to ascertain the

location signature of a wireless device.  "In one embodiment, the PDE [(*i.e.*, Position

Determination Entity)] may collect statistical data about the reported PN phases from any []

[wireless device], organized within small geographic regions surrounding a [][cell site]....  With

a sufficient number of phase measurement samples, the PDE can make general assumptions

about the multipath environment within a given region, measured by a plurality of [][wireless

devices]..."[472]  The phase measurement samples (*i.e.*, historical cell site location information)

are entered into a statistical database[473] used to divide each cell site coverage area into regions

that correspond to the available location signatures.[474]  In U.S. Patent No. 6,999,778, DiBuduo

provides a diagram showing five regions surrounding a cell site with each region corresponding

to a different location signature.[475]  If a wireless carrier needs to determine the region where a

wireless device is located, it compares cell site location information corresponding to the target

472.   DiBuduo, Marcus, Denso Corp., *Multipath Assistance For Pilot Phase Measurement Processes*, U.S. Patent No. 6,999,778 (Oceanside, CA: Feb. 14, 2006), *available at* http://www.freepatentsonline.com/6999778.html (last accessed: Sept. 29, 2010),  p. 7, ln. 44-46 and 49-52 (for clarity and consistency purposes, the terms "BS" (Base Station) are changed to "cell site" and "MS" (Mobile Station) to "wireless device").

473.   *See id.*, p. 12, ln. 61-65 ("[T]his statistical database can be generated by considering any information provided to the PDE in the PPM.  Over time, the PDE will compile previously reported pilot phase measurements from multiple MSs in a particular region and create the statistical distribution...").

474.   *See id.*, p. 11, ln. 33-38 ("The statistical database compiled by the PDE can be divided into multiple regions for each BS.  FIG. 10 is a diagram showing five regions surrounding BS A for which a database consisting of received PPMs from MSs located within those regions is maintained according to the present invention.").

475.   *See id.*, Sheet 9 of 11, Fig. 10; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 057 of *2nd Consolidated Exhibits* (Dkt. #821-3) (Fig. 10 attached).

- 104 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

wireless device to entries in the statistical database in order to obtain a location signature

match.[476]

        In another embodiment, Dupray *et al.* explains a system that collects historical location

data to establish location signatures "based on: (a) the terrain area classifications; *e.g.*, the

terrain of an area surrounding a target MS, (b) the configuration of base stations in the radio

coverage area, and (c) characterizations of the wireless signal transmission paths between a

target MS location and the base stations."[477]  Dupray *et al.* employs a real number confidence

value system to weight specific geographic areas according to the probability of containing the

target wireless device (*i.e.*, the MS).  "That is, confidence values that are larger indicate a

higher likelihood that the target MS is in the corresponding MS estimated area, wherein -1

indicates that the target MS is absolutely NOT in the estimated area, 0 indicates a substantially

neutral or unknown likelihood of the target MS being in the corresponding estimated area, and

1 indicates that the target MS is absolutely within the corresponding estimated area."[478]  In

summary, the invention by Dupray *et al.*, "provide[s] location hypothesis enhancing and

evaluation techniques that can adjust target MS location estimates according to historical MS

---

476.  *See id.*, p. 17, ln. 30-31 (claiming that the invention allows for locating a wireless by
"estimating a location of the MS using PN phase offsets previously reported by the MS;").

477.  Dupray, *et al.*, TracBeam, LLC, *Geographic Location Using Multiple Location
Estimators*, U.S. Patent No. 7,298,327, p. 43, ln. 41-46 (claim notes omitted); *see also id.*, p. 15
ln. 62-67, p. 16 ln. 1 ("A novel aspect of the present invention relies on the discovery that in
many areas where MS location services are desired, the wireless signal measurements obtained
from communications between the target MS and the base station infrastructure are extensive
enough to provide sufficiently unique or peculiar values so that the pattern of values alone may
identify the location of the target MS.").

478.  *Id.*, p. 14, ln. 60-67.

- 105 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

location data and/or adjust the confidence values of location hypotheses according to how

consistent the corresponding target MS location estimate is...”[479]

### 3. Cell site triangulation of a wireless device using cell site location information.

There are various geolocation techniques that can be used to triangulate a wireless

device using cell site location information.  The most basic form of cell site triangulation uses

low resolution angle-of-arrival (AOA) measurements taken from two overlapping cell site

sectors belonging to adjacent cell sites:

> Triangulation is the process of determining the coordinates of a point based on
> the known location of two other points. If the direction (but not distance) from
> each known point to the unknown point can be determined, then a triangle can be
> drawn connecting all three points. While only the length of one side of the
> triangle is known at first (the side connecting the two known points), simple
> trigonometry reveals the lengths of the other sides and so the position of the third
> point. **In the context of cell site information**, the two known points are the
> antenna towers, the third point is the cellular telephone, and the direction from
> each tower to the phone is discerned from the information about which face of
> each tower is facing the phone.
>
> In Re: Application of the United States for an Order for Prospective Cell Site
> Location Information on a Certain Cellular Telephone, 460 F. Supp.2d 448, 451
> (S.D.N.Y. 2006) (district Judge Kaplan) (emphasis added).

For the type of cell site triangulation explained above, the 120° cell site sectors[480] make up the

angles used in the angle-of-arrival (AOA) measurements.  Therefore, the minimum amount of

---

479.   *Id.*, p. 15, ln. 2-7.

480.   Typical cell sites, including the cell sites accessed by the UTStarcom PC5740 1xEV-DO
aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.), had three 120° sectors
providing cellular service.  *See Technical Explanations*, Section III(B)(2)(c), *supra* (explaining
cell sites in the geolocation context); United States v. Rigmaiden, CR08-814-PHX-DGC,
D.Ariz., EXHIBIT 22 of *1ˢᵗ Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map
showing three tri-sectored cell sites that were accessed by the aircard).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

cell site location information needed for triangulation is information identifying each sector

accessed by the wireless device.  Angle-of-arrival (AOA) measurements in this context are

considered low resolution because a sector having a radiation pattern oriented at 120° with

center azimuth bearing at 60° is only capable of locating a wireless device at a vector angle

centered at 60° with a line bearing uncertainty of 120°.  Therefore, the line bearing pointing to

the location of the wireless device is somewhere along a set 120° arc as part of a 360° circle

with the cell site hardware at the center of the circle.  However, because line bearings are

measured from two separate cell site sectors, the level of location uncertainty is reduced to an

area where the two cell site sectors overlap.[481]

More precise forms of cell site triangulation are also employed—mainly in real-time by

wireless carriers seeking to "compl[y] with the FCC's 'E911' mandate for more precisely

locating cellular callers to emergency services.  When a subscriber places a call to 911, many

cellular networks automatically employ some form of triangulation and automatically transmit

the calculated location of the caller to the 911 call center."[482]  However, high resolution

geolocation information may also be continuously compiled by wireless carriers for law

---

481.   United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of 1st
Consolidated Exhibits (Dkt. #587-2) (cell tower range chart/map showing how triangulation via
cell site sector angle-of-arrival (AOA) measurements in combination with location signature
techniques eliminated **93.9%** of the location uncertainty); see also How The Aircard Was
Intruded Upon, Section IV(B)(2), infra (explaining the precise techniques used to created the
cell tower range chart/map).

482.   ECPA Reform and the Revolution in Location Based Technologies and Services, 111th
Cong. 2nd sess. (Jun. 24, 2010), APPENDIX, "Materials Submitted for the Hearing Record"
(Written Responses of Matt Blaze), p. 138 (PDF, p. 142).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

enforcement use—even while 911 calls are not involved.[483]  In order to conduct high

resolution geolocation of a wireless device, wireless carriers use various network-based

triangulation techniques including time-of-flight (TOF), time-difference-of-arrival (TDOA),

angle-of-arrival (AOA), and power-distance.  For network based geolocation, triangulation

calculations are conducted by cell sites in combination with other network hardware and may

also involve handset based measurements of cell site pilot signals as recorded by the wireless

device.[484][485][486]  According to E911 requirements, network-based geolocation techniques will

have a sufficient resolution if they are accurate to "100 meters for 67 percent of calls, [and] 300

_____

483.    For example, TruePosition's network-based geolocation product not only serves E911
purposes, it also serves a law enforcement need for "safe shared and secure access to definitive
information relating to the size, detail, location and activity of illegal conduct." *ECPA Reform
and the Revolution in Location Based Technologies and Services*, 111th Cong. 2nd sess. (Jun.
24, 2010) (Prepared Statement of Michael Amarosa, Senior Vice President, TruePosition, Inc.),
p. 44 (PDF, p. 48).

484.    *See* Caffery, James J., Jr. and Stüber, Gordon L., Georgia Institute of Technology,
*Overview of Radiolocation in CDMA Cellular Systems*, IEEE Communications Magazine,
0163-6804/98/ (April, 1998), *available at* http://citeseerx.ist.psu.edu/viewdoc/download?
doi=10.1.1.134.1704&rep=rep1&type=pdf (last accessed: Apr. 9, 2012).

485.    The primary technical standard addressing position determining services is the
Telecommunications Industry Association, TIA-801-A (Revision of TIA/EIA/IS-801), *Position
Determining Service for cdma2000 Spread Spectrum Systems* (Arlington, VA: Apr. 2004).

486.    Aside from pilot signals, wireless carriers may employ handset-based geolocation where
the wireless device uses GPS to calculate its location, which is then communicated to the
nearest cell site.  "By itself, GPS can be the most accurate (when satellites are
acquired/available), but this technology is often enhanced by the network.  Assisted GPS
(AGPS) refers to a PDE system that makes use of additional network equipment that is
deployed to help acquire the mobile device (much faster than non-assisted GPS) and provide
positioning when the A-GPS system is unsuccessful in acquiring any/enough satellites."
MobileIN.com [website], *Mobile Positioning*, 2001-2004,
http://www.mobilein.com/mobile_positioning.htm (last accessed: Jul. 20, 2011).

- 108 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

meters for 95 percent of calls[.]"[487][488]  However, E911 requirements set a minimum standard

and network-based geolocation techniques have the potential to be much more accurate and

intrusive.  For example, TruePosition boasts that its U-TDOA network-based geolocation

product "[l]ocates mobile phones and devices in any environment (indoors, in-vehicle, urban,

suburban, rural, *etc.*)... with very high accuracy (typically under 50 meters)..."[489]  "Described

discretely, TruePosition location security solutions allow for automatic notifications based on

desired criteria, such as the geographic zone of activity, specific communications patterns or

particular users....  U-TDOA technology allows for locating multiple devices in real time with

high accuracy.  The information obtained can be viewed in a map-based format, also in real

time.  It includes alerting capability with regard to specific geographic areas and users."[490]

### E.    Global Positioning System (GPS).

Global Positioning System (GPS) "is a space-based positioning, navigation and timing

system developed by the U.S. Department of Defense (DoD)....  The U.S. Air Force currently

finances and operates the basic system of 24+ satellites and associated ground monitoring

stations located around the world.  GPS is widely characterized as a satellite navigation or a

satellite positioning system, providing signals for geolocation and for safe and efficient

movement, measurement, and tracking of people, vehicles, and other objects anywhere from

---

487.   47 C.F.R. § 20.18(h)(1) *et seq.* (2008).

488.   In contrast, handset-based geolocation techniques are high enough resolution if they are
accurate to "50 meters for 67 percent of calls, [and] 150 meters for 95 percent of calls."  *Id*.

489.   *ECPA Reform and the Revolution in Location Based Technologies and Services*, 111th
Cong. 2nd sess. (Jun. 24, 2010) (Prepared Statement of Michael Amarosa), p. 39 (PDF, p. 43).

490.   *Id.*, p. 44 (PDF, p. 48).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

the earth's surface to geosynchronous orbit in space.  A less-known element omitted from many

GPS descriptions is the embedded timing that serves an essential role in its navigation

services."[491][492]  "A GPS receiver calculates its position by timing the signals sent by the GPS

satellites.  Each satellite continually transmits messages containing the time the message was

sent, precise orbital information (the ephemeris), and the general system health and rough

orbits of all GPS satellites (the almanac).  The receiver measures the transit time of each

message and computes the distance to each satellite.  Geometric trilateration is used to combine

these distances with the location of the satellites to determine the receiver's location."[493][494]

"GPS satellites provide service to civilian and military users."[495]  The civilian service is

491.   United States department of Defense, Defense Science Board Task Force, *The Future of the Global Positioning System* (Washington, D.C.: Oct. 2005), *available at* http://www.acq.osd.mil/dsb/reports/ADA443573.pdf (last accessed: Apr. 10, 2012), p. 25 (PDF, p. 33).

492.   *See also* USDOD, *Global Positioning System Standard Positioning Service Performance Standard* (4th ed. 2008), p. 1 ("GPS has provided positioning, navigation, and timing services to military and civilian users on a continuous worldwide basis since first launch in 1978.  An unlimited number of users with a civil or military GPS receiver can determine accurate time and location, in any weather, day or night, anywhere in the world.").

493.   Ullah, Zafa and Goodrich, Floyd, Arrow Electronics [white paper], *GPS Technology: Know Where You Are, Know How It Works*, *available at* http://www.arrownac.com/services-tools/design/whitepapers/resource_aug09_gps.pdf (last accessed: Apr. 10, 2012), p. 2 (PDF, p. 2).

494.   Location information is displayed to the user of the receiver as latitude and longitude values.  *See* nationalatlas.gov, *Latitude and Longitude*, http://www.nationalatlas.gov/articles/mapping/a_latlong.html (last accessed: Aug. 30, 2011).

495.   gps.gov [website], *GPS.gov: GPS Overview*, "GPS Services," *available at* http://www.gps.gov/systems/gps/ (last accessed: Apr. 24, 2012).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

called the Standard Positioning Service (SPS)[496] and the military service is called the Precise

Positioning Service (PPS).[497]  "The civilian service is freely available to all users on a

continuous, worldwide basis.  The military service is available to U.S. and allied armed forces

as well as approved Government agencies."[498]  "Real-world data collected by the FAA show

that some high-quality GPS SPS receivers currently provide better than 3 meter horizontal

accuracy."[499]  Because PPS broadcasts on two frequencies as apposed to the one frequency

broadcast by SPS, "military users can perform ionospheric correction, a technique that reduces

radio degradation caused by the Earth's atmosphere.  With less degradation, PPS provides better

accuracy than the basic SPS."[500]  For additional information on GPS, *see Brief of Center For*

*Democracy & Technology, Electronic Frontier Foundation, Matt Blaze, Andrew J. Blumberg,*

*Roger L. Easton, and Norman M. Sadeh as Amici Curiae in Support of Respondent*, p. 7-14,

United States v. Jones, 556 U.S. ___, 181 L. Ed. 2d 911, No. 10-1259 (2012).

---

496.  "**Standard Positioning Service (SPS).**  The GPS broadcast signals based on the L1
C/A-codes, as defined in IS-GPS-200, providing constellation performance to peaceful civil,
commercial, and scientific users, as established in the SPS Performance Standard (SPS PS), in
accordance with U.S. Government (USG) policy."  USDOD, *Global Positioning System
Standard Positioning Service Performance Standard*, APPENDIX C, p. C-4.

497.  "**Precise Positioning Service (PPS).**  The GPS broadcast signals based on the L1 P(Y)-
codes, L1 C/A-codes, and L2 P(Y)-codes, as defined in the GPS ISs/ICDs, providing
constellation performance to authorized users, as established in the PPS Performance Standard
(PPS PS), in accordance with U.S. Government (USG) policy."  *Id.*, APPENDIX C, p. C-3.

498.  gps.gov [website], *GPS.gov: GPS Overview*, "GPS Services," *available at*
http://www.gps.gov/systems/gps/ (last accessed: Apr. 24, 2012).

499.  gps.gov [website], *GPS.gov: GPS Accuracy*, "GPS Accuracy," *available at*
http://www.gps.gov/systems/gps/performance/accuracy/ (last accessed: Apr. 24, 2012).

500.  *Id.*, "Is Military GPS More Accurate Than Civilian GPS".

- 111 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

### F.  Explanation of the term "mobile tracking device."

Mobile tracking devices are surveillance devices that can be attached to a person or object sought to be tracked.  A federal statute titled "Mobile tracking devices," 18 U.S.C. § 3117, defines the broader term "tracking device" as "an electronic or mechanical device which permits the tracking of the movement of a person or object."[501]  Although the statutory definition of "tracking device" is not particularized, an analysis of the historical origins of 18 U.S.C. § 3117, enacted in 1986 as part of the Electronic Communications Privacy Act (ECPA), makes clear that legislators understood the term "tracking device" to mean a homing device "which might be placed in an automobile, on a person, or in some other item."[502]  Prior to the wide scale use of GPS, mobile tracking devices were "beepers" or "bird dogs" consisting of "a radio transmitter, usually battery operated, which emits periodic signals that can be picked up by a radio receiver."[503]  The beepers of the 1980s were physically installed by law enforcement in order to track a person or object for the purpose of aiding in visual surveillance. [504]  Modern day mobile tracking devices still require physical installation but the tracking is now done through use of GPS satellites.  For example, the Daviscomms EaziTRAC 1000 GSM/GPRS/GPS Mobile Tracking Device uses GPS satellites to generate geolocation data that

---

501.    18 U.S.C. § 3117(b).

502.    S. Rep. No. 541, 99th Cong., 2d Sess. 10 (1986), reprinted in 1986 U.S. Code. Cong. & Admin. News 3555, 3564 (1986 Senate Report on the ECPA including a glossary of technological terms).

503.    United States v. Knotts, 460 U.S. 276, 277 (1983) (beeper installed in a can of chloroform and used to track movement of car).

504.    See id. (beeper installed in a can of chloroform and used to track movement of car); United States v. Karo, 468 U.S. 705 (1984) (beeper installed in a can of ether and tracked into residences).

- 112 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

can be stored and transmitted back to law enforcement via SMS messages.[505]  Likewise,

numerous other modern day mobile tracking devices are of similar design and function.[506]

### G.    Air interface surveillance equipment with an emphasis on geolocation of wireless devices.

Portable/transportable wireless device locators, virtual base stations, cell site

emulators/simulators, and IMSI catchers are all generic names[507] used for hardware based

surveillance equipment targeted at wireless devices such as cell phones, tablets, aircards, and

other devices that communicate via a cellular air interface standard, *e.g.*, GSM, UMTS, 1xRTT,

1xEV-DO, *etc*.  The surveillance devices discussed in this section operate independent from

any wireless carrier network by automatically sending and/or receiving radio signals to/from

target wireless devices over the air interface.  Recording or "catching" IMSIs, ESNs or other

identifying data; emulating base stations; locating/tracking wireless devices; conducting denial

of service attacks; downloading data from wireless devices; and intercepting communications

---

505.    *See* Daviscomms [datasheet], *GSM/GPRS/GPS Mobile Tracking Device: EaziTRAC 1000, available at* http://www.daviscommsusa.com/pdf/EaziTRAC %201000_Brochure_RevE1.pdf (last accessed: Jan. 5, 2012); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 035 of *2nd Consolidated Exhibits* (Dkt. #821-2) (datasheet attached).

506.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 036 of *2nd Consolidated Exhibits* (Dkt. #821-2) (collection of various web pages from http://www.alibaba.com advertising GPS based mobile tracking devices).

507.    Generic names used by law enforcement for cell site emulators/simulators are "digital analyzer, cell site locator, triggerfish, ESN reader, or swamp box[.]"  USDOJ [M.D.La.] Aug. 12, 2008, Response to ACLU FOIA Request No. 07-4130, *available at* http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last accessed: Jan. 11, 2011), p. 18 of 42; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 021 of *2nd Consolidated Exhibits* (Dkt. #821-1) (relevant pages of cellfoia_release_074130_20080812.pdf attached with page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

(either passively or through a man-in-the-middle attack) are all possible functions of the type of

surveillance equipment addressed in this section.  While specific features vary across

manufacturers, surveillance equipment targeted at wireless devices can be classified into one or

both of the following general categories: (1) communication interception capabilities, and/or

(2) wireless device locating/tracking capabilities.  Additionally, each make/model of air

interface surveillance equipment is either man-portable (using handheld controls) or vehicle-

transportable (using laptop controls).[508]  While a cursory glance shows that there are many

similar types of off-the-shelf air interface surveillance equipment having geolocation

capabilities, a more detailed analysis reveals that the RayFish line by Harris Corporation[509] is

set apart from all other equipment sold by other companies.  As an initial matter, Harris'

RayFish product line[510] is within a class of cell site emulator capable surveillance devices—

---

508.    In theory, either configuration would also allow for stationary operation.

509.    "Harris is an international communications and information technology company
serving government and commercial markets in more than 150 countries.  Headquartered in
Melbourne, Florida, the company has approximately $5 billion of annual revenue and more
than 16,000 employees — including nearly 7,000 engineers and scientists.  Harris is dedicated
to developing best-in-class assured communications products, systems, and services."  Harris
[website], *Harris Corporation - Media Center*, http://www.harris.com/corporate-profile.html
(last accessed: Sept. 28, 2010).

510.    *See* [Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**,
*available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf, (last accessed: Mar.
9, 2011), p. 1 (StingRay does not intercept communications); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd Consolidated Exhibits* (Dkt.
#821-1) (datasheet attached)]; [Miami, FL, USA – Legislative Files, **Harris KingFish Product
Datasheet**, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last
accessed: Mar. 9, 2011), p. 2 (KingFish does not intercept communications); *see also* United
States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd Consolidated
Exhibits* (Dkt. #821-1) (datasheet attached)].  Product descriptions contained in Harris'
StingRay and KingFish trademark documents also do not contain communications interception

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

which also includes devices sold by Altron,[511] NeoSoft,[512] and MMI[513]—that are specifically

designed to **not** have integrated communications interception (*i.e.*, man-in-the-middle attack)

capabilities.  In contrast, all cell site emulator capable devices sold by Ability,[514] Meganet,[515]

Shoghi Communications Ltd.,[516] Verint,[517] and View Systems[518] have integrated

communications interception capabilities in addition to wireless device locating/tracking

capabilities.  *See* [United States Patent and Trademark Office, Trademark Reg. No. 2,762,468
[StingRay registered by Harris] (registered Sep. 9, 2003), **Harris StingRay Product
Description**, *all associated trademark documents available via search at*
http://tmportal.uspto.gov/external/portal/tow (last accessed: Mar. 11, 2011), p. 10 of 88 page
compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT
005 of *2nd Consolidated Exhibits* (Dkt. #821-1) (product description attached)]; [United States
Patent and Trademark Office, Trademark Reg. No. 2,867,227 [KingFish registered by Harris]
(registered Jul. 27, 2004), **Harris KingFish Product Description**, *all associated trademark
documents available via search at* http://tmportal.uspto.gov/external/portal/tow (last accessed:
Mar. 11, 2011), p. 10 of 67 page compilation; *see also* United States v. Rigmaiden, CR08-814-
PHX-DGC, D.Ariz., EXHIBIT 009 of *2nd Consolidated Exhibits* (Dkt. #821-1) (product
description attached)].

511.  *See* Altron, *GSM/UMTS Grabber: Deploying local mobile networks and secret grabbing
of identification information in GSM and UMTS bands*, PDF provided at ISS World Europe
2008, *available at* http://wikileaks.org/spyfiles/files/0/87_ALTRON-GRABBER.pdf (last
accessed: Apr. 10, 2012) (device does not intercept communications); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 022 of *2nd Consolidated Exhibits* (Dkt.
#821-1) (PDF attached).

512.  *See* NeoSoft [website], *Portable IMSI/IMEI GSM catcher NS-17-1*,
http://www.neosoft.ch/products/emerg_tracking/detail.php?ID=1017&IBLOCK_ID=39 (last
accessed: Feb. 10, 2012) (device does not intercept communications); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 023 of *2nd Consolidated Exhibits* (Dkt.
#821-1) (print-out attached).

513.  MMI sells its devices through partner companies such as Elaman and Cobham.  *See*
[MMI Research Trading as Cobham Surveillance, *Tactical Lawful Intercept*, PDF presentation
provided at ISS World Europe 2008, *available at*
http://wikileaks.org/spyfiles/files/0/43_200906-ISS-PRG-COBHAM.pdf (last accessed: Apr. 5,
2012) (device does not intercept communications); *see also* United States v. Rigmaiden, CR08-
814-PHX-DGC, D.Ariz., EXHIBIT 024 of *2nd Consolidated Exhibits* (Dkt. #821-1) (PDF

- 115 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

capabilities.  Regardless of whether only geolocation or geolocation with communications

interception is supported, the Harris RayFish product line is entirely distinguished from all

other similar products considering it offers the only cell site emulator capable air interface

surveillance equipment supporting cdma2000 based air interface standards.[519]  "The Harris

RayFish product line includes the StingRay II, StingRay, and KingFish systems, which are

_____

attached).]; *see also* [[Elaman, *Active Off-Air System 3GN UMTS*, Product Brochure, *available
at* http://wikileaks.org/spyfiles/files/0/124_ELAMAN-200805-CATALOGUE-P1.zip (last
accessed: May 14, 2012) [Active Off-Air System 3GN UMTS Technical Specification.pdf]
(device does not intercept communications); *see also* United States v. Rigmaiden, CR08-814-
PHX-DGC, D.Ariz., EXHIBIT 025 of 2*nd* Consolidated Exhibits (Dkt. #821-1) (product
brochure attached)]; [Elaman, *GSM Vehicle Direction Finder (VDF)*, Product Brochure,
*available at* http://wikileaks.org/spyfiles/files/0/124_ELAMAN-200805-CATALOGUE-P1.zip
(last accessed: May 14, 2012) [GSM Vehicle Direction Finder-VDF.pdf] (device does not
intercept communications); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC,
D.Ariz., EXHIBIT 026 of 2*nd* Consolidated Exhibits (Dkt. #821-1) (product brochure
attached)]].

514.    *See* Ability, *3G Interception & Advanced GSM Active Solution*, PDF provided at ISS
World Europe 2008, *available at* http://wikileaks.org/spyfiles/files/0/80_ABILITY-
GSM_3G_Intercept.pdf (last accessed: Apr. 10, 2012); *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 027 of 2*nd* Consolidated Exhibits (Dkt. #821-1)
(PDF attached).

515.    *See* Meganet [website], *Meganet Corporation - VME Undetectable Cell Phone
Interceptors*, http://www.meganet.com/meganet-products-cellphoneinterceptors.html (last
accessed: Nov. 20, 2011); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 028 of 2*nd* Consolidated Exhibits (Dkt. #821-2) (print-out attached).

516.    *See* Shoghi Communications Ltd., *Semi Active GSM Monitoring System*, PDF provided
at ISS World Europe 2008, *available at* http://wikileaks.org/spyfiles/files/0/160_SHOGI-2006-
semiactive_gsm_monitoring.pdf (last accessed: Apr. 10, 2012); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 029 of 2*nd* Consolidated Exhibits (Dkt.
#821-2) (PDF attached).

517.    *See* Verint, *ENGAGE GI2 Models*, Product Brochure, *available at*
http://files.cloudprivacy.net.s3.amazonaws.com/wikileaks-verint-location-tracking.pdf (last
accessed: Apr. 5, 2012); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

compatible with the **CDMA2000**, GSM, and iDEN (Nextel) protocols."[520][521][522]  In contrast,

all other off-the-shelf air interface surveillance equipment having geolocation through cell site

emulation capabilities are limited to locating **only** GSM/UMTS[523] based wireless devices and

lack compatibility with cdma2000 based wireless devices (*i.e.*, devices that operate via 1xRTT,

<hr />

EXHIBIT 030 of *2nd Consolidated Exhibits* (Dkt. #821-2) (product brochure attached).

518.   *See* View Systems, *Cell Phone Intercept Apparatus*, Product Brochure, *available at*
http://www.viewsystems.com/pdf/CIA_11_20_06.pdf (last accessed: Apr. 5, 2012); *see also*
United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 031 of *2nd Consolidated
Exhibits* (Dkt. #821-2) (product brochure attached).

519.   The only other off-the-shelf air interface surveillance equipment compatible with
cdma2000 based wireless devices operate passively (*i.e.*, no cell site emulator capabilities) and
is limited to communications interception (*i.e.*, no geolocation capabilities).  *See* [Stratign,
*Strategic Defense Technologies*, 2011 Product Catalog, PDF provided at ISS World Europe
2008, *available at* http://wikileaks.org/spyfiles/files/0/278_STRATIGN-Catalogue-2011.pdf
(last accessed: Apr. 10, 2012), p. 19; *see also* United States v. Rigmaiden, CR08-814-PHX-
DGC, D.Ariz., EXHIBIT 032 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of
PDF attached)]; [Ability [website], *Passive CDMA Interceptor, ACIS – Advanced CDMA
Interception System*, http://www.interceptors.com/intercept-solutions/Passive-CDMA-
Interceptor.html (last accessed: May 6, 2012) ("The ACIS CDMA INTERCEPTOR is a passive
monitoring system that intercepts voice and SMS traffic in cellular CDMA networks."); *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 033 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (print-out attached)].

520.   Durham, NC, USA - City Council Agenda No. 7503, **Harris Sole Source Vendor
Letter** (Sept. 29, 2010), *available at*
http://www.durhamnc.gov/agendas/2010/cws20110103/251951_7503_342363.pdf (last
accessed: Mar. 9, 2011); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 015 of *2nd Consolidated Exhibits* (Dkt. #821-1) (letter attached).

521.   The Harris RayFish product line (*e.g.*, the StingRay and KingFish) also supports the 3G
GSM upgrade referred to as UMTS.  *See* Miami, FL, USA – Legislative Files, **Harris Sole
Source Letter** (Aug. 25, 2008), *available at*
http://egov.ci.miami.fl.us/Legistarweb/Attachments/40003.pdf (last accessed: Mar. 9, 2011), p.
2 ("The Harris StingRay and KingFish systems are compatible with the... UMTS standard...");

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

1xEV-DO Rel. 0, *etc.*).[524]

**1.  Detailed description of the Harris RayFish line of
portable/transportable wireless device locators, *i.e.*, the StingRay,
KingFish, and related equipment.**

Harris has been manufacturing wireless deice locators for law enforcement use

since the early 1990s.[525]  In February of 2009, one FBI agent testified that he alone used such

---

*see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 017 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (letter attached).

522.   Harris is also one of the few companies selling both portable *and* transportable air
interface surveillance equipment that operate cooperatively.  "The Harris StingRay and
KingFish systems are the only cooperative portable/man-portable standard +12VDC
powered/battery powered multiprotocol surveillance systems currently available."  *Id.*

523.   Although UMTS (the 3G upgrade for GSM) is based on W-CDMA, it is incompatible
with the protocols used by cdma2000.  *See* Dornan, Andy, *The Essential Guide to Wireless
Communications Applications*, 2nd ed. (Prentice Hall, May 16, 2002) p. 113-14 ("Until mid-
2000, the upgrade path for cdmaOne seemed clear.  The end result was supposed to be a system
named cdma2000 3XMC, so called because it combines three channels together, resulting in a
wider band.  Unfortunately, this system was not compatible with the form of W-CDMA favored
by Europe and Japan, though its specifications are almost identical.  The difference is the chip
rate, the frequency at which the transceiver resonates.  cdma2000's chip rate needs to be a
multiple of cdmaOne's, while W-CDMA's has to fit the GSM framing structure.").

524.   Other than for equipment sold by Harris, all cell site emulator capable air interface
surveillance equipment sold by the companies discussed in this section (*i.e.*, Altron, NeoSoft,
MMI, Ability, Meganet, Shoghi Communications Ltd., Verint, and View Systems) lack the
ability to locate cdma2000 based wireless devices (*e.g.*, 1xEV-DO Rel. 0 based aircards).  *See*
air interface surveillance equipment exhibits referenced in various footnotes immediately
above.

525.   *See* Shimomura, Tsutomu, *Catching Kevin* [Mitnick], 1993-2004 The Condé Nast
Publications Inc., *available at* http://www.wired.com/wired/archive/4.02/catching_pr.html (last
accessed: Apr. 5, 2012) ("The team talked to me a little about the technology they had toted
along in the station wagon, especially something called a cell-site simulator, which was packed
in a large travel case.  The simulator was a technician's device normally used for testing cell
phones, but it could also be used to page Mitnick's cell phone without ringing it, as long as he
had the phone turned on but not in use.  The phone would then act as a transmitter that they

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

equipment more than 300 times over the last nine years and that "other agencies, U.S.

Marshals, Secret Service, any different number of agencies all over the country [use the

equipment] every day."[526]  Current era Harris products include the StingRay and KingFish as

part of the RayFish line of wireless device locators.  The StingRay[527] is a vehicle-transportable

(*e.g.*, operational from an automobile, helicopter, airplane, *etc.*)[528][529] wireless device locator

---

could home in on with a Triggerfish cellular radio direction-finding system that they were
using.").  The TriggerFish is a first generation wireless device locator manufactured and sold by
Harris.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,762,468
[TriggerFish registered by Harris] (registered Jan. 29, 2002), *all associated documents
available via search at* http://tmportal.uspto.gov/external/portal/tow (last accessed Mar. 11,
2011) (documents showing that the TriggerFish "was first used in connection with the goods at
least as early as November 26, 1997...").

526.    *See* United States v. Allums, No. 2:08-CR-30 TS, District of Utah (Doc. #128, p. 16 and
43) (transcripts of testimony given by FBI Agent William Shute).

527.    *See* United States Patent and Trademark Office, Trademark Reg. No. 2,762,468
[StingRay registered by Harris] (registered Sep. 9, 2003), **Harris StingRay Product Pictures**,
*all associated trademark documents available via search at*
http://tmportal.uspto.gov/external/portal/tow (last accessed: Mar. 11, 2011), p. 9 & 15 of 88
page compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 002 of *2nd Consolidated Exhibits* (Dkt. #821-1) (pictures attached).

528.    Miami, FL, USA – Legislative Files, **Harris GCSD Price List** (Sep. 2008) (Nov. 29,
2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf (last
accessed: Mar. 9, 2011), p. 4 (price list having a StingRay accessory named "Airborne DF Kit
CONUS" ($9,000), indicating that the StingRay may be used via helicopter, airplane, *etc.*); *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 014 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (price list attached).

529.    *See* Durham, NC, USA - City Council Agenda No. 7503, **Harris Sole Source Vendor
Letter** (Sept. 29, 2010) ("When interfaced with the optional Harris AmberJack DF antenna,
supported mapping software, **laptop PC controller**, and the Harris 25-Watt power amplifier
kit, the StingRay can perform **vehicular-based operations**." (emphasis added)); *see also*
United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 015 of *2nd Consolidated
Exhibits* (Dkt. #821-1) (letter attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

with laptop location determining processor[530] and the KingFish[531] is a man-portable[532]

wireless device locator with handheld PDA location determining processor.[533]  As explained

above, the Harris RayFish product line is able to conduct surveillance on wireless devices

compatible with the cdma2000, GSM, UMTS and iDEN wireless network communication

technologies.[534]  The Harris "StingRay and KingFish support 3 technologies simultaneously,

additional technologies can be swapped through a hardware flash process (software

---

530.  *See id*.

531.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,867,227
[KingFish registered by Harris] (registered Jul. 27, 2004), **Harris KingFish Product Picture**,
*all associated trademark documents available via search at*
http://tmportal.uspto.gov/external/portal/tow (last accessed: Mar. 11, 2011), p. 7 of 67 page
compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT
006 of *2nd Consolidated Exhibits* (Dkt. #821-1) (picture attached).

532.  *See* Miami, FL, USA – Legislative Files, **Harris Sole Source Vendor Letter** (Nov. 29,
2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last
accessed: Mar. 9, 2011), p. 1 ("The **man-portability** and battery power features of the Harris
KingFish product are unique for tactical mission needs, allowing the user to perform passive
collection, active interrogation and active location **while on foot** (*i.e.*, inside a multi-story
building, or outside in rough terrain)." (emphasis added)); *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 016 of *2nd Consolidated Exhibits* (Dkt. #821-1)
(letter attached).

533.  *See* Miami, FL, USA – Legislative Files, **Harris KingFish Product Datasheet**, p. 2
("Wireless remote control from commercially available **Pocket PC**" (emphasis added)); *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

534.  Additionally, "[s]oftware reconfigurable architecture will allow for future software
upgrades to support other wireless standards and capabilities[.]"  *See* United States Patent and
Trademark Office, Trademark Reg. No. 2,762,468 [StingRay registered by Harris] (registered
Sep. 9, 2003), **Harris StingRay Product Datasheet**, *all associated trademark documents
available via search at* http://tmportal.uspto.gov/external/portal/tow (last accessed: Mar. 11,
2011), p. 60-61 of 88 page compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-
DGC, D.Ariz., EXHIBIT 004 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

provided)."[535]  Engineers employed by Harris explain the technology incorporated into the

StingRay and KingFish as follows:

> [T]he wireless device locator may include at least one antenna and a transceiver
> connected thereto, and a controller for cooperating with the transceiver for
> transmitting a plurality of location finding signals to a target wireless
> communications device from among the plurality thereof.  The target device may
> transmit a respective reply signal for each of the location finding signals.
>
> Billhartz, Thomas J., *et al.*, Harris Corp., *Wireless Communications System
> Including A Wireless Device Locator And Related Methods*, U.S. Patent No.
> 7,321,777 (Melbourne, FL: Jan. 22, 2008), *available at*
> http://www.freepatentsonline.com/7321777.html (last accessed: Feb. 16, 2011),
> p. 2, ln. 47-55.
>
> The location determining system may also include a location determining
> processor coupled to the receiver to collect, during movement relative to the
> wireless transmitter, a series of range measurements [(using propagation delays)]
> and a corresponding series of received signal measurements, and to estimate a
> location of the wireless transmitter based upon the range measurements weighted
> using the received signal measurements.
>
> McPherson, Rodney and Lanza, David J., Harris Corp., *Wireless Transmitter
> Location Determining System And Related Methods*, U.S. Patent No. 7,592,956
> (Melbourne, FL: Sept. 22, 2009), *available at* http://www.freepatentsonline.com/
> 7592956.html (last accessed: Feb. 22, 2011),  p. 2, ln. 16-22.
>
> In certain embodiments, the antenna may comprise a directional antenna.  In
> these embodiments, the location determining processor may cooperate with the
> directional antenna to collect, during movement relative to the wireless
> transmitter, a corresponding series of angle of arrival measurements.  The
> location determining processor may also estimate the location of the wireless
> transmitter further based upon the angle of arrival measurements.
>
> *Id.*, p. 2, ln. 40-47.

---

535.    Maricopa County, FL, USA – **Harris Contract**, Serial No. 09041-SS (May 27, 2010),
*available at* http://www.maricopa.gov/materials/Awarded_Contracts/PDF/09041-c.pdf (last
accessed: Mar. 9, 2011), p. 14; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC,
D.Ariz., <u>EXHIBIT 018</u> of *2nd Consolidated Exhibits* (Dkt. #821-1) (contract attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Moreover, the location determining processor may cooperate with the receiver to collect, during movement relative to the wireless transmitter, a corresponding series of received signal strength measurements.  The location determining processor may further estimate the location of the wireless transmitter further based upon the received signal strength measurements weighted using the received signal measurements.

*Id.*, p. 2, ln. 52-58.

A Harris wireless device locator records and stores geolocation data and then uses the video display of its location determining processor (*e.g.*, laptop or PDA screen) to superimpose over a digital map the estimated location of the target wireless device.[536][537][538]  McPherson and Lanza further explain that Harris wireless device locators include a GPS receiver as a platform position determining system which provides the wireless device locator with a current

---

536.    *See* Miami, FL, USA – Legislative Files, **Harris KingFish Product Datasheet**, p. 2 ("Provides **real-time display** of Interrogation and Passive Collection results" (emphasis added)); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

537.    *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011), p. 1 ("Optional **geolocation software** overlays target tracks and tracking vehicle location on a **digital map**"); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

538.    *See* Miami, FL, USA – Legislative Files, **Harris Geolocation Product Datasheet**, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: Mar. 9, 2011), p. 1 ("Geolocation provides a user-friendly, geospatially accurate **mapping routine which shows on-screen** the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone.... **Tracking missions can be stored for post-mission analysis**" (emphasis added)); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 009 of *2nd Consolidated Exhibits* (Dkt. #821-1) (Geolocation Product datasheet attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

geographical location of the platform.[539][540]  The GPS receiver cooperates with the location

determining processor so that the target wireless device may be located with longitude, latitude,

and elevation coordinates tethered to the accuracy of the GPS coordinates of the platform.[541]

When GPS signals are not available, such as when using the handheld KingFish within a

building, the location determining processor may also provide for a proximity indicator

involving a 3D graphic display of an arrow pointing along the azimuth and elevation angles in

the direction of the target wireless device with a distance value designating the distance from

the wireless device locator to the target wireless device.

    Public information regarding Harris wireless device locators indicates that the Harris

products allow for locating wireless devices inside buildings[542] with precision accurate to a

---

539.    *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System
And Related Methods*, U.S. Patent No. 7,592,956, p. 6, ln. 28-33.

540.    The term "platform" refers to the person or vehicle transporting the wireless device
locator.  *See id.*, p. 3, ln. 50-54 ("The location determining system is illustratively carried by a
platform movable relative to the wireless transmitter.  The platform may comprise an airborne
platform, for example, an aircraft, or alternatively a ground based platform, for example, an
automobile." (claim notes omitted)).

541.    *See id.*,  p. 6, ln. 33-41.

542.    *See* Miami, FL, USA – Legislative Files, **Harris Sole Source Vendor Letter** (Nov. 29,
2006) (the Harris KingFish can be used "while on foot (*i.e.*, inside a multi-story building, or
outside in rough terrain)."); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC,
D.Ariz., EXHIBIT 016 of *2nd Consolidated Exhibits* (Dkt. #821-1) (letter attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

singe room.[543][544]  In order to achieve such a high precision, the StingRay and KingFish

wireless device locators combine numerous geolocation measurement techniques to triangulate

wireless devices.  The geolocation techniques employed include (1) signal time-of-flight (TOF)

measurements to calculate distance (a.k.a. Range), (2) signal strength measurements to

calculate distance (a.k.a. range), (3) signal angle-of-arrival (AOA) measurements to calculate

direction (via a phased array antenna), (4) frequency-of-arrival (FOA) measurements to

calculate velocity, (5) weighting collected geolocation data and using statistical functions (*e.g.*,

average, mean, median, mode, *etc.*),  and (6) data fusion of calculated geolocation

measurements.  Whether the StingRay or KingFish, various radio signal and data collection

methods are used in order to obtain signals that are subject to the noted geolocation

measurement techniques.  These methods include: (1) base station surveys, (2) passive

interception, (3) downloading data from wireless device internal storage, (4) transmitting

interrogation signals in order to force reply signals, (5) approach method for triangulation, (6)

forced transmission power increase, and (7) denial-of-service attacks.  The proceeding

---

543.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/082707_dcs01.pdf [EFF PDF Set
1 of 6] (last accessed: Oct. 25, 2010), p. 41 of 67 (The FBI indicated that it has locating
equipment allowing agents "to find phones hidden in an office building and a hotel..."); *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 038 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with page
numbers added).

544.   *See* Lapin, Lee, *How To Get Anything On Anybody – Book 3* (Mt. Shasta, CA:
Intelligence Here, Jan. 15, 2003), p. 123 (Harris products are able to "track a cellular user to an
area the size of a hotel room.").

- 124 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

subsections explain the above listed geolocation measurement techniques[545] and signal/data

collection methods[546] used by the StingRay and KingFish while locating/tracking wireless

devices.

> **a.  Geolocation measurement techniques used by the StingRay
>      and KingFish while triangulating the location of a wireless
>      device.**
>
> > **i.  Signal time-of-flight (TOF) measurements to calculate
> >      distance (a.k.a. range).**

The StingRay uses "active... ranging techniques..."[547] in order to locate a wireless

device.  The StingRay's companion Geolocation software "shows on-screen the... estimated

range/location information on the targeted phone."[548]  A Harris patent addressing wireless

device locator technology provides detailed examples of mathematical equations used in time-

---

545.   Frequency-of-arrival (FOA) is not explained because such measurements are not
relevant to the aircard locating mission in United States v. Rigmaiden, CR08-814-PHX-DGC
(D.Ariz.).  For an explanation of FOA, *see, e.g.*, Ryu, Kil-Hyen, Samsung Electronics Co., Ltd.,
*Apparatus And Method For Estimating A Doppler Frequency And A Moving Velocity Of A
Wireless Terminal*, U.S. Patent No. 7,529,328 (Suwon-si, KR: May 5, 2009), *available at* http://
www.freepatentsonline.com/7529328.html (last accessed: Feb. 16, 2011).

546.   Passive interception and denial-of-service attack via jamming are not explained because
such methods are not relevant to the aircard locating mission in United States v. Rigmaiden,
CR08-814-PHX-DGC (D.Ariz.).  However, the FBI conducted two other types of denial-of-
service attacks that are discussed in *How The Aircard Was Intruded Upon*, *infra*.

547.   *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

548.   *See* Miami, FL, USA – Legislative Files, **Harris Geolocation Product Datasheet**, p. 1;
*see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 009 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (Geolocation Product datasheet attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

of-flight (TOF) measurements for conducting ranging techniques.[549]  A wireless device locator

employing TOF[550] will measures the propagation delay time of signals received from a target

wireless device in order to find the distance between the wireless device locator and the target

wireless device.[551]  If the wireless device locator knows the transmission time of a signal,[552] it

can subtract that time from the signal receive time to obtain the time-of-flight.  Because all

radio waves travel at the speed of light,[553] multiplying the time-of-flight by the speed of light

549.   *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System
And Related Methods*, U.S. Patent No. 7,592,956, p. 7 *et seq.* ("Time of Flight Based
Approach").

550.   TOF is also sometimes referred to as time-of-arrival (TOA).  *See*, *e.g.*, Coluzzi, Michael,
E. and Kang, Sung P., ITT Manufacturing Enterprises, Inc., *Method And System For
Determining The Position Of An Object*, U.S. Patent No. 7,187,327 (Los Angeles, CA: Mar. 6,
2007), *available at* http://www.freepatentsonline.com/7187327.html (last accessed: Feb. 22,
2011),  p. 6, ln. 6-25 (explaining TOF measurements but referring to them as TOA).

551.   *See* Kim and Lee, *Apparatus And Method For Tracking Location Of Mobile Station*,
U.S. Patent App. No. 2003/0117320, p. 4, ¶ 15.

552.   As previously explained, for 1xEV-DO Rel. 0 cellular data networks, the Access
Terminal (*i.e.*, target wireless device) and Access Network (*e.g.*, StingRay or KingFish)
establish a common time reference that is used to derive timing for the transmitted chips,
symbols, slots, frames, and system timing over the air interface.  *See Technical Explanations*,
Section III(B)(3)(f), *supra*.  Because of the common timing, the Access Network always knows
the time at which the Access Terminal transmits a signal.  *See id.*  Harris wireless device
locators take advantage of the common timing reference in order to obtain a precise
transmission time for CDMA based signals transmitted from a target wireless device.  *See*
McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System And Related
Methods*, U.S. Patent No. 7,592,956, p. 4 ln. 56-59 ("[T]he time of flight measurements may be
generated using a time of transmission stamp within the reply signal by differing the reply
signal receipt time with the indicated time of transmission.").

553.   *See Technical Explanations*, Section III(A), *supra* (explaining electromagnetic radiation
in the radio frequency band); Jandrell, Louis H. M., Pinpoint Communications, Inc.,
*Communication system and method for determining the location of a transponder unit*, U.S.
Patent No. 5,526,357 (Dallas, TX: Jun. 11, 1996), *available at*
http://www.freepatentsonline.com/5526357.html (last accessed: Feb. 16, 2011), p. 16, ln. 18-19

- 126 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

gives a measurement of distance from the wireless device locator to the target wireless device.

[554]  Knowledge of one TOF distance measurement constrains the location of the target wireless

device to any point along the circumference of a circle in a 2D coordinate system, or to any

point on the surface of a sphere in a 3D coordinate system—with each scenario having the

wireless device locator at the center.[555]  If a second propagation delay can be measured from a

second known location, the result is the intersection of two circles in 2D, which in turn

constrains the location of the wireless device to two intersecting points, or the result is the

intersection of two spheres in 3D, which in turn constrains the location of the wireless device to

any point around the circumference of a circle created by the intersecting spheres.[556]

Knowledge of at least three propagation delays measured from three separate known locations

will resolve the ambiguity in a 2D coordinate system and constrain the location of the wireless

---

("...radio signals travel at the speed of light, approximately 0.98357 ft. per nanosecond through
air...").

554.    *See* Hall, Christopher, J. *et al.*, *Method and apparatus for geolocating a wireless
communications device*, U.S. Patent No. 7,057,556 (Satellite Beach, FL: Jun. 6, 2006),
*available at* http://www.freepatentsonline.com/7057556.html (last accessed: Feb. 22, 2011), p.
2, ln. 37-42

555.    *See* Caffery and Stüber, *Overview of Radiolocation in CDMA Cellular Systems*, IEEE
Communications Magazine, 0163-6804/98/, p. 39 (explaining TOF in a 2D coordinate system);
*see also* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System And
Related Methods*, U.S. Patent No. 7,592,956, p. 7-9 (proving TOF geolocation measurement
equations for a 3D coordinate system, *i.e.*, inclusion of altitude).

556.    *See* Moeglein, Mark and Riley, Wyatt, Qualcomm, Inc., *Method And Apparatus For
Location Determination In A Wireless Assisted Hybrid Positioning System*, U.S. Patent App.
No. 2004/0002344 (Ashland, OR: Jan. 1, 2004), *available at*
http://www.freepatentsonline.com/y2004/0002344.html (last accessed: Sept. 29, 2010), p. 1, ¶
8; McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System And
Related Methods*, U.S. Patent No. 7,592,956, p. 7-9 (proving TOF geolocation measurement
equations for a 3D coordinate system, *i.e.*, inclusion of altitude)

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

device to one of the two previously discussed intersecting points.[557]  Knowledge of at least

four propagation delays measured from four separate known locations will resolve the

ambiguity in a 3D coordinate system and constrain the location of the target wireless device to

a single point along the circumference of the previously discussed circle.[558]

> ### ii.  Signal strength measurements to calculate distance (a.k.a. range).

The StingRay "[i]nterfaces with AmberJack antenna to form a complete target tracking

and location solution using active... ranging techniques..."[559]  The AmberJack phased array

beam-forming antenna "[d]etermines... received signal strength of a targeted mobile phone's

transmission[.]"[560]  Similarly, the KingFish "[d]ynamically updates received signal strength to

enable precise location of a target phone[.]"[561]  A Harris patent addressing wireless device

locator technology provides detailed examples of mathematical equations used in power-

distance measurements for conducting ranging techniques.[562]  A wireless device locator having

---

557.   *See* references cited in fn. No. 555, *supra*.

558.   *See* references cited in fn. No. 556, *supra*.

559.   *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

560.   Miami, FL, USA – Legislative Files, **Harris AmberJack Product Datasheet**, p. 6-7;
*see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 011 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

561.   Miami, FL, USA – Legislative Files, **Harris KingFish Product Datasheet**, p. 2; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

562.   *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System
And Related Methods*, U.S. Patent No. 7,592,956, p. 9 *et seq.* ("Received Signal Strength

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

a power-distance detector will measure the difference between the signal receive power and the

signal transmit power in order to determine the distance between the wireless device locator

and the target wireless device that transmitted the signal.[563]  If the wireless device locator

knows the transmit power of the signal,[564] it can subtract that value from the signal receive

power to obtain the loss power value.[565]  Because the intensity of  radio wave propagation in

free space is inversely proportional to the square of the distance traveled,[566] knowledge of the

loss power value constrains the location of the target wireless device to any point around the

circumference of a circle in a 2D coordinate system, or to any point on the surface of a sphere

in a 3D coordinate system—with each scenario having the wireless device locator at the center.

[567]  The process for resolving 2D and 3D location ambiguity for a target wireless device while

---

Indication Based Approach").

563.    *See* Kim and Lee, *Apparatus And Method For Tracking Location Of Mobile Station*,
U.S. Patent App. No. 2003/0117320, p. 2, ¶ 32.

564.    "[F]or signal-strength-based [geolocation measurement] systems it is necessary that the
transmit power of the MSs be known and controlled with reasonable accuracy."  Caffery and
Stüber, *Overview of Radiolocation in CDMA Cellular Systems*, IEEE Communications
Magazine, 0163-6804/98/, p. 39.  As previously explained, for 1xEV-DO Rel. 0 cellular data
networks, the Access Network (*e.g.*, StingRay or KingFish) controls the transmit power of the
Access Terminal (*i.e.*, target wireless device) by sending it commands called Reverse Power
Control (RPC) Bits.  *See Technical Explanations*, Section III(B)(3)(e)(ii), *supra*.  Therefore, the
StingRay and KingFish while operating in cell site emulator mode have the ability to know and
control the transmit power of a target wireless device.

565.    *See* Proctor, James A, Jr. and Otto, James C., Harris Corp., *Range And Bearing Tracking
System With Multipath Rejection*, U.S. Patent No. 5,687,196 (Indialantic, FL: Nov. 11, 1997),
*available at* http://www.freepatentsonline.com/5687196.html (last accessed Feb. 16, 2011),  p.
1, ln. 29-37.

566.    *See id*.

567.    *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

using power-distance measurements is identical to what is used in TOF involving the

intersection of multiple circles or spheres.[568]  In U.S. Patent No. 7,592, 956, McPherson *et al.*

of Harris provides a diagram showing three power-distance circles (only two are drawn) plotted

on a 2D map intersecting where the target wireless device is located.[569]  However, as indicated

by the mathematical equations taught by McPherson *et al.*, the power-distance geolocation

measurement technique is typically used to locate wireless devices in a 3D coordinate system,

*i.e.*, the inclusion of altitude.[570]

### iii.  Signal angle-of-arrival (AOA) measurements to calculate direction (via a phased array antenna).

Measurements of signal angle-of-arrival (AOA) are used to obtain a 3D directional fix

(azimuth angle and elevation angle) on a target wireless device having an unknown location

relative to the wireless device locator.[571]  The azimuth angle points in the direction of the

wireless device along the horizontal plane and the elevation angle points in the direction of the

---

*And Related Methods*, U.S. Patent No. 7,592,956, p. 9, ln. 38-67; p. 10, ln. 1-67.

568.   *See Technical Explanations*, Section III(G)(1)(a)(i), *supra* (explaining TOF geolocation
measurements used by the StingRay and KingFish to locate wireless devices).

569.   *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System
And Related Methods*, U.S. Patent No. 7,592,956, Figure No. 10.

570.   *See id.*, p. 9, ln. 38-67; p. 10, ln. 1-67.

571.   *See* Kim, Eung-Bae and Lee, Seung-Hwan, *Apparatus And Method For Tracking
Location Of Mobile Station*, U.S. Patent App. No. 2003/0117320 (Daejeon, KR: Jun. 26, 2003),
*available at* http://www.freepatentsonline.com/y2003/0117320.html (last accessed: Feb. 16,
2011), p. 1, ¶ 13; McPherson and Lanza, Harris, *Wireless Transmitter Location Determining
System And Related Methods*, U.S. Patent No. 7,592,956,  p. 11, ln. 9-19.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

wireless device along the vertical plane.[572]  "There are a myriad of methods for determining

the angle of arrival of a signal at a receiving site, such as by: the use of a rotating antenna

which is rotated to obtain the strongest signal from the target unit; a phase array of antenna

elements which may be variably electrically steered to obtain the strongest signal; plural

antennas at which the receiving unit may compare the instantaneous phase of the arriving

signal at each of the plural antennas to determine the direction of a signal...; or other

conventional methods."[573]  The most advanced direction finding antenna is the phased array

beam-forming antenna.[574]  "An array antenna is a special arrangement of basic antenna

components."[575]  "In an array propagating a given amount of energy, more radiation takes

place in certain directions than in others.  The elements in the array can be altered in such a

way that they change the pattern and distribute it more uniformly in all directions....  On the

other hand, the elements could be arranged so that the radiation would be focused in a single

---

572.    *See* Kim and Lee, *Apparatus And Method For Tracking Location Of Mobile Station*,
U.S. Patent App. No. 2003/0117320, p. 4, ¶ 15.

573.    *See* Otto, James C., Harris Corp., *System And Method For Determining The
Geolocation Of A Transmitter*, U.S. Patent No. 5,719,584 (Indian Harbor Beach, FL: Feb. 17,
1998), *available at* http://www.freepatentsonline.com/5719584.html (last accessed: Feb. 22,
2011), p. 3, ln. 38-47.

574.    "The signals induced on different elements of an array in space are combined to form a
single output (*beam*) of the array.  This process of combining the signals from different
elements is known as *beam forming*.  The direction at which the array has maximum response
(array has maximum gain) is said to be the *beam pointing direction or look direction*." Akhter,
Mohammad S., *Signal Processing for MC-CDMA*, Master of Engineering (by Research)
Dissertation, The University of South Australia (Mar. 1998), p. 70.

575.    United States Army, *Communications-Electronics Fundamentals: Wave Propagation,
Transmission Lines, and Antennas*, p. 4.29 (PDF, p. 195).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

direction."[576]  Changing the directivity of a phased array antenna involves altering the phase

of the antenna elements so that the various propagated radio waves either reinforce or cancel

one another in controlled directions.[577]  The controlled directivity of a phased array antenna is

the same for receiving signals as for transmitting signals.[578][579]

　　　Harris wireless device locators are used with the AmberJack phased array antenna with

beam-forming technology.[580]  "AmberJack is a phased array direction-finding (DF) antenna

system capable of tracking and locating mobile phone users and base stations."[581] "AmberJack

combines Harris' expertise in phased array antenna technology and tracking and locating

---

576.   *Id.*, p.4.32 (PDF, p. 198).

577.   "Various reflected and refracted components of the propagated wave create effects of
reinforcement and cancellation.  At certain distant points from the transmitter, some of the
wave components meet in space.  Reception at these points is either impaired or improved.  If
the different components arrive at a given point in the same phase, they add, making a stronger
signal available.  If they arrive out of phase, they cancel, reducing the signal strength."  *Id.*, p.
4.30, (PDF, p. 196).

578.   *See id.*, p. 4.11 (PDF, p. 177) ("When a transmitting antenna with a certain gain is used
as a receiving antenna, it will also have the same gain for receiving.").

579.   When determining a line bearing via received signals, "[t]he angle of arrival of the
response signal may be determined by evaluating the phase of the response signal
simultaneously at each of the antennas.  The simultaneous phase relationships at the antennas,
the geometric relationship of the antennas and the frequency of the response signal can be used
to estimate the angle of arrival of the response signal with respect to the antennas."  *See* Proctor
and Otto, Harris, *Range And Bearing Tracking System With Multipath Rejection*, U.S. Patent
No. 5,687,196, p. 1, ln. 47-53.

580.   *See* Miami, FL, USA – Legislative Files, **Harris AmberJack Product Datasheet**,
*available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/40003.pdf (last accessed: Mar.
9, 2011), p. 6-7; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 011 of *2nd Consolidated Exhibits* (Dkt. #821-1) (AmberJack datasheet attached).

581.   *Id.*

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

systems to offer a state-of-the-art direction finding system.  Beam forming technology offers a

universal DF antenna for existing as well as future cellular standards."[582]  The AmberJack is

specifically designed to operate with the StingRay and allows it to determine "direction of

arrival and received signal strength of a targeted mobile phone's transmissions."[583]  "Harris'

unique adaptive array processing techniques provide for automatic signal optimizing,

interference suppression, and custom beam shaping."[584]  For adaptive antenna arrays, "the

gain and phase of individual antennas are changed before combining to adjust the overall gain

of the array in a dynamic fashion as required by the system [(*i.e.*, electronically changing the

direction of the beam in real-time)]."[585]  Harris' phased array antennas are backed by 20+

years of experience with capabilities that "combine two separate processes, classical antenna

array design and antenna array signal processing, to significantly improve signal-to-noise,

geolocation accuracy and Angle of Arrival estimates."[586]

---

582.   Miami, FL, USA – Legislative Files, **Harris AmberJack Product Datasheet**, *available
at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011),
p. 2; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 010</u> of *2nd
Consolidated Exhibits* (Dkt. #821-1) (AmberJack datasheet attached).

583.   Miami, FL, USA – Legislative Files, **Harris AmberJack Product Datasheet**, p. 6-7;
*see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 011</u> of *2nd
Consolidated Exhibits* (Dkt. #821-1) (AmberJack datasheet attached).

584.   Harris, Government Communications Systems Division, *Phased Array Antennas
Brochure* (2004), *available at* http://download.harris.com/app/public_download.asp?fid=450
(last accessed: Sept. 22, 2010); *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC,
D.Ariz., <u>EXHIBIT 012</u> of *2nd Consolidated Exhibits* (Dkt. #821-1) (Phased Array Antennas
Brochure attached).

585.   Akhter, *Signal Processing for MC-CDMA*, The University of South Australia, p. 69.

586.    Harris, Government Communications Systems Division, *Phased Array Antennas
Brochure*; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 012</u>

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

### iv.   Weighting collected geolocation data and using statistical functions (*e.g.*, average, mean, median, mode, *etc.*).

In order to more precisely determine the location of a target wireless device, the wireless device locator will use received signal measurements to weight received signals corresponding to any given measurement family (*e.g.*, TOF, power-distance, AOA, *etc.*).  Received signal measurements may consist of bit-error rate measurements, received signal strength measurements, receiver metrics, and signal-to-noise ratio measurements.[587]  When the received signal measurements indicate a high quality received signal, such as when the signal-to-noise ratio value is larger, the wireless device locator interprets the other associated signal measurements (used to determine the location of the target wireless device) to be of higher quality and weights those measurements more heavily while producing the location estimate. [588]  The wireless device locator may also use statistical functions (*e.g.*, mean, median, mode, *etc.*) on a group of geolocation measurements within a set of measurements corresponding to any given measurement family in order to more precisely determine the location of a target wireless device.[589]  Both weighting and averaging depend on a multitude of geolocation measurements, preferably taken from different locations in order to increase the variety of the relevant signals.[590]

---

of *2nd Consolidated Exhibits* (Dkt. #821-1) (Phased Array Antennas Brochure attached).

587.   *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System And Related Methods*, U.S. Patent No. 7,592,956,  p. 5, ln. 57-64.

588.   *See id.*, p. 5, ln. 64-67; p. 6, ln. 1-7.

589.   *See* Billhartz, *et al.*, Harris, *Wireless Communications System Including A Wireless Device Locator And Related* Methods, U.S. Patent No. 7,321,777,  p. 7, ln. 56-59.

590.   *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

**v.    Data fusion of calculated geolocation measurements.**

In order to more precisely determine the location of a target wireless device, the wireless
device locator will use data fusion by combining and simultaneously using the various
collected geolocation measurements spanning multiple measurement families (*e.g.*, TOF,
power-distance, AOA, *etc.*).[591]  By using data fusion, different families of measurements, and
even measurements within families, can be combined in a weighted sense to arrive at an
optimized target wireless device location estimate.[592]  Using data fusion across multiple
measurement families increases the precision of locating a wireless device considering
suspected measurement errors within any given measurement family can be given less weight
or even eliminated completely.[593]  For example, the propagation delay used to determine
distance in a TOF measurement may be imprecise due to measurements taken on multipath
signals having a longer propagation delay when compared to direct path signals.  The noted
measurement errors may be eliminated by fusing power-distance geolocation data with TOF
geolocation data.[594]  Data fusion may also be used to fill measurement voids that may be
present within any given measurement family.  For example, the TOF geolocation measurement
technique requires at least three separate measurements in order to confine the location of a

_____

*And Related Methods*, U.S. Patent No. 7,592,956,  p. 6, ln. 18-27.

591.   *See id.*, p. 13, ln. 50-59.

592.   *See id.*, p. 14, ln. 34-39.

593.   *See id*.

594.   *See* Kim and Lee, *Apparatus And Method For Tracking Location Of Mobile Station*,
U.S. Patent App. No. 2003/0117320, p. 3, ¶ 38.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

target wireless device to a single point in a 2D coordinate system.[595]  This limitation may be

eliminated by fusing AOA measurements with an inadequate number of TOF measurements in

order to achieve the same precision that would otherwise be achieved using an adequate

number of TOF measurements.[596]  Just like weighting and averaging within signal

measurement families, data fusion depends on a multitude of geolocation measurements

preferably taken from different locations in order to increase the variety of the relevant signals.
[597]

**b.  Radio signal and data collection methods used by the
StingRay and KingFish while triangulating the location of a
wireless device.**

**i.  Base station surveys.**

Among other surveillance capabilities, the StingRay "performs network base station

surveys.."[598] in any given network coverage area.  Similarly, the KingFish "[i]dentifies active

CDMA channels and catalogs base station parameters[.]"[599]  Harris wireless device locators

---

595.  *See Technical Explanations*, Section III(G)(1)(a)(i), *supra* (explaining TOF geolocation
measurements used by the StingRay and KingFish to locate wireless devices).

596.  *See* Otto, Harris, *System And Method For Determining The Geolocation Of A
Transmitter*, U.S. Patent No. 5,719,584, p. 4, ln. 6-23.

597.  *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System
And Related Methods*, U.S. Patent No. 7,592,956,  p. 6, ln. 18-27.

598.  *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

599.  Miami, FL, USA – Legislative Files, **Harris KingFish Product Datasheet**, p. 2; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

are used with the AmberJack phased array antenna, which "[d]etermines... received signal

strength of a targeted base station's transmission[.]"[600]  The *Allums* court opinion, published as

United States v. Allums, No. 2:08-CR-30 TS, 2009 WL 806748 (D.Utah 2009), paraphrases

sworn testimony given by FBI Agent William Shute on the StingRay's base station survey

capabilities:

> Shute testified that he identified the originating cell tower for each of the calls in
> question.  Shute testified that he purchased a cell phone from the same service
> provider as the Defendant and placed the phone into 'engineering mode,' where
> the phone display showed the cell tower to which it was currently connected.
> Using that phone and another device called a Stingray, which also tracked which
> cell tower was the strongest at any geographical position, Shute drove for some
> time around the neighborhoods surrounding the cell towers in question and
> determined an approximate range for each cell tower.  Specifically, Shute testified
> that he was able to determine the approximate distance from the originating cell
> tower where the cell phone and Stingray switched from the originating cell
> tower to another cell tower.  Shute testified that this method allows him to determine,
> with a reasonable degree of certainty, a fairly narrow geographical location where
> an individual is located while a cell call is being placed.

*Id*. at 1.

### ii.  Cell site emulation and forced connection handoff.

The datasheet for the StingRay states that it "emulates base station to collect MINs and

_____

600.   Miami, FL, USA – Legislative Files, **Harris AmberJack Product Datasheet**, p. 7; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 011 of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-1) (AmberJack datasheet attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

ESNs through forced registration[.]"[601][602]  Lee Lapin, former government surveillance

advisor, also indicated in his book that various Harris wireless device locators emulate base

stations and force wireless devices to connect to the government's emulated cellular networks.

[603]  Lapin explained cell site emulation as "[e]mulat[ing] Base Station Control Channel to

'capture' mobile phones in close proximity[.]"[604]  Documents from the Executive Office for

United States Attorneys indicate that a cell site emulator "is a mobile device that can

electronically force a cell phone to register its telephone number (MIN), electronic serial

number (ESN), and information about its location, when the phone is turned on.  This can be

done without the user knowing about it, and without involving the cell phone provider."[605]

While operating in cell site emulator mode, the wireless device locator will appear to all

compatible wireless devices within signal range as an actual and legitimate cell site

---

601.   *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

602.   In the context of modern day mobile communications standards, the meaning of the term "registration" as used by Harris should be read as "forced handoff" because the handoff to the cell site emulator occurs first and whether "registration" occurs depends on the cellular technology at issue.  For example, 1xRTT wireless devices "register" with the StingRay while 1xEV-DO Rel. 0 wireless devices conduct session establishment with the StingRay.  *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra*.

603.   *See* Lapin, Lee, *How To Get Anything On Anybody – Book 3*, Intelligence Here (Mt. Shasta, CA: Jan. 15, 2003), p. 122-23.

604.   *See id.*, p. 122.

605.   USDOJ [M.D.La.] Aug. 12, 2008, Response to ACLU FOIA Request No. 07-4130, p. 18 of 42; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 021 of *2nd Consolidated Exhibits* (Dkt. #821-1) (relevant pages of cellfoia_release_074130_20080812.pdf attached with page numbers added).

- 138 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

indistinguishable from cell sites operated by the wireless carrier.  If configured for cdma2000

technologies, the wireless device locator will broadcast a high powered pilot signal, which will

force the target wireless device to disconnect from its legitimate serving cell site and connect to

the emulated cell site.  Once forced to connect to the emulated cell site, the wireless device

locator seizes control of the wireless device allowing for interrogation, downloading of stored

data, denial-of-service attacks, and other supported operations.[606]  The Harris RayFish line of

wireless device locators can emulate cell sites across a wide range of mobile network protocols.

As previously explained, the RayFish line is compatible with cdma2000, GSM, UMTS, and

iDEN protocols with a maximum of three mobile network software packages loaded at any

given time.[607]  In order to emulate a cell site under any given protocol, the StingRay and

KingFish must follow the procedures set forth in the relevant communications standards set by

international standards setting bodies.[608]

### iii.  Downloading data from wireless device internal storage.

The StingRay "[s]upports targeting and real-time searching of mobile identification

numbers (MIN), dialed numbers, and electronic serial numbers (ESN)[.]"[609]  Similarly, the

---

606.  *See Technical Explanations*, Section III(G)(1)(b)(iii) through (vi), *infra*.

607.  *See id.*, Section III(G)(1), *supra*.

608.  *See*, *e.g.*, TIA-2000.1-E, *Introduction to cdma2000 Spread Spectrum Systems*, § 1.1.1, p.
1.1 ("The technical requirements contained in cdma2000 form a compatibility standard for
CDMA systems.  They ensure that a mobile station can obtain service in a system manufactured
in accordance with the cdma2000 standards.").

609.  *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

KingFish "provides investigators with a tool that extracts the telephone number (MIN) and

Electronic Serial Number (ESN) from a CDMA mobile telephone."[610]  Harris trademark

documents for "StingRay" and "KingFish" also indicate that the devices are  used for

"gathering information from cellular telephones..."[611]  The process of searching for and

extracting data from a target wireless devices, as supported by the StingRay and KingFish,

begins after the wireless device is forced to connect to the emulated cellular network being

broadcast.[612]  For example, if operating as a 1xEV-DO Rel. 0 cell site, the wireless device

locator will establish a session with the target wireless device in order to transmit signals

containing a HardwareIDRequest message allowing the wireless device locator to download the

ESN stored within the target wireless device.[613]  By downloading identifying information from

each wireless device that connects to the cell site emulator, the wireless device locator

determines which wireless device is the target wireless device sought to be located and which

---

610.    Miami, FL, USA – Legislative Files, **Harris KingFish Product Datasheet**, p. 2; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

611.    *See* [United States Patent and Trademark Office, Trademark Reg. No. 2,762,468 [StingRay registered by Harris] (registered Sep. 9, 2003), **Harris StingRay Product Description**, p. 10 of 88 page compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 005 of *2nd Consolidated Exhibits* (Dkt. #821-1) (product description attached)]; [United States Patent and Trademark Office, Trademark Reg. No. 2,867,227 [KingFish registered by Harris] (registered Jul. 27, 2004), **Harris KingFish Product Description**, p. 11 of 67 page compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 008 of *2nd Consolidated Exhibits* (Dkt. #821-1) (product description attached)].

612.    *See Technical Explanations*, Section III(G)(1)(b)(ii), *supra*.

613.    *See id.*, Section III(B)(3)(c)(v), *supra* (explaining the 1xEV-DO Rel. 0 HardwareIDRequest and HardwareIDResponse messages).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

wireless devices are to be ignore.

### iv.  Transmitting interrogation signals in order to force reply signals.

The StingRay datasheet contains a heading reading "Transmit Capabilities" with "For Interrogation and Active Tracking and Location" under the heading.[614]  Similarly, the KingFish datasheet is titled "Portable CDMA Interrogation... System[.]"[615]  The term "interrogation" in the geolocation context is adapted from radar terminology.[616]  "The process by which a radar transmits a signal suitable for triggering the beacon is known as interrogation; the corresponding beacon transmission is termed the reply.  Radar beacons which reply to interrogations are called transponders and the radar set used to interrogate a beacon is called an interrogator."[617]  A Harris patent addressing wireless device locator technology explains that interrogation in the geolocation context involves "prompt[ing] the target wireless communications device to send reply signals using the location finding signals, rather than passively waiting until the target device begins transmitting.  This allows for quicker and more

---

614.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,762,468 [StingRay registered by Harris] (registered Sep. 9, 2003), **Harris StingRay Product Datasheet**, p. 61 of 88 page compilation; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 004 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

615.  Miami, FL, USA – Legislative Files, **Harris KingFish Product Datasheet**, p. 2; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 007 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

616.  Kelly, Robert J. and Cusick, Danny R., *Advances in Electronics and Electron Physics, Volume 68*, ed. Hawkes, Peter W., "Distance Measuring Equipment and Its Evolving Role in Aviation" (Orlando, FL: Academic Press, Inc., 1986), p. 7.

617.  *Id.*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

efficient device location."[618]  Another relevant Harris patent explains that a location finding

signal "may comprise a signal that would routinely prompt a transmission reply from the

wireless transmitter under the applicable communications standard.  Once the wireless

transmitter receives the signal from the location determining system, the wireless transmitter

transmits a reply signal that is received by the platform."[619]  In order to force a target wireless

device to generate an abundance of response signals during interrogation, the wireless device

locator will exploit elements of the applicable mobile communications protocol being used by

the target wireless device.[620]  For example, if emulating a 1xEV-DO Rel. 0 cellular data

network, the wireless device locator may force the target wireless device to transmit an

abundance of ACK signals that would go unnoticed by the wireless device user.

### v.  Approach method for triangulation.

The StingRay utilizes "active approach" in order to triangulate the location of a target

wireless device.[621]  A relevant Harris patent explains that a wireless device locator engaged in

---

618.  *See* Billhartz, *et al.*, Harris, *Wireless Communications System Including A Wireless
Device Locator And Related* Methods, U.S. Patent No. 7,321,777, p. 2, ln. 67; p. 3, ln. 1-5.  The
Harris patent also references U.S. Patent No. 5,706,010 (bridging the technology reference gap
between radar and geolocation for wireless devices).

619.  *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System
And Related Methods*, U.S. Patent No. 7,592,956, p. 4, ln. 43-48.

620.  *See* Billhartz, *et al.*, Harris, *Wireless Communications System Including A Wireless
Device Locator And Related* Methods, U.S. Patent No. 7,321,777, p. 6, ln. 29-36 ("By way of
example, the location finding signal may include the UID of the target device in a header
packet and a valid but empty data packet.  This will force the target device to generate a reply
signal acknowledging receipt of the location finding signal (*i.e.*, an ACK signal).  Of course,
various other location finding signals could be used to cause the target terminal to generate the
ACK signal, as will be appreciated by those skilled in the art." (claim note omitted)).

621.  *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see*

- 142 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

"approach" is fixed to a portable/transportable platform (*e.g.*, airplane, automobile, person, *etc.*) so that it may collect geolocation measurements during movement relative to the wireless device being located,[622] *i.e.*, while it "approaches" the wireless device.  "As the platform moves relative to the wireless transmitter, the accuracy of the location estimate improves if the trajectory of the platform: breaks symmetry with regards to the wireless transmitter, reduces ambiguity resolution, and minimizes geometric dilution of precision (GDOP)."[623]  The Harris patent further explains that "it may be preferable to encircle the approximate location of the wireless transmitter to provide more accurate results, *i.e.*, breaking the symmetry."[624]  In referencing this method, the USDOJ Electronic Surveillance Manual states that "[l]aw enforcement possesses electronic devices that allow agents to determine the location of certain cellular phones[, and b]y shifting the location of the device, the operator can determine the phone's location more precisely using triangulation."[625]  The approach method is the primary

---

*also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

622.   *See* McPherson and Lanza, Harris, *Wireless Transmitter Location Determining System And Related Methods*, U.S. Patent No. 7,592,956, p. 3 ln. 48-57.

623.   *Id.*, p. 6 ln. 13-17 (claim note omitted).

624.   *Id.*, p. 6 ln. 50-53 (claim note omitted).  In providing further explanation, McPherson *et al.* also makes reference to Figure No. 8, attached to the cited patent, showing a wireless device locator aboard an airplane taking three different range bearing measurements from three different positions in order to triangulate the location of a cellular phone.  *See also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 52 of *1st Consolidated Exhibits* (Dkt. #587-1) (Figure No. 8, attached).

625.   U.S. Dep't of Justice, *Electronic Surveillance Manual*, p. 45 (emphasis added).  *See also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 052 of *2nd Consolidated Exhibits* (Dkt. #821-3) (section on cell site emulators, *etc.*, p. 40-41 and 44-45).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

benefit of using a portable/transportable wireless device locator, as apposed to a stationary

wireless device locator (*e.g.*, a cell site with location finding hardware and software), because it

allows for many geolocation measurements to be taken from different locations within a short

time period.  For example, if being transported in an automobile while in cell site emulator

mode, a wireless device locator may take a geolocation measurement from a different location

once every three seconds.[626]  Therefore, if the wireless device locator is transported within the

area of the target wireless device over the course of 30 minutes, it would be the equivalent of

having 600 wireless carrier cell sites working together to triangulate the location of the target

wireless device.

### vi.  Forced transmission power increase.

Increasing the signal transmission power of a target wireless device is standard

functionality for all wireless device locators.  The Wiki for the OsmocomBB based "IMSI

Catcher Catcher" software—designed to detect and defeat wireless device locators such as the

StingRay and KingFish—lists "[y]our phone sends at the highest possible power"[627] as one of

the StingRay/KingFish detection mechanisms.  The process of instructing a target wireless

device to transmit at the highest possible power, as supported by the StingRay and KingFish, is

---

626.   *See* Billhartz, *et al.*, Harris, *Wireless Communications System Including A Wireless
Device Locator And Related* Methods, U.S. Patent No. 7,321,777,  p. 8, ln. 63-64 ("Preferably,
the location finding signals are transmitted over a relatively short interval (a few seconds or
less)...").

627.   srlabs.de [website], *Catcher Catcher - Wiki – Redmine, available at*
http://opensource.srlabs.de/projects/catcher/wiki/Wiki (last accessed: Apr. 5, 2012); *see also*
United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 034 of *2nd Consolidated
Exhibits* (Dkt. #821-2) (Wiki page attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

done after the wireless device is forced to connect to an emulated cellular network.[628]  Once

the target wireless device is connected to the emulated cellular network, the wireless device

locator employs closed-loop power control[629][630] while transmitting signals instructing the

target wireless device to transmit at the highest possible power.  For example, if locating a

1xEV-DO Rel. 0 wireless device, the wireless device locator will transmit Reverse Power

Control (RPC) bits, with a value of "1,"[631] to the target wireless device until it is transmitting

at the highest possible power.  By increasing the transmit power of the target wireless device,

the wireless device locator is able to collect higher quality signals sent in response to the

location finding interrogation signals.[632]  By collecting higher quality response signals,

geolocation measurements become more accurate and the precision of the location estimate

increases.

### H.      The FBI Digital Collection Program.

The FBI Digital Collection Program provides agents "with the means to collect evidence

and intelligence through the acquisition, deployment, and support of communications

---

628.   *See Technical Explanations*, Section III(G)(1)(b)(ii), *supra*.

629.   "[I]n CDMA cellular systems the MSs are power controlled to combat the near-far
effect.  Time-division multiple access (TDMA) cellular systems use power control to conserve
battery power in the Mss."  *See* Caffery and Stüber, *Overview of Radiolocation in CDMA
Cellular Systems*, IEEE Communications Magazine, 0163-6804/98/, p. 39.

630.   *See Technical Explanations*, Section III(B)(3)(e)(ii), *supra* (explaining 1xEV-DO Rel. 0
closed-loop power control on the Reverse Traffic Channel).

631.   *See Technical Explanations*, Section III(B)(3)(e)(ii).

632.   *See id.*, Section III(G)(1)(b)(iv), *supra* (explaining interrogation used by the StingRay
and KingFish to locate wireless devices).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

interception techniques and systems which facilitate and support national security, domestic

counterterrorism, and criminal investigative efforts."[633]  In more practical terms, the FBI

Digital Collection Program provides agents of the FBI a means to: (1) collect communications

content, (2) collect signaling information (*i.e.*, Pen/Trap data)[634] relating to transmitted

communications, and (3) geolocate wireless devices such as cell phones and aircards.  The

Digital Collection Program is comprised of numerous elements including: (1) computer

hardware and software, (2) surveillance equipment, (3) a specialized network used for

intercepting data directly from telecommunications providers, (4) technical standards, (5) data

collection and delivery points, (6) designated personnel responsible for administrating and

operating the program, and (7) FBI policy dictating operations of the program.  The proceeding

subsections provide a brief explanation of various elements making up the FBI Digital

Collection Program, as explained in FBI documents.

### 1.  Digital Collection Systems.

In order to receive data collected through the Digital Collection Program, agents use

specialized computers, referred to as Digital Collection Systems, comprised primarily of

---

633.  *See* FBI Dec. 17, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20071217_dcs05.pdf [EFF PDF
Set 5 of 5] (last accessed: Oct. 25, 2010), p. 33 of 150; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20071217_dcs05.pdf attached with page numbers added).

634.  The term "Pen/Trap data" is shorthand for any data that may be obtained via a pen
register and/or trap and trace device as defined in 18 U.S.C. §§ 3127(3) (pen registers) and
3127(4) (trap and trace devices).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

commercial-off-the-shelf hardware and software with limited proprietary application software. [635]  The FBI began development of Digital Collection Systems in late 1996.[636]  These systems intercept multi-source digital (and analog) communications information for intelligence gathering applicable to foreign counterintelligence activities and for investigative purposes for providing evidence at criminal trials.[637]  The electronic information collected includes Pen/Trap data (*i.e.*, call-identifying information), analog and digital call content, facsimile transmissions, modem transmissions, microphone audio,[638] real-time cell site location information,[639] and other real-time geolocation information.  Digital Collection Systems process and evaluate the collected electronic information "for migration to a separate information technology system where the collected data is analyzed, managed and archived as case related information.  Processing of information collected through digital collection

---

635.  *See id.*

636.  *See* FBI Jul. 2, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1, *available at* http://www.eff.org/files/filenode/061708CKK/070207_dcs08.pdf [EFF PDF Set 8 of 8] (last accessed: Oct. 25, 2010), p. 37 ("In late 1996, TICTU spearheaded the development of a unique telecommunications access program called 'DCS-3000,' a system capable of interfacing with the switching facilities of many wireless carriers that deploy new digital technologies..."); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 037 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 070207_dcs08.pdf attached with page numbers added).

637.  *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 33 of 150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with page numbers added).

638.  *See id.*

639.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 06 of *1st Consolidated Exhibits* (Dkt. #587-1) (LAESP messages containing real-time cell site sector location information).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

systems involves monitoring information, recording it onto digital media, and

playback/transcription into a readable document."[640]  "Digital Collection Systems are used

primarily by FBI field offices and Resident Agencies in support of active foreign intelligence

and criminal cases.  Support is also provided to other federal, state, local and tribal agencies, as

required."[641]

## 2.  DCSNET.

The Digital Collection Systems Network (DCSNET)[642] is the communications medium

used by the FBI Digital Collection Systems.[643]  DCSNET is a peerless and private encrypted

---

640.  *See* FBI Aug. 27, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/082707_dcs05.pdf [EFF PDF Set
5 of 6] (last accessed: Oct. 25, 2010), p. 44 of 125; *see also* United States v. Rigmaiden, CR08-
814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant
pages of 082707_dcs05.pdf attached with page numbers added).

641.  *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 33 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

642.  *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 56 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-5) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

643.  *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 33 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

IP network[644][645] layered over the FBI Trilogy network backbone—an enterprise wide area

digital communications network deployed to link all FBI field offices and resident agencies.[646]

[647]  DCSNET supports the transport and delivery of CALEA based call-identifying

information and call content from Telecommunications Service Providers to Digital Collection

Systems located at Central Monitoring Plants within FBI offices.[648][649][650]  The FBI is in a

---

644.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20080114_dcs04.pdf [EFF PDF
Set 4 of 4] (last accessed: Oct. 25, 2010), p. 105 of 129; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20080114_dcs04.pdf attached with page numbers added).

645.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20071022_dcs03.pdf [EFF PDF
Set 3 of 6] (last accessed: Oct. 25, 2010), p. 32-33 of 90; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 042 of *2nd Consolidated Exhibits* (Dkt. #821-2)
(relevant pages of 20071022_dcs03.pdf attached with page numbers added).

646.   *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 33 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

647.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 3 of 6], p. 32-33
of 90; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 042 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs03.pdf attached with
page numbers added).

648.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 105 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

649.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 56 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

650.   A Central Monitoring Plant is a physical area set aside within a building to house Digital

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY: Daniel David Rigmaiden

_____

continual relationship with all major Telecommunications Service Providers[651][652] to allow

them limited access to DCSNET for the purpose of providing the FBI with call-identifying

information and call content associated with the communications of intercept targets.[653][654]

Telecommunications Service Providers deliver this information via Call Data Channels (CDCs)

and Call Content Channels (CCCs) logically linked[655] to FBI DCSNET gateways[656] from

_____

Collection System servers (*e.g.*, the DCS-3000), networking equipment, client PCs, *etc*. *See*
FBI Jul. 2, 2007, Response to EFF FOIA Request [EFF PDF Set 8 of 8], p. 90; *see also* United
States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 037 of *2nd Consolidated
Exhibits* (Dkt. #821-2) (relevant pages of 070207_dcs08.pdf attached with page numbers
added).

651.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20071022_dcs02.pdf [EFF PDF
Set 2 of 6] (last accessed: Oct. 25, 2010), p. 60 of 74; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of *2nd Consolidated Exhibits* (Dkt. #821-2)
(relevant pages of 20071022_dcs02.pdf attached with page numbers added).

652.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 38 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

653.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 105 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

654.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 60-62
of 74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

655.   *See* Telecommunications Industry Association, TIA/EIA/J-STD-025A, *Lawfully
Authorized Electronic Surveillance* (Arlington, VA: May 31, 2000), § 4.2.3, p. 18-19.

656.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 105 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Intercept Access Points (IAPs) located within telecommunications network infrastructure.[657]

Once CDC and CCC information is received at a DCSNET gateway, equipment maintained by

FBI staff at the Engineering Research Facility (ERF) Operational Technology Division (OTD)

Telecommunications Intercept and Collection Technology Unit (TICTU) Switch-Based

Intercept Team (SBIT) distributes the data in real-time to network switches located at Central

Monitoring Plants at the appropriate FBI field offices where the data is collected per court

orders and/or warrants.[658][659][660]

---

page numbers added).

657.   An Intercept Access Point is "a point within a telecommunication system where some of
the communications or call-identifying information of an intercept subject's equipment,
facilities and services are accessed."  TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic
Surveillance*, § 3, p. 9.  An Intercept Access Point typically consists of a telecommunications
network switch.  *See id.*, "Annex A," § A.1, p. 82.  The switch is connected to a Packet
Assembler-Disassembler (PAD) which is in turn connected to a modem with a direct link to a
DCSNET gateway.  *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of
6], p. 58-59 of 74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 041 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-2) (relevant pages of
20071022_dcs02.pdf attached with page numbers added).

658.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 3 of 6], p. 33 of
90 ("The DCSNET is monitored and maintained by staff from the Operational Technology
Division's (OTD) Telecommunications Intercept and Collection Technology Unit (TICTU).");
*see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 042 of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs03.pdf attached with
page numbers added).

659.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 51 of
74 ("The TICTU's Switch-Based Intercept Team is responsible for distributing this data to the
appropriate field offices where it is collected per court orders....  [T]his data is delivered real-
time..."); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041
of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached
with page numbers added).

660.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 38 of
125 ("The TICTU SBIT operations currently network all FBI field offices with realtime

---

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

3.  **The technical specifications outlined in the Telecommunications Industry Association, TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance*.**

Certain hardware and software elements of the FBI's Digital Collection Program follow the technical specifications outlined in the Telecommunications Industry Association  technical standard: TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance*.[661]  J-STD-025A, which "defines the interfaces between a telecommunication service provider (TSP) and a Law Enforcement Agency (LEA) to assist the LEA in conducting lawfully authorized electronic surveillance."[662]  According to J-STD-025A, in order to facilitate the collection and delivery of communications content and Pen/Trap data, the FBI and TSPs must implement an Access Function, a Delivery Function, and a Collection Function.[663]  The Access Function "consist[s] of one or more Intercept Access Points (IAPs)..."[664] and includes the ability to access intercept subjects' call-identifying information and call content unobtrusively, and make the information available to the Delivery Function.[665]  "The Delivery Function is responsible

---

delivery of pen register/trap trace information for all major wireless carriers."); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page numbers added).

661.  *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 123 of 129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with page numbers added).

662.  *See* TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance*, § 1.1, p. 1.

663.  *See id.*, § 5.3, p. 34 (Network Reference Model).

664.  *Id.*, § 4.2.2, p. 16.

665.  *See id.*, § 5.3.1.1, p. 35.

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

for delivering intercepted communications [(over DCSNET)] to one or more Collection Functions.  The Delivery Function delivers information over two distinct types of channels:  Call Content Channels (CCCs) and Call Data Channels (CDCs)."[666]  "The Collection Function is responsible for collecting and analyzing intercepted communications and call-identifying information [(*i.e.*, Pen/Trap data)][]"[667] sent to it by the Delivery Function.  The Collection Function is solely the responsibility of the law enforcement agency.[668]  For example, the FBI's primary Collection Function is at its Engineering Research Facility where the collected communications content and Pen/Trap data is forwarded to destination Central Monitoring Plants at the various FBI offices.[669]

Under J-STD-025A, delivery of Pen/Trap data from a wireless carrier Delivery Function is made over a DCSNET Call Data Channel using the Lawfully Authorized Electronic Surveillance Protocol (LAESP)—an Open System Interconnection (OSI) Layer 7 (Application Layer) Protocol.[670]  LAESP messages are binary encoded and compatible with the X.208

---

666.   *Id.*, § 4.2.2, p. 17 ("The CCCs are generally used to transport call content, such as voice or data communications.  The CDCs are generally used to transport messages which report call-identifying information, such as the calling party identities and called party identities."). However, in the case of packet-mode content information, CDCs are used by the Delivery Function to delivery communications content to the Collection Function.  *See id.*, § 5.3.1.2, p. 35.

667.   *Id*.

668.   *See id*.

669.   *See Technical Explanations*, Section III(H)(2), *supra* (explaining DCSNET).

670.   *See* TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance*, § 6.2.1, p. 61.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

Abstract Syntax Notation One (ASN.1) and the X.209 Basic Encoding Rules (BER).[671][672]

LAESP messages received by an FBI Central Monitoring Plant are considered the raw and

unaltered Pen/Trap data as collected and encoded by an Intercept Access Point belonging to a

Telecommunications Service Provider.[673][674]  LAESP messages are delivered over Call Data

Channels to Central Monitoring Plants using a variety of OSI Layer 2-4 communications

protocols including, but not limited to, Transmission Control/Internet Protocol (TCP/IP), Point-

to-Point protocol (PPP), Serial Link Internet Protocol (SLIP), Link Access Protocol—Balanced

(LAPB), and Link Access Protocol—D-Channel (LAPD).[675]  Regardless of the protocol stack,

Pen/Trap data sent to the FBI via LAESP messages must be sent in real-time, *i.e.*, within eight

seconds of the Intercept Access Point receiving Pen/Trap data from the telecommunications

---

671.   *See id.*, § 6.3.2, p. 62.

672.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 06 of *1st
Consolidated Exhibits* (Dkt. #587-1) (example of decoded LAESP messages).

673.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 112 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

674.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20071119_dcs01.pdf [EFF PDF
Set 1 of 4] (last accessed: Oct. 25, 2010), p. 100 of 143; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20071119_dcs01.pdf attached with page numbers added).

675.   *See* TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance*, "Annex A," §
A.5, p. 91-92 (Figure 23, "Possible CDC Protocol Stacks").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

network.[676][677]  As indicated by a data retention chart created by the Department of Justice,

LAESP message data is not listed as being recorded/stored by Telecommunications Service

Providers.[678]

### 4.  Digital Collection System 3000 (DCS-3000) server.

The Digital Collection System 3000 (DCS-3000), deployed to Central Monitoring Plants

in all FBI field offices and resident agencies,[679] is the FBI's primary Pen/Trap and

---

676.    *See* TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance*, § 4.7, p. 31 ("A
call-identifying message must be sent from the TSP's IAP to the LEA Collection Function
within eight seconds of receipt of that message by the IAP at least 95% of the time, and with
the call event time-stamped to an accuracy of at least 200 milliseconds.").

677.    Depending on the type of circuit used to connect the functions, there is a possibility of
the Delivery Function receiving call-identifying information before the Access Function
utilizes that information for the purpose of providing wireless service.  For example, a looped
circuit would result in the prospective Pen/Trap data being switched out of the Access Function
as a circuit, looped into the Delivery Function, and then back into the Access Function.  *See id.*,
Annex A, p. 89 (showing diagram of CALEA network Looped Access); *see also* United States
v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 056 of *2nd Consolidated Exhibits* (Dkt.
#821-3) (diagram attached).  In such a case, law enforcement may receive Pen/Trap data before
the wireless carrier even utilizes the data to provide service to the intercept subject.

678.    *See* Department of Justice, *Retention Periods of Major Cellular Service Providers* (Aug.
2010), *available at*
http://www.wired.com/images_blogs/threatlevel/2011/09/retentionpolicy.pdf (last accessed:
Dec. 7, 2011) (Neither LAESP messages, call-identifying information, nor Pen/Trap data are
listed amongst the data recorded and retained by Verizon Wireless, T-Mobile, AT&T, Sprint,
Nextel, and Virgin Mobile.); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC,
D.Ariz., EXHIBIT 054 of *2nd Consolidated Exhibits* (Dkt. #821-3) (data retention period chart
attached).

679.    *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 3 of 6], p. 32 of
90; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 042 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs03.pdf attached with
page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

communications content collection system.[680][681]  For Pen/Trap data, the DCS-3000 is

responsible for processing LAESP messages[682] (containing call-identifying information) sent

by Telecommunications Service Provider IAPs as they arrive at FBI Central Monitoring Plants

over DCSNET.  All major Telecommunications Service Providers have network switches

configured to be IAPs capable of generating and sending LAESP messages that are ultimately

routed to DCS-3000 servers by SBIT.[683][684]  The DCS-3000 is a Microsoft Windows based[685]

---

680.    *See* FBI Jan. 14, 2008, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/20080114_dcs03.pdf [EFF PDF Set 3 of 4]
(last accessed: Oct. 25, 2010), p. 41 of 204 ("The DCS-3000 software suite is the Bureau's
primary CALEA pen register collection application..."); *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 047 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20080114_dcs03.pdf attached with page numbers added).

681.    *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 22 of
74 ("The DCS-3000 provides access and collection of both call detail information (*i.e.*, pen
register and trap/trace) and call content for a variety of telecommunications switches."); *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

682.    *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 17 of
74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

683.    *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 17 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

684.    *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 38 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

685.    *See* FBI Feb. 11, 2008, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20080211_dcs02.pdf [EFF PDF

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

[686] server platform comprised of commercial-off-the-shelf hardware[687] and loaded with a

custom application suite developed by Booz Allen & Hamilton (BAH)[688][689] under the

direction of TICTU.[690]  The DCS-3000 server software suite consists of the following

applications: (1) Server application (used to collect CDC information pursuant to CALEA);[691]

---

Set 2 of 3] (last accessed: Oct. 25, 2010), p. 88 of 96 (indicating that "TICTU needs
PCAnywhere licenses" (a Microsoft Windows program) to support installations of DCS-3000
systems); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 050
of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080211_dcs02.pdf attached
with page numbers added).

686.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20071022_dcs04.pdf [EFF PDF
Set 4 of 6] (last accessed: Oct. 25, 2010), p. 99-100 of 100 (discussing Windows 2000 software
for DCS-3000); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 043 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of
20071022_dcs04.pdf attached with page numbers added).

687.   *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 33 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

688.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 2-3 of
74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

689.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 3 of 4], p. 41 of
204; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 047 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs03.pdf attached with
page numbers added).

690.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 21-22
of 74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

(2) Viking application (used to decode audio communications);[692] (4) Enhanced Codec

Decoder application (used to decode audio communications);[693] (5) Multivanguard application

(used to *(a)* route FISA CDC and CCC information to the DCS-5000 (FISA platform),[694][695]

[696] *(b)* route Title III (wiretap) CCC information to the DCS-6000 (criminal platform),[697][698]

and *(c)* route CALEA CDC information to the DCS-3000 Multiserver application); (6)

Multiserver application (used to send collected CALEA CDC information to DCS-3000 client

computer workstations located in the same Central Monitoring Plant as the DCS-3000 server);

_____

691.    *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 60-62
of 74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

692.    *See id*.

693.    *See id*.

694.    *See id*.

695.    *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 105 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

696.    *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 115 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

697.    *See id*.

698.    *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 60-62
of 74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

[699][700] (7) Tracker application (used to geographically display cell site position based off of

CALEA CDC information associated with the communications of an intercept subject);[701] and

(8) Backtrack application (used to geographically display cell site position based off of

historical cell site location information associated with the communications of an intercept

subject).[702]  In order to access data collected by a DCS-3000 server, agents use a client

software suite consisting of various component applications[703] residing on one or more

Microsoft Windows based client computer workstations[704] within the Central Monitoring

Plant.[705]

---

699.   *See id.*

700.   *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 17 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

701.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 60-62
of 74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

702.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 85-87
of 100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of
*2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with
page numbers added).

703.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 17 of
74; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 041 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with
page numbers added).

704.   *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 149 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

705.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 2 of 6], p. 63 of

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

## 5.  DCS-3000 CDNRS Files.

Once the raw and unaltered LAESP messages are received at an FBI Central Monitoring

Plant, they are processed and altered by the DCS-3000 into "human readable"[706] text

formatted archive files[707] using the "CDNRS" file format.[708][709]  While processing the raw

and unaltered LAESP messages, the DCS-3000 attempts to extract and format relevant

Pen/Trap data before saving it into archive files having .cdnrs file extensions.[710]  This post-

processed (altered) Pen/Trap data is processed by the DCS-3000 a second time if agent

---

74; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 041</u> of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs02.pdf attached with page numbers added).

706.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 112 of 129; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 048</u> of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with page numbers added).

707.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 100 of 143; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 044</u> of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page numbers added).

708.   *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 105 of 150; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 046</u> of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with page numbers added).

709.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 46 of 100; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 043</u> of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

710.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 46 of 100; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 043</u> of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

instructs the DCS-3000 to save the data into the CDNRS upload file format.[711][712]  In response

to an agent requesting such a save, the DCS-3000 reformats the Pen/Trap data contained in

the .cdnrs files and saves the reformatted data in "summary" and "log" files[713] having .sum

and .log file extensions.[714]  The DCS-3000 then automatically places the .sum and .log files

into folders named "sum" and "log" respectively and places those folders into a second folder

named "Cdnrs" nested in a parent folder taking the name of the target phone number[715] (*e.g.*,

H:\5551234567\Cdnrs\Log\000000.000.log).  The CDNRS .sum and .log files are typically

---

711.  *See* FBI Dec. 17, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 5], p. 105 of
150; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 046 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071217_dcs05.pdf attached with
page numbers added).

712.  *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 75 of
100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with
page numbers added).

713.  *See* FBI Feb. 11, 2008, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20080211_dcs03.pdf [EFF PDF
Set 3 of 3] (last accessed: Oct. 25, 2010), p. 84 of 163; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 051 of *2nd Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20080211_dcs03.pdf attached with page numbers added).

714.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 10 of *1st
Consolidated Exhibits* (Dkt. #587-1) (example of .sum CDNRS file); United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 09 of *1st Consolidated Exhibits* (Dkt.
#587-1) (example of .log CDNRS file).

715.  *See* FBI Feb. 11, 2008, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20080211_dcs01.pdf [EFF PDF
Set 1 of 3] (last accessed: Oct. 25, 2010), p. 20 of 154; *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 049 of *2nd Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20080211_dcs01.pdf attached with page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

used to upload the post-processed Pen/Trap data to the Telephone Applications (TA) database[716] at FBI Headquarters.[717]

### 6.    Telephone Applications System.

The Telephone Applications System, maintained by the FBI's Information Technology Operations Division (ITOD),[718] consists of a database of Pen/Trap data and various software applications remotely used by FBI field offices to search and analyze the data contained in the database.[719][720]  Most FBI field offices use the DCS-3000 as a front-end collection system for Pen/Trap data.[721] Once the Pen/Trap data is collected, it is converted into the CDNRS upload

---

716.    *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 75 of 100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

717.    *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 100 of 143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page numbers added).

718.    *See* FBI Feb. 11, 2008, Response to EFF FOIA Request [EFF PDF Set 1 of 3], p. 15 of 154; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 049 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080211_dcs01.pdf attached with page numbers added).

719.    *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 100 of 143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page numbers added).

720.    *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 111 and 121 of 129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with page numbers added).

721.    *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 121 of 129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

file format[722] and then uploaded to the Telephone Applications database located at FBI

Headquarters.[723]  The task of uploading the CDNRS files to the Telephone Applications

database may be done either manually by an agent or automatically by the DCS-3000.[724][725]

The Telephone Applications database maintains a record of all Pen/Trap data collected by the

FBI since the time the database was created.  The Telephone Applications software allow

investigators to conduct cross reference and datamining investigations using the database in

order to generate leads and display Pen/Trap data in a user friendly form.  Agents may use

either Trilogy desktop computers or DCS-3000 client computers to access the Telephone

Applications database via search and analysis application software.

### 7.   FBI Cell Site Database.

The FBI TICTU/SBIT maintains a large central database containing cell site position

---

*Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

722.   *See Technical Explanations*, Section III(H)(5), *supra*.

723.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 100 of
143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page
numbers added).

724.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 112 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

725.   *See* FBI Feb. 11, 2008, Response to EFF FOIA Request [EFF PDF Set 1 of 3], p. 15-20
of 154; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 049 of
*2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080211_dcs01.pdf attached with
page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

information for all major wireless carriers.[726][727]  The cell site database may be queried by

agents to provide the geographic location of a particular target's location based off of either real

time Pen/Trap data[728] contained in LAESP messages or historical data[729] obtained directly

from wireless carrier personnel.  The cell site database contains up to date records of the

longitude and latitude coordinates for each wireless carrier cell site and the general cell site

sector positioning convention used by each respective wireless carrier, *i.e.*, beamrange and a

standard default beamwidth for each sector.[730]  For some wireless carriers, the cell site

database also contains up to date records on the precise antenna azimuth and beamwidth of

---

726.    *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 43 and
93 of 143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044
of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached
with page numbers added).

727.    *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 54 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

728.    *See id*.

729.    *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 6], p. 42 of
67; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 038 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with page
numbers added).

730.    *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 93 of
143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071119_dcs01.pdf attached with page
numbers added).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

each cell site sector covering the wireless network.[731][732]  There are numerous ways that

agents may access the cell site database for the purpose of locating wireless devices.  Among

other means of access, the DCS-3000 has a "software hook" that can be used to automatically

send cell site position records from the cell site database to various locally installed mapping

programs[733] such as Wintrack[734] by Integrated Systems Research (ISR) and Microsoft Streets

and Trips.[735][736]  The "software hook" also allows for sending cell site position records from

---

731.   *See id.*, p. 92-96 of 143; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC,
D.Ariz., <u>EXHIBIT 044</u> of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of
20071119_dcs01.pdf attached with page numbers added).

732.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 55 of
100; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 043</u> of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs04.pdf attached with
page numbers added).

733.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 93 of
143 ("There's a hook in the DCS 3000 Client software that can feed [REDACTED] or any
other GPS mapping system with cell-site position information in real-time."); *see also* <u>United
States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 044</u> of *2nd Consolidated
Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page numbers
added).

734.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 6], p. 66-67
of 67; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 038</u> of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with
page numbers added).

735.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 93 of
143; *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 044</u> of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page
numbers added).

736.   *See* FBI Dec. 17, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/20071217_dcs03.pdf [EFF PDF
Set 3 of 5] (last accessed: Oct. 25, 2010), p. 103 of 123; *see also* <u>United States v. Rigmaiden</u>,
CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 045</u> of *2nd Consolidated Exhibits* (Dkt. #821-3)
(relevant pages of 20071217_dcs03.pdf attached with page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

the cell site database to other DCS server platforms such as the DCS-1020 used in the FBI

"WITT Van" integration project.[737][738]

### 8.   FBI Wireless Intercept and Tracking Team (WITT).

Once cell site location information (either historical or real time)[739] is used to locate a

target wireless device to an area covered by a single cell site sector, local FBI Wireless

Intercept and Tracking Team (WITT) agents[740] will attempt to pinpoint the location of the

---

737.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 95 of
143 ("We developed this feature to integrate with our [REDACTED] van-based systems.  The
idea is to have the DCS 3000 feed lat/long information via cellular modem to a [REDACTED]
van."); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of
*2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with
page numbers added).

738.   *See* FBI Sept. 24, 2007, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-
1, *available at* http://www.eff.org/files/filenode/061708CKK/092407_dcs01.pdf [EFF PDF Set
1 of 3] (last accessed: Oct. 25, 2010), p. 52-58 of 113 (sections DCS-1020 Software Installation
and Users Manual); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 040 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 092407_dcs01.pdf
attached with page numbers added).

739.   *See* FBI Jan. 14, 2008, Response to EFF FOIA Request [EFF PDF Set 4 of 4], p. 118 of
129; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 048 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20080114_dcs04.pdf attached with
page numbers added).

740.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 6], p. 45-47
of 67; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 038 of
*2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with
page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

device[741][742] by deploying a "WITT Van"[743][744] equipped with a transportable wireless device

locator,[745] *i.e.*, the Harris StingRay.[746]  The WITT agents will attempt to pinpoint the location

of the target wireless device by using the StingRay and related surveillance equipment while

driving the WITT Van around the area covered by the previously identified serving cell site

sector.[747][748]  If agents are collecting call-identifying information on the intercept subject, the

---

741.   *See id.*, p. 41 of 67; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz.,
EXHIBIT 038 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf
attached with page numbers added).

742.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 54 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page
numbers added).

743.   *See id.*, p. 36 of 125 ("...DCS-1020 gateway server for the real-time delivery of cell site
location information to Wireless Tracking Team (WITT) vans."); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd Consolidated Exhibits* (Dkt.
#821-2) (relevant pages of 082707_dcs05.pdf attached with page numbers added).

744.   *See* FBI Sept. 24, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 3], p. 52-58
of 113 (sections DCS-1020 Software Installation and Users Manual); *see also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 040 of *2nd Consolidated Exhibits* (Dkt.
#821-2) (relevant pages of 092407_dcs01.pdf attached with page numbers added).

745.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 6], p. 41 of
67; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 038 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with page
numbers added).

746.   *See Technical Explanations*, Section III(G)(1), *supra* (explaining the StingRay).

747.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 6], p. 16 and
26 of 67; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 038
of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with
page numbers added).

748.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 100 of
143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

local Central Monitoring Plant will send the target's cell site sector location/position

information to the WITT van in real-time.[749]  The local Central Monitoring Plant completes

this task through the following chain of events: (1) the DCS-3000 server receives cell site

location information for a target[750] via LAESP messages[751] sent from a wireless carrier

Intercept Access Point,[752] (2) the DCS-3000 server processes and alters the LAESP messages

into the CDNRS file format,[753] (3) the DCS-3000 server queries the cell site database at the

FBI ERF over DCSNET for longitude, latitude, azimuth, beamwidth, and beamrange[754][755] of

the serving cell site/sector listed in the CDNRS files, (4) once receiving the requested cell site

position information, the DCS-3000 server sends the data to a DCS-1020 gateway server[756]

---

*Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page
numbers added).

749.    *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 36 of
125 ("...DCS-1020 gateway server for the real-time delivery of cell site location information to
Wireless Tracking Team (WITT) vans."); *see also* United States v. Rigmaiden, CR08-814-
PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages
of 082707_dcs05.pdf attached with page numbers added).

750.    *See Technical Explanations*, Section III(H)(4), *supra* (explaining the DCS-3000 server).

751.    *See id.*, Section III(H)(3), *supra* (explaining LAESP messages).

752.    *See id.*, Section III(H)(2), *supra* (explaining IAPs).

753.    *See id.*, Section III(H)(5), *supra* (explaining CDNRS files).

754.    *See id.*, Section III(H)(7), *supra* (explaining FBI cell site database).

755.    *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 93 of
143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page
numbers added).

756.    *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 36 of
125; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2nd
Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

_____

located at the same Central Monitoring Plant as the DCS-3000, and (5) the DCS-1020 server sends the cell site/sector location/position information over the Internet[757][758] via a Virtual Private Network (VPN),[759] to a wireless cellular modem (*i.e.*, an FBI aircard)[760][761] paired with a laptop computer[762][763] located inside the WITT Van.  Once the WITT van receives the real-time cell site location information, WITT agents drive the van around the target area while

_____

757.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 3 of 6], p. 7 of 90; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 042 of *2nd Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 20071022_dcs03.pdf attached with page numbers added).

758.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 61 of 100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

759.   *See id.*, p. 55-56 of 100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

760.   *See* FBI Nov. 19, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 4], p. 93 of 143; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 044 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071119_dcs01.pdf attached with page numbers added).

761.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 61 of 100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

762.   *See* FBI Oct. 22, 2007, Response to EFF FOIA Request [EFF PDF Set 4 of 6], p. 56 of 100; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 043 of *2nd Consolidated Exhibits* (Dkt. #821-3) (relevant pages of 20071022_dcs04.pdf attached with page numbers added).

763.   *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 5 of 6], p. 54 of 125 ("The DCS-3000 software has been enhanced to push cell site GPS coordinates for specific

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

using the StingRay to obtain a general, but more precise, location estimate.  Once the StingRay obtains the general location, WITT agents will deploy handheld equipment (*i.e.*, the Harris KingFish) to pinpoint the exact location of the target wireless device—even as precise as within a hotel, office building, or similar structure.[764]

## IV.    **How The Aircard Was Intruded Upon**

While the FBI's ultimate goal in United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz. was to determine the precise location of the UTStarcom PC5740 1xEV-DO aircard, a number of independent intrusions occurred during the process.  The proceeding subsections explain the various ways the FBI intruded upon the aircard, the host laptop computer paired with the aircard, and the home residence of the owner/user of those devices, *i.e.*, apartment No. 1122 at the Domicilio apartment complex.[765]  In support of the factual claims outlined in the subsections immediately below, I cite to the *Technical Explanations* above, case discovery and concessions on the record in United States v. Rigmaiden, and public sources of information.  In this section, whenever I refer to the aircard's "user," I am referring to myself.

_____

targets to a remote tracking laptop of mobile FBI agents."); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 039 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs05.pdf attached with page numbers added).

764.  *See* FBI Aug. 27, 2007, Response to EFF FOIA Request [EFF PDF Set 1 of 6], p. 41 of 67; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 038 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-2) (relevant pages of 082707_dcs01.pdf attached with page numbers added).

765.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE: *Daniel Rigmaiden's residence was at 431 El Camino Real, Apartment No. 1122, Santa Clara, CA. 95050* (Dkt. #824-2).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

**A.    Prerequisite background information.**

**1.    General background information on the aircard, host laptop
computer, aircard account, and aircard service.**

1.      The aircard[766] relevant in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC,

D.Ariz. is a "UTStarcom PC5740 Broadband Connection Card For Verizon Wireless"[767]  The

aircard was used to access a monthly billed Verizon Wireless 1xEV-DO "BroadbandAccess

Connect Service" account.[768]  The aircard account allowed for accessing the Internet through

the Verizon Wireless cellular data network, which is based on the cdma2000 1xEV-DO Rel. 0

technical standards,[769][770] and also had an SMS text message service[771] based on the

---

766.    The government's filings relating to the D.Ariz. 08-3286MB-LOA, 08-3298MB-LOA,
and 08-7273MB-ECV applications and court orders, and the N.D.Cal. 08-90330MISC-RS and
08-90331MISC-RS applications and court orders, interchangeably refer to the aircard as the
"Target Device," "target broadband access card," "Target Broadband Access Card/Cellular
Telephone," "telephone," and other similar terms.

767.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 11</u> of *1st
Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard).

768.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz. (Dkt. #565-1, p. 11);
<u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE:
*Daniel Rigmaiden owns the aircard and used the aircard service as a home Internet connection*
(Dkt. #824-3, ¶ 7, p. 3-4).

769.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 11</u> of *1st
Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard indicating that the
aircard is not 1xEV-DO Rev. A capable); Qualcomm Inc., EV-DO Rev. A and B: Wireless
Broadband for the Masses (whitepaper), *The History of Mobile Broadband* (Dec. 2007),
*available at* http://www.qualcomm.com/documents/files/ev-do-rev-and-b-wireless-broadband-
masses-whitepaper.pdf, p. 3-4 (last accessed: Dec. 14, 2011) ("EV-DO Release 0 was first
launched in 2002" and was later succeeded by EV-DO Rev. A and B.).

770.    *See Technical Explanations*, Section III(B), *supra* (listing the primary relevant 3GPP2
cdma2000, 1xEV-DO Rel. 0 technical standards).

771.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz. (Dkt. #565-1, p. 11).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

cdma2000 1xRTT technical standards.  The associated aircard account did not have cellular

telephone service.[772]

2.      The aircard is a cellular device that transmits and receives Internet data and text

messages (*i.e.*, electronic communications) through a radio transceiver and antenna contained

in the device.  Specifically, the aircard is a High Rate Packet Data (HRPD) 1xEV-DO Rel. 0

Access Terminal[773] with hybrid[774] 1xRTT text message service and low rate data service

capabilities.  The aircard hardware is incapable of ringing or alerting to an incoming call and it

does not allow for placing or receiving telephone calls (*i.e.*, wire communications).[775]  Unlike

cellular telephones that have built into their hardware "a compact speaker, a microphone, a

keyboard, [and] a display screen...,"[776] the aircard is a personal computer hardware "add-on

card" that can only function when plugged into the PCMCIA slot of a host laptop computer.[777]

3.      The host laptop computer used with the aircard was an IBM ThinkPad (S/N #LV-

772.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 13 of *1st Consolidated Exhibits* (Dkt. #587-1) (on June 26, 2008, FBI Agent Murray was advised by Verizon Wireless that the aircard does not have telephone service).

773.   *See Technical Explanations*, Section III(B)(2)(a), *supra* (explaining 1xEV-DO Rel. 0 Access Terminals).

774.   *See Technical Explanations*, Section III(B)(3)(g)(ii), *supra* (explaining 1xEV-DO Rel. 0 Hybrid Access Terminals (HAT) operations).

775.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 11 of *1st Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard).

776.   CTIA [website], *How Wireless Works*, http://www.ctia.org/consumer_info/index.cfm/AID/10324 (last accessed: Dec. 7, 2011) (explaining how cell phones work).

777.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 11 of *1st Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

C4398) laptop computer (hereafter "host laptop computer" or "home computer") with mouse,

docking station, external LCD monitor, external keyboard, and external hard drives.[778][779]  In

order to function, the aircard drew power from the host laptop computer, stored data on the

hard drive of the host laptop computer, and its functions and operations were accessed through

software installed on the host laptop computer.[780]

        4.      Whenever the aircard was plugged into the host laptop computer, the user would

immediately initialize a connection with Verizon Wireless and then take measures to ensure that

the connection would reconnect upon a disconnect.[781]  In order to connect to Verizon Wireless

and access the Internet, either the host laptop computer operating system software compatible

with the aircard would be used or the VZAccess Manager software bundled with the aircard

would be used.[782]  While accessing the Internet, radio waves were transmitted to/from the

aircard and the cell sites that were part of the Verizon Wireless 1xEV-DO Rel. 0 data network.

---

778.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of
Materials Related To Search Warrant No. 08-70460, Authorized By Magistrate Judge Patricia
V. Trumbull, Northern District Of California, On July 30, 2008* (return) (Dkt. #464-1).

779.    United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE:
*Daniel Rigmaiden owns the aircard and used the aircard service as a home Internet connection*
(Dkt. #824-3, ¶ 4, p. 2-3).

780.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 11 of *1st
Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard indicating that the
aircard is bundled with VZAccess Manager software); *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE: *Daniel Rigmaiden owns the
aircard and used the aircard service as a home Internet connection* (Dkt. #824-3, ¶ 17, p. 6-7).

781.    *See id.*, ¶ 17-20, p. 6-7.

782.    *See id.*, ¶ 17, p. 6-7.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

[783]  The radio waves sent between the aircard and the Verizon Wireless 1xEV-DO Rel. 0 data

network carried the signals that communicated data between the host laptop computer and the

Internet.[784]

> ## 2.  Basis for concluding that the government used the Harris StingRay, KingFish, and related equipment to locate the aircard and its user.
>
> ### a.  The government admitted that FBI technical agents used the Harris StingRay to locate the aircard.

5.        The government refuses to disclose detailed discovery to the defense in United

States v. Rigmaiden relating to the portable/transportable wireless device locators used to locate

the aircard.  Likewise, the Court refuses to order the government to produce the sought after

evidence.[785]  However, the government has already identified one piece of equipment used to

locate the aircard: the StingRay manufactured by Harris.[786][787]  In a report of investigation

---

783.  *See Technical Explanations*, Section III(B) *et seq.*, *supra* (explaining aspects of a 1xEV-DO Rel. 0 cellular data network).

784.  *See id*.

785.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *January 4, 2012 Court Order* (Dkt. #723, p. 13) (Denying the defendant's motion for disclosure (Dkt. #592) and noting that "[d]isclosing the particular equipment used, and how it was used, would disclose how the FBI seeks to track mobile electronic devices such as the aircard.  Even if some of the technology were publicly available, the precise technology used by the FBI in this case and the precise manner in which it was used, if disclosed, would educate the public and adversaries of law enforcement on how precisely to defeat FBI surveillance efforts.").

786.  *See Technical Explanations*, Section III(G) *et seq.*, *supra* (explaining technical details of the Harris StingRay).

787.  Even if the government used portable/transportable wireless device locators that were not the Harris products, the operations of the actual devices used will be similar to the operations of the Harris products.  For example, any portable/transportable wireless device locator seeking to locate a 1xEV-DO Rel. 0 wireless device in cell site emulator mode must

- 174 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

disclosed to the defense, USPIS Inspector James L. Wilson stated that FBI technical agents

were "using a **Stingray**' to pinpoint the location of the aircard."[788]  Furthermore, in rough

notes disclosed to the defense, IRS-CI Agent Denise L. Medrano created a "to-do list"

containing the "S**t**ing**R**ay" term in CaSe-CoRrEcT fashion.[789][790]

6.     After realizing that use of the Harris StingRay was revealed to the defense in

United States v. Rigmaiden, the lead prosecutor, AUSA Frederick A. Battista claimed, without

presenting any evidence, that the term "StingRay" is a generic term used by law enforcement to

---

follow all of the procedures outlined in the *Technical Explanations*, Sections II(B) *et seq.*,
*supra* (addressing the 1xEV-DO Rel. 0 communications protocol).  Additionally, geolocation of
radio frequency signals discussed in the *Technical Explanations* is a well defined science.

788.   United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 26 of *1st
Consolidated Exhibits* (Dkt. #587-2) (August 7, 2008 USPIS Investigation Details Report entry
by USPIS Inspector Wilson) (emphasis added).

789.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 109 of *2nd
Consolidated Exhibits* (Dkt. #821-6) (July 15, 2008 rough notes by IRS-CI Agent Medrano).

790.   Harris spells "StingRay" with a capital "S" and a capital "R" in the same way IRS-CI
Agent Medrano used the term on her list.  IRS-CI Agent Medrano did not use such capital
spelling style for any other listed phrase.

- 175 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

refer to any type of surveillance equipment capable of locating wireless devices.[791][792]  AUSA

Battista specifically claimed that USPIS Inspector Wilson and IRS-CI Agent Medrano used the

term "StingRay" generically and that the primary case agents neither saw nor learned of the

equipment used to locate the aircard.[793]

       7.      Contrary to AUSA Battista's claims, FBI Agent Richard J. Murray (a primary

_____

791.    The government made this claim via AUSA Battista during the September 22, 2011
court hearing:

          MR. BATTISTA: I've sought to explain to Mr. Rigmaiden, and the
example I use, and I talked about this case so many times, is Kleenex and tissue.
Kleenex is a brand name but it's a tissue.  People regularly refer to tissue as
Kleenex.  "I need to blow my nose.  Will you give me a Kleenex?" Everyone
knows what they're talking about.

          In the law enforcement world, there's a StingRay and then there's the
generic term "StingRay" meaning all types of devices.  The five case agents were
using the term "StingRay" as the term "Kleenex."  They did not operate the
equipment.  They did not know what the equipment is.  They didn't receive any
training on the equipment.

United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *September 22, 2011
Status Conference, Partial Transcript of Proceedings* [MR. BATTISTA], p. 36.

792.    The word "StingRay" (or "stingray") is not, in fact, a generic term for "cell site
emulator" or "cell site simulator."  A government document produced via a FOIA request does
not list "StingRay" as one of the many generic terms used to refer to portable/transportable
wireless device locators.  *See* USDOJ [M.D.La.] Aug. 12, 2008, Response to ACLU FOIA
Request No. 07-4130, p. 18 of 42 (listing "digital analyzer, cell site locator, triggerfish, ESN
reader, or swamp box" as generic terms used to refer to cell site simulators); *see also* United
States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 021 of *2nd Consolidated
Exhibits* (Dkt. #821-1) (relevant pages of cellfoia_release_074130_20080812.pdf attached with
page numbers added).

793.    The claim made by AUSA Battista during the September 22, 2011 court hearing is as
follows:

          So they were -- in the course of the investigation, the term "StingRay" was

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

case agent) stated in two "case write ups" that he conducted a test with the IRS involving the

geolocation of a similar aircard prior to FBI technical agents locating the actual aircard:

> I worked with the AUSA and the FBI SF to obtain a pen register and tracking court order to locate the aircard with TTA [(*i.e.*, FBI Technically Trained Agent)] assistance.  I ran a field test with IRS of a similar aircard and communicated with OTD to ensure that the tracking would not be detected by the subject.
>
> *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 065 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (Feb. 28, 2009 "case write up" by FBI Agent Murray).

The above quoted "case write up" is corroborated by a text message sent by FBI Agent Murray

to FBI Agent Kevin F. Killigrew on July 16, 2008 at 1:46am.[794]  Because the primary case

agents were aware of the precise make and model of the equipment used, the references in the

discovery to the StingRay refer to the Harris StingRay.

---

> used as a generic term.  I've explained this to the defendant numerous times. None of the five investigators know the make, model, manufacturer of the exact equipment.  There were tech agents out there.  They're the ones who possessed the equipment, operated the equipment.
>
>     So, yes, the word "StingRay" is in the discovery.  When they're using the term "StingRay," and I've explained this to the defendant, it's Kleenex.  It's tissue. They don't know.  It could be a StingRay.  It could not be.  It could be something else.  They didn't know what it was.  They didn't see it.  They didn't operate it.
>
> *September 22, 2011 Status Conference, Partial Transcript of Proceedings* [MR. BATTISTA], p. 36.

794.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 063 of *2ⁿᵈ Consolidated Exhibits* (Dkt. #821-3) (July 16, 2008, 1:46am, text message sent from FBI Agent Murray to FBI Agent Killigrew: "We verified the ability to pull the card over through testing on an irs verizon card. Atech agent from [REDACTED: TTA First Name], is here helping out and he has top game.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
        UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
        DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

### b. Heuristics and process of elimination confirms that FBI technical agents used the Harris StingRay, KingFish and AmberJack to locate the aircard.

8.      FBI Supervisory Agent Bradley S. Morrison confirmed that the "equipment used

to locate the defendant's aircard did not capture, collect, decode, view, or otherwise obtain any

content transmitted from the aircard, and therefore was unable to pass any of this information

from the aircard to Verizon Wireless [(*i.e.*, no communication interception)]."[795][796]  The

prosecution thereafter stated that the equipment used to locate the aircard was **incapable** of

intercepting and forwarding aircard communications content.[797]  Through process of

elimination, the surveillance equipment used to locate the aircard must be limited to solely

having geolocation capabilities.  While there are numerous air interface surveillance devices

available from various manufacturers, only Altron, NeoSoft, MMI, and Harris manufacture

devices specifically designed to not have the ability to intercept communications and conduct

man-in-the-middle attacks.[798]

---

795.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Government's Memorandum Re Motion For Discovery*, "Affidavit Of Supervisory Special Agent Bradley S. Morrison," ¶ 4, p. 2-3 (Dkt. #674-1, p. 2-3).

796.  Note: Unless otherwise noted, I do not agree with FBI Agent Morrison's technical conclusions and other claims in his affidavit.

797.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 071 of *2nd Consolidated Exhibits* (Dkt. #821-4) (December 2, 2011 letter from AUSA Battista to the defendant, p. 2: "[T]he FBI equipment used in your case could not be used to conduct a 'man in the middle' attack.").

798.  *See Technical Explanations*, Section III(G), *supra* (explaining how technical data on air interface surveillance equipment manufactured by Ability, Meganet, Shoghi Communications Ltd., Verint, and View Systems indicate an ability to conduct man-in-the-middle attacks while technical data on certain models of air interface surveillance equipment manufactured by Altron, NeoSoft, MMI, and Harris indicate no such capabilities).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

9.      Through further process of elimination, the only possible manufacturer of the
equipment used to locate the aircard is Harris.  It is undisputed that in order to "track the
signals from the aircard, the FBI used [][equipment] that functions as a cell site simulator.  The
equipment mimicked a Verizon Wireless cell tower and sent and received signals directly to and
from the aircard."[799]  It is also undisputed that the aircard is a cdma2000 based wireless
device, *i.e.*, compatible with the 1xEV-DO Rel. 0 and 1xRTT air interface standards.[800]  Out of
all cell site emulator capable air interface surveillance equipment sold by Altron, NeoSoft,
MMI, Harris, Ability, Meganet, Shoghi Communications Ltd., Verint, and View Systems—only
the Harris StingRay and KingFish support cdma2000 based air interface standards (*e.g.*, 1xEV-
DO Rel. 0 and 1xRTT as used by the aircard).[801]  Through process of elimination, the only
portable/transportable wireless device locators that are technologically capable of locating the
aircard are the Harris StingRay and KingFish.

10.      The government also effectively conceded that the FBI used two separate
wireless device locators to locate the aircard.  The government stated that "[t]he FBI used the
[locating] equipment in multiple locations... [but] it never used more than a single piece of

---

799.   United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Government's Response To
Motion For Discovery* (Dkt. #602, p. 3).

800.   S*ee How The Aircard Was Intruded Upon*, Section IV(A)(1), *supra* (explaining how the
aircard communicates with the Verizon Wireless 1xEV-DO Rel. 0 and 1xRTT cellular
networks).

801.   *See Technical Explanations*, Section III(G), *supra* (other than for Harris equipment, all
off-the-shelf cell site emulator capable air interface surveillance devices only support
surveillance of UMTS and/or GSM based wireless devices).

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

equipment at any given time."[802]  It logically follows that the government's concession means that the FBI used more than one device but not at the same time.  Additionally, the government conceded that "[d]uring a portion of the tracking operation, the FBI used handheld equipment from within the Domicilio apartment complex."[803]  Although the FBI initially used the StingRay, it is designed to be transportable via a land or air vehicle;[804] therefore, the FBI needed to use a second, handheld wireless device locator while on foot within the Domicilio apartment complex.  The Harris KingFish is the only handheld man-portable wireless device locator that operates in cooperation with the Harris StingRay.[805]  It logically follows that the FBI would use the KingFish along with the StingRay, as apposed to using a handheld device not designed for cooperative operation with the StingRay.

11.     The standard antenna used with the StingRay is the AmberJack phased array beam-forming antenna.[806]  The datasheet for the StingRay indicates that it operates with the AmberJack[807] and the datasheet for the AmberJack indicates that it operates with the StingRay.

---

802.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Government's Response To Motion For Discovery* (Dkt. #602, p. 3).

803.  *Id*.

804.  *See Technical Explanations*, Section III(G)(1), *supra* (explaining how the StingRay is vehicle-transportable as apposed to man-portable).

805.  *See id.*, Section III(G), *supra*.

806.  *See id.*, Section III(G)(1)(a)(iii), *supra* (explaining the AmberJack phased array beam-forming antenna used with the StingRay).

807.  *See* Miami, FL, USA – Legislative Files, **Harris StingRay Product Datasheet**, p. 1; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 003 of *2nd Consolidated Exhibits* (Dkt. #821-1) (datasheet attached).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

[808]  Because the AmberJack is the standard antenna used with the StingRay, and because the

FBI technical agents used the StingRay to locate the aircard, they also used the AmberJack to

locate the aircard.

> **B.   The government's mission to locate the aircard and its user within a
>         private home residence.**
>
>> **1.   The government identified the aircard and seized destination IP
>>        addresses relating to the aircard user's Internet activity.**

12.    Based on an unrelated aspect of the investigation,[809] the government identified

Verizon Wireless network IP addresses 75.209.101.132, 75.208.105.186, and 75.209.41.104 as

being possible end-source IP addresses responsible for submitting three of the allegedly

fraudulent e-filed tax returns relating to the investigation in United States v. Rigmaiden, CR08-

814-PHX-DGC, D.Ariz.  In June of 2008, the government served Verizon Wireless with

D.Ariz. Grand Jury subpoena Nos. 07-03-609 and 07-03-615 requesting identifying

information on the customer account and wireless device assigned the three source IP addresses

noted above.[810]

13.    On June 13, 2008, Verizon Wireless responded to the government's request and

---

808.   *See* Miami, FL, USA – Legislative Files, **Harris AmberJack Product Datasheet**, p. 6-
7; *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 011 of *2nd
Consolidated Exhibits* (Dkt. #821-1) (AmberJack datasheet attached).

809.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 065 of *2nd
Consolidated Exhibits* (Dkt. #821-3) ("[T]hrough separate investigative means, [][FBI Agent
Murray] and other agents analyzed ISP IP records and identified the Internet aircard used by the
subject...").

810.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of
Documents Related To District Of Arizona Grand Jury Subpoenas 07-03-609 And 07-03-615
Obtained To Facilitate Locating The Aircard* (Dkt. #565-1, p. 4).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

provided identifying information on the aircard and aircard account.[811][812]  In the subpoena

response, Verizon Wireless also provided the government with approximately 411,257

destination IP addresses pertaining to websites and other Internet resources accessed by the

aircard.[813][814][815]

14.    By June 25, 2008, the government had matched up a list of IP addresses

associated with various e-filed tax returns to some of the aircard destination IP addresses listed

in the Verizon Wireless subpoena responses.[816]  Based on the match up, the government was

convinced that the aircard was responsible for perpetuating the alleged scheme.[817]  On July 1,

---

811.    *See id*.

812.    Although agents obtained identifying information for the aircard and aircard account,
they were unable to determine the location of the aircard and its user.

813.    *See id*.

814.    On June 18, 2008, the government obtained an additional 111 aircard destination IP
addresses accessed by the aircard.  *See id*.

815.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., defendant's declaration
RE: *Internet activity reflected by the 1,836,140 aircard destination IP addresses seized by the
government* (Dkt. #824-4).

816.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 078 of *2nd
Consolidated Exhibits* (Dkt. #821-4) (June 25, 2008 email from IRS-CI Agent Daun to FBI
Agent Murray *et al.*: "based on the pattern following along for just all of the Ips that I found to
match - I really think this is the person filing the returns...").  *See also* United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 14 of *1st Consolidated Exhibits* (Dkt.
#587-1) (July 1, 2008 email from IRS-CI Agent Daun to Nathan A. Watt: "We have correlated
returns being filed from specific Proxy Ips, that this guy was also connected to at the same
time."); United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 15 of *1st
Consolidated Exhibits* (Dkt. #587-1) (July 7, 2008 email from IRS-CI Agent Medrano to
Constance M. Davis: "We strongly believe we have identified the [][suspect]...").

817.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of
Documents Related To Original Northern District Of California 08-70460-HRL Search
Warrant Used To Physically Search Apartment No. 1122*, Application, p. 17-25 (Dkt. #566-1, p.

---

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

2008, the government began to prepare and execute plans to use historical cell site location

information, real-time cell site location information, and Harris brand portable/transportable

wireless device locators to "ping and triangulate on a cellular broadband card we are 99% sure

is him."[818]

      15.     After investigators had relied upon the destination IP addresses to investigate the

aircard and its user for a period of 26 days, AUSA Battista learned that it was illegal for the

government to use Grand Jury subpoenas to compel disclosure of the destination IP

addresses[819] and that subpoenas only allow for disclosure of source IP addresses.[820]  On July

8, 2008, AUSA Battista instructed the investigation team to place all aircard destination IP

addresses into sealed envelopes[821] and then subsequently applied for a "retroactive order" to

19-27) (explaining government's use of the aircard destination IP addresses to link aircard to e-
filed tax returns).

818.   United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 14 of *1st
Consolidated Exhibits* (Dkt. #587-1) (July 1, 2008 email from IRS-CI Agent Daun to Nathan A.
Watt); s*ee also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 16 of *1st
Consolidated Exhibits* (Dkt. #587-1) (July 7, 2008 email from IRS-CI Agent Daun to IRS-CI
Agent Willert: the FBI plans to "triangulate down on the [][suspect's] broadband access card
with Verizon in San Jose.").

819.   *See* 18 U.S.C. § 2703(c)(2) *et seq.* (allowing the government to obtain "records of
session times and durations" and "any temporarily assigned network address" but not
destination IP addresses).

820.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 17 of *1st
Consolidated Exhibits* (Dkt. #587-1) (on July 7, 2008, USDOJ Office of Enforcement
Operations notified AUSA Battista of an "issue" with the aircard destination IP addresses); *see
also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of Documents
Related To District Of Arizona Court Orders 08-3286MB-LOA, 08-3298MB-LOA, and 08-
7273MB-ECV Obtained To Facilitate Locating The Aircard* (Dkt. #576-1).

821.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 18 of *1st
Consolidated Exhibits* (Dkt. #587-2) (July 8, 2008 email from AUSA Battista to all primary

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

unseal the envelopes.[822]  On July 9, 2008, the "retroactive order" was granted[823] and the

government then continued with its plan to use various geolocation techniques to obtain the

precise location of the aircard and its user.[824]

> **2.  The government seized aircard historical cell site location
> information and conducted historical triangulation / location
> signature techniques.**

16.    In July of 2008, the government served Verizon Wireless with the D.Ariz. 08-

3298MB-LOA order requesting historical cell site information relating to connections made by

the aircard to Verizon Wireless cell sites.[825]  On July 12, 2008, Verizon Wireless responded to

the D.Ariz. 08-3298MB-LOA order by emailing Robert Byrne, LEO, and FBI Agent Murray

historical cell site information pertaining to the aircard and generated during the date range of

_____

case agents: "Please place[] in a sealed envelope all copies of destination IP addresses and...
discontinue any use of the information...").

822.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of
Documents Related To District Of Arizona Court Orders 08-3286MB-LOA, 08-3298MB-LOA,
and 08-7273MB-ECV Obtained To Facilitate Locating The Aircard* (Dkt. #576-1).

823.    *See id*.  In addition to effectively unsealing the approximate 411,375 destination IP
addresses illegally obtained via subpoena, the government also used the order to obtain an
additional 1,424,773 destination IP addresses pertaining to websites and other Internet
resources accessed by the aircard.  *See id*.

824.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 19 of *1st
Consolidated Exhibits* (Dkt. #587-2) (July 11, 2008 email from Albert A. Childress to Brad
Taylor *et al.*: the FBI will be able triangulate the suspect's location through use of a
portable/transportable wireless device locator).

825.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of
Documents Related To District Of Arizona Court Orders 08-3286MB-LOA, 08-3298MB-LOA,
and 08-7273MB-ECV Obtained To Facilitate Locating The Aircard* (Dkt. #576-3).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

June 10, 2008 through July 11, 2008.[826]

      17.     Although the order only authorized obtaining historical cell site information to determine the network's *registration* of the aircard, the government obtained historical cell site **location** information showing the network's geographical location of the aircard, *i.e.*, locations of cell sites where the aircard established sessions with the 1xEV-DO Rel. 0 cellular data network.[827]  The information provided by Verizon Wireless indicated that the aircard had been historically located within signal range of the following cell sites:

    (1)    Cell site # 5; Latitude: 37.369733; Longitude: -121.923442; Street address: 2001 Gateway Place, San Jose, CA 95110;

    (2)    Cell site # 139; Latitude: 37.34955; Longitude: -121.943435; Street address: 900 Lafayette St, Santa Clara, CA 95050;

    (3)    Cell site # 153; Latitude: 37.418053; Longitude: -121.85978; Street address: 10000 Old Piedmont Rd., San Jose, CA 95132;

    (4)    Cell site # 268; Latitude: 37.346481; Longitude: -121.923164; Street address: 1070 Elm St, San Jose, CA 95126;

    (5)    Cell site # 279; Latitude: 37.3416; Longitude: -121.947941; Street Address: 490 Lincoln St., Santa Clara, CA 95050;

The historical cell site location information allowed the government to determine that the

---

826.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 02 of *1st Consolidated Exhibits* (Dkt. #587-1).

827.   *See Technical Explanations*, Section III(B)(3)(c)(ii), *supra* (explaining the 1xEV-DO Rel. 0 session establishment process).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

aircard was previously located within signal range of five cell sites covering parts of San Jose

and Santa Clara, CA.[828][829]

18.    As explained in the *Technical Explanations*, Section III(B)(3)(c)(vi), *supra*,[830]

1xEV-DO Rel. 0 wireless devices such as the aircard do not "register" with cell sites (*i.e.*,

Access Networks)—instead, they establish "sessions"[831] and conduct "route updates"[832] with

both operations being associated with the IPv6 address identifying the cell site sector.  1xEV-

DO Rel. 0 registration occurs separate from cell sites, over the A11 Interface, and does not

involve location information as may be relevant to "registration" in the context of GSM and

other non IP based mobile networks.[833]

---

828.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 20</u> of *1st Consolidated Exhibits* (Dkt. #587-2) (July 14, 2008 email from AUSA Battista to AUSA Yen: the government is looking for the aircard in the area of San Jose International Airport and Santa Clara University).

829.    On  July 31, 2008, Verizon Wireless responded to the D.Ariz. 08-7273MB-LOA order by providing similar aircard historical cell site location information generated during the date range of June 11, 2008 through July 17, 2008.  *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 05</u> of *1st Consolidated Exhibits* (Dkt. #587-1); *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., *Submission Of Documents Related To District Of Arizona Court Orders 08-3286MB-LOA, 08-3298MB-LOA, and 08-7273MB-ECV Obtained To Facilitate Locating The Aircard* (Dkt. #576-5).  Additionally, On August 1, 2008, John Profaca provided a second set of cell site information in response to a direct request made by FBI Agent Murray under the authority of the D.Ariz. 08-3298MB-LOA order.  *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 03</u> of *1st Consolidated Exhibits* (Dkt. #587-1).

830.    *See also* fn. No. 347, *supra*.

831.    *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra*.

832.    *See id.*, Section III(B)(3)(d) *et seq.*, *supra*.

833.    *See id.*, Section III(B)(3)(c)(vi) and fn. No. 347, *supra*.

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

19.     As an initial matter, the historical cell site location information provided by

Verizon Wireless allowed the government to determine that the aircard was in a stationary

location from June 10, 2008 to July 11, 2008.[834]

20.     On the morning of July 14, 2008,[835]  FBI Agent Killigrew created a cell tower

range chart/map consisting of a street map, plotted Verizon Wireless cell site sectors belonging

to cell site Nos. 268, 139, and 279, and a triangulated aircard location signature estimate

represented by a shaded area.[836]  On the chart/map, the total land area collectively covered by

cell site Nos. 268, 139, and 279 is approximately *105,789,264 ft²*.[837]  FBI Agent Killigrew

used triangulation techniques and location signature techniques to eliminate **93.9%** of that

---

834.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 35</u> of *1ˢᵗ
Consolidated Exhibits* (Dkt. #587-3) (IRS-CI Agent Medrano rough notes stating that the
aircard was accessing the "same tower in San Jose 90% [of the time]" and it "appears not
moving[.]"); <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 20</u> of *1ˢᵗ
Consolidated Exhibits* (Dkt. #587-2) (July 14, 2008 email from AUSA Battista to AUSA Yen:
"the initial Cell Site data" has the government "looking at the area around San Jose
International Airport and Santa Clara University.").

835.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 068</u> of *2ⁿᵈ
Consolidated Exhibits* (Dkt. #821-3) (May 2, 2011 letter from AUSA Battista to the defendant,
p. 5: "[P]lease be advised that it appears that the cell tower range chart was created the morning
of July 14, 2008, and then shared with the investigation team after 1:00 p.m. that same date.").

836.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 21</u> of *1ˢᵗ
Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map showing a *6,412,224 ft²*
triangulated location signature estimate (marked with black pen lines) covering the location of
apartment No. 1122); <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT
22</u> of *1ˢᵗ Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map with government's
*6,412,224 ft²* triangulated location signature estimate marked in red and apartment No. 1122
marked with a yellow star).

837.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 23</u> of *1st
Consolidated Exhibits* (Dkt. #587-2) (mathematical equation information for calculating the
square footage of overlapping signal coverage areas of multiple cell sites and cell site sectors).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

*105,789,264 ft²* area resulting in the location estimate being reduced to *6,412,224 ft²*

represented by the shaded area.  The shaded area on the cell tower range chart covers the

location of apartment No. 1122 at the Domicilio apartment complex.[838]

21.     FBI Agent Killigrew's triangulation techniques and location signature techniques

consisted of the following steps: (1) obtaining aircard historical cell site location information

for June 10, 2008 through July 11, 2008,[839] (2) using the latitude and longitude coordinates of

three of the five cell sites (cell site Nos. 268, 139, and 279) contained in the historical cell site

location information to plot the cell site locations on a digital/computerized street map,[840] (3)

using prior knowledge of Verizon Wireless cell site signal ranges (*i.e.*, antenna radiation

patterns) to draw signal range circles around each of the three cell site locations plotted on the

digital/computerized street map,[841] (4) using prior knowledge of typical Verizon Wireless cell

---

838.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of *1st
Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map with government's *6,412,224
ft²* triangulated location signature estimate marked in red and apartment No. 1122 marked with
a yellow star).

839.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 25 of *1st
Consolidated Exhibits* (Dkt. #587-2) (January 7, 2011 email from FBI Agent Killigrew to FBI
Agent Murray: FBI Agent Killigrew indicating that he "took the historical cell site data that the
cellular provider provided to [][FBI Agent Murray]" in order to create the cell tower range
chart/map.).

840.    *See id.* (January 7, 2011 email from FBI Agent Killigrew to FBI Agent Murray: "The
historical data provided several cell towers with their latitude and longitude.  I plotted these on
the map by lat/lon.").

841.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 068 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (May 2, 2011 letter from AUSA Battista to the defendant,
p. 5: AUSA Battista indicating that FBI Agent Killigrew informed FBI Agent Murray on March
31, 2011 that, "For this particular case I used my knowledge of Verizon wireless cell tower
layouts from working previous cases and previous training.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

site sector orientations (*i.e.*, sector azimuths at 0º, 120º, and 240º with sector radiation patterns

covering 300º-60º, 60º-180º, and 180º-300º)[842] to draw lines separating each of the noted

signal range circles into three sectors each,[843] (5) using the historical cell site location

information to calculate which two cell sites were being accessed by the aircard most often

(*i.e.*, cell site Nos. 268 and 139)[844] and then weighting the respective signal range circle of the

remaining cell site (*i.e.*, cell site No. 279) with a confidence value of -1 (*i.e.*, the aircard is

absolutely NOT in the estimated area),[845] (6) using the digital/computerized street map to

calculate an overlapping signal range area for the two cell sites used by the aircard most often

(*i.e.*, cell site Nos. 268 and 139),[846] (7) using the digital/computerized street map to calculate

---

842.   *See id.* (May 2, 2011 letter from AUSA Battista to the defendant, p. 5: AUSA Battista
indicating that FBI Agent Killigrew informed FBI Agent Murray on March 31, 2011 that,
"Generally speaking, in urban areas Verizon Azimuths are 0, 120, and 240 degrees.  The sectors
then encompass 300-60, 60-180, and 180-300.").

843.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 25 of *1st
Consolidated Exhibits* (Dkt. #587-2) (January 7, 2011 email from FBI Agent Killigrew to FBI
Agent Murray: "After the towers were plotted, using my past experience and training in dealing
with cellular networks, I drew circles around the towers that provided for overlapping areas of
cellular coverage.").

844.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 02 of *1st
Consolidated Exhibits* (Dkt. #587-1) (historical cell site location information showing that the
aircard was accessing cell site Nos. 268 and 139 most often); United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 25 of *1st Consolidated Exhibits* (Dkt. #587-2)
(January 7, 2011 email from FBI Agent Killigrew to FBI Agent Murray: "The tower data
provided by the wireless company showed that three towers were hit most often, with one of
the three hit significantly more often than the other two.").

845.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of *1st
Consolidated Exhibits* (Dkt. #587-2) (labeled cell tower range chart/map showing nearly no
shade lines over sector signal coverage area belonging to cell site No. 279).

846.   *See id.* (labeled cell tower range chart/map showing cell site Nos. 268 and 139 having
signal coverage areas overlapping).

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

---

the three overlapping sector regions within the overlapping signal range area described in No. 6 above,[847] (8) weighting two of the noted three overlapping sector regions covering non residential areas (*i.e.*, the airport as shown on the noted cell tower range chart/map) with a confidence value of -1 (*i.e.*, absolutely NOT containing the location of the aircard),[848] and (9) weighting the remaining overlapping sector region (*i.e.*, the shaded area on the cell tower range chart/map) with a confidence value of 1 (*i.e.*, the aircard is absolutely within the corresponding estimated area).[849]  The shaded area on the cell tower range chart/map represents a government triangulated aircard location signature based off of the above explained geolocation techniques.

22.     FBI Agent Killigrew's geolocation techniques fit the definition of cell site triangulation as explained by Judge Kaplan.[850]  For the triangulation calculation represented

---

847.   *See id.* (labeled cell tower range chart/map showing overlapping sectors from cell site Nos. 268 and 139 creating three separate overlapping sector regions).

848.   *See id.* (labeled cell tower range chart/map showing no shade lines over sectors from cell site Nos. 268 and 139 that cover the airport); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 070 of *2nd Consolidated Exhibits* (Dkt. #821-4) (June 18, 2010 letter from AUSA Battista to the defendant, p. 4-5: "The three circles represent estimates of the range of the noted cell towers taking into consideration multiple factors, primarily the distance between the towers and **the terrain**." (emphasis added)).

849.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 21 of *1st Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map showing a *6,412,224 ft²* triangulated location signature estimate (marked with black pen lines) covering the location of apartment No. 1122); United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of *1st Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map with government's *6,412,224 ft²* triangulated location signature estimate marked in red and apartment No. 1122 marked with a yellow star).

850.   *See Technical Explanations*, Section III(D)(3), *supra* ("In the context of cell site information, the two known points are the antenna towers, the third point is the cellular telephone, and the direction from each tower to the phone is discerned from the information

---

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

by the shaded area on the cell tower range chart/map, the two known points are cell sites No.

139 and 268, the third unknown point is the aircard, and the south-east sector of cell site No.

139 and the south-west sector of cell site No. 268 are the angles used to complete the equation.
[851]

        23.     FBI Agent Killigrew's geolocation techniques also fit the definition of a location

signature calculation using a statistical database containing historical cell site location

information and heuristics similar to what is explained by inventors of location signature

technology.[852]  The statistical database used by FBI Agent Killigrew was the aircard's

historical cell site location information (seized from Verizon Wireless) covering the date range

of June 10, 2008 through July 11, 2008.  FBI Agent Killigrew's location signature techniques

allowed for determining (1) the precise cell site sectors accessed by the aircard for use in the

triangulation calculation,[853] (2) the specific regions within those sectors accessed by the

aircard (e.g., elimination of the terrain covering the airport),[854] and (3) confirmation that the

_____

about which face of each tower is facing the phone." (quoting district Judge Kaplan)).

851.   See United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of 1st
Consolidated Exhibits (Dkt. #587-2) (labeled cell tower range chart/map).

852.   See Technical Explanations, Section III(D)(3), supra (explaining location signature
techniques that take into consideration the terrain, historical cell site location information,
weighting of data for confidence values, etc. to separate cell site sectors into regions for
location signatures).

853.   Verizon Wireless only provided the cell sites accessed by the aircard and not the cell site
sectors.  Through location signature techniques, FBI Agent Killigrew was able to determine the
precise sectors accessed by the aircard so that a triangulation calculation could be conducted.

854.   See United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 22 of 1st
Consolidated Exhibits (Dkt. #587-2) (labeled cell tower range chart/map showing no shade
lines over sectors from cell site Nos. 268 and 139 that cover the airport).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

aircard remained in a stationary position over time.

### 3.  The primary case agents flew from Arizona to California to triangulate the precise location of the aircard and its user.

24.     On July 15, 2008, one day after receiving FBI Agent Killigrew's triangulated

aircard location signature estimate,[855]  FBI Agent Murray, IRS-CI Agent Medrano, IRS-CI

Agent Fleischmann, IRS-CI Agent Tracy L. Daun, and USPIS Inspector Wilson (previously and

hereafter collectively the "primary case agents") "flew to Santa Clara/San Jose to start

triangulating the suspect's position."[856]  Upon their arrival, the primary case agents met with

FBI Agent Ng at the Campbell FBI field office and later "met with several FBI agents with

their Technical Service Division to help [][them] track the suspect's aircard."[857]

25.     While in California, the primary case agents employed the help of three FBI

technical agents[858] from San Francisco to conduct the real-time portion of the aircard locating

mission.[859]  The FBI technical agents were members of a Wireless Intercept and Tracking

---

855.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 068 of *2nd Consolidated Exhibits* (Dkt. #821-3) (May 2, 2011 letter from AUSA Battista to the defendant, p. 5: "[P]lease be advised that it appears that the cell tower range chart was created the morning of July 14, 2008, and then shared with the investigation team after 1:00 p.m. that same date.").

856.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 26 of *1st Consolidated Exhibits* (Dkt. #587-2) (August 7, 2008 USPIS Investigation Details Report entry by USPIS Inspector Wilson).

857.  *Id*.

858.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 073 of *2nd Consolidated Exhibits* (Dkt. #821-4) (December 16, 2011 letter from AUSA Battista to the defendant, p. 1:  AUSA Battista making reference to "two of the three tech agents...").

859.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 065 of *2nd Consolidated Exhibits* (Dkt. #821-3) (Feb. 28, 2009 "case write up" by FBI Agent Murray indicating that he "worked with the AUSA and the **FBI SF** to obtain a pen register and tracking

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

Team (WITT),[860] which uses aspects of the FBI Digital Collection Program to locate wireless

devices.[861]  The prosecution has not provided the defense with the identities of three FBI

technical agents.[862]

> **4.    The FBI technical agents began the real-time portion of the
> aircard locating mission by conducting base station surveys of all
> cell sites located in the area covered by the cell tower range chart/
> map**.

26.      Prior to the real-time portion of the aircard locating mission, the FBI technical

agents loaded CDMA communications protocol firmware onto their StingRay and KingFish (if

not loaded previously).[863][864]  The firmware is provided by Harris[865] and was loaded onto the

court order to locate the aircard with TTA assistance." (emphasis added)); United States v.
Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 066 of *2nd Consolidated Exhibits* (Dkt.
#821-3) (FBI technical agent memorandum stating that "Phoenix Division requested assistance
from San Francisco in locating a target wireless aircard.").

860.   *See id.* (FBI technical agent memorandum explaining use of portable/transportable
wireless device locators and indicating: "Personnel Performing Mission: TTA-WITT").

861.   *See Technical Explanations*, Section III(H)(8), *supra* (explaining FBI WITT).

862.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *January 4, 2012 Court
Order* (Dkt. #723, p. 12) (The Court denied the defendant's motion for disclosure (Dkt. #592)
and concluded that "[d]isclosures of the specific identities of agents involved in this operation
could jeopardize their safety and would effectively eliminate them as law enforcement assets
used in electronic surveillance.").

863.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 066 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (FBI technical agent memorandum explaining use of
portable/transportable wireless device locators and indicating: "Technology Addressed:
CDMA").

864.   *See Technical Explanations*, Section III(G)(1), *supra* (explaining how the Harris
StingRay and KingFish support CDMA, GSM, iDEN, and UMTS wireless technologies but
only a maximum of three simultaneously).

865.   *See* Maricopa County, FL, USA – **Harris Price List** (Feb 24, 2010), *available at* http://
www.maricopa.gov/materials/Awarded_Contracts/PDF/09041-c.pdf (last accessed: Mar. 9,

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

FBI's devices so that they would be able to send and receive signals to/from the aircard using

the CDMA based 1xEV-DO Rel. 0 communications protocol.[866]  Once the firmware was

loaded onto the FBI's devices, the technical agents were ready to conduct the real-time portion

of the aircard locating mission.

27.      In preparation of using the Harris StingRay and KingFish to locate the aircard on

July 16-17, 2008, the FBI technical agents collected data on all cell sites located in the area

identified by FBI Agent Killigrew.  In order to complete this task, the FBI used its StingRay in

"base station survey" mode[867] while traveling around the area covered by the cell tower range

chart/map.[868]

28.      While conducting base station surveys, the data collected by the FBI technical

agents included signal range estimates for every cell site in the area and radio frequencies used

by each cell site sector.  The signal range estimates, in combination with other data, were

intended to assist the FBI technical agents "in obtaining a start location for the search."[869]  The

_____

2011), p. 21 (listing "StingRay CDMA Software" part No. "SRAY-CDMA-SW 2" for
$22,000.00); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT
013 of *2nd Consolidated Exhibits* (Dkt. #821-1) (price list attached).

866.    *See Technical Explanations*, Section III(B), *supra* (explaining how all cell sites
(including cell site emulators) wishing to communicate with 1xEV-DO Rel. 0 wireless devices
must follow the instructions contained in the relevant technical standards).

867.    *See Technical Explanations*, Section III(G)(1)(b)(i), *supra* (explaining base station
surveys conducted by the Harris StingRay).

868.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 21 of *1st
Consolidated Exhibits* (Dkt. #587-2) (cell tower range chart/map).

869.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 066 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (FBI technical agent memorandum).

- 194 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

radio frequency information was needed so that the FBI technical agents could properly

configure their StingRay and KingFish for use in cell site emulator mode.  By referencing a list

of all the radio frequencies already in use, the FBI was able to choose an unused frequency for

use by its emulated cellular network that would not interfere with the various FCC licensed

cellular networks already operating in the noted area.[870]

### 5.   The FBI technical agents had Verizon Wireless reprogram and write data to the aircard so that it would be compatible with the Harris StingRay and KingFish.

29.   On July 15, 2008, Verizon Wireless utilized network-initiated Over-The-Air

Service Provisioning (OTASP), also known as Over-The-Air Parameter Administration

(OTAPA),[871] to surreptitiously write data to the aircard's internal storage device, i.e., the

Number Assignment Module (NAM).[872]  The purpose of initiating OTAPA was to facilitate

compatibility between the aircard, the Verizon Wireless network, and the government's Harris

StingRay, KingFish, and related equipment.  Verizon Wireless "had a set-up problem with the

'Provisions'"[873] and the government was therefore "not able to get a signal"[874] on July 15th.

---

870.   *See Technical Explanations*, Section III(B)(3)(g)(i), *supra* (explaining how the FCC requires cellular networks to be carefully planned so as to avoid various types of radio signal interference such as interference with ambulance radios).

871.   *See Technical Explanations*, Section III(B)(3)(a), *supra* (explaining OTASP and OTAPA).

872.   *See Technical Explanations*, Section III(B)(2)(a), *supra* (explaining the Access Terminal NAM).

873.   United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 26 of *1st Consolidated Exhibits* (Dkt. #587-2) (August 7, 2008 USPIS Investigation Details Report entry by USPIS Inspector Wilson).

874.   *Id*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

The following day, all OTAPA issues were resolved and the required data had been written to

the aircard's hardware.

   30.  During the OTAPA session on July 16, 2008, Verizon Wireless wrote data to the

aircard consisting of (1) identifying information for the FBI's emulated cell sites,[875] (2)

configuration changes that would cause the aircard to recognize the FBI's emulated cell sites as

authorized for providing service, and (3) configuration changes that would cause the aircard to

attempt connections with the FBI's emulated cell sites prior to attempting connections with

actual Verizon Wireless cell sites.  The FBI technical agents needed Verizon Wireless to write

data to the aircard in this manner because the aircard's properly configured Preferred Roaming

List prevented it from accessing rogue, unauthorized cell sites[876][877] such as cell site emulators

---

875. Cell site emulation was a feature of the Harris StingRay and KingFish used by the FBI
technical agents to locate the aircard.  *See How The Aircard Was Intruded Upon*, Section IV(B)
(9)(a), *supra*.

876. *See Technical Explanations*, Section III(B)(3)(b)(i), *supra* (explaining how an Access
Terminal will only scan radio frequencies listed in its Preferred Roaming List Acquisition
Table); *id.*, Section III(B)(3)(c)(i), *supra* (explaining how an Access Terminal will only
establish a session with an Access Network that has a subnet listed as authorized in the Access
Terminal Preferred Roaming List System Table).

877. The only other option for causing the aircard to recognize an emulated cell site as being
authorized for service is for the FBI to (1) hijack identifying information for an actual Verizon
Wireless cell site by recording Overhead Messages off the air interface, (2) load the Overhead
Messages parameters into its cell site emulator, and (3) proceed to spoof an actual Verizon
Wireless cell site by broadcasting copies of the hijacked Overhead Messages while within
signal range of the aircard.  Because the aircard would already have the hijacked identifying
information stored on its Preferred Roaming List, the FBI would not need Verizon Wireless to
update the list via OTAPA.  However, such a spoofing operation would run the risk of
intermarket and intramarket radio signal interference causing disruption to numerous users of
not only Verizon Wireless' network but also of other cellular and Public Safety Radio Service
networks operating in the area.  *See id.*, Section III(B)(3)(g)(i), *supra* (explaining interference).
In order to avoid spectrum interference, it is a logical assumption that Verizon Wireless updated

---

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

used by the FBI.

31.     In order to write data to the aircard as described in paragraph No. 30 above,

Verizon Wireless: (1) surreptitiously initiated Over-the-Air Parameter Administration (OTAPA)

with the aircard over the air interface;[878] (2) disabled the SPL for the aircard's internal NAM

by using the aircard's SPC;[879] (3) used the SSD known only to the aircard and Verizon

Wireless to validate the aircard's SPASM;[880] (4) transmitted a Configuration Request Message

to the aircard instructing it to transmit back all of its stored NAM parameters;[881] (5) received

the aircard's transmitted Configuration Response Message containing all of its stored NAM

---

the aircard's Preferred Roaming List with separate frequencies, *etc.* as apposed to the FBI
hijacking Overhead Messages from a random Verizon Wireless cell cite for use in a cell site
spoofing operation.

     Additionally, such a spoofing operation would be a criminal offense.  Since October of
1994, it has been a crime for whoever "knowingly and with intent to defraud uses, produces,
traffics in, has control or custody of, or possesses a scanning receiver," 18 U.S.C. § 1029(a)(8),
meaning "a device or apparatus that can be used to... intercept an... identifier of any
telecommunications service, equipment, or instrument," 18 U.S.C. § 1029(e)(8), which would
include, *e.g.*, using the StingRay to record the SUBNET_COMMON_LENGTH,
SUBNET_COMMON, and other identifying data fields contained in the SectorParameters and
QuickConfig messages broadcast by Verizon Wireless cell sites.  In the context of 18 U.S.C. §
1029(a)(8), the "intent to defraud" element is satisfied by defrauding a wireless user of service
by forcing the wireless device to connect to a spoofed cell site operating outside the wireless
carrier network.

878.   *See Technical Explanations*, Section III(B)(3)(a), *supra* (explaining how OTAPA is
initiated by the wireless carrier surreptitiously).

879.   *See id.* (explaining how NAM parameters are protected by the SPC/SPL).

880.   *See id.* (explaining how NAM parameters are protected by the SPASM).

881.   *See id.* (explaining how the Configuration Request Message is used by the Access
Network to read data from the NAM).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

parameters;[882] (6) transmitted a Download Request Message[883] to the aircard containing an

updated Preferred Roaming List consisting of *(a)* an Acquisition Table containing the band-

class and channel number corresponding to the radio frequencies used by FBI's cell site

emulators,[884][885] and *(b)* a System Table with the highest priority entry[886] containing the

sector subnet and other identifying information for the FBI's cell site emulators;[887] and (7)

transmitted a Commit Request Message to the aircard instructing it to write the new Preferred

Roaming List to its permanent NAM memory.[888]

32.      During the OTAPA session on July 16, 2008, additional data was written to the

aircard by Verizon Wireless in order to reprogram the aircard's hardware.  Verizon Wireless

reprogrammed the aircard to respond in the following manner upon receiving a paging signal

---

882.   *See id.* (explaining how the Configuration Response Message is used to return NAM
data to the Access Network).

883.   *See id.* (explaining how the Download Request Message is used by the Access Network
to write data to the Access Terminal NAM).

884.   *See id.*, Section III(B)(3)(b)(i), *supra* (explaining how the Preferred Roaming List
Acquisition Table is used to choose radio frequencies to scan for available Access Networks).

885.   The frequencies used by the FBI's cell site emulators and loaded onto the aircard by
Verizon Wireless were the frequencies chosen after the FBI conducted base station surveys to
determine an appropriate unused frequency.  *See How The Aircard Was Intruded Upon*, Section
IV(B)(4), *supra*.

886.   *See Technical Explanations*, Section III(B)(3)(a), *supra* (explaining how Preferred
Roaming List System Table entries are listed with the most preferred system first).

887.   *See id.,* Section III(B)(3)(c)(i), *supra* (explaining how the Preferred Roaming List
System Table is used to identify Access Networks authorized for providing service).

888.   *See id.*, Section III(B)(3)(a), *supra* (explaining how the Commit Request Message is
used by the Access Network to write the Download Request Message data to the Access
Terminal permanent NAM memory).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

indicating an incoming 1xRTT voice call: (1) disconnect from its 1xEV-DO Rel. 0 data

connection being provided by an actual Verizon Wireless cell site, and (2) enter the Idle State.

[889]  Additionally, the aircard was reprogrammed to respond to incoming 1xRTT voice calls by

generating real-time cell site location information that could be forwarded to the FBI's SF-

Martinez DCS-3000 server by Verizon Wireless.[890]  Because the aircard is not a telephone[891]

and does not normally respond to incoming 1xRTT voice calls,[892] the FBI needed Verizon

Wireless to use OTAPA to reprogram the aircard's hardware to respond to the FBI's planned

surreptitious voice calls placed to the aircard from a landline telephone.[893][894]

---

889.  *See id.*, Section III(B)(3)(c) *et seq.*, *supra* (explaining the 1xEV-DO Idle State).

890.  *See How The Aircard Was Intruded Upon*, Section IV(B)(6), *infra* (explaining the FBI's
forced generation of real-time cell site sector location information facilitated through
surreptitious voice calls placed to the aircard).

891.  *See id.*, Section IV(A), *supra* (general background information on the aircard).

892.  *See Technical Explanations*, Section III(B)(3)(g)(ii), *supra* (explaining how non-
telephone 1xEV-DO Access Terminals ignore incoming 1xRTT voice calls).

893.  *See How The Aircard Was Intruded Upon*, Section IV(B)(8), *infra* (explaining the FBI's
denial-of-service attack facilitated through surreptitious voice calls placed to the aircard).

894.  In the alternative, if the aircard did not contain adequate manufacturer specific NAM
parameters to reprogram the aircard as desired, the FBI had Verizon Wireless use IP Based
Over-the-Air Device Management (IOTA-DM) using the Open Mobile Alliance Device
Management (OMA DM) protocol to surreptitiously update the aircard's firmware over-the-air
so that it would respond to the FBI's planned surreptitious voice calls placed to the aircard from
a landline telephone.  *See Technical Explanations*, Section III(B)(3)(a), fn. No. 125, *supra*
(referencing technical standard explaining protocol used to update wireless device firmware
surreptitiously using radio waves).  *See also* USDOJ [M.D.La.] Aug. 12, 2008, Response to
ACLU FOIA Request No. 07-4130, p. 18 of 42 ("It may also be possible to **flash the firmware
of a cell phone**....  You don't even have to have possession of the phone to modify it; **the
'firmware' is modified wirelessly**." (emphasis added)); *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 021 of *2nd Consolidated Exhibits* (Dkt. #821-1)
(relevant pages of cellfoia_release_074130_20080812.pdf attached with page numbers added).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

33.     In order to write data to the aircard as described in paragraph No. 32 above,

Verizon Wireless: (1) surreptitiously initiated Over-the-Air Parameter Administration (OTAPA)

with the aircard over the air interface;[895] (2) disabled the SPL for the aircard's internal NAM

by using the aircard's SPC;[896] (3) used the SSD known only to the aircard and Verizon

Wireless to validate the aircard's SPASM;[897] (4) transmitted a Configuration Request Message

to the aircard instructing it to transmit back all of its stored NAM parameters;[898] (5) received

the aircard's transmitted Configuration Response Message containing all of its stored NAM

parameters;[899] (6) transmitted a Download Request Message[900] to the aircard containing

manufacturer-specific NAM parameters[901] instructing the aircard to *(a)* generate real-time cell

site location information upon receiving an incoming 1xRTT paging signal, and *(b)* disconnect

from its Verizon Wireless 1xEV-DO Rel. 0 data connection upon receiving an incoming 1xRTT

paging signal; and (7) transmitted a Commit Request Message to the aircard instructing it to

---

895.   *See Technical Explanations*, Section III(B)(3)(a), *supra* (explaining how OTAPA is
initiated by the wireless carrier surreptitiously).

896.   *See id.* (explaining how NAM parameters are protected by the SPC/SPL).

897.   *See id.* (explaining how NAM parameters are protected by the SPASM).

898.   *See id.* (explaining how the Configuration Request Message is used by the Access
Network to read data from the NAM).

899.   *See id.* (explaining how the Configuration Response Message is used to return NAM
data to the Access Network).

900.   *See id.* (explaining how the Download Request Message is used by the Access Network
to write data to the Access Terminal NAM).

901.   *See id.* (explaining how an Access Terminal NAM contains manufacturer-specific NAM
parameters).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

write the new manufacturer-specific NAM parameters to permanent NAM memory.[902]

6.   **The FBI used the SF-Martinez DCS-3000 Pen/Trap device to obtain real-time cell site sector location information to narrow the geographical area of where to use the StingRay, KingFish, and related equipment.**

34.   Prior to using the Harris StingRay, KingFish, and related equipment to pinpoint the precise location of the aircard and its user, the FBI needed to first narrow the geographical area of where to search for the aircard.  In order to accomplish this task, the three FBI technical agents planned to use real-time cell site sector location information to determine the Verizon Wireless cell site sector providing service to the aircard.[903]  In order to obtain the needed real-time cell site sector location information relating to the aircard, the FBI relied upon the N.D.Cal. 08-90331MISC-RS order[904] to use a Pen/Trap device.

35.   At the time of the aircard locating mission, Verizon Wireless had not yet configured its network Intercept Access Points (IAPs)[905] to provide FBI DCS-3000 servers[906]

---

902.   *See id.* (explaining how the Commit Request Message is used by the Access Network to write the Download Request Message data to the Access Terminal permanent NAM memory).

903.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 069 of *2nd Consolidated Exhibits* (Dkt. #821-4) (June 7, 2011 letter from AUSA Battista to the defendant, p. 1:  AUSA Battista indicating that the FBI technical agents "generate[d] activity on the device [(*i.e.*, aircard)] in order to obtain the cell site serving the device pursuant to the [N.D.Cal 08-90331MISC-RS] Court Order...").

904.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of Materials Related To Applications And Court Orders Numbered 08-90330 And 08-90331, Authorized By Magistrate Judge Richard Seeborg, Northern District Of California, On July 11, 2008* (Dkt. #470-2).

905.   *See Technical Explanations*, Section III(H)(2) and fn. No. 657, *supra* (explaining Intercept Access Points).

906.   *See Technical Explanations*, Section III(H)(4), *supra* (explaining DCS-3000 servers, *i.e.*,

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

(Pen/Trap devices) with real-time cell site location information relating to 1xEV-DO Rel. 0 data

connections for aircards.[907]  As a workaround, the FBI decided to "ping the number associated

to the [air]card..."[908] in order to generate the needed data.  By pinging the aircard (*i.e.*, placing

surreptitious telephone calls to the aircard without having it ring or answer),[909][910] the FBI

would force the aircard to generate real-time cell site sector location information associated

with a 1xRTT voice call (as apposed to an 1xEV-DO Rel. 0 data connection) that could be

forwarded to the FBI SF-Martinez DCS-3000 server from a Verizon Wireless IAP.[911]

---

Pen/Trap devices and the FBI Digital Collection Program).

907.    *See, e.g.,* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 27</u> of
*1st Consolidated Exhibits* (Dkt. #587-2) (FBI Agent Murray's rough notes indicating that no cell
site data is available for an aircard when using a Pen/Trap device); <u>United States v. Rigmaiden</u>,
CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 28</u> of *1st Consolidated Exhibits* (Dkt. #587-2) (June
27, 2008 email from FBI Agent Murray to FBI Agent Leising: "Verizon Wireless can't separate
tower data from content for a broadband card.").

908.    <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 26</u> of *1st
Consolidated Exhibits* (Dkt. #587-2) (August 7, 2008 USPIS Investigation Details Report entry
by USPIS Inspector Wilson); *see also* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC,
D.Ariz., <u>EXHIBIT 27</u> of *1st Consolidated Exhibits* (Dkt. #587-2) (FBI Agent Murray's rough
notes indicating that "you have to call into the card.").

909.    *See How The Aircard Was Intruded Upon*, Section IV(A)(1), *supra* (explaining how the
aircard is incapable of ringing or answering calls).

910.    The only other option for the government was to obtain a Title III wiretap warrant to
receive real-time cell site location information along with the communications content of which
the location data could not be separated.  *See, e.g.,* <u>United States v. Rigmaiden</u>, CR08-814-
PHX-DGC, D.Ariz., <u>EXHIBIT 26</u> of *1st Consolidated Exhibits* (Dkt. #587-2) (Based on the
destination IP addresses obtained via subpoenas, the government was "in the process of
securing a Title 3" so that agents could "monitor the content of the computer that the [air]card
[][was] being used [][with]" in order to "possibly triangulate the signal.")

911.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 072</u> of *2nd
Consolidated Exhibits* (Dkt. #821-4) (December 9, 2011 letter from AUSA Battista to the
defendant, p. 1:  AUSA Battista indicating that "the incoming phone calls made to your aircard

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

_____

        36.    Beginning at 11:02am on July 16, 2008,[912] the FBI began to place surreptitious

telephone calls to the aircard using the public telephone network[913] while Verizon Wireless,

acting pursuant to the N.D.Cal. 08-90331MISC-RS order, forwarded the resulting LAESP

messages[914] (*i.e.*, Pen/Trap data including the cell site and sector accessed by the aircard) to

the FBI SF-Martinez DCS-3000 server in real-time.[915]  The FBI continued to surreptitiously

call the aircard a total of 32 times until 5:03pm on July 16, 2008.[916]  The LAESP messages

sent over that six hour period informed the FBI that the aircard was located within the signal

coverage area of sector No. 3, Verizon Wireless cell site No. 5, having a latitude of 37.369733

and longitude of -121.923442 with a cell site street address of 2001 Gateway Place, San Jose,

_____

were placed in order to stimulate your aircard to provide the identity of the cell tower with
which your aircard connected during these calls.").

912.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 06 of *1st
Consolidated Exhibits* (Dkt. #587-1) (LAESP messages sent to the SF-Martinez DCS-3000
server (Pen/Trap device) by Verizon Wireless IAPs); *see also* United States v. Rigmaiden,
CR08-814-PHX-DGC, D.Ariz., EXHIBIT 07, EXHIBIT 08, EXHIBIT 09, and EXHIBIT 10 of
*1st Consolidated Exhibits* (Dkt. #587-1) (The FBI's "human readable" CDNRS files created
from the Verizon Wireless LAESP messages).

913.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 069 of *2nd
Consolidated Exhibits* (Dkt. #821-4) ( June 7, 2011 letter from AUSA Battista to the defendant,
p. 1: "The operators called this number [belonging to the aircard] using the Public Switched
Telephone Network to generate activity on the device in order to obtain the cell site serving the
device...").

914.   *See Technical Explanations*, Section III(H)(3), *supra* (explaining LAESP messages).

915.   *See id.* (neither LAESP messages, call-identifying information, nor Pen/Trap data are
amongst the data recorded and retained by Verizon Wireless).

916.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 07,
EXHIBIT 08, EXHIBIT 09, and EXHIBIT 10 of *1st Consolidated Exhibits* (Dkt. #587-1) (The
FBI's "human readable" CDNRS files created from the Verizon Wireless LAESP messages).

- 203 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

CA 95110.[917]

37.    While the FBI called/pinged the aircard, the real-time cell site sector location information was fed into the SF-Martinez DCS-1020 gateway server[918] and sent over the Internet via a Virtual Private Network (VPN) to a wireless cellular modem[919] (*i.e.*, the FBI's own aircard) paired with a laptop computer being accessed by the FBI technical agents while they were lurking the streets of Santa Clara, CA looking for the aircard.[920]  The FBI technical agents used the real-time cell site sector location information to narrow the geographical area of where to use the Harris StingRay, KingFish, and related surveillance equipment to search for the aircard.[921]

38.    Considering the aircard is not a telephone and does not have telephone service,

_____

917.    *See id.* (showing a "location = 5-3" relating to the FBI's surreptitious phone calls); *see also How The Aircard Was Intruded Upon*, Section IV(B)(2), *supra* (listing location information for Verizon Wireless cell site No. 5 in San Jose, CA).

918.    *See Technical Explanations*, Section III(H)(8), *supra* (explaining DCS-1020 gateway servers).

919.    *See id*.

920.    Using a DCS-1020 gateway server, VPN, and aircard is the standard Digital Collection Program (DCS) operation conducted by FBI Wireless Intercept and Tacking Team (WITT) agents to locate wireless devices.  *See Technical Explanations*, Section III(H) *et seq.*, *supra* (explaining the FBI Digital Collection Program).  The FBI's WITT was used to locate my aircard.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 066 of *2nd Consolidated Exhibits* (Dkt. #821-4) (FBI technical agent memorandum stating: "Personnel Performing Mission: TTA-WITT").

921.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 068 of *2nd Consolidated Exhibits* (Dkt. #821-3) (May 2, 2011 letter from AUSA Battista to the defendant, p. 5: FBI Agent Killigrew advised FBI Agent Murray that "when a call comes into the monitoring device, it produces a shadow over the sector of the tower the phone is hitting.").

- 204 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

[922] the FBI's surreptitious phone calls did not cause the aircard to "ring" and otherwise did not

cause the aircard to notify the aircard user that the FBI was calling the aircard.  As shown by

the LAESP messages[923] and as admitted by the prosecution,[924] the FBI's surreptitious phone

calls were not answered by the aircard in any fashion, *i.e.*, no calls were ever established as "in

progress" and the aircard was never "off the hook."

        39.     As supported by sources cited in the *Technical Explanations*, Section III(H)(3),

*supra*, and as admitted by the prosecution,[925] Verizon Wireless only buffered the aircard's Pen/

Trap data and neither recorded nor stored the data prior to forwarding it to the FBI.  Even if

Verizon Wireless, through a separate mechanism, simultaneously recorded *some* of the data

---

922.   *See How The Aircard Was Intruded Upon*, Section IV(A)(1), *supra* (general background
information on the aircard).

923.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 06 of *1st
Consolidated Exhibits* (Dkt. #587-1) (LAESP messages showing that the FBI's surreptitious
phone calls were forwarded to internal Verizon Wireless telephone numbers set up to handle
unanswered calls).

924.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 069 of *2nd
Consolidated Exhibits* (Dkt. #821-4) ( June 7, 2011 letter from AUSA Battista to the defendant,
p. 1: "The forwarded numbers arose after the operators of the equipment used to locate the
aircard called a telephone number associated with the aircard....  Because the aircard device
was not a conventional telephone, incoming calls to the device could not be connected to it as a
normal call.  The incoming calls in question were forwarded by the Verizon Wireless network
to the various numbers which belong to, and are used by, Verizon Wireless for processing
incoming calls that cannot be connected/terminated to the original called number - *i.e.*, the
targeted number.").

925.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 067 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (January 28, 2011 letter from AUSA Battista to the
defendant, p. 4:  "Any information transmitted to the FBI pursuant to any disclosed court Order
was received by Verizon Wireless, buffered by Verizon Wireless and then transmitted to the
FBI.  The time period from receipt by Verizon Wireless, buffering and then transmission to the
FBI is extremely short.").

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

sent in the real-time LAESP messages (for example, recording "call-detail records" as historical data via separate network elements), it still did not record cell site **sector** information before sending it to the FBI.  The data retention chart showing Verizon Wireless' practices for recording historical data lists "Cell towers used by phone" but not cell site sectors.[926] Additionally, an analysis of the aircard's historical cell site information recorded by Verizon Wireless[927] confirms that it only recorded and saved cell site locations—not the more precise cell site **sectors** as was provided in real-time via the LAESP messages sent to the FBI.

### 7. The FBI obtained additional real-time aircard data from Verizon Wireless through means other than the SF-Martinez DCS-3000 Pen/Trap device.

40.  As explained above, the FBI relied upon the N.D.Cal. 08-90331MISC-RS order and used the SF-Martinez DCS-3000 server (Pen/Trap device) to obtain real-time cell site **sector** location information corresponding to the location of the aircard.  In order to further narrow the location of where to use the Harris StingRay, KingFish, and related equipment, the FBI also sought further real-time aircard data from Verizon Wireless while relying upon the N.D.Cal. 08-90330MISC-RS order.  Because the government destroyed and/or failed to

---

926.  *See* Department of Justice, *Retention Periods of Major Cellular Service Providers* (Aug. 2010), *available at* http://www.wired.com/images_blogs/threatlevel/2011/09/retentionpolicy.pdf (last accessed: Dec. 7, 2011); *see also* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 054 of *2nd Consolidated Exhibits* (Dkt. #821-3) (data retention period chart attached).

927.  *See* aircard historical cell site information records provided to the FBI by Verizon Wireless: United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 02 of *1st Consolidated Exhibits* (Dkt. #587-1); United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 03 of *1st Consolidated Exhibits* (Dkt. #587-1); United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 05 of *1st Consolidated Exhibits* (Dkt. #587-1).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

preserve all data seized from Verizon Wireless,[928] the precise and full nature of the data and

how it was obtained and/or generated is unknown.  However, at the very least, an FBI technical

agent received from Verizon Wireless the aircard's distance from a specific cell site sector.[929]

### 8.   The FBI's surreptitious phone calls booted the aircard off the Internet so that the FBI's StingRay and related equipment could hijack the aircard's signal from Verizon Wireless.

41.   Prior to conducting geolocation techniques using the Harris StingRay and

KingFish, the FBI first needed to force the aircard to establish a session[930] with the FBI's

emulated cellular network.  Due to technical limitations of the 1xEV-DO Rel. 0

communications protocol, the Harris StingRay and KingFish were incapable of forcing the

aircard to handoff an open data connection established with a Verizon Wireless cell site to the

FBI's emulated cellular network.[931]  The only possible inter-system handoffs in 1xEV-DO Rel.

---

928.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *January 4, 2012 Court Order* (Dkt. #723, p. 14) (Noting the settled fact that "[a]ll data generated by the [] [portable/transportable wireless device locators] and received from Verizon as part of the locating mission was destroyed by the government shortly after Defendant's arrest on August 3, 2008.").

929.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 066 of *2nd Consolidated Exhibits* (Dkt. #821-3) (FBI technical agent memorandum stating that "Verizon gave a distance from the tower to the target.")

930.  *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra* (explaining 1xEV-DO Rel. 0 sessions).

931.  As explained in the *Technical Explanations*, Section III(B)(3)(d) *et seq.*, *supra*, 1xEV-DO Rel. 0 Access Networks (which include the FBI's cell site emulators) are incapable of accepting a wireless device **active connection** "handoff" from another Access Network without significant collaboration between the Access Terminal, the serving Access Network, the new Access Network, and the underlying network.  Because the FBI's emulated cell sites are on their own network not connected to Verizon Wireless, the only type of aircard handoff possible is an Idle State handoff, which is done autonomously by the aircard.  *See id*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

0 are Idle State Route Updates[932] and the Harris products are not immune to this inherent

protocol limitation.[933]

     42.     Because there were attempts to keep the aircard continuously in the Connected

State[934] (*i.e.*, connected to the Internet) whenever powered on,[935] the FBI technical agents

first had to knock the aircard offline and into the Idle State[936] so that it would be in a position

to conduct an Idle State Route Update (*i.e.*, handoff)[937] of its signal to the FBI's emulated

cellular network.  With the aircard in the Idle State, the FBI's emulated cellular network would

have the opportunity to broadcast a very strong signal and present itself to the aircard as an

available and preferred network over all Verizon Wireless cell sites in the area.[938]

932.   *See Technical Explanations*, Section III(B)(3)(d) *et seq.*, *supra* (explaining the different
types of handoffs dictated by the Default Route Update Protocol).

933.   *See Technical Explanations*, Section III(B)(3), *supra* (explaining how all 1xEV-DO Rel.
0 compatible Access Terminals and Access Networks must follow the instructions contained in
the relevant standards).

934.   *See Technical Explanations*, Section III(B)(3)(c)(vi), *supra* (explaining technical
procedures for opening a 1xEV-DO Rel. 0 connection).

935.   <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE:
*Daniel Rigmaiden owns the aircard and used the aircard service as a home Internet connection*
(Dkt. #824-3, ¶ 17-20, p. 6-7).

936.   "It must be ensured, that the mobile phone of the observed person is in standby mode
and the correct network operator is found out. Otherwise, for the Mobile Station, there is no
need to log into the simulated Base Station."  Strobel, Daehyun, *IMSI Catcher*, Ruhr-
Universit¨at Bochum, Jul. 13, 2007, *available at*
http://www.emsec.rub.de/media/crypto/attachments/files/2011/04/imsi_catcher.pdf (last
accessed: Feb. 10, 2012), p. 16 (PDF, p. 20).

937.   *See Technical Explanations*, Section III(B)(3)(d)(i), *supra* (explaining 1xEV-DO Rel. 0
Idle State Route Updates).

938.   As explained in *How The Aircard Was Intruded Upon*, Section IV(B)(5), *supra*, the FBI
previously had Verizon Wireless use OTAPA to update the aircard's Preferred Roaming List

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

43.     As explained by the FBI, in addition to generating real-time cell site sector

location information, the previously noted surreptitious phone calls[939] also served the purpose

of knocking the aircard offline from its Verizon Wireless data connection so that it would

"connect to the best available cell phone tower that will provide it service."[940]  Each

surreptitious voice call placed to the aircard by the FBI resulted in Verizon Wireless sending a

paging signal from sector No. 3, cell site No. 5, notifying the aircard of the incoming call.[941]

Based on the aircard's new NAM parameter configuration facilitated via OTAPA,[942] the

paging signals caused the aircard to disconnect from its Verizon Wireless 1xEV-DO Rel. 0 data

connection and enter the Idle State.

44.     While in the Idle State, the aircard had the opportunity to use the Default Route

Update Protocol to decide whether to conduct an Idle State Route Update (*i.e.*, handoff) to a

cell site broadcasting a pilot signal with a higher signal strength than the current serving cell

---

with identifying information on the FBI's cell site emulators.

939.    *See How The Aircard Was Intruded Upon*, Section IV(B)(6), *supra* (explaining details on
the FBI's surreptitious phone calls placed to the aircard).

940.    United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 071 of *2nd
Consolidated Exhibits* (Dkt. #821-4) (December 2, 2011 letter from AUSA Battista to the
defendant, p. 1).

941.    *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 07,
EXHIBIT 08, EXHIBIT 09, and EXHIBIT 10 of *1st Consolidated Exhibits* (Dkt. #587-1) (The
FBI's "human readable" CDNRS files created from the Verizon Wireless LAESP messages
showing a "location = 5-3" relating to the FBI's surreptitious phone calls).

942.    *See How The Aircard Was Intruded Upon*, Section IV(B)(5), *supra* (explaining how the
aircard was reprogrammed using OTAPA).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
       UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
       DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

site sector.[943]  After each surreptitious voice call placed to the aircard (over the previously

noted six (6) hour period), the FBI technical agents used their StingRay in the area of the cell

tower range chart/map to broadcast an emulated cellular network signal in hopes that the

aircard would detect the network and conduct an Idle State Route Update (*i.e.*, handoff) to the

StingRay.

      45.      Because their were attempts to keep the aircard continuously connected to the

Internet,[944] the FBI had a very short window of time to force the aircard to handoff its signal to

the StingRay after each surreptitious voice call.  Due to the auto-reconnect software,[945] and/or

typical manual reconnect attempts,[946] the FBI needed to repeatedly call the aircard in order to

repeatedly boot it offline over the six hours of surreptitious phone calls.  Each few minute

window of time that followed each denial-of-service attack (*i.e.*, surreptitious phone call) was

used by the FBI to move its StingRay, while in cell site emulator mode, to various positions

until it was close enough to the aircard to force an Idle State Route Update (*i.e.*, handoff).

---

943.  *See Technical Explanations*, Section III(B)(3)(d)(i), *supra* (explaining 1xEV-DO Rel. 0 Idle State Route Updates).

944.  <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE: *Daniel Rigmaiden owns the aircard and used the aircard service as a home Internet connection* (Dkt. #824-3, ¶ 17-20, p. 6-7).

945.  *See id*.

946.  *See id*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

9.     **The FBI technical agents used the Harris StingRay, KingFish, and
related equipment to locate the aircard precisely inside apartment
No. 1122.**

a.     **Cell site emulation and forced connection handoff.**

46.     During the final surreptitious phone call placed to the aircard at 5:03pm on July

16, 2008, the FBI technical agents finally positioned their StingRay close enough to the aircard

and to force it to acquire the pilot signal[947] of the FBI's emulated cellular network. Because the

StingRay was broadcasting a stronger pilot signal than the legitimate Verizon Wireless cell sites

in the area, the aircard began an Idle State Route Update (*i.e.*, handoff) of its Verizon Wireless

connection to the StingRay.[948]  Once the Idle State Route Update was in progress, the aircard

was no longer communicating with Verizon Wireless and was now forced unwittingly to

communicate directly with the government.

47.     While the aircard was in direct communication with the government, the FBI

technical agents engaged in a series of actions that further intruded upon the aircard user's

privacy, property, and possessory interests.  The proceeding subsections detail the specific

actions carried out by the FBI technical agents after the aircard acquired the StingRay's pilot

signal.  All of the government actions explained below were necessary in order for the FBI

technical agents to locate the aircard.

_____

947.     *See Technical Explanations*, Section III(B)(3)(b)(ii), *supra* (explaining 1xEV-DO Rel. 0
Access Terminal Pilot Acquisition Substate).

948.     Although an archaic technical term, Harris refers to this technique as "forced
registration."  *See id.*, Section III(G)(b)(iii), *supra*; *see also id.*, Section III(B)(3)(c)(iii) and
II(B)(3)(d), *supra* (explaining how in the context of 1xEV-DO Rel. 0 and other all IP based
cellular networks, wireless devices establish "sessions" and conduct "route updates" with cell
sites as apposed to "registering" with cell sites).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

### b. The FBI repeatedly wrote data to the aircard using its StingRay.

48.     Once the Idle State Route Update was complete, the aircard began monitoring the
StingRay's broadcast Control Channel as dictated by 1xEV-DO Rel. 0 technical standards.[949]
Via its forward link Control Channel, the StingRay sent a Sync message to the aircard with the
following data fields intended to be written to the aircard's internal storage: (1) MessageID, (2)
MaximumRevision, (3) MinimumRevision, (4) PilotPN, and (5) SystemTime.[950]  Upon
receiving the Sync message, the data contained in the message was written to the aircard's
internal storage so that the aircard could further communicate with the StingRay.[951]

49.     Once the data contained in the Sync message had been written to the aircard's
internal storage, the aircard began to monitor the StingRay's overhead messages broadcast over
its Control Channel as dictated by 1xEV-DO Rel. 0 technical standards.[952]  The aircard
received the StingRay's overhead messages which included the QuickConfig message and
SectorParameters message.[953]  The QuickConfig message contained numerous data fields
including MessageID, ColorCode, SectorID24, SectorSignature, AccessSignature, Redirect,
RPCCount, ForwardTrafficValid, and a Reserved field.[954]  The SectorParameters message
contained numerous data fields including MessageID, CountryCode, SectorID, SubnetMask,

---

949.  *See Technical Explanations*, Section III(B)(3)(b)(iii), *supra*.

950.  *See id*.

951.  *See id*.

952.  *See id*., Section III(B)(3)(c)(i), *supra*.

953.  *See id*.

954.  *See id*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

SectorSignature, Latitude, Longitude, RouteUpdateRadius, LeapSeconds, LocalTimeOffset, ReverseLinkSilenceDuration, ReverseLinkSilencePeriod, ChannelCount, Channel, NeighborCount, NeighborPilotPN, NeighborChannelIncluded, NeighborChannel, NeighborSearchWindowSizeIncluded, NeighborSearchWindowSize, NeighborSearchWindowOffsetIncluded, NieghborSearchWindowOffset, and a Reserved field. [955] Upon receiving the overhead messages, the data contained in the messages was written to the aircard's internal storage so that the aircard could further communicate with the StingRay. [956]

50.     Immediately after receiving the SectorParameters message, the aircard used the SectorID and SubnetMask data fields to determine the subnet of the system to which the StingRay belonged.[957]  After deducing the StingRay's subnet, the aircard checked its locally stored Preferred Roaming List System Table to determine if the subnet was listed as corresponding to a group of Access Networks (*i.e.*, a system) authorized for providing wireless service.[958]  Because the government had Verizon Wireless update the aircard's Preferred Roaming List, the aircard found the StingRay's subnet listed as an authorized network and believed that it was accessing a legitimate Verizon Wireless cell site and not a StingRay in cell site emulator mode.

———————————————

955.  *See id.*

956.  *See id.*

957.  *See id.*

958.  *See id.*

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

51.     Prior to beginning the Access Probe process to establish a session with the FBI's StingRay, the aircard received the StingRay's AccessParameters message broadcast by the StingRay.[959]  The AccessParameters message contained numerous data fields including MessageID, AccessCycleDuration, AccessSignature, OpenLoopAdjust, ProbeInitialAdjust, ProbeNumStep, PowerStep, PreambleLength, CapsuleLengthMax, Apersistence, and a Reserved field.[960] Upon receiving the AccessParameters message, the data contained in the message was written to the aircard's internal storage so that the aircard could further communicate with the StingRay via the Access Probe process.[961][962]

### c. The StingRay deactivated 1xEV-DO Rel. 0 security layer encryption during session establishment causing the aircard's signals to be transmitted in plaintext and exposed to third-parties.

52.     While the aircard was establishing a session[963] during the Access Probe process, the FBI's StingRay failed to initiate negotiation of the security layer protocols resulting in no session key being created for use in data integrity, authentication, and encryption in the MAC

---

959.   *See id.*, Section III(B)(3)(c)(ii), *supra*.

960.   *See id*.

961.   *See id*.

962.   After the Access Probe process, there are numerous other occurrences of an Access Network (*e.g.*, the StingRay) writing data to an Access Terminal (*e.g.*, the aircard).  For example, the UATIAssignment message.  *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra*.  Not all occurrences of the StingRay writing data to the aircard are explained in this declaration.

963.   *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra* (explaining 1xEV-DO Rel. 0 session establishment).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

layer.[964]  The prosecution admitted that no encryption was in use while the FBI's surveillance

equipment was communicating with the aircard.[965]  Because the FBI failed to implement

standard security layer encryption over the air interface, the aircard's signals containing private

information (*e.g.*, the ESN via the HardwareIDRequest message) and geolocation information

were exposed to third-parties over the air interface.

> **d.  The FBI used its StingRay to download data stored on the
> aircard's internal storage device (*i.e.*, the aircard's Electronic
> Serial Number (ESN)).**

53.     After the aircard and the FBI's StingRay had established a session, the StingRay

was only aware that a 1xEV-DO Rel. 0 compatible wireless device had connected to its

emulated cellular network while the identity of the device remained unknown.[966]  Prior to

conducting geolocation techniques, the FBI technical agents needed to determine if the wireless

device connecting to its emulated cellular network was actually the aircard and not another

device.  In order to identify the aircard prior to collecting signals for triangulation purposes, the

---

964.   *See id.*, Section III(B)(3)(c)(iv), *supra* (explaining how the Access Terminal is
responsible for initiating security layer encryption in 1xEV-DO Rel. 0).

965.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 072 of *2nd
Consolidated Exhibits* (Dkt. #821-4) (December 9, 2011 letter from AUSA Battista to the
defendant, p. 1:  AUSA Battista indicating that "while the specific techniques used to locate the
aircard are Law Enforcement Sensitive, neither encryption nor encryption-defeating techniques
were used in this location mission.").

966.   *See Technical Explanations*, Section III(B)(3)(c)(v), *supra* (explaining how prior to
sending the HardwareIDRequest message, the Access Network does not have the absolute
identity of the Access Terminal).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

StingRay sent a HardwareIDRequest message[967][968] (via radio wave transmissions) to the

receive antenna of what was then an unknown device.  The aircard, being the unknown device,

responded by transmitting back its ESN to the FBI's StingRay via a HardwareIDResponse

message.[969]  The FBI technical agents logged (*i.e.*, seized) the ESN it received directly from

the aircard and then compared it to the aircard ESN it previously received from Verizon

Wireless via subpoena.[970]  By matching the two separate ESNs, the FBI technical agents

determined that its StingRay was communicating with the right wireless device.

> **e.   The FBI used the StingRay to send location finding
> interrogation signals into apartment No. 1122 and into the
> aircard in order to search out the location of the aircard and
> its user.**

54.      Once the FBI downloaded the aircard's stored ESN via the HardwareIDRequest

message, the FBI technical agents knew that they had locked-on to the right wireless device

and began "using [][the] 'Stingray' to pinpoint the location of the aircard."[971]  The StingRay

conducts geolocation through the process of interrogation involving the transmission of

---

967.  *See id*.

968.  *See id.*, Section III(G)(1)(a)(iv), *supra* (explaining how the Harris StingRay downloads
identifying data from wireless devices such as ESNs).

969.  *See id.*, Section III(B)(3)(c)(v), *supra*.

970.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Submission Of
Documents Related To District Of Arizona Grand Jury Subpoenas 07-03-609 And 07-03-615
Obtained To Facilitate Locating The Aircard* (Dkt. #565-1).

971.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 26 of *1st
Consolidated Exhibits* (Dkt. #587-2) (August 7, 2008 USPIS Investigation Details Report entry
by USPIS Inspector Wilson).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

specially crafted location finding interrogation signals sent to a target wireless device.[972]  In

response to the location finding interrogation signals, the target wireless device responds with

location finding response signals.[973]  The prosecution conceded that the FBI technical agents

used interrogation to locate the aircard and it user within apartment No. 1122.[974]  Because the

aircard was located inside apartment No. 1122, the StingRay's location finding interrogation

signals penetrated the exterior walls of the apartment and entered the confines of apartment No.

1122.  Once inside the confines of apartment No. 1122, the StingRay's location finding

interrogation signals searched out the aircard, entered the aircard's receive antenna, and forced

the aircard to transmit location finding response signals telling of its location.[975]

55.     While using the StingRay, the FBI technical agents used the AmberJack phased

array beam-forming antenna to transmit a highly directional and concentrated beam of location

finding interrogation signals into apartment No. 1122.[976]  The AmberJack antenna is different

from cell site antennas in the effect that it is capable of facilitating highly precise angle-of-

---

972.   *See Technical Explanations*, Section III(G)(1)(b)(iv), *supra* (explaining the interrogation
techniques used by the Harris StingRay to locate wireless devices).

973.   *See id*.

974.   *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Government's
Response To Motion For Discovery* (Dkt. #602, p. 3) ("The equipment mimicked a Verizon
Wireless cell tower and sent and received signals directly to and from the aircard."); United
States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *January 4, 2012 Court Order* (Dkt. #723,
p. 14) (signals sent by the surveillance equipment used by the FBI technical agents were
"signals that would not have been sent to the aircard in the normal course of Verizon's
operation of its cell towers.").

975.   *See Technical Explanations*, Section III(G)(1)(a)(v), *supra* (explaining the interrogation
techniques used by the StingRay and KingFish to locate wireless devices).

- 217 -

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

arrival measurements in order to obtain a line-bearing to a target wireless device.[977]

>    **f.   The FBI collected the aircard's signal transmissions sent in
>          response to the location finding interrogation signals sent to
>          the aircard by the FBI via the StingRay.**

56.     While the FBI technical agents were conducting interrogation, they used the

StingRay to collect (*i.e.*, seize) the aircard's location finding response signals.[978]  During the

September 22, 2011 court hearing, the prosecution admitted that the aircard's signals were

seized by the FBI with its concession that the "device sent signals to, and **received signals**

**from**, the air card[.]"[979]  The signals that were seized contained information (*i.e.*, the UATI

assigned to the aircard by the StingRay during session establishment)[980] allowing the FBI to

determine that the signals were being transmitted by the aircard.  The signals in question were

generated and transmitted by the aircard upon the StingRay's specific instruction (via the

location finding interrogation signals) and would not have been transmitted during the aircard's

communications with actual Verizon Wireless cell sites.

---

976.  *See id.*, Section III(G)(1)(a)(iii), *supra* (explaining the AmberJack phased array antenna
used with the StingRay to locate wireless devices).

977.  *See id*.

978.  *See id*.

979.  <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., *October 5, 2011 Court
Order* (Dkt. #644, p. 2) (emphasis added) (noting undisputed facts).

980.  *See Technical Explanations*, Section III(B)(3)(c)(iii), *supra* (explaining how the Access
Terminal UATI is assigned by the Access Network and used by the MAC layer protocol to label
and identify transmissions during a session).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

        **g.**   **In order to determine the location of the aircard and its user,
the FBI conducted triangulation techniques on the aircard's
location finding response signals collected by the StingRay.**

57.     While conducting interrogation techniques, the FBI technical agents engaged in

active approach to facilitate triangulation of the aircard's collected location finding response

signals.  The approach method involves using the StingRay to collect and measure location

finding response signals while emulating a cell site at one location and then repeatedly moving

the StingRay to new locations to repeat cell site emulation, signal collection, and signal

measurements.[981]  By emulating a cell site at numerous locations, enough geolocation

measurements can be taken by the StingRay to triangulate the location of a wireless device.[982]

The prosecution admitted that the StingRay was used to triangulate the location of the aircard

in this manner when it conceded that the FBI technical agents "would take a reading, move to a

new location, take another reading, move to another location, *etc.*"[983]

58.     While conducting interrogation techniques during movement of the StingRay in

the geographical area surrounding the aircard (*i.e.*, active approach), the FBI technical agents

conducted numerous geolocation measurements on collected aircard signals.  The geolocation

---

981.   *See id.*, Section III(G)(1)(b)(v), *supra* (explaining the approach method used by the
StingRay and KingFish to locate wireless devices).

982.   *See id*.

983.   United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *January 4, 2012 Court
Order* (Dkt. #723, p. 14) (noting government concession).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

measurement techniques included time-of-flight,[984] power-distance,[985] angle-of-arrival,[986]

statistical functions,[987] and data fusion.[988]  The geolocation measurement techniques used by

the FBI technical agents meet the definition of triangulation in the geolocation context.[989]

59.    At some point prior to 4:45pm on July 16, 2008, the FBI technical agents were

able to triangulate the location of the aircard and its user as being somewhere within a smaller

geographical area including the Domicilio apartment complex.  In a report of investigation,

USPIS Inspector Wilson indicated that at some point after July 16, 2008 he was informed that

the FBI technical agents "were able to get a positive signal at an apartment complex in Santa

Clara[,]" *i.e.*, the Domicilio apartment complex located at 431 El Camino Real, Santa Clara,

CA 95050.[990]  At approximately 4:45pm on July 16, 2008, government agents began visual

---

984.  *See Technical Explanations*, Section III(G)(1)(a)(i), *supra* (explaining TOF as used by
the StingRay and KingFish to locate wireless devices).

985.  *See id.*, Section III(G)(1)(a)(ii), *supra* (explaining power-distance as used by the
StingRay and KingFish to locate wireless devices).

986.  *See id.*, Section III(G)(1)(a)(iii), *supra* (explaining AOA as used by the StingRay and
KingFish to locate wireless devices).

987.  *See id.*, Section III(G)(1)(a)(iv), *supra* (explaining statistical functions as used by the
StingRay and KingFish to locate wireless devices).

988.  *See id.*, Section III(G)(1)(a)(v), *supra* (explaining data fusion as used by the StingRay
and KingFish to locate wireless devices).

989.  *See id.*, Section III(C), *supra* (explaining triangulation in the context of geolocation of
radio frequency (RF) signals).

990.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 26 of *1st
Consolidated Exhibits* (Dkt. #587-2) (August 7, 2008 USPIS Investigation Details Report entry
by USPIS Inspector Wilson).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

surveillance of the Domicilio apartment complex.[991]  Therefore, it can be reasonably assumed

that the FBI technical agents used their StingRay and related equipment to narrow down the

location of the aircard and its user to a smaller geographical area, which included the Domicilio

apartment complex, shortly before 4:45pm on July 16, 2008.

>           **h.   The FBI technical agents used the KingFish within the
>                  Domicilio apartment complex to pinpoint the exact location of
>                  the aircard and its user within apartment No. 1122.**

60.     In Section IV(A)(2) *et seq.*, *supra*, it was explained how relevant evidence,

heuristics, and process of elimination confirm that the handheld equipment used by the FBI

technical agents included the Harris KingFish.  The KingFish operates nearly identical to the

StingRay with the only relevant difference being that it is a man-portable wireless device

locator, as apposed to a vehicle-transportable wireless device locator, and is capable of locating

wireless devices more accurately than the StingRay.[992]  Therefore, all of the operations

explained in Sections III(B)(9)(a) through (g), *supra* (paragraph Nos. 46-59 above), were

repeated by the FBI technical agents while it used the handheld KingFish within the Domicilio

apartment complex.

61.     Once the FBI technical agents narrowed the location of the aircard and its user to

a smaller geographical area including the Domicilio apartment complex, they began "to pin the

---

991.    *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., <u>EXHIBIT 097</u> of *2nd
Consolidated Exhibits* (Dkt. #821-6) (surveillance log indicating that visual surveillance of the
Domicilio apartment complex began at 4:45pm on July 16, 2008).

992.    *See Technical Explanations*, Section III(G)(1) *et seq.*, *supra*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

exact number"[993] where the aircard was located.  In order to do so, "the FBI used handheld

equipment from within the Domicilio apartment complex[,]"[994] *i.e.*, the Harris KingFish.[995]

At approximately 12:53am on July 17, 2008, FBI Agent Murray sent a text message to FBI

Agent Killigrew stating that "[w]e are down to an apt complex[.]"[996]  At approximately

2:42am on July 17, 2008, one of the FBI technical agents locating the aircard sent a text

message to an unknown individual stating that they had "[f]ound the card[]" and "Sqd is

working on a plan for arrest[.]"[997]  Additionally, the prosecution agreed "to allow the Court to

---

993.  *See id*.

994.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *Government's Response To
Motion For Discovery* (Dkt. #602, p. 3); *see also* United States v. Rigmaiden, CR08-814-PHX-
DGC, D.Ariz., *October 5, 2011 Court Order* (Dkt. #644, p. 2) (Establishing as undisputed that
the surveillance equipment "used to locate the air card in this case was used by government
agents on foot and within the Domicilio apartment complex[.]").

995.  The FBI technical agents destroyed all real-time geolocation data and other data
collected by the StingRay and KingFish approximately 18 days after the aircard was located.
*See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., *January 4, 2012 Court Order*
(Dkt. #723, p. 14) (Noting the settled fact that "[a]ll data generated by the []
[portable/transportable wireless device locators] and received from Verizon as part of the
locating mission was destroyed by the government shortly after Defendant's arrest on August 3,
2008."). Because geolocation evidence was destroyed, the precise geographical and temporal
point at which the FBI technical agents stopped using the StingRay and started using the
KingFish in unknown.  It is known, however, that the StingRay first narrowed the location of
the aircard to a geographical area which included the Domicilio apartment complex.  This area
may have been larger or smaller than the entirety of the Domicilio property.  Once this area was
identified, FBI technical agents stopped using the StingRay and then used the KingFish to
pinpoint the precise location of the aircard.

996.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 063 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (July 17, 2008, 12:53am, text message sent from FBI
Agent Murray to FBI Agent Killigrew).

997.  United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., EXHIBIT 064 of *2nd
Consolidated Exhibits* (Dkt. #821-3) (July 17, 2008, 2:42am, text message sent from FBI
technical agent to unknown individual).

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

factually assume, that, at the conclusion of the July 16, 2008, aircard tracking operation, the

FBI located the aircard within Unit 1122 of the Domocilio [sic] Apartments."[998]

> i.   **Whenever the aircard was connected to either the StingRay or
>       KingFish, the FBI denied the aircard access to the Internet
>       (*i.e.*, a denial-of-service attack).**

62.      Immediately after the aircard established a session with the FBI's StingRay or

KingFish, the user, believing he was connected to a Verizon Wireless cell site, attempted to

connect his aircard and laptop computer to the aircard Internet access service.[999]  Because the

StingRay and KingFish are not capable of forwarding communications content to Verizon

Wireless,[1000] the aircard user was not provided with any type of Internet access service.[1001]

From approximately 5:03pm on July 16, 2008 (time at which the last surreptitious phone call

was placed to the aircard)[1002] to approximately 2:42am on July 17, 2008 (time at which the

---

998.   *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., *Government's
Memorandum RE Motion For Discovery* (Dkt. #674, p. 2) (footnote omitted).

999.   <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., defendant's declaration RE:
*Daniel Rigmaiden owns the aircard and used the aircard service as a home Internet connection*
(Dkt. #824-3, ¶ 17-20, p. 6-7) (explaining my standard practice to immediately initiate a
connection with Verizon Wireless whenever I plug my aircard into my laptop computer).

1000.  *See How The Aircard Was Intruded Upon*, Section IV(A)(2)(a), *supra* (explaining how
the Harris StingRay and KingFish are incapable of conducting man-in-the-middle-attacks).

1001.  The government conceded that the equipment used by the FBI technical agents "caused
a brief disruption in service to the aircard."  <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC,
D.Ariz., *January 4, 2012 Court Order* (Dkt. #723, p. 14).  I do not agree with the government's
limited concession.  The evidence shows that the FBI technical agents caused an **extensive**
disruption in service, *i.e.*, first for a six (6) hour period using surreptitious phone calls (*see How
The Aircard Was Intruded Upon*, Section IV(B)(8), *supra*) followed by a ten (10) hour period
using the StingRay and KingFish (*see How The Aircard Was Intruded Upon*, Section IV(B)(9)
(i), *supra*).

1002.  *See How The Aircard Was Intruded Upon*, Section IV(B)(9)(a), *supra*.

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

---

KingFish pinpointed the aircard inside apartment No. 1122),[1003] the aircard user was denied

access to the Internet by the FBI.  Using the StingRay and KingFish, the FBI technical agents

conducted a denial-of-service attack on the aircard for almost a 10 hour period.

### j.   The FBI's StingRay and KingFish relied upon the electricity provided to the aircard by its user.

63.   In order for radio waves to be transmitted from a wireless device, they require a

power source of which to draw electricity.  Once transmitted, the radio waves carry the energy

drawn from the power source to the receive antenna of the destination radio receiver.[1004]  The

receive antenna uses the transmitted energy to decode the radio waves into readable signals.

[1005] Without the energy that originated at the transmit antenna, the receiver would be unable to

receive, let alone decode, the transmitted signals.

64.   Because the FBI technical agents were forcing the aircard to generate and

transmit radio waves that were subsequently collected and decoded by their surveillance

equipment, the FBI was relying upon the electricity being provided to the aircard.  The aircard

received its power from the host laptop computer,[1006] which in turn received its power from a

wall outlet within apartment No. 1122.[1007]  The electricity flowing from the wall outlet was

---

1003.  *See id.*, Section IV(B)(9)(h), *supra*.

1004.  *See Technical Explanations*, Section III(A), *supra*, and fn. Nos. 29-30.

1005.  *See id*.

1006.  *See How The Aircard Was Intruded Upon*, Section IV(A)(1), *supra* (general background
information on the aircard and host laptop computer).

1007.  *See* United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., defendant's declaration
RE: *Daniel Rigmaiden's residence was at 431 El Camino Real, Apartment No. 1122, Santa
Clara, CA. 95050* (Dkt. #824-2, ¶ 11-12, p. 3-4).

DECLARATION UNDER PENALTY OF PERJURY

RE: The independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.);

BY: Daniel David Rigmaiden

purchased by the aircard user from Silicon Valley Power via a utility account.[1008]  The FBI technical agents were hijacking the aircard user's electricity for use in their aircard locating mission.

### k. The FBI's StingRay and KingFish sent the aircard commands instructing it to increase its signal transmission power to facilitate more effective geolocation.

65.     The FBI technical agents were also forcing the aircard to transmit at the highest possible power[1009] thus increasing the amount of electricity hijacked from apartment No. 1122. One feature of the StingRay and KingFish while emulating 1xEV-DO Rel. 0 cell sites is the ability to transmit closed-loop Reverse Power Control (RPC) bits to a target wireless device. [1010]  By transmitting enough RPC bits, the FBI's equipment can force a wireless device to transmit at the highest possible power so that the collected location finding response signals are easier to measure.[1011]  In order to more precisely search for and locate the aircard while using its StingRay and KingFish, the FBI technical agents sent RPC bits to the aircard causing it to transmit at a higher power than it would have normally transmitted if it were accessing cellular service through an actual Verizon Wireless cell site covering apartment No. 1122.

---

1008.  *See id.*, ¶ 11, p. 3.

1009.  *See Technical Explanations*, Section III(G)(1)(b)(vi), *supra* (explaining forced transmission power increase as used by the StingRay and KingFish to locate wireless devices).

1010.  *See id.*, Section III(B)(3)(e)(ii), *supra* (explaining 1xEV-DO Rel. 0 closed-loop power control on the Reverse Traffic Channel).

1011.  *See id.*, Section III(G)(1)(b)(vi), *supra* (explaining forced transmission power increase as used by the StingRay and KingFish to locate wireless devices).

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

## V.        Daniel Rigmaiden's Expert Qualifications

I am as qualified an expert as the sources cited in this declaration.  I have read every

cited Telecommunications Industry Association Engineering Standard/Publication—front to

back—as well as large sections of all cited technical books and a number of other technical

resources not cited.  I spent approximately seven hundred (700) hours over approximately

seven (7) months (i.e., November of 2011 through May of 2012) reviewing more than 10,000

pages of Telecommunications Industry Association documents and other resources in order to

draft the content of this declaration.

After my original submission of the information contained in this declaration,[1012] Kim

Zetter of Wired Magazine wrote an article explaining cell site emulator technology based on

my technical conclusions.[1013]  In Kim Zetter's article, my technical conclusions were cited and

quoted numerous times.[1014]

In United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., the Court noted that I

have an "extensive command of technical information[.]"[1015]  The Court also found that the

government withheld discoverable evidence relating to the cell site emulators used to intrude

---

1012.  See United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., Motion To Suppress,
Memorandum RE: Fourth Amendment Violations (Dkt. #824-1).

1013.  See Zetter, Kim, wired.com [website], Secrets of FBI Smartphone Surveillance Tool
Revealed in Court Fight | Threat Level | Wired.com (Apr. 9, 2013),
http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: Apr.
10, 2013).

1014.  See id.

1015.  See United States v. Rigmaiden, CR08-814-PHX-DGC, D.Ariz., January 4, 2012 Court

DECLARATION UNDER PENALTY OF PERJURY

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
     UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
     DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

upon and locate the aircard.[1016]  Because evidence was withheld, the Court indicated that the

government would not be permitted to present its own expert or agent, or use other means not

involving the disclosure of evidence, to rebut my self-collected evidence and technical

explanations regarding the operations of cell site emulators:

> [THE COURT:] ... Now, if I were to conclude that the method by which
> the device works is privileged, and if I were also to conclude that the government
> doesn't have to produce[, for example,] the details of whether it writes software
> to the laptop or boosts the signal of the aircard because Mr. Rigmaiden has other
> means for  making that argument, then it seems to me when we get to the
> suppression hearing, this is what's likely to happen:

> Mr. Rigmaiden will present evidence, as he has in his motion, that the
> device the government uses boosts the signal strength and writes software to the
> hard drive, and he has evidence from the Harris products criteria.  He's got
> evidence from government documents.  He's pulled it from a number of different
> sources.

> The government at that suppression hearing could not respond by saying,
> "No, here's how it works," because you've withheld that information.  Therefore,
> I would find by a preponderance of the evidence that he's right, that this device
> does, in fact, boost the signal and does write software to the laptop.  And I would
> take that factual finding into account when I ruled on the motion to suppress
> because I would find by a preponderance of the evidence, which is all that is
> needed, he's shown that that's what this kind of a device does.

> If the government were at the suppression hearing to say, "Well, we're not
> going to put any of the sensitive information into evidence but we want to call an
> expert or an agent to testify that most of these devices don't do that, they don't
> boost signal strength, they don't write software to the laptop," it seems to me that
> I need to do one of two things.  I either need to say, "Well, if you're saying most
> of  them don't but some of them do, then you've got to give him the evidence with
> which he can figure out whether this one does," or I've got to find in his favor on
> this question of fact because he's presented evidence that that's how the device

_Order_ (Dkt. #723, p. 29-30).

1016.  _See id._ (Dkt. #723) (denying defendant access to discoverable evidence based on
government's claim of law "enforcement privilege").

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
      UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
      DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

works.  You haven't ruled it out with your evidence because some do that.  So by
a preponderance of the evidence I will find that the device in this case boosts
signal strength and writes software to the laptop.

Now, if we were to go to that point, it seems to me that Mr. Rigmaiden's
rights would not have been compromised because he's been able to make the
point as to how the device works, and I'm accepting it as true by a preponderance
of the evidence.  The government couldn't complain because it withheld the
information with which it could disprove that if, in fact, it could disprove it.

<u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz., *September 22, 2011
Motion Hearing, Partial Transcript of Proceedings*, p. 10-11.

Therefore, at the very least, I am qualified as a cdma2000 1xEV-DO Rel. 0 expert, cell site

emulator expert, and geolocation expert in the context of the government intruding upon the

aircard in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, D.Ariz.[1017]

* * * * *

I declare, certify, verify, and state under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct to the best of my knowledge, except as

to those matters which are therein stated on information and belief, and, as to those matters, I

believe it to be true.  *See* 28 U.S.C. § 1746 ("Wherever... any matter is required or permitted to

be supported, evidenced, established, or proved by the sworn... affidavit, in writing of the

person making the same [], such matter may, with like force and effect, be supported,

evidenced, established, or proved by the unsworn declaration..., in writing of such person

which is subscribed by him, as true under penalty of perjury, and dated..."); 18 U.S.C. § 1621

("Whoever... in any declaration... under penalty of perjury as permitted under section 1746 of

---

1017.  *See* <u>Masterson Marketting, Inc. v. KSL Recreation Corp.</u>, 495 F. Supp. 2d 1044, 1050
(S.D.Cal. 2007) (Noting that "a party who is otherwise qualified as an expert may testify as an
expert witness in his own case regardless of concerns that the party is plainly self-interested.").

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  The independent operations of the FBI's cell site emulators, etc. used to locate the
UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-
DGC (D.Ariz.);

BY:  Daniel David Rigmaiden

title 28, United States Code, willfully subscribes as true any material matter which he does not

believe to be true... is guilty of perjury and shall, except as otherwise expressly provided by

law, be fined under this title or imprisoned not more than five years, or both....").

Executed on ___May 29, 2013___, in Florence, Arizona, United States of America.

Daniel David Rigmaiden

*Daniel Rigmaiden*

Daniel Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132